RON BENDER (SBN 143364)
TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; tma@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors & Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>MediaShift, Inc.,<br><br>       Debtor and Debtor in Possession.<br>_____<br><br>In re:<br><br>Ad-Vantage Networks, Inc.,<br><br>       Debtor and Debtor in Possession.<br>_____<br>☒ Affects Both Debtors<br><br>☐ Affects MediaShift, Inc.  Only<br><br>☐ Affects Ad-Vantage Networks, Inc. Only | Lead Case No.: 2:15-bk-25024-SK<br>(Jointly administered with:<br>Case No. 2:15-bk-25030-SK)<br><br>Chapter 11 Cases<br><br><br>**APPLICATION OF DEBTORS AND DEBTORS IN POSSESSION TO EMPLOY HOULIHAN LOKEY CAPITAL, INC. AS FINANCIAL ADVISOR AND INVESTMENT BANKER PURSUANT TO 11 U.S.C. § 327(a) WITH COMPENSATION TO BE DETERMINED AND PAID PURSUANT TO 11 U.S.C. § 328(a)**<br><br>[No hearing required unless requested per L.B.R. 2014-1(b)] |

1

MediaShift, Inc.  ("MediaShift") and Ad-Vantage Networks, Inc. ("Ad-Vantage"), chapter

11 debtors and debtors in possession in the above-captioned, jointly-administered, chapter 11

bankruptcy cases (collectively, the "Debtors"), hereby submit this application (the "Application")

for Court approval of their employment of Houlihan Lokey Capital, Inc. ("Houlihan Lokey ") as

financial advisor and investment banker, effective as of September 30, 2015 (which  was the date

of the Debtors' chapter 11 bankruptcy filings), pursuant to 11 U.S.C. § 327(a) with compensation

to be determined and paid pursuant to 11 U.S.C. § 328(a) and in accordance with the terms and

conditions of the engagement letter and the amendment thereto (the "Amendment" and together

with the original engagement letter the (the "Engagement Letter"), and this Application.  A true

and correct copy of the Engagement Letter (including the Amendment thereto) is attached hereto

as Exhibit "1."  In support of this Application, the Debtors respectfully represent as follows:

A.    **BACKGROUND, THE DEBTORS' BUSINESS, EVENTS LEADING TO THE FILING OF THE DEBTORS' CHAPTER 11 BANKRUPTCY CASES AND ANTICIPATED EXIT STRATEGY**

1.    On September 30, 2015 (the "Petition Date"), the Debtors each filed a voluntary

petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").  The Debtors

continue to manage their financial affairs and operate their bankruptcy estates as debtors in

possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    On October 1, 2015, the Court entered orders granting the Debtors' motions for

joint administration of their Chapter 11 cases, with the MediaShift, Inc. case serving as the lead

case.  [MediaShift Dkt. 6]

3.    Ad-Vantage is a wholly owned subsidiary of MediaShift.  MediaShift is a public

company.  However, in February 2014, MediaShift filed a Form 15 with the Securities and

Exchange Commission and, as a result, is no longer subject to the Securities and Exchange

Commission's reporting requirements and experiences very little trading of its stock.    The Debtors have the same officers and directors.

4.        Ad-Vantage owns numerous patents and related computer software (the "IP") related to internet advertising.  Based on valuations obtained by the Debtors, the Debtors believe that the IP has a value of between $30 – 100 million.

5.        With the IP, the Debtors can enable the owners of wi-fi networks to monetize their networks through the placement of internet advertising both during the login to the wi-fi network and during sessions on the wi-fi network.  The IP overrides advertising that would normally appear on web pages accessed through the wi-fi network so that the advertising space can be sold. The Debtors and affiliates sell the advertising space, place the advertising on pages accessed by users on the wi-fi network, and share the advertising revenue with the owner of the wi-fi network.

6.        The Debtors, generally contracting through MediaShift, have contracts with, among others, JetBlue, various airports, MGM Las Vegas, and Hotel International Services, whereby the Debtors sell and place advertising that appears during login and sessions on the wi-fi networks operated by the foregoing entities.  Google is one of the Debtors' largest purchasers of advertising space.  The Debtors are in a position to contract with other wi-fi network providers and to expand their advertising placement footprint, and therefore their advertising sharing revenue.  However, the Debtors need additional funds to do so, as many parties interested in contracting with the Debtors require the Debtors to pay a guaranteed advertising sharing amount before they will allow the Debtors to place advertising on their wi-fi networks.

7.        In order to fund operations, the development of its IP and platform, the implementation of its platform, and the expansion of its advertising footprint, Ad-Vantage obtained various rounds of equity financing.  Unfortunately, due to various complications and the failure of equity contributors to perform as required, Ad-Vantage was not able to obtain all of the

equity financing it expected to receive.  As a result, the Debtors were forced to obtain a number of bridge loans to meet their financial needs.  One such loan was provided by MediaShift Holdings, Inc. ("MS Holdings").  MS Holdings provided the Debtors with a loan in the approximate amount of $3.3 million.  MS purported to roll that loan up with approximately $2.2 million in bridge loans previously made to one or both of the Debtors by entities and individuals affiliated with MS Holdings and allegedly secured the rolled up loan against the assets of both Debtors.  In addition to MS Holdings, the Debtors have other purported common creditors.  The equity financing, bridge loans, and loan provided by MS Holdings proved insufficient to enable the Debtors to fund their operations, their efforts to expand their advertising placement, and their debt obligations.

8.    In light of the foregoing, on or about March 24, 2015, the Debtors executed an Engagement Letter with Houlihan Lokey, which was amended pursuant to the Amendment executed October 29, 2015.  A true and correct copy of the Engagement Letter (including the Amendment thereto) is attached hereto as Exhibit "1."  Pursuant to the Engagement Letter, the Debtors engaged Houlihan Lokey as the Debtors' financial advisor and investment banker to assist in the marketing and sale of the Debtors' assets (and to potentially facilitate financing transactions).  With the assistance of Houlihan Lokey pursuant to the terms of Engagement Letter, the Debtors were pursuing such a sale prior to the Petition Date.  After the Petition Date, with the assistance of Houlihan Lokey pursuant to the terms of the Engagement Letter (as amended), the Debtors have continued to pursue a sale in bankruptcy with the goal of having an auction for the IP and the Debtors' other assets in December 2015.  However, on August 3, 2015, before the Debtors could fully market their assets to obtain the highest and best price for them and consummate a sale of their assets, MS Holdings called a default on its purported secured loan to the Debtors and started to initiate efforts to foreclose on the Debtors' assets, including the highly valuable IP.

9.      As a result of the foregoing, and in an effort to protect the value of the Debtors' assets for the benefit of all creditors and interest holders, the Debtors decided to file for bankruptcy protection.

**B.      EMPLOYMENT OF HOULIHAN LOKEY**

10.      The Debtors require the assistance of a financial advisor and investment banker to continue the Debtors' efforts to maximize value for the estate.  The Debtors wish to employ Houlihan Lokey to perform such services pursuant to the terms of the Engagement Letter and this Application.

11.      The terms of the Engagement Letter were negotiated in good faith and at arm's-length between the Debtors and Houlihan Lokey and reflect the Debtors' evaluation of the extensive work to be performed by Houlihan Lokey.  The Debtors acknowledge and agree that the fee structure was agreed upon by the parties in anticipation of a substantial professional commitment of time and effort by Houlihan Lokey and its professional staff under the Engagement Letter, and in light of the fact that such commitment may foreclose other opportunities for Houlihan Lokey and its professional staff and that the actual time and commitment required of Houlihan Lokey and its professional staff to perform the services under the Engagement Letter may vary substantially from week to week or month to month, creating "peak load" issues for the firm.

12.      Houlihan Lokey is well-suited to provide the financial advisor and investment banker services that the Debtors require.  Established in 1972, Houlihan Lokey is an international, advisory-focused investment bank with seventeen offices worldwide and more than 850 employees.  Houlihan Lokey has expertise in asset sales, mergers and acquisitions, valuations, and capital markets.  Houlihan Lokey's financial restructuring group is one of the leading advisors to debtors, bondholder groups, secured and unsecured creditors, asset acquirers,

and other parties in interest involved in financially distressed companies, both in and outside of bankruptcy.

13.     More specifically, Houlihan Lokey has been employed to provide services similar to those to be rendered to the Debtors in numerous chapter 11 cases, including, among other cases: *See, e.g.*, *In re Dex One Corp.*, Case No. 13-10533 (KG) (Bankr. D. Del. Apr., 10, 2013) (approving application for retention of Houlihan Lokey); *In re Barzel Indus. Inc.*, Case No. 09-13204 (CSS) (Bankr. D. Del. Mar. 27, 2012) (same); *In re CWT Liquidation Co. (f/k/a Clare at Water Tower)*, Case No. 11-46151 (SPS) (Bankr. N.D. Ill. Mar. 26, 2012) (same); *In re J.L. French Auto. Castings, Inc.*, Case No. 09-12445 (KG) (Bankr. D. Del. Nov. 21, 2011) (same); *In re Erickson Ret. Cmtys., LLC*, Case No. 09-37010 (SGJ) (Bankr. N.D. Tex. Nov. 21, 2011) (same); *In re MSR Resort Golf Course LLC*, Case No. 11-10372 (SHL) (Bankr. S.D.N.Y. Feb. 1, 2011) (same).

14.     A copy of Houlihan Lokey's firm resume is attached hereto as Exhibit "2." A copy of the professional biographies of Houlihan Lokey's Eric M. Winthrop (Managing Director), Raj Dayalan (Director), Mike Krakovsky (Director), Jorge Villen (Senior Vice President), Kevin Striepe (Associate), and Samadrita Guin (Financial Analyst), who were principally involved in the Debtors' pre-petition efforts to market and sell their assets and who would continue to be principally involved in the Debtors' post-petition efforts to market and sell their assets, is attached hereto as Exhibit "3."

15.     Further, since Houlihan Lokey was engaged by the Debtors pre-petition to act as their financial advisor and investment banker with regard to the marketing and sale of the Debtors' assets, Houlihan Lokey is already familiar with the Debtors and the assets they are seeking to sell, has already assembled a pool of potential buyers and communicated with some of them, has already assembled documents and information to be provided to potential buyers to

conduct due diligence, and has already begun efforts to market the Debtors' assets and close a sale thereof.  Thus, if Houlihan Lokey's employment is approved by the Court, Houlihan Lokey will be able to continue, without interruption, to perform the services for the Debtors described herein so that a sale of the Debtors' assets for the highest and best price can be achieved within a reasonable amount of time.  This is critically important in these cases, because the Debtors currently do not generate enough revenue to pay all expenses as they come due and, therefore, will need to obtain post-petition debtor-in-possession financing to fund operations pending a sale.  As discussed, the Debtors intend to proceed with an auction sale in December 2015 and to close such sale by January 2016.  Further, interest continues to accrue on secured debt. Therefore, the sooner the Debtors can effectuate a sale and pay their secured creditors and any party providing debtor-in-possession financing, the sooner the Debtors can stop the accrual of interest to preserve net sale proceeds for distribution to other creditors and parties in interest.

16.    The Debtors also believe that it makes sense to employ Houlihan Lokey as the Debtors' financial advisor and investment banker to continue the Debtors' efforts to market and sell their assets because the Engagement Letter provides for a "tail period," whereby, in the event any asset sale or other transaction described in the Engagement Letter is closed within 12 months after the termination of the Engagement Letter, Houlihan Lokey would still be entitled to the fees provided for in the Engagement Letter, which are described below.  *See* Engagement Letter, ¶ 4. Thus, if another financial advisor and investment banker were hired to replace Houlihan Lokey, the Debtors estates may have to pay fees to both professionals on any asset sale or other transaction described in the Engagement Letter.

17.    Additionally, pursuant to the Engagement Letter, due to the filing of the Debtors' bankruptcy case, the Debtors are required to seek to employ Houlihan Lokey pursuant to 11 U.S.C. § 327(a) with compensation to be determined and paid pursuant to 11 U.S.C. § 328(a).

*See* Engagement Letter, ¶ 15.

18.    Based on the foregoing, pursuant to this Application, the Debtors are seeking to employ Houlihan Lokey as financial advisor and investment banker, effective as of the Petition Date of September 30, 2015, pursuant to 11 U.S.C. § 327(a) with compensation to be determined and paid pursuant to 11 U.S.C. § 328(a) and in accordance with the terms and conditions of the Engagement Letter attached hereto as Exhibit "1" and this Application.

**SERVICES TO BE PROVIDED**

19.    As more fully described in the Engagement Letter, the services to be provided by Houlihan Lokey to the Debtors include the following:[1]

a.    assisting the Debtors in the development and distribution of selected information, documents and other materials, including, if appropriate, advising the Debtors in the preparation of an offering memorandum,

b.    assisting the Debtors in evaluating indications of interest and proposals regarding any Transaction(s) [as defined in the Engagement Letter][2] from current and/or potential lenders, equity investors, acquirers and/or strategic partners,

c.    assisting the Debtors with the negotiation of any Transaction(s), including participating in negotiations with creditors and other parties involved in any

---

[1]    This Application includes various summaries of, and is qualified in its entirety by, the Engagement Letter. In the event there is a discrepancy or conflict between this Application and the Engagement Letter, the Engagement Letter shall control in all respects.

[2]    Under the Engagement Letter, a "Transaction" includes (1) a "Sale Transaction" involving the sale of all or a majority of the Debtors' equity securities and/or any significant portion of the Debtors' assets and (2) a "Financing Transaction" involving the placement, raising or issuance of any form of equity, equity linked or debt securities (including, without limitation, convertible securities and preferred stock).   *See* Engagement Letter, ¶ 5. Notwithstanding any terms of the Engagement Letter, Houlihan Lokey agrees that a Transaction under the Engagement Letter shall not include (1) a liquidation of the Debtors' assets conducted by a chapter 7 or 11 trustee, unless Houlihan Lokey has been employed by the trustee, and (2) any debtor-in-possession financing obtained by the Debtors not involving the issuance of equity or equity linked securities (including, without limitation, convertible securities and preferred stock), for example, any debtor-in-possession obtained by the Debtors whereby the Debtors provide security interests and liens upon the Debtors' assets, superpriority administrative expense claims, and/or administrative expense claims.

Transaction(s),

d.    providing expert advice and testimony regarding financial matters related to any Transaction(s), if necessary,

e.    attending meetings of the Debtors' Board of Directors, creditor groups, official constituencies and other interested parties, as the Debtors and Houlihan Lokey mutually agree, and

f.    providing such other financial advisory and investment banking services as may be required by additional issues and developments not anticipated on the March 24, 2015 effective date of the Engagement Letter.

## PROFESSIONAL COMPENSATION

20.    As more fully described in the Engagement Letter (including the Amendment thereto), in consideration of the services to be provided by Houlihan Lokey to the Debtors, the Debtors have agreed to pay Houlihan Lokey the following fees:

a.    *Sale Transaction Fee.* Upon the closing of each Sale Transaction (as defined in the Engagement Letter at ¶ 5, and the Amendment), Houlihan Lokey shall earn a cash fee ("Sale Transaction Fee") based upon Aggregate Gross Consideration ("AGC"), calculated as follows:

- For AGC from $10 million to $15 million:    $250,000.
- For AGC from $15 million to $22 million:    $500,000.
- For AGC in excess of $22 million:    4% of AGC.

b.    *Financing Transaction Fee.* If the Debtors do not utilize a Sale Transaction (as defined in the Engagement Letter at ¶ 5) and decides to fund the Debtors via a Financing Transaction (as defined in the Engagement Letter at ¶ 5) brokered by Houlihan Lokey, the following fees will apply.  Upon the closing of each Financing Transaction,

Houlihan Lokey shall earn a cash fee ("Financing Transaction Fee") equal to 7% of the gross proceeds of all equity or equity-linked securities (including, without limitation, convertible securities and preferred stock) placed or committed. Any warrants issued in connection with the raising of equity capital shall, upon the exercise thereof, be considered equity for the purpose of calculating the Financing Transaction Fee, and such portion of the Financing Transaction Fee shall be paid upon such exercise and from the gross proceeds thereof, regardless of any prior termination or expiration of the Engagement Letter. If the proceeds of any such Financing Transaction are to be funded in more than one stage, Houlihan Lokey shall be entitled to its applicable Financing Transaction Fee upon the closing date of each stage. The Financing Transaction Fee(s) shall be payable in respect of any sale of securities whether such sale has been arranged by Houlihan Lokey, by another agent (or other issuer of the Securities in such Financing Transaction) or directly by the Debtors. Any non-cash consideration provided to or received in connection with the Financing Transaction (including but not limited to intellectual or intangible property) shall be valued for purposes of calculating the Financing Transaction Fee as equaling the number of Securities issued in exchange for such consideration multiplied by (in the case of debt securities) the face value of each such Security or (in the case of equity securities) the price per Security paid in the then current round of financing. *See* Engagement Letter, ¶¶ 3 and 5-7.

21. In addition, and regardless of whether any Transaction is consummated, pursuant to the Engagement Letter, the Debtors shall, upon Houlihan Lokey's request, reimburse Houlihan Lokey for its reasonable out-of-pocket expenses incurred from time to time in connection with the rendering of its services in these cases. *See* Engagement Letter, ¶ 10.

22.     Pursuant to the Engagement Letter, due to the filing of the Debtors' bankruptcy cases, any fees payable to Houlihan Lokey are subject to, and can only be paid with, Court approval.  *See* Engagement Letter, ¶ 15.

23.     The hours worked, the results achieved and the ultimate benefit to the Debtors of the work performed by Houlihan Lokey in connection with its engagement may vary and the Debtors have taken this into account in setting the above fees.

24.     The foregoing fee structure is consistent with and typical of compensation arrangements entered into by Houlihan Lokey and other comparable firms in connection with the rendering of similar services under similar circumstances.  Houlihan Lokey's restructuring, asset disposition, and financing expertise and capabilities, some or all of which may be required by the Debtors during the term of Houlihan Lokey's engagement hereunder, were all important factors in determining the fee structure.  The Debtors believe that the ultimate benefit of Houlihan Lokey's services cannot be measured by reference to the number of hours to be expended by Houlihan Lokey's professionals in the performance of such services.  Accordingly, the Debtors submit that the fee structure is both fair and reasonable under the standards set forth in Bankruptcy Code section 328(a).

25.     However, consistent with its ordinary practice and the practice of financial advisors and investment bankers in other chapter 11 cases whose fee arrangements are typically not hours-based, Houlihan Lokey does not ordinarily maintain contemporaneous time records in one-tenth hour increments or provide or conform to a schedule of hourly rates for its professionals.  Nevertheless, Houlihan Lokey will maintain records in support of any actual, necessary costs and expenses incurred in connection with the rendering of its services in these bankruptcy cases.  As Houlihan Lokey's compensation will be calculated based on a contingency fee basis, Houlihan Lokey requests that it not be required to file time records in accordance with

the practice for professionals employed on an hourly fee basis.

26. Houlihan Lokey understands the provisions of 11 U.S.C. §§ 327-331, which require, among other things, Court approval of the Debtors' employment of Houlihan Lokey as financial advisor and investment banker and of all fees and expenses that Houlihan Lokey will receive from the Debtors and the Debtors' estates. Houlihan Lokey seeks to be employed pursuant to 11 U.S.C. § 327(a) with its compensation to be determined and paid pursuant to 11 U.S.C. § 328(a).

### DISCLOSURES AND DISINTERESTEDNESS

27. As of the Petition Date, the Debtors owed the total sum of $8,914 to Houlihan Lokey for the reimbursement of expenses. Houlihan Lokey waived its claim for this amount and, therefore, has no prepetition claim against either of the Debtors.

28. Houlihan Lokey has not received any lien or other interest in property of the Debtors or of a third party to secure payment of Houlihan Lokey's fees or expenses.

29. Houlihan Lokey has not shared or agreed to share its compensation for representing the Debtors with any other person or entity, except among its members.

30. Houlihan Lokey is not a creditor, an equity security holder or an insider of the Debtors.

31. While the Engagement Letter provides for the possibility of Houlihan Lokey acting as an investment banker for security of the Debtors, as of the date hereof, (a) Houlihan Lokey is not and was not an investment banker for any outstanding security of the Debtors and (b) Houlihan Lokey has not been within three years before the Petition Date an investment banker for a security of the Debtors, or an attorney for such an investment banker in connection with the offer, sale or issuance of any security of the Debtors.

32.    Neither Houlihan Lokey nor any member of Houlihan Lokey is, nor was, within two years before the Petition Date, a director, officer or employee of the Debtors or of any investment banker for any security of the Debtors.

33.    While not effecting Houlihan Lokey's disinterestedness, in the interests of full disclosure, Houlihan Lokey hereby discloses that (a) Eric M. Winthrop, a Managing Director of Houlihan Lokey, is the son of Mark Marc J. Winthrop, a founding member and shareholder of Winthrop Couchot, which formerly served as counsel to the Debtors and is a creditor in the Debtors bankruptcy cases, (b) over the years, Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), the Debtors' proposed bankruptcy counsel, has worked on a number of matters, both in and outside of chapter 11 bankruptcies, with Houlihan Lokey and will presumably continue to do so in the future, and (c) from time to time, LNBYB has represented Houlihan Lokey in various matters, including in connection with employment and fee disputes that Houlihan Lokey has had in various bankruptcy cases.  The Debtors engaged Houlihan Lokey well in advance of LNBYB's involvement with, and retention by, the Debtors.  LNBYB is not currently representing Houlihan Lokey in any matter, and LNBYB will not be serving as counsel to Houlihan Lokey in these cases.

34.    As set forth in the annexed declaration of Raj Dayalan, (the "Dayalan Declaration"), Houlihan Lokey, among other things, searched it client databases to determine whether it represents, or has represented, certain of the Debtors' creditors or other parties in interest in these cases and/or matters wholly unrelated to these cases.  A copy detailing the connections revealed by those searches is attached hereto as Exhibit "4."

35.    Due to the size of Houlihan Lokey and the number of creditors and other parties involved in these cases, Houlihan Lokey may have been engaged to represent certain of the Debtors' creditors or other parties in interest in these cases and/or matters wholly unrelated to

these cases.  If any such engagements are discovered after the filing of this Application, Houlihan Lokey will file supplemental disclosures regarding such engagements as soon as practicable after they are discovered.

36.    As set forth in the Dayalan Declaration, to the best of Houlihan Lokey's knowledge, information, and belief, other than as set forth herein, Houlihan Lokey does not hold or represent, and none of Houlihan Lokey's past or current engagements would or does appear to create, any interest materially adverse to the interest of the Debtors' estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors or an investment banker for any security of the Debtors, or for any other reason, and Houlihan Lokey is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code.  Also, to the best of Houlihan Lokey's knowledge, information, and belief, other than as set forth herein, Houlihan Lokey has no prior connection with the Debtors, any creditors of the Debtors or their estates, or any other party in interest in these cases, or their respective attorneys or accountants, the United States Trustee or any person employed by the United States Trustee.

/ / /

/ / /

/ / /

37.    The Debtors believe that their employment of Houlihan Lokey in accordance with the terms and conditions of the Engagement Letter and this Application is in the best interest of the Debtors' estates.

**WHEREFORE**, the Debtors respectfully request that the Court approve the Debtors' employment of Houlihan Lokey, effective as of the Petition Date, in accordance with the terms and conditions of the Engagement Letter and upon the terms and conditions described herein.

Dated: November 4, 2015

MediaShift, Inc./Ad-Vantage Networks, Inc.
(collectively, the Debtors)

By:    Rick Baran, President

Submitted by:

LEVENE, NEALE, BENDER, YOO & BRILL, L.L.P.

By:____*/s/ Todd M. Arnold*_____
        RON BENDER
        TODD M. ARNOLD
Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

## **DECLARATION OF RAJ DAYALAN**

I, Raj Dayalan, hereby declare as follows:

1.      I am over 18 years of age.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.  Capitalized terms not otherwise defined herein shall have the same meaning ascribed to such terms in the Application to which this Declaration is attached.

2.      I am a Director in Houlihan Lokey's Technology, Media & Telecom Group, and am duly authorized to execute this Declaration on behalf of Houlihan Lokey.  I focus primarily on providing strategic advisory services for companies in the Internet sector.  I am based in the firm's Los Angeles office.  Prior to joining Houlihan Lokey, I was an Executive Director at UBS overseeing the Internet investment banking practice within the firm's Global TMT Group.  Prior to UBS, I worked as an Internet entrepreneur and as a principal investor. Earlier in my career, I was a member of Deutsche Bank's Technology Group and Salomon Brothers' Media & Telecom practice, where I began my career.  I hold a B.A. in Economics and Political Science from the University of California, Irvine, and an MBA from the UCLA Anderson School of Management. I am included among the team at Houlihan Lokey principally involved in efforts to market and sell the Debtors' IP and other assets.

3.      I am informed that, on September 30, 2015 (the "Petition Date"), the Debtors each filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

4.      I am informed that, with the Debtors' IP, the Debtors can enable the owners of wi-fi networks to monetize their networks through the placement of internet advertising both during the login to the wi-fi network and during sessions on the wi-fi network.  I am further informed that, the IP overrides advertising that would normally appear on web pages accessed through the wi-fi network so that the advertising space can be sold.

5.      In furtherance of the Debtors' efforts to market and sell their IP and other assets, on or about March 24, 2015, the Debtors executed an Engagement Letter with Houlihan Lokey, which was amended pursuant to the Amendment executed October 29, 2015.  A true and correct copy of the Engagement Letter (including the Amendment thereto) is attached hereto as Exhibit "1."  Pursuant to the Engagement Letter, the Debtors engaged Houlihan Lokey as the Debtors' financial advisor and investment banker to assist in the marketing and sale of the Debtors' assets (and to potentially facilitate financing transactions).  With the assistance of Houlihan Lokey pursuant to the terms of Engagement Letter, the Debtors were pursuing such a sale prior to the Petition Date.  After the Petition Date, with the assistance of Houlihan Lokey pursuant to the terms of the Engagement Letter (as amended), the Debtors have continued to pursue a sale in bankruptcy with the goal of having an auction for the IP and the Debtors' other assets in December 2015.

6.      The Debtors require the assistance of a financial advisor and investment banker to continue the Debtors' efforts to maximize value for the estate.  Therefore, the Debtors have sought and are seeking to employ Houlihan Lokey to perform such services pursuant to the terms of the Engagement Letter and this Application.

7.      The terms of the Engagement Letter were negotiated in good faith and at arm's-length between the Debtors and Houlihan Lokey and, as I am informed, reflect the Debtors' evaluation of the extensive work to be performed by Houlihan Lokey.  The Debtors have acknowledged and agreed pursuant to the Application that the fee structure was agreed upon by the parties in anticipation of a substantial professional commitment of time and effort by Houlihan Lokey and its professional staff under the Engagement Letter, and in light of the fact that such commitment may foreclose other opportunities for Houlihan Lokey and its professional staff and that the actual time and commitment required of Houlihan Lokey and its professional

staff to perform the services under the Engagement Letter may vary substantially from week to week or month to month, creating "peak load" issues for the firm.

8.       Houlihan Lokey is well-suited to provide the financial advisor and investment banker services that the Debtors require.  Established in 1972, Houlihan Lokey is an international, advisory-focused investment bank with seventeen offices worldwide and more than 850 employees.  Houlihan Lokey has expertise in asset sales, mergers and acquisitions, valuations, and capital markets.  Houlihan Lokey's financial restructuring group is one of the leading advisors to debtors, bondholder groups, secured and unsecured creditors, asset acquirers, and other parties in interest involved in financially distressed companies, both in and outside of bankruptcy.

9.       More specifically, Houlihan Lokey has been employed to provide services similar to those to be rendered to the Debtors in numerous chapter 11 cases, including, among other cases: *See, e.g.*, *In re Dex One Corp.*, Case No. 13-10533 (KG) (Bankr. D. Del. Apr., 10, 2013) (approving application for retention of Houlihan Lokey); *In re Barzel Indus. Inc.*, Case No. 09-13204 (CSS) (Bankr. D. Del. Mar. 27, 2012) (same); *In re CWT Liquidation Co. (f/k/a Clare at Water Tower)*, Case No. 11-46151 (SPS) (Bankr. N.D. Ill. Mar. 26, 2012) (same); *In re J.L. French Auto. Castings, Inc.*, Case No. 09-12445 (KG) (Bankr. D. Del. Nov. 21, 2011) (same); *In re Erickson Ret. Cmtys., LLC*, Case No. 09-37010 (SGJ) (Bankr. N.D. Tex. Nov. 21, 2011) (same); *In re MSR Resort Golf Course LLC*, Case No. 11-10372 (SHL) (Bankr. S.D.N.Y. Feb. 1, 2011) (same).

10.       A copy of Houlihan Lokey's firm resume is attached hereto as Exhibit "2."  A copy of the professional biographies of myself and Houlihan Lokey's Eric M. Winthrop (Managing Director), Mike Krakovsky (Director), Jorge Villen (Senior Vice President), Kevin Striepe (Associate), and Samadrita Guin (Financial Analyst), who were principally involved in

the Debtors' pre-petition efforts to market and sell their assets and who will continue to be principally involved in the Debtors' post-petition efforts to market and sell their assets, is attached hereto as Exhibit "3."

11.     Further, since Houlihan Lokey was engaged by the Debtors pre-petition to act as their financial advisor and investment banker with regard to the marketing and sale of the Debtors' assets, Houlihan Lokey is already familiar with the Debtors and the assets they are seeking to sell, has already assembled a pool of potential buyers and communicated with some of them, has already assembled documents and information to be provided to potential buyers to conduct due diligence, and has already begun efforts to market the Debtors' assets and close a sale thereof.  Thus, I believe that, if Houlihan Lokey's employment is approved by the Court, Houlihan Lokey will be able to continue, without interruption, to perform the services for the Debtors described herein so that a sale of the Debtors' assets for the highest and best price can be achieved within a reasonable amount of time.

12.     Due to the filing of the Debtors' bankruptcy case, the Debtors are required to seek to employ Houlihan Lokey pursuant to 11 U.S.C. § 327(a) with compensation to be determined and paid pursuant to 11 U.S.C. § 328(a).  *See* Engagement Letter, ¶ 15.

13.     Based on the foregoing and other facts set forth in the Application, pursuant to the Application, the Debtors are seeking to employ Houlihan Lokey as financial advisor and investment banker, effective as of the Petition Date of September 30, 2015, pursuant to 11 U.S.C. § 327(a) with compensation to be determined and paid pursuant to 11 U.S.C. § 328(a) and in accordance with the terms and conditions of the Engagement Letter attached hereto as Exhibit "1" and this Application.

14.     As more fully described in the Engagement Letter, the services to be provided by Houlihan Lokey to the Debtors include the following:[3]

a.      assisting the Debtors in the development and distribution of selected information, documents and other materials, including, if appropriate, advising the Debtors in the preparation of an offering memorandum,

b.      assisting the Debtors in evaluating indications of interest and proposals regarding any Transaction(s) [as defined in the Engagement Letter][4] from current and/or potential lenders, equity investors, acquirers and/or strategic partners,

c.      assisting the Debtors with the negotiation of any Transaction(s), including participating in negotiations with creditors and other parties involved in any Transaction(s),

d.      providing expert advice and testimony regarding financial matters related to any Transaction(s), if necessary,

e.      attending meetings of the Debtors' Board of Directors, creditor groups, official constituencies and other interested parties, as the Debtors and Houlihan Lokey mutually agree, and

f.      providing such other financial advisory and investment banking services

---

[3]     The Application includes various summaries of, and is qualified in its entirety by, the Engagement Letter. In the event there is a discrepancy or conflict between this Application and the Engagement Letter, the Engagement Letter shall control in all respects.

[4]     Under the Engagement Letter, a "Transaction" includes (1) a "Sale Transaction" involving the sale of all or a majority of the Debtors' equity securities and/or any significant portion of the Debtors' assets and (2) a "Financing Transaction" involving the placement, raising or issuance of any form of equity, equity linked or debt securities (including, without limitation, convertible securities and preferred stock).   *See* Engagement Letter, ¶ 5. Notwithstanding any terms of the Engagement Letter, Houlihan Lokey agrees that a Transaction under the Engagement Letter shall not include (1) a liquidation of the Debtors' assets conducted by a chapter 7 or 11 trustee, unless Houlihan Lokey has been employed by the trustee, and (2) any debtor-in-possession financing obtained by the Debtors not involving the issuance of equity or equity linked securities (including, without limitation, convertible securities and preferred stock), for example, any debtor-in-possession obtained by the Debtors whereby the Debtors provide security interests and liens upon the Debtors' assets, superpriority administrative expense claims, and/or administrative expense claims.

as may be required by additional issues and developments not anticipated on the March 24, 2015 effective date of the Engagement Letter

15.    As more fully described in the Engagement Letter (including the Amendment thereto), in consideration of the services to be provided by Houlihan Lokey to the Debtors, the Debtors have agreed to pay Houlihan Lokey the following fees:

a.    *Sale Transaction Fee.* Upon the closing of each Sale Transaction (as defined in the Engagement Letter at ¶ 5, and the Amendment), Houlihan Lokey shall earn a cash fee ("Sale Transaction Fee") based upon Aggregate Gross Consideration ("AGC"), calculated as follows:

- For AGC from $10 million to $15 million:    $250,000.

- For AGC from $15 million to $22 million:    $500,000.

- For AGC in excess of $22 million:    4% of AGC.

b.    *Financing Transaction Fee.* If the Debtors do not utilize a Sale Transaction (as defined in the Engagement Letter at ¶ 5) and decides to fund the Debtors via a Financing Transaction (as defined in the Engagement Letter at ¶ 5) brokered by Houlihan Lokey, the following fees will apply.  Upon the closing of each Financing Transaction, Houlihan Lokey shall earn  a cash fee ("Financing Transaction Fee") equal to 7% of the gross proceeds of all equity or equity-linked securities (including, without limitation, convertible securities and preferred stock) placed or committed. Any warrants issued in connection with the raising of equity capital shall, upon the exercise thereof, be considered equity for the purpose of calculating the Financing Transaction Fee, and such portion of the Financing Transaction Fee shall be paid upon such exercise and from the gross proceeds thereof, regardless of any prior termination or expiration of the Engagement Letter.   If the proceeds of any such Financing Transaction are to be funded in more than

one stage, Houlihan Lokey shall be entitled to its applicable Financing Transaction Fee upon the closing date of each stage. The Financing Transaction Fee(s) shall be payable in respect of any sale of securities whether such sale has been arranged by Houlihan Lokey, by another agent (or other issuer of the Securities in such Financing Transaction) or directly by the Debtors. Any non-cash consideration provided to or received in connection with the Financing Transaction (including but not limited to intellectual or intangible property) shall be valued for purposes of calculating the Financing Transaction Fee as equaling the number of Securities issued in exchange for such consideration multiplied by (in the case of debt securities) the face value of each such Security or (in the case of equity securities) the price per Security paid in the then current round of financing. *See* Engagement Letter, ¶¶ 3 and 5-7.

16.     In addition, and regardless of whether any Transaction is consummated, pursuant to the Engagement Letter, the Debtors shall, upon Houlihan Lokey's request, reimburse Houlihan Lokey for its reasonable out-of-pocket expenses incurred from time to time in connection with the rendering of its services in these cases. *See* Engagement Letter, ¶ 10.

17.     Houlihan Lokey understands that, pursuant to the Engagement Letter, due to the filing of the Debtors' bankruptcy cases, any fees payable to Houlihan Lokey are subject to, and can only be paid with, Court approval. *See* Engagement Letter, ¶ 15.

18.     The hours worked, the results achieved and the ultimate benefit to the Debtors of the work performed by Houlihan Lokey in connection with its engagement may vary and I am informed that the Debtors have taken this into account in setting the above fees.

19.     The fee structure set forth in the Engagement Letter and above is consistent with and typical of compensation arrangements entered into by Houlihan Lokey and other comparable firms in connection with the rendering of similar services under similar circumstances. Houlihan Lokey's

restructuring, asset disposition, and financing expertise and capabilities, some or all of which may

be required by the Debtors during the term of Houlihan Lokey's engagement hereunder, were all

important factors in determining the fee structure.  I believe that the ultimate benefit of Houlihan

Lokey's services cannot be measured by reference to the number of hours to be expended by

Houlihan Lokey's professionals in the performance of such services.  Accordingly, Houlihan Lokey

submits that the fee structure is both fair and reasonable under the standards set forth in Bankruptcy

Code section 328(a).

20.    However, consistent with its ordinary practice and the practice of financial

advisors and investment bankers in other chapter 11 cases whose fee arrangements are typically

not hours-based, Houlihan Lokey does not ordinarily maintain contemporaneous time records in

one-tenth hour increments or provide or conform to a schedule of hourly rates for its

professionals.  Nevertheless, Houlihan Lokey will maintain records in support of any actual,

necessary costs and expenses incurred in connection with the rendering of its services in these

bankruptcy cases.  As Houlihan Lokey's compensation will be calculated based on a contingency

fee basis, Houlihan Lokey requests that it not be required to file time records in accordance with

the practice for professionals employed on an hourly fee basis.

21.    Houlihan Lokey understands the provisions of 11 U.S.C. §§ 327-331, which

require, among other things, Court approval of the Debtors' employment of Houlihan Lokey as

financial advisor and investment banker and of all fees and expenses that Houlihan Lokey will

receive from the Debtors and the Debtors' estates.  Houlihan Lokey seeks to be employed

pursuant to 11 U.S.C. § 327(a) with its compensation to be determined and paid pursuant to 11

U.S.C. § 328(a).

22.     As of the Petition Date, the Debtors owed the total sum of $8,914 to Houlihan Lokey for the reimbursement of expenses.  Houlihan Lokey waived its claim for this amount and, therefore, has no prepetition claim against either of the Debtors.

23.     Houlihan Lokey has not received any lien or other interest in property of the Debtors or of a third party to secure payment of Houlihan Lokey's fees or expenses.

24.     Houlihan Lokey has not shared or agreed to share its compensation for representing the Debtors with any other person or entity, except among its members.

25.     Houlihan Lokey is not a creditor, an equity security holder or an insider of the Debtors.

26.     While the Engagement Letter provides for the possibility of Houlihan Lokey acting as an investment banker for security of the Debtors, as of the date hereof, (a) Houlihan Lokey is not and was not an investment banker for any outstanding security of the Debtors and (b) Houlihan Lokey has not been within three years before the Petition Date an investment banker for a security of the Debtors, or an attorney for such an investment banker in connection with the offer, sale or issuance of any security of the Debtors.

27.     Neither Houlihan Lokey nor any member of Houlihan Lokey is, nor was, within two years before the Petition Date, a director, officer or employee of the Debtors or of any investment banker for any security of the Debtors.

28.     While not effecting Houlihan Lokey's disinterestedness, in the interests of full disclosure, Houlihan Lokey hereby discloses that (a) Eric M. Winthrop, a Managing Director of Houlihan Lokey, is the son of Mark Marc J. Winthrop, a founding member and shareholder of Winthrop Couchot, which formerly served as counsel to the Debtors and is a creditor in the Debtors bankruptcy cases, (b) over the years, Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), the Debtors' proposed bankruptcy counsel, has worked on a number of matters, both

in and outside of chapter 11 bankruptcies, with Houlihan Lokey and will presumably continue to do so in the future, and (c) from time to time, LNBYB has represented Houlihan Lokey in various matters, including in connection with employment and fee disputes that Houlihan Lokey has had in various bankruptcy cases.  The Debtors engaged Houlihan Lokey well in advance of LNBYB's involvement with, and retention by, the Debtors.  LNBYB is not currently representing Houlihan Lokey in any matter, and LNBYB will not be serving as counsel to Houlihan Lokey in these cases.

29.    Houlihan Lokey, among other things, searched it client databases to determine whether it represents, or has represented, certain of the Debtors' creditors or other parties in interest in these cases and/or matters wholly unrelated to these cases.  A copy detailing the connections revealed by those searches is attached hereto as Exhibit "4."

30.    Due to the size of Houlihan Lokey and the number of creditors and other parties involved in these cases, Houlihan Lokey may have been engaged to represent certain of the Debtors' creditors or other parties in interest in these cases and/or matters wholly unrelated to these cases.  If any such engagements are discovered after the filing of this Application, Houlihan Lokey will file supplemental disclosures regarding such engagements as soon as practicable after they are discovered.

31.    To the best of my knowledge, information, and belief, other than as set forth herein, Houlihan Lokey does not hold or represent, and none of Houlihan Lokey's past or current engagements would or does appear to create, any interest materially adverse to the interest of the Debtors' estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors or an investment banker for any security of the Debtors, or for any other reason, and Houlihan Lokey is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code.  Also, to the best of

my knowledge, information, and belief, other than as set forth herein, Houlihan Lokey has no prior connection with the Debtors, any creditors of the Debtors or their estates, or any other party in interest in these cases, or their respective attorneys or accountants, the United States Trustee or any person employed by the United States Trustee.

32.    In conjunction with preparing this declaration, I investigated whether or not Houlihan Lokey was "disinterested" by: (a) interviewing the Debtors concerning their businesses and creditors, (b) reviewing documents concerning the Debtors' assets and liabilities, and (c) making a conflicts check of existing Houlihan Lokey clients.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 4th day of November 2015, at Los Angeles, California.

_____
RAJ DAYALAN

# EXHIBIT "1"

*Personal and Confidential*

As of March 24, 2015


MediaShift, Inc.
600 North Brand Blvd, Suite 230
Glendale, CA 91203
Attn: Rick Baran, Chief Executive Officer, and David Grant, Chairman of the Board

Dear Mr. Baran and Mr. Grant:


      This letter agreement (this "Agreement") confirms the terms under which **MediaShift, Inc.** (collectively with its direct and indirect subsidiaries, the "Company") has engaged Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), effective as of the date indicated above (the "Effective Date"), as its exclusive financial advisor to provide financial advisory and investment banking services in connection with one or more merger and/or acquisition transactions and/or one or more financing transactions for the Company and with respect to such other financial matters as to which the Company and Houlihan Lokey may agree in writing during the term of this Agreement.

1.      **Services**.  In connection with each potential Transaction (as defined below), Houlihan Lokey will assist and advise the Company with the analysis, evaluation, pursuit and effectuation of any such Transaction.  Houlihan Lokey's services will consist of, if appropriate and if requested by the Company, (i) assisting the Company in the development and distribution of selected information, documents and other materials, including, if appropriate, advising the Company in the preparation of an offering memorandum; (ii) assisting the Company in evaluating indications of interest and proposals regarding any Transaction(s) from current and/or potential lenders, equity investors, acquirers and/or strategic partners; (iii) assisting the Company with the negotiation of any Transaction(s), including participating in negotiations with creditors and other parties involved in any Transaction(s); (iv) providing expert advice and testimony regarding financial matters related to any Transaction(s), if necessary; (v) attending meetings of the Company's Board of Directors, creditor groups, official constituencies and other interested parties, as the Company and Houlihan Lokey mutually agree; and (vi) providing such other financial advisory and investment banking services as may be required by additional issues and developments not anticipated on the Effective Date, as described in Section 16 of this Agreement.

2.      **Exclusive Agency.**  The Company agrees that neither it nor its management will initiate any discussions regarding a Transaction during the term of this Agreement, except with prior consultation with Houlihan Lokey.  In the event the Company or its management receives any inquiry regarding a Transaction from any party, the Company shall promptly inform Houlihan Lokey of such inquiry so that Houlihan Lokey can assist the Company in evaluating such party and its interest in a Transaction and in any resulting negotiations.

3.      **Fees**.  In consideration of Houlihan Lokey's acceptance of this engagement, the Company shall pay the following:

    (i)  *Transaction Fee(s)*:  In addition to the other fees provided for herein, the Company shall pay Houlihan Lokey the following transaction fee(s):

        a.  *Sale Transaction Fee.* Upon the closing of each Sale Transaction (as defined below), Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly from the gross proceeds of such Sale Transaction, as a cost of such Sale

Transaction, a cash fee ("Sale Transaction Fee") based upon Aggregate Gross Consideration ("AGC"), calculated as follows:

For AGC from $**30** million to $**50** million:    **3**% of such incremental AGC above $30 million, plus

For AGC from $**50** million to $**100** million:    **5**% of such incremental AGC, plus

For AGC in excess of $**100** million:    **10**% of such incremental AGC.

b.   *Financing Transaction Fee.* If the company does not utilize the sales transaction process and associated fees, and decides to fund the company via a financing transaction (defined below) brokered by Houlihan Lokey, the following fees will apply.  Upon the closing of each Financing Transaction (as defined below), Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly from the gross proceeds of such Financing Transaction, as a cost of such Financing Transaction, a cash fee ("Financing Transaction Fee") equal to 7% of the gross proceeds of all equity or equity-linked securities (including, without limitation, convertible securities and preferred stock) placed or committed.  Any warrants issued in connection with the raising of equity capital shall, upon the exercise thereof, be considered equity for the purpose of calculating the Financing Transaction Fee, and such portion of the Financing Transaction Fee shall be paid upon such exercise and from the gross proceeds thereof, regardless of any prior termination or expiration of this Agreement. It is understood and agreed that if the proceeds of any such Financing Transaction are to be funded in more than one stage, Houlihan Lokey shall be entitled to its applicable compensation hereunder upon the closing date of each stage.  The Financing Transaction Fee(s) shall be payable in respect of any sale of securities whether such sale has been arranged by Houlihan Lokey, by another agent (or other issuer of the Securities in such Financing Transaction) or directly by the Company.  Any non-cash consideration provided to or received in connection with the Financing Transaction (including but not limited to intellectual or intangible property) shall be valued for purposes of calculating the Financing Transaction Fee as equaling the number of Securities issued in exchange for such consideration multiplied by (in the case of debt securities) the face value of each such Security or (in the case of equity securities) the price per Security paid in the then current round of financing.  The fees set forth herein shall be in addition to any other fees that the Company may be required to pay to any investor or other purchaser of Securities to secure its financing commitment.

Any Sale Transaction Fee and Financing Transaction Fee is each referred to herein as a "Transaction Fee" and are collectively referred to herein as "Transaction Fees." All payments received by Houlihan Lokey pursuant to this Agreement at any time shall become the property of Houlihan Lokey without restriction.  No payments received by Houlihan Lokey pursuant to this Agreement will be put into a trust or other segregated account.

4.     **Term and Termination.**  This Agreement shall have an initial term of 6 months, and thereafter shall be automatically extended on a month-to-month basis until either party provides thirty days' prior written notice to the other party.  The expiration or termination of this Agreement shall not affect (i) any provision of this Agreement other than Sections 1 through 3 and (ii) Houlihan Lokey's right to receive, and the Company's obligation to pay, any and all fees, expenses and other amounts due, whether or not any Transaction shall be consummated prior to or subsequent to the effective date of expiration or termination, as more fully set forth in this Agreement.

In addition, notwithstanding the expiration or termination of this Agreement, Houlihan Lokey shall be entitled to full payment by the Company of the Transaction Fees described in this Agreement: (i) so long as a Transaction is consummated during the term of this Agreement, or within 12 months after the

date of expiration or termination of this Agreement ("Tail Period"), and/or (ii) if an agreement in principle to consummate a Transaction is executed by any entity comprising the Company during the term of this Agreement, or within the Tail Period, and such Transaction is consummated at any time following such execution with the counterparty named in such agreement, or with any affiliate or employee of, or investor in, such counterparty, or any affiliate of any of the foregoing.

5.    **Transaction.**    As used in this Agreement, the term "Transaction" shall mean any of the following:

(i) *Sale Transaction*.    Any transaction or series of related transactions that constitute the disposition to one or more third parties (including, without limitation, any person, group of persons, partnership, corporation or other entity, and also including, among others, any of the existing owners, shareholders, employees, or creditors of any entity comprising the Company and/or the affiliates of each) in one or a series of related transactions of (a) all or a majority of the equity securities of any entity comprising the Company or any interest held by any entity comprising the Company and/or (b) any significant portion of the assets (including the assignment of any executory contracts) or operations of any entity comprising the Company or any joint venture or partnership or other entity formed by it, in either case, including, without limitation, through a sale or exchange of capital stock, options or assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, a recapitalization, the formation of a joint venture, partnership or similar entity, or any similar transaction, including, without limitation, any sale transaction under Sections 363, 1129 or any other provision of Title 11, United States Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code") (each a "Sale Transaction"); or

(ii) *Financing Transaction.*    The placement, raising or issuance of any form of equity, equity-linked or debt securities (including, without limitation, any convertible securities or preferred stock (any or all of which being "Securities"), from any source including, without limitation, any of the existing owners, shareholders, employees, or creditors of any entity comprising the Company (whether or not such transaction is effectuated in-court, out-of-court, through the confirmation of a plan of reorganization or otherwise under the Bankruptcy Code, or whether the requisite consents to such transaction(s) are obtained in-court or out-of-court) (each a "Financing Transaction")

6.    **Aggregate Gross Consideration ("AGC").**    For the purpose of calculating the Sale Transaction Fee, the AGC shall be the gross proceeds and other consideration paid to, or received by, or to be paid to or received by, any entity comprising the Company, or any of its equity or debt holders, or other parties in interest, including, without limitation, holders of warrants and convertible securities, and holders of options or stock appreciation rights, whether or not vested (collectively "Constituents"), in connection with the relevant Sale Transaction. Such proceeds and consideration shall be deemed to include, without limitation: amounts in escrow and any deposits or other amounts forfeited by any investor; cash, notes, securities, and other property; payments made in installments; amounts payable under consulting agreements, above-market employment contracts, non-compete or severance agreements, consulting contracts or similar arrangements with any equity holder; Contingent Payments (as defined below) and/or insurance proceeds upon the occurrence of an insurable event that diminishes the value of the Company. Upon the closing of a Sale Transaction in which less than 100% of the ownership of the equity interests are sold, the AGC shall be calculated as if 100% of the ownership of the equity interests of the Company on a fully diluted basis had been sold by dividing (i) the total consideration, whether in cash, securities, notes or other forms of consideration, received or receivable by the Company and/or its Constituents by (ii) the percentage of ownership which is sold. If, in the Sale Transaction, no consideration is being paid in respect of the existing equity, AGC of the retained equity shall be determined by the good faith agreement of the parties as to the value of such retained equity implied by the Sale Transaction. In addition, if any of the liabilities of any entity comprising the Company are assumed, decreased, reinstated, satisfied or otherwise paid off in conjunction with a Sale Transaction (by any entity comprising the

MediaShift, Inc.
Page 4

Company or any investor, in the form of "cure" payments or otherwise), or any of the assets of any entity comprising the Company are sold or otherwise transferred outside of the Company's ordinary course of business to another party prior to the closing of a Sale Transaction (including, without limitation, any dividends or distributions paid to security holders or amounts paid to repurchase any securities) or are retained by any entity comprising the Company after the closing of the Sale Transaction, the AGC will be increased to reflect the face value of any such liabilities and the fair market value of any such assets. Contingent Payments shall be defined as the consideration received or receivable by the Company, or any of its Constituents and/or any other parties in the form of deferred performance-based payments, "earn-outs", or other contingent payments based upon the future performance of any entity comprising the Company, or any of its businesses or assets.

7.      **Value of Consideration.**  For the purpose of calculating the AGC received in a Sale Transaction, any securities, other than a promissory note, will be valued at the time of the announcement of the Sale Transaction, without regard to any restrictions on transferability, as follows: (i) if such securities are traded on a stock exchange, the securities will be valued at the average last sale or closing price for the ten trading day period ending two days prior to the announcement of the Sale Transaction; (ii) if such securities are traded primarily in over-the-counter transactions, the securities will be valued at the mean of the closing bid and asked quotations similarly averaged over a ten trading day period ending two days prior to the announcement of the Sale Transaction; and (iii) if such securities have not been traded prior to the announcement of the Sale Transaction, Houlihan Lokey and the Company shall negotiate in good faith to agree on a fair valuation thereof, without regard to any restrictions on transferability, for the purposes of calculating the AGC.  For any lease payments and other consideration that is not freely tradable or has no established public market, if the consideration utilized consists of property other than securities, then the value of such property shall be the fair market value thereof as determined in good faith by Houlihan Lokey and the Company.  If any consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such consideration is payable.  The value of any purchase money or other promissory notes shall be deemed to be the face amount thereof.  In the event the AGC includes any Contingent Payments, Houlihan Lokey's Transaction Fee shall be calculated based on the mutually agreed value of such Contingent Payments as of closing. If the parties cannot reach such an agreement, an additional Sale Transaction Fee shall be paid to Houlihan Lokey from, and on account of, such Contingent Payments at the same time that each of such Contingent Payments are received regardless of any prior termination or expiration of this Agreement.  Each such additional Sale Transaction Fee shall be calculated pursuant to the provisions of this Agreement based upon the amount of each such Contingent Payment.

8.      **Characterization of Multiple and/or Complex Transactions.**  In the event the Company and Houlihan Lokey are unable to agree in good faith upon the classification of any single Transaction as a Sale Transaction or Financing Transaction, or if a single Transaction with only one third party shall consist of two, or more, of the foregoing types of Transactions, or elements thereof, Houlihan Lokey shall receive only one Transaction Fee in respect of such Transaction, which shall be equal to the greater of the Sale Transaction Fee or Financing Transaction Fee, as applicable, as calculated in accordance with the terms of this Agreement.   For the avoidance of doubt, if two or more single Transactions occur simultaneously or at different times, whether or not they are connected with or related to one another, the Company shall pay Houlihan Lokey the Transaction Fee for each such Transaction in addition to, and not in lieu of, each other.

9.      **Reasonableness of Fees.**  The parties acknowledge that this engagement will require a substantial professional commitment of time and effort by Houlihan Lokey.  Moreover, the amount of time and effort may vary substantially during different periods of the engagement. As a result, in order to ensure the availability of all necessary professional resources, whenever required, Houlihan Lokey may be foreclosed from pursuing other alternative engagement opportunities. In light of the foregoing, and given: (i) the numerous issues which can currently be anticipated  in engagements such as this, (ii) Houlihan Lokey's commitment to the variable level of time and effort necessary to address such issues, (iii) the

MediaShift, Inc.
Page 5

expertise and capabilities of Houlihan Lokey that will be required in this engagement, and (iv) the market rate for Houlihan Lokey's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Houlihan Lokey, and provides the requisite certainty to the Company. The parties further agree and acknowledge that: (a) additional issues and developments, not currently anticipated, may arise and have an impact upon the services to be rendered by Houlihan Lokey hereunder, and may result in substantially more work and/or services being performed by Houlihan Lokey than is anticipated at this time; and (b) as a result of such unanticipated issues and/or developments, the results of Houlihan Lokey's services under this Agreement may also be substantially more beneficial than anticipated at this time. Accordingly, in the event of the occurrence of (a) and/or (b), in the prior sentence, each of the parties to this Agreement  may, at the conclusion of the services rendered by Houlihan Lokey pursuant hereto, agree to a modification of the Transaction Fees described herein to more appropriately reflect the actual work performed, services rendered and/or any extraordinary results achieved by Houlihan Lokey pursuant to its engagement hereunder.

10.    **Expenses.**  In addition to all of the other fees and expenses described in this Agreement, and regardless of whether any Transaction is consummated, the Company shall, upon Houlihan Lokey's request, reimburse Houlihan Lokey for its reasonable out-of-pocket expenses incurred from time to time in connection with its services hereunder.  Houlihan Lokey bills its clients for its reasonable out-of-pocket expenses including, but not limited to (i) travel-related and certain other expenses, without regard to volume-based or similar credits or rebates Houlihan Lokey may receive from, or fixed-fee arrangements made with, travel agents, airlines or other vendors, and (ii) research, database and similar information charges paid to third party vendors, and postage, telecommunication and duplicating expenses, to perform client-related services that are not capable of being identified with, or charged to, a particular client or engagement in a reasonably practicable manner, based upon a uniformly applied monthly assessment or percentage of the fees due to Houlihan Lokey.

Houlihan Lokey shall, in addition, be reimbursed by the Company for the fees and expenses of Houlihan Lokey's legal counsel incurred in connection with the negotiation and performance of this Agreement and the matters contemplated hereby.

11.    **Invoicing and Payment.**  All amounts payable to Houlihan Lokey shall be made in lawful money of the United States in accordance with the payment instructions set forth on the invoice provided with this Agreement, or to such accounts as Houlihan Lokey shall direct, and the Company shall provide contemporaneous written notice of each such payment to Houlihan Lokey.  All amounts invoiced by Houlihan Lokey shall be exclusive of value added tax, withholding tax, sales tax and any other similar taxes ("Taxes").  All amounts charged by Houlihan Lokey will be invoiced together with Taxes where appropriate.

12.    **Information.**  The Company will provide Houlihan Lokey with access to management and other representatives of the Company and other participants in the Transaction, as reasonably requested by Houlihan Lokey. The Company will furnish Houlihan Lokey with such information as Houlihan Lokey may reasonably request for the purpose of carrying out its engagement hereunder, all of which will be, to the Company's best knowledge, accurate and complete at the time furnished. The Company further represents and warrants that any financial projections delivered to Houlihan Lokey have been or will be reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of the future financial results and condition of the Company. The Company will promptly notify Houlihan Lokey in writing of any material inaccuracy or misstatement in, or material omission from, any information previously delivered to, or discussed with, Houlihan Lokey, or any materials provided to any interested party.  Houlihan Lokey shall rely, without independent verification, on the accuracy and completeness of all information that is publicly available and of all information furnished by or on behalf of the Company or any other potential party to any Transaction or otherwise reviewed by, or discussed with, Houlihan Lokey.  The Company understands and agrees that Houlihan Lokey will not be responsible for the accuracy or completeness of such information, and shall not be liable for any inaccuracies or omissions therein.  The Company acknowledges that Houlihan Lokey has no obligation to

MediaShift, Inc.
Page 6

conduct any appraisal of any assets or liabilities of the Company or any other party or to evaluate the solvency of any party under any applicable laws relating to bankruptcy, insolvency or similar matters. Any advice (whether written or oral) rendered by Houlihan Lokey pursuant to this Agreement is intended solely for the use of the Board of Directors of the Company (solely in its capacity as such) in evaluating a Transaction, and such advice may not be relied upon by any other person or entity or used for any other purpose. Any advice rendered by, or other materials prepared by, or any communication from, Houlihan Lokey may not be disclosed, in whole or in part, to any third party, or summarized, quoted from, or otherwise referred to in any manner without the prior written consent of Houlihan Lokey. In addition, neither Houlihan Lokey nor the terms of this Agreement may otherwise be referred to without our prior written consent.

13.    **Additional Provisions Regarding Financing Transaction.**  The Company authorizes Houlihan Lokey to provide an information memorandum (or similar document) (as such document may be amended or supplemented and including any information incorporated therein by reference, the "Information Memorandum") and other pertinent information to prospective investors and other purchasers and agrees not to transmit the Information Memorandum to prospective investors or other purchasers without Houlihan Lokey's prior approval.  The Company will be solely responsible for the contents of the Information Memorandum and any and all other written or oral communications provided by or on behalf of the Company to any actual or prospective investor or other purchaser.  The Company represents and warrants that the Information Memorandum and such other communications will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.  If an event occurs as a result of which the Information Memorandum (as then supplemented or amended) would include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, the Company will promptly notify Houlihan Lokey of such event and Houlihan Lokey will suspend solicitations of prospective investors and other purchasers until such time as the Company prepares (and the Company agrees that, if the solicitation of prospective investors and other purchasers has been so suspended after the Company has accepted orders from prospective investors or other purchasers, the Company will promptly prepare) a supplement or amendment to the Information Memorandum which corrects such statement(s) or omission(s). The Company will (i) make available to each bona fide offeree of the Securities such information (in addition to that contained in the Information Memorandum) concerning the offering of the Securities, the Company and any other relevant matters, and (ii) provide each bona fide offeree the opportunity to ask questions of, and receive answers from, the officers and employees of the Company concerning the terms and conditions of the offering of the Securities.

The Company acknowledges that closing of a Financing Transaction is subject, among other factors, to acceptable documentation, market conditions, and satisfaction of the conditions set forth in one or more agreements to be entered into with any financier, lender, investor or other purchaser of Securities. It is expressly understood that this engagement does not constitute any commitment, express or implied, on the part of Houlihan Lokey to acquire, and does not ensure the successful placement of, any portion of the Securities.  The Company further acknowledges and agrees that Houlihan Lokey is not acting as an underwriter of the Securities and shall have no responsibility or obligation to underwrite the Securities.

In connection with all offers and sales of the Securities, the Company will cause to be addressed and delivered to Houlihan Lokey a written opinion of Company counsel acceptable to Houlihan Lokey containing (i) an opinion to the effect that the placement of Securities was exempt from registration under the Securities Act of 1933, as amended (the "Act"), and (ii) any other opinions of counsel that have been provided to investors or other purchasers of the Securities or which Houlihan Lokey may reasonably request.  The Company also will cause to be furnished to Houlihan Lokey at or after each closing of a sale of Securities copies (addressed to Houlihan Lokey, if requested and as appropriate) of such agreements, opinions, certificates and other documents (including, without limitation, accountant's letters) as Houlihan Lokey may reasonably request.  The Company hereby acknowledges and agrees that Houlihan

Lokey shall be entitled to rely upon the representations and warranties made (whether pursuant to a subscription agreement or in any other format) to investors or other purchasers of Securities and the Company shall be deemed to have made such representations and warranties to and for the benefit of Houlihan Lokey.

It is understood that the offer and sale of the Securities in a Financing Transaction will be exempt from the registration requirements of the Act, pursuant to Section 4(2) thereof.  The Company has not taken, and will not take, any action, directly or indirectly, so as to cause the transactions contemplated by this Agreement to fail to be entitled to exemption under Section 4(2) of the Act. The Company will promptly from time to time take such reasonable action as necessary to qualify the Securities as a private placement under the securities laws of such States and foreign jurisdictions as any prospective investor or other purchaser may reasonably request and will comply with applicable laws. The Company shall cause the issuer of the Securities to offer and sell the Securities only to investors and other purchasers of the Securities that they reasonably believe to be "accredited investors", as defined in Rule 501 of Regulation D under the Act. The Company will cause the issuer of the Securities to file in a timely manner with the Securities and Exchange Commission (the "SEC") and/or each other regulatory authority any notices or other filings with respect to the Securities required by Rule 503 of Regulation D under the Act and/or other applicable law or regulation and will upon request furnish to Houlihan Lokey a signed copy of each such notice or filing promptly after its submission.

The Company represents and warrants that it has filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the Securities Exchange Act of 1934, as amended ("1934 Act") (all of the foregoing filed prior to the Effective Date and all exhibits included therein and financial statements, notes and schedules thereto and documents incorporated by reference therein being hereinafter referred to as the "SEC Documents").  As of their respective dates, all SEC Documents complied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.  As of their respective dates, the financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto.

14.    **Limitations on Services as Advisor.**  Houlihan Lokey's services are limited to those specifically provided in this Agreement, or subsequently agreed upon in writing, by the parties hereto. Houlihan Lokey shall have no obligation or responsibility for any other services including, without limitation, any crisis management or business consulting services related to, among other things, the implementation of any operational, organizational, administrative, cash management, or similar activities. The parties understand that Houlihan Lokey is being engaged hereunder as an independent contractor to provide the services hereunder solely to the Company, and that Houlihan Lokey is not acting as an agent or fiduciary of the Company, its security holders or creditors or any other person or entity in connection with this engagement, and the Company agrees that it shall not make, and hereby waives, any claim based on an assertion of such an agency or fiduciary relationship. In performing its services pursuant to this Agreement, Houlihan Lokey is not assuming any responsibility for the Company's decision on whether to pursue, endorse or support any business strategy, or to effect, or not to effect, any Transaction(s), which decision shall be made by the Company in its sole discretion. Any duties arising by reason of this Agreement or as a result of the services to be rendered by Houlihan Lokey hereunder will be owed solely to the Company.

15.    **Bankruptcy Court Approval.**  In the event that the Company is or becomes a debtor under Chapter 11 of the Bankruptcy Code, whether voluntarily or involuntarily, the Company shall seek an order authorizing the employment of Houlihan Lokey pursuant to the terms of this Agreement, as a professional person pursuant to, and subject to the standard of review of, Section 328(a) of the

MediaShift, Inc.
Page 8

Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and applicable local rules and orders and not subject to any other standard of review under Section 330 of the Bankruptcy Code. In so agreeing to seek Houlihan Lokey's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Houlihan Lokey's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Transaction, that the value to the Company of Houlihan Lokey's services derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the contingent Transaction Fee(s) is reasonable regardless of the number of hours to be expended by Houlihan Lokey's professionals in the performance of the services to be provided hereunder. The Company shall submit Houlihan Lokey's employment application as soon as practicable following the Company's filing of a voluntary Chapter 11 case, or the entry of an order for relief in any involuntary case filed against the Company, and use its best efforts to cause such application to be considered on the most expedited basis. The employment application and the proposed order authorizing employment of Houlihan Lokey shall be provided to Houlihan Lokey as much in advance of any Chapter 11 filing as is practicable, and must be acceptable to Houlihan Lokey in its sole discretion. Following entry of the order authorizing the employment of Houlihan Lokey, the Company shall pay all fees and expenses due pursuant to this Agreement, as approved by the court having jurisdiction of the bankruptcy case involving the Company (the "Bankruptcy Court"), as promptly as possible in accordance with the terms of this Agreement and the order of such Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and orders, and will work with Houlihan Lokey to promptly file any and all necessary applications regarding such fees and expenses with the Bankruptcy Court. Houlihan Lokey shall have no obligation to provide services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless Houlihan Lokey's retention under this Agreement is approved under Section 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which is acceptable to Houlihan Lokey in all respects. If the order authorizing the employment of Houlihan Lokey is not obtained, or is later reversed or set aside for any reason, Houlihan Lokey may terminate this Agreement, and the Company shall reimburse Houlihan Lokey for all fees and expenses reasonably incurred prior to the date of expiration or termination, subject to the requirements of the Bankruptcy Code, Bankruptcy Rules and applicable local rules and orders. Prior to commencing a Chapter 11 case, the Company shall pay all amounts due and payable to Houlihan Lokey in cash. The terms of this Section are solely for the benefit of Houlihan Lokey, and may be waived, in whole or in part, only by Houlihan Lokey.

16.     **Additional Services.** To the extent Houlihan Lokey is requested by the Company to perform any financial advisory or investment banking services which are not within the scope of this engagement (such as rendering a fairness opinion), the Company shall pay Houlihan Lokey such fees as shall be mutually agreed upon by the parties hereto in writing, in advance, depending on the level and type of services required, and shall be in addition to the fees and expenses described hereinabove. In addition, during the term of this Agreement and for a period of 18 months from the termination or expiration of this Agreement, the Company shall offer Houlihan Lokey the right to act as exclusive placement agent or financial advisor in connection with any transaction(s) not covered by Section 3 of this Agreement. If Houlihan Lokey agrees to act in any such capacity, the Company and Houlihan Lokey will enter into an appropriate form of agreement relating to the type of transaction involved and containing customary terms and conditions, including fees customarily payable to nationally recognized investment banks performing such roles in connection with comparable transactions. The Company acknowledges that this Agreement is neither an express nor an implied commitment by Houlihan Lokey to act in any such capacity, which commitment shall only be set forth in a separate agreement.

17.     **Required Services.** If Houlihan Lokey is required to render services not described herein, but which relate directly or indirectly to the subject matter of this Agreement (including, but not limited to, producing documents, answering interrogatories, attending depositions, giving expert or other testimony, whether by subpoena, court process or order, or otherwise), the Company shall pay Houlihan Lokey additional fees to be mutually agreed upon for such services, plus reasonable related out-of-pocket costs

MediaShift, Inc.
Page 9

and expenses, including, among other things, the reasonable legal fees and expenses of Houlihan Lokey's counsel in connection therewith.

18.    **Credit.**  After the announcement or closing of any Transaction, Houlihan Lokey may, at its own expense, place announcements on its corporate website and in financial and other newspapers and periodicals (such as a customary "tombstone" advertisement, including the Company's logo or other identifying marks) describing its services in connection therewith.  Furthermore, if requested by Houlihan Lokey, the Company agrees that in any press release announcing any Transaction, the Company will include in such press release a mutually acceptable reference to Houlihan Lokey's role as financial advisor to the Company with respect to such Transaction.

19.    **Choice of Law; Jury Trial Waiver; Jurisdiction.**  **THIS AGREEMENT SHALL BE DEEMED TO BE MADE IN NEW YORK.  ALL DISPUTES ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.  EACH OF HOULIHAN LOKEY AND THE COMPANY (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS EQUITY HOLDERS) IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT OF HOULIHAN LOKEY PURSUANT TO, OR THE PERFORMANCE BY HOULIHAN LOKEY OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT.  REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) SHALL BE BROUGHT AND MAINTAINED IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION OF SUCH MATTERS, AND AGREES TO VENUE IN SUCH COURTS; PROVIDED THAT SUCH CONSENT AND AGREEMENT SHALL NOT BE DEEMED TO REQUIRE ANY BANKRUPTCY CASE INVOLVING THE COMPANY TO BE FILED IN SUCH COURTS, AND IF THE COMPANY BECOMES A DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DURING ANY SUCH CASE, ANY CLAIMS MAY ALSO BE HEARD AND DETERMINED BEFORE THE BANKRUPTCY COURT. EACH PARTY FURTHER IRREVOCABLY SUBMITS AND CONSENTS IN ADVANCE EXCLUSIVELY TO SUCH JURISDICTION AND VENUE IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURTS, AND HEREBY WAIVES IN ALL RESPECTS ANY CLAIM OR OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS.  THE COMPANY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, SUIT OR CLAIM BROUGHT IN ANY OF THE COURTS REFERRED TO ABOVE SHALL BE CONCLUSIVE AND BINDING UPON IT AND MAY BE ENFORCED IN ANY OTHER COURTS HAVING JURISDICTION OVER IT BY SUIT UPON SUCH JUDGMENT. THE COMPANY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ALL SUCH DISPUTES BY THE MAILING OF COPIES OF SUCH PROCESS TO THE COMPANY AT 600 NORTH BRAND BLVD, SUITE 230, GLENDALE, CA 91203.**

20.    **Indemnification and Standard of Care.**  As a material part of the consideration for the agreement of Houlihan Lokey to furnish its services under this Agreement, the Company agrees (i) to indemnify and hold harmless Houlihan Lokey and its affiliates, and their respective past, present and future directors, officers, shareholders, partners, members, employees, agents, representatives, advisors,

MediaShift, Inc.
Page 10

subcontractors and controlling persons (collectively, the "Indemnified Parties"), to the fullest extent lawful, from and against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to this Agreement, Houlihan Lokey's engagement under this Agreement, any Transaction or proposed Transaction, or any actions taken or omitted to be taken by an Indemnified Party or the Company in connection with this Agreement and (ii) to reimburse each Indemnified Party for all expenses (including, without limitation, the fees and expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling, compromising or otherwise becoming involved in any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person or entity (including, without limitation, any shareholder or derivative action), arising out of or relating to this Agreement, or such engagement, Transaction or actions. However, the Company shall not be liable under the foregoing indemnification provision for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of such Indemnified Party.

If for any reason the foregoing indemnification or reimbursement is unavailable to any Indemnified Party or insufficient fully to indemnify any Indemnified Party or to hold it harmless in respect of any losses, claims, damages, liabilities or expenses referred to in such indemnification or reimbursement provisions, then the Company shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and Houlihan Lokey, on the other hand, in connection with the matters contemplated by this Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Company shall contribute to such amount paid or payable by such Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Company (and its affiliates, and their respective directors, employees, agents or other advisors), on the one hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations. Notwithstanding the foregoing, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of fees actually received by Houlihan Lokey from the Company pursuant to this Agreement. Relative benefits received by the Company, on the one hand, and Houlihan Lokey, on the other hand, shall be deemed to be in the same proportion as (i) the total value paid or received or contemplated to be paid or received by the Company, and its security holders and creditors, as the case may be, pursuant to the transaction(s) (whether or not consummated) contemplated by the engagement hereunder, bears to (ii) the fees received by Houlihan Lokey under this Agreement. The Company shall not settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not an Indemnified Party is an actual or potential party thereto), unless such settlement, compromise, consent or termination contains a release of the Indemnified Parties reasonably satisfactory in form and substance to Houlihan Lokey.

The Company further agrees that neither Houlihan Lokey nor any other Indemnified Party shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Company or any person or entity asserting claims on behalf of or in right of the Company related to or arising out of this Agreement, Houlihan Lokey's engagement under this Agreement, any Transaction or proposed Transaction, or any actions taken or omitted to be taken by an Indemnified Party or the Company in connection with this Agreement, except for losses, claims, damages or liabilities incurred by the Company which are finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of such Indemnified Party.

The Company shall cause any new company that may be formed by the Company, for any purpose, to agree to all of the obligations in this Section to Houlihan Lokey in accordance with the foregoing provisions. Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant

MediaShift, Inc.
Page 11

recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement, the Company will notify Houlihan Lokey in writing thereof (if not previously so notified) and, if requested by Houlihan Lokey, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this Agreement, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions satisfactory to Houlihan Lokey. The Company agrees that Houlihan Lokey would be irreparably injured by any breach of this Agreement (including, without limitation, the agreement set forth in the immediately preceding sentence), that money damages alone would not be an adequate remedy for any such breach and that, in the event of any such breach, Houlihan Lokey shall be entitled, in addition to any other remedies, to pursue injunctive relief and specific performance.

The indemnity, reimbursement, and other obligations and agreements of the Company set forth herein (i) shall apply to any services provided by Houlihan Lokey in connection with this engagement prior to the Effective Date and to any modifications of this Agreement, (ii) shall be in addition to any obligation or liability which the Company may otherwise have to any Indemnified Party, (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Company or any Indemnified Party or any person controlling any of them, and (iv) shall survive the completion of the services described in, and any expiration or termination of the relationship established by, this Agreement.

21.    **Miscellaneous.**  This Agreement shall be binding upon the parties hereto and their respective successors, heirs and assigns and any successor, heir or assign of any substantial portion of such parties' respective businesses and/or assets, including any Chapter 11 or Chapter 7 trustee appointed on behalf of the Company.

Nothing in this Agreement, express or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Parties and each of their respective successors, heirs and assigns, any rights or remedies (directly or indirectly as a third party beneficiary or otherwise) under or by reason of this Agreement or as a result of the services to be rendered by Houlihan Lokey hereunder.

This Agreement is the complete and exclusive statement of the entire understanding of the parties regarding the subject matter hereof, and supersedes all previous agreements or understandings regarding the same, whether written or oral.  This Agreement may not be amended, and no portion hereof may be waived, except in a writing duly executed by the parties hereto.

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect pursuant to the terms hereof.

To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires all financial institutions to obtain, verify and record information that identifies each person with whom they do business as a condition to doing business with that person. Accordingly, the Company will provide Houlihan Lokey upon request certain identifying information necessary to verify the Company's identity, such as a government-issued identification number (e.g., a U.S. taxpayer identification number), certified articles of incorporation, a government-issued business license, partnership agreement or trust instrument.

This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument. Such counterparts may be delivered by one party to the other by facsimile or other electronic transmission, and such counterparts shall be valid for all purposes.

MediaShift, Inc.
Page 12

The Company has all requisite power and authority to enter into this Agreement. This Agreement has been duly and validly authorized by all necessary action on the part of the Company and has been duly executed and delivered by the Company and constitutes a legal, valid and binding agreement of the Company, enforceable in accordance with its terms. This Agreement has been reviewed by the signatories hereto and their counsel. There shall be no construction of any provision against Houlihan Lokey because this Agreement was drafted by Houlihan Lokey, and the parties waive any statute or rule of law to such effect.

The Company agrees that it will be solely responsible for ensuring that any Transaction complies with applicable law. The Company understands that Houlihan Lokey is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice and the Company confirms that it is relying on its own counsel, accountants and similar advisors for such advice.

To the extent that the Company hereunder is comprised of more than one entity or company, the obligations of the Company under this Agreement are joint and several, and any consent, direction, approval, demand, notice or the like given by any one of such entities or companies shall be deemed given by all of them and, as such, shall be binding on the Company.

The Company understands and acknowledges that Houlihan Lokey and its affiliates, including ORIX USA Corporation and its subsidiaries and affiliates (collectively, the "Houlihan Lokey Group"), engage in providing investment banking, securities trading, financing, financial advisory, and consulting services and other commercial and investment banking products and services to a wide range of institutions and individuals. In the ordinary course of business, the Houlihan Lokey Group and certain of its employees, as well as investment funds in which they may have financial interests or with which they may co-invest, may acquire, hold or sell, long or short positions, or trade or otherwise effect transactions, in debt, equity, and other securities and financial instruments (including bank loans and other obligations) of, or investments in, the Company or any other party that may be involved in the matters contemplated by this Agreement or have other relationships with such parties. With respect to any such securities, financial instruments and/or investments, all rights in respect of such securities, financial instruments and investments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. In addition, the Houlihan Lokey Group may in the past have had, and may currently or in the future have, financial advisory or other investment banking or consulting relationships with parties involved in the matters contemplated by this Agreement, including parties that may have interests with respect to the Company, a Transaction or other parties involved in a Transaction, from which conflicting interests or duties may arise. Although the Houlihan Lokey Group in the course of such other activities and relationships may acquire information about the Company, a Transaction or such other parties, or that otherwise may be of interest to the Company, the Houlihan Lokey Group shall have no obligation to, and may not be contractually permitted to, disclose such information, or the fact that the Houlihan Lokey Group is in possession of such information, to the Company or to use such information on the Company's behalf.

In order to enable Houlihan Lokey to bring relevant resources to bear on its engagement hereunder from among its global affiliates, the Company agrees that Houlihan Lokey may share information obtained from the Company and other parties hereunder with other members of the Houlihan Lokey Group, and may perform the services contemplated hereby in conjunction with such other members.

MediaShift, Inc.
Page 13

If the foregoing correctly sets forth our agreement, please sign and return to us a copy of this Agreement.

All of us at Houlihan Lokey thank you for choosing us to advise the Company, and look forward to working with you on this engagement.

Very truly yours,

HOULIHAN LOKEY CAPITAL, INC.

By: _____
    Raj Dayalan
    Director

Accepted and agreed to as of the Effective Date:

MEDIASHIFT, INC., on its own behalf, and on behalf of its direct and indirect subsidiaries

By: _____
    Rick Baran
    Chief Executive Officer

CONFIDENTIAL

October 29, 2015

MediaShift, Inc.
600 North Brand Blvd, Suite 230
Glendale, CA 91203
Attn: Rick Baran, Chief Executive Officer, and David Grant, Chairman of the Board

Dear Mr. Baran and Mr. Grant:

Reference is hereby made to that certain letter agreement between MediaShift, Inc. and Houlihan Lokey Capital, Inc., dated March 24, 2015 (the "Agreement"). The parties hereby agree to amend the Agreement in the following limited respect:

Section 3 (i) a. of the Agreement is hereby deleted and replaced in its entirety with the following:

"a.  *Sale Transaction Fee.* Upon the closing of each Sale Transaction (as defined below), Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly from the gross proceeds of such Sale Transaction, as a cost of such Sale Transaction, a cash fee ("Sale Transaction Fee"), based upon Aggregate Gross Consideration ("AGC"), calculated as follows:

For AGC from $10 million to $15 million: $250,000.

For AGC from $15 million to $22 million: $500,000.

For AGC in excess of $22 million: 4.0% of AGC."

Undefined capitalized terms used in this letter shall have the meanings ascribed thereto in the Agreement. Except as expressly amended hereby, all terms and provisions of the Agreement (including, without limitation, Schedule A attached thereto) are hereby ratified and confirmed in all respects and shall remain in full force and effect in accordance with the terms thereof. To the extent any provision of the Agreement is inconsistent with this letter, this letter shall control. From and after the date hereof, each reference in the Agreement to "this Agreement,"

MediaShift, Inc.
October 29, 2015
Page 2

"hereunder," "hereof" or words of like import shall mean and be a reference to the Agreement, as amended hereby.

This letter and all controversies arising hereunder or relating hereto will be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

This letter shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns, and may be amended only by a written instrument signed by the parties.

This letter may be executed in any number of counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument. Such counterparts may be delivered by one party to the other by facsimile or other electronic transmission, and such counterparts shall be valid for all purposes.

Please confirm that the foregoing is in accordance with your understanding of our agreement by signing and returning to us a copy of this letter.

Very truly yours,

HOULIHAN LOKEY CAPITAL, INC.

By: _____
    Raj Dayalan
    Director

The foregoing has been read, understood and approved, and the undersigned hereby agree to amend the Agreement according to the foregoing terms as of the date first written above.

MEDIASHIFT, INC.

By: _____
    Rick Baran
    Chief Executive Officer

EXHIBIT "2"



# Houlihan Lokey Introduction and Qualifications

## November 2015

CORPORATE FINANCE
FINANCIAL ADVISORY SERVICES
FINANCIAL RESTRUCTURING
STRATEGIC CONSULTING

HL.com

November 2015

*Confidential*

**Houlihan Lokey Introduction and Qualifications**

# Houlihan Lokey – Comprehensive Coverage

## Comprehensive Offer of Independent Advice

| M&A | Capital Markets | Restructuring | Financial Advisory/Valuation |
|---|---|---|---|
| ■ Analysis of Strategic Alternatives<br>■ Sell-Side M&A<br>■ Buy-Side M&A<br>■ Merger<br>■ Public takeover<br>■ Corporate Alliance & JVs<br>■ Leveraged Buy Outs | ■ Growth Equity<br>■ LBO/MBO/MBI<br>■ Growth Facilities<br>■ Asset Financing<br>■ Add-ons<br>■ Staple Financing<br>■ Pipes Financing<br>■ Dividend and Corporate Recap | ■ Balance Sheet Restructuring<br>■ Waivers and amendments<br>■ Tender and Exchange Offers<br>■ Insolvency Proceedings<br>■ Special Situation Financing<br>■ Distressed M&A<br>■ Sovereign Restructuring | ■ Fairness and Solvency Opinions<br>■ Business and Securities Valuation<br>■ Tax and Financial reporting valuations<br>■ Portfolio Valuation<br>■ Derivatives Valuation<br>■ Dispute and Litigation Support |
| #1 Advisor in US Transactions Under $5 Billion<br>140+ M&A deals annually<br>50+ European M&A deals since 2005 | Raised over $100 Billion of capital in the past five years | Largest Global Restructuring Practice<br>Advisor on Almost 900 Transactions Valued in Excess of $1.5 Trillion | #1 Provider of Fairness Opinions for Past 10 Years<br>Perform over 1,000 Valuation Engagements per Year |

## Global Reach

London
Frankfurt
Paris
Madrid

Minneapolis
San Francisco
Los Angeles
Dallas
Chicago
New York
Washington D.C.
Miami
Atlanta

Korea
Pakistan
Beijing
India
Tokyo
Hong Kong
United Arab Emirates
Singapore
Sydney

## Industry Specific Knowledge

| Technology, Media & Telecom | Aerospace Defense Government | Business Services | Consumer, Food & Retail | Energy | Financial Institutions |
|---|---|---|---|---|---|
| | Financial Technology | Healthcare | Industrials | Real Estate Lodging & Leisure | Transportation & Logistics |

**HOULIHAN LOKEY**    1

# Recent Highlights and Accomplishments

**Houlihan Lokey Introduction and Qualifications**

## Closed More Mid-Cap Deals Than Any Other Firm

### 2014

**2014 M&A Advisory Rankings**
**U.S. Transactions Under $1 Billion**

| Rank | Advisor | Number of Deals |
|------|---------|-----------------|
| 1 | Houlihan Lokey | 141 |
| 2 | Goldman Sachs & Co | 88 |
| 3 | JP Morgan | 82 |
| 4 * | Evercore Partners | 81 |
| 4 * | Stifel/KBW | 81 |
| 6 | Barclays | 78 |
| 7 | Morgan Stanley | 76 |
| 8 | RBC Capital Markets | 73 |
| 9 | Raymond James Financial Inc | 72 |
| 10 * | Moelis & Co | 69 |
| 10 * | Jefferies LLC | 69 |

*denotes tie.*
*Source: Thomson Reuters*

### 2013

**2013 M&A Advisory Rankings**
**U.S. Transactions Under $1 Billion**

| Rank | Advisor | Number of Deals |
|------|---------|-----------------|
| 1 | Houlihan Lokey | 114 |
| 2 | Goldman Sachs & Co | 88 |
| 3 | Stifel/KBW | 81 |
| 4 | Lazard | 75 |
| 5 | JP Morgan | 68 |
| 6 | Morgan Stanley | 67 |
| 7 * | Bank of America Merrill Lynch | 64 |
| 7 * | Jefferies LLC | 64 |
| 9 | Evercore Partners | 61 |
| 10 | RBC Capital Markets | 59 |

*denotes tie.*
*Source: Thomson Reuters*

### 2012

**2012 M&A Advisory Rankings**
**U.S. Transactions Under $1 Billion**

| Rank | Advisor | Number of Deals |
|------|---------|-----------------|
| 1 | Houlihan Lokey | 119 |
| 2 | Goldman Sachs & Co | 86 |
| 3 | Barclays | 78 |
| 4 | Lazard | 76 |
| 5 | JP Morgan | 75 |
| 6 | Jefferies & Co Inc | 71 |
| 7 | RBC Capital Markets | 69 |
| 8 | Bank of America Merrill Lynch | 62 |
| 9 * | Morgan Stanley | 58 |
| 9 * | Lincoln International | 58 |

*denotes tie.*
*Source: Thomson Reuters*

### 2011

**2011 M&A Advisory Rankings**
**U.S. Transactions Under $1 Billion**

| Rank | Advisor | Number of Deals |
|------|---------|-----------------|
| 1 | Houlihan Lokey | 103 |
| 2 | Bank of America Merrill Lynch | 91 |
| 3 | Goldman Sachs & Co | 80 |
| 4 | Jefferies & Co Inc | 73 |
| 5 | Morgan Stanley | 72 |
| 6 | JP Morgan | 67 |
| 7 | UBS | 60 |
| 8 | Credit Suisse | 55 |
| 9 | Lazard | 51 |
| 10 | Barclays Capital | 50 |

*Source: Thomson Reuters*

## Winner of Numerous Industry Awards



- Investment Banking Firm of the Year
  - Awarded by the M&A Advisor International Awards in October 2012



- Investment Banking Firm of the Year
- Financing Dealmaker of the Year
  - Awarded by the M&A Advisor Financing Awards in May 2011



- 2010 Mid-market Financial Advisor of the Year – United States
  - Awarded by Financial Times and Mergermarket on December 13, 2010

- 2010 Investment Bank of the Year – North America
  - Awarded by InterContinental Finance Magazine on September 20, 2010

**Houlihan Lokey**  2

# Comprehensive Technology, Media & Telecom Industry Coverage

**Houlihan Lokey Introduction and Qualifications**

**With over 60 TMT bankers on staff, Houlihan's TMT group provides the most comprehensive coverage anywhere**

**TMT Offices**



San Francisco · Los Angeles · New York · London

**Sector Coverage**

| Software & Technology Services | New Media & Internet Solutions | Communications & Infrastructure Components | Healthcare Information Technology & Services |
|---|---|---|---|
| ■ Software as a Service ("SaaS")<br>■ Enterprise Software<br>■ Vertical Application Solutions<br>■ Infrastructure Software<br>■ Cloud Computing | ■ Consumer Internet<br>■ Online Services<br>■ Entertainment, Content and Distribution<br>■ Mobile Media<br>■ Digital Media Services | ■ Wireless Technologies<br>■ Mobility and Messaging<br>■ Digital Home Technology<br>■ IP Infrastructure<br>■ VoIP & IP Video<br>■ Infrastructure Hardware | ■ Payer Application Solutions<br>■ Provider Application Solutions<br>■ Consumer Healthcare<br>■ Collaboration Technologies and Service Solutions |

| Telecommunications | Media | Education | Entertainment |
|---|---|---|---|
| ■ CLECs<br>■ Data Center and Hosting<br>■ ILECs/RBOCs<br>■ RLECs<br>■ Satellite Services and Operators<br>■ VoIP & Hosted PBX Providers<br>■ Wireless Services | ■ Cable Networks<br>■ Diversified Media<br>■ Publishing<br>■ Outdoor Advertising<br>■ Radio and TV Broadcasting<br>■ Satellite Radio | ■ Content/Service Providers<br>■ K-12 Services<br>■ Post-Secondary<br>■ Education Software<br>■ Education Hardware<br>■ Corporate Training | ■ Advertising<br>■ Digital Media<br>■ Film & TV<br>■ Interactive Entertainment<br>■ Live Entertainment<br>■ Music<br>■ Sports |

**Select Representative Relationships**





3

Houlihan Lokey
Introduction and
Qualifications

# Technology / Internet Focus

## Houlihan Lokey's Technology Group is a recognized leader across technology verticals and in numerous end-markets

| Software & Technology Services | New Media & Internet Solutions | Communications & Infrastructure Components | Healthcare Information Technology & Services |
|---|---|---|---|
| ■ Software as a Service ("SaaS") | ■ Consumer Internet | ■ Wireless Technologies | ■ Payer Application Solutions |
| ■ Enterprise Software | ■ Online Services | ■ Mobility and Messaging | ■ Provider Application Solutions |
| ■ Vertical Application Solutions | ■ Entertainment, Content and Distribution | ■ Digital Home Technology | ■ Consumer Healthcare |
| ■ Infrastructure Software | ■ Mobile Media | ■ IP Infrastructure | ■ Collaboration Technologies and Service Solutions |
| ■ Cloud Computing | ■ Digital Media Services | ■ VoIP & IP Video | ■ Outsourced Clinical and Business Services |
| ■ Security | ■ Advertising & Marketing Services | ■ IP Services | ■ Content and Compliance Solutions |
| ■ Data & Business Intelligence | ■ E-commerce | ■ Enterprise Hardware | |
| ■ Tech-Enabled Services | ■ Social Software/ Collaboration | | |

### Capabilities

■ Unmatched **transaction expertise** – Houlihan Lokey's Technology Group has:

- Over **60 years of M&A and Private Placement** expertise

- Over **400 combined transactions** representing over $200 billion in value

- Closed **more than 80 transactions** as a team over the past 6 years

### Select Representative Relationships



HOULIHAN LOKEY    4

# Recent HL Transactions in Internet / Digital Media

























*Selected transactions were executed by Houlihan Lokey professionals while at other firms.*

# EXHIBIT "3"

**Eric M. Winthrop (Managing Director)**

Mr. Winthrop is a Managing Director and a member of Houlihan Lokey's Financial Restructuring Group. He specializes in financial restructuring, M&A and financing transactions, and his experience spans numerous industries. His notable clients include Charter Communications, Southern California Edison, Education Media and Publishing Group International (a.k.a. Houghton Mifflin Harcourt), Northwest Airlines Corp., Dex One (f.k.a. RH Donnelley), Freedom Communications, Inc. GateHouse Media, Inc., Travelport, American Restaurant Group, Inc. (Stuart Anderson's Black Angus), DDi Corp., Scotia Pacific Company LLC, Silicon Graphics, Pacific Lumber Company, Atlas Air Worldwide Holdings, Inc., Malden Mills Industries, Huntsman International LLC, and SpectraSite Communications, Inc. Mr. Winthrop is based in the firm's Los Angeles office.

Before joining Houlihan Lokey, Mr. Winthrop was a member of the corporate finance, restructuring, and disputes group of Price Waterhouse, where he specialized in operational consulting for financially distressed companies, as well as in valuations and litigation consulting-related projects.

Mr. Winthrop has authored or co-authored materials and/or spoken on a number of topics, including "Trends and Opportunities in U.S. Restructurings," "Financial Restructuring Issues Impacting Trade Creditors," "Buying & Selling the Troubled Company" (2001 revision and seminar series, and 2007 seminar series), and "Investing in Distressed Securities: An Overview of an Expanding Asset Class."

Mr. Winthrop holds a B.A. in Business Economics, with honors, from the University of California at Santa Barbara. He is a member of the Turnaround Management Association and the American Bankruptcy Institute.

**Raj Dayalan (Director)**

Mr. Dayalan is a Director in Houlihan Lokey's Technology, Media & Telecom Group. He focuses primarily on providing strategic advisory services for companies in the Internet sector. Mr. Dayalan is based in the firm's Los Angeles office.

Prior to joining Houlihan Lokey, Mr. Dayalan was an Executive Director at UBS overseeing the Internet investment banking practice within the firm's Global TMT Group. Prior to UBS, he worked as an Internet entrepreneur and as a principal investor. Earlier in his career, Mr. Dayalan was a member of Deutsche Bank's Technology Group and Salomon Brothers' Media & Telecom practice, where he began his career.

Mr. Dayalan holds a B.A. in Economics and Political Science from the University of California, Irvine, and an MBA from the UCLA Anderson School of Management.

**Mike Krakovsky (Director)**

Mr. Krakovsky is a Director and a member of Houlihan Lokey's Financial Restructuring Group. He has focused on distressed companies as both an investment banker and a principal investor. He has advised debtors and creditors in a range of in-court and out-of-court restructurings and distressed M&A transactions. His notable transactions include Sotera Defense Solutions, Inc., IAP Worldwide Services, Inc., Coda Holdings, Powerwave Technologies, Inc., U.S. Shipping Partners, L.P., Culligan International Co., Chemtura Corp., Oriental Trading Company, Inc., Hawaiian Telcom, Inc., Euramax International, Inc., Panavision, Inc., Frontier Airlines, Inc., Eagle Picher Technologies LLC, TelCove, Inc. (formerly Adelphia Business Solutions), Horizon PCS Inc., SonicBlue, Inc. and Coeur d'Alene Mines Corp. Mr. Krakovsky is based in the Los Angeles office.

Before rejoining Houlihan Lokey in 2008, Mr. Krakovsky was a managing director at Levine Leichtman Capital Partners' Deep Value distressed debt fund, where he sourced and analyzed distressed debt opportunities and managed the fund's investment portfolio.

Before joining Houlihan Lokey in 2001, Mr. Krakovsky was an investment banker with Lazard LLC, where he advised technology companies on corporate finance transactions. He began his career as a transactional lawyer with Irell & Manella LLP. Mr. Krakovsky holds a B.S.E.E. from the University of Michigan and a J.D. from Columbia Law School.

### Jorge Villen (Senior Vice President)

Mr. Villen is a Senior Vice President in the Financial Restructuring Group in Houlihan Lokey's Los Angeles office. He has advised debtors and creditors on a range of in-court and out-of-court restructuring transactions in multiple jurisdictions. His notable transactions include Sbarro, Quizno's, iBAHN Corporation, Culligan International, IAP Worldwide Services, Reichhold Industries, Rhythm & Hues Studios, UniversalPegasus International, Den-Mat, Independent News & Media, Bodybell, Martinsa-Fadesa, Panrico and Levantina.

Before joining Houlihan Lokey, Mr. Villen worked as a Senior Associate at Prudential Financial's M&A and Corporate Development Group in Newark, NJ. He was also an analyst with Deutsche Bank's Financial Institutions Group in London.

Mr. Villen holds a B.S. in business administration from Pontificia de Comillas University and an M.B.A. from Columbia Business School. He speaks fluent Spanish and French.

### Kevin Striepe (Associate)

Mr. Striepe is an Associate in the Technology, Media & Telecom Group in Houlihan Lokey's Los Angeles office. Since joining the firm in 2012, he has worked on various engagements, primarily focusing on the Telecommunications, Media and Entertainment sectors. Select transactions include the sale of Doremi Labs to Dolby Laboratories, the sale of Powerwave Technologies to a consortium of buyers and the representation of P. Schoenfeld Asset Management in connection with its proxy campaign regarding the proposed T-Mobile / MetroPCS transaction.

Before joining Houlihan Lokey, Mr. Striepe was an Associate in the Leveraged Finance group at the Royal Bank of Scotland, where he focused on structuring leveraged loan and high yield bond financings for private equity and corporate clients.

Mr. Striepe holds a Bachelor of Science degree from Cornell University and an M.B.A. from the University of Chicago Booth School of Business.

### Samadrita Guin (Financial Analyst)

Ms. Guin is a Financial Analyst in Houlihan Lokey's Technology, Media & Telecom Group. She is based in the firm's Los Angeles office. Ms. Guin joined Houlihan Lokey in 2015, where she has worked on various engagements primarily focusing on the media & telecom sectors. Prior to joining Houlihan Lokey, she was an Investment Banking Analyst at Scotiabank Global Banking & Markets. Ms. Guin holds an Honors Business Administration from the Ivey Business School at Western University.

# EXHIBIT "4"

# EXHIBIT 4 TO DECLARATION

## RELATIONSHIPS WITH INTERESTED PARTIES

| NAME | ENGAGEMENT SUMMARY | STATUS |
|---|---|---|
| Google, Inc. | Financial Advisory | Closed |
| NexTag, Inc. | Financial Advisory | Closed |
| Orbitz Worldwide, LLC | Financial Advisory | Closed |
| RedShift Ventures | Financial Advisory | Closed |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): **APPLICATION OF DEBTORS AND DEBTORS IN POSSESSION TO EMPLOY HOULIHAN LOKEY CAPITAL, INC. AS FINANCIAL ADVISOR AND INVESTMENT BANKER PURSUANT TO 11 U.S.C. § 327(a) WITH COMPENSATION TO BE DETERMINED AND PAID PURSUANT TO 11 U.S.C. § 328(a)** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **November 4, 2015**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Todd M Arnold    tma@lnbyb.com
- Ron Bender    rb@lnbyb.com
- Stephen L Burton    steveburtonlaw@aol.com
- Cathrine M Castaldi    ccastaldi@brownrudnick.com
- Michael I Gottfried    mgottfried@lgbfirm.com,
  kalandy@lgbfirm.com;cboyias@lgbfirm.com;rspahnn@lgbfirm.com;srichmond@lgbfirm.com
- Dare Law    dare.law@usdoj.gov, ron.maroko@usdoj.gov
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Aleksandra Zimonjic    azimonjic@lgbfirm.com, cboyias@lgbfirm.com;sdeiches@lgbfirm.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On **November 4, 2015,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

| RSN | Dare Law | The Honorable Sandra Klein |
| U. S. Securities and Exchange Commission | Office of the United States Trustee | U.S. Bankruptcy Court, Suite 1582 |
| Attn: Bankruptcy Counsel | 915 Wilshire Blvd., Suite 1850 | 255 E. Temple Street |
| 444 South Flower Street, Suite 900 | Los Angeles, CA 90017 | Los Angeles, CA 90012 |
| Los Angeles, CA 90071-9591 | | |

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **November 4, 2015**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 4, 2015 | Lourdes Cruz | /s/ Lourdes Cruz |
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.