RON BENDER (SBN 143364)
TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; tma@lnbyb.com

Attorneys for Chapter 11 Debtors & Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>MediaShift, Inc.,<br><br>       Debtor and Debtor in Possession.<br>_____<br><br>In re:<br><br>Ad-Vantage Networks, Inc.,<br><br>       Debtor and Debtor in Possession.<br>_____<br><br>☒ Affects Both Debtors<br><br>☐ Affects MediaShift, Inc. Only<br><br>☐ Affects Ad-Vantage Networks, Inc. Only | Lead Case No.: 2:15-bk-25024-SK<br>(Jointly administered with:<br>Case No. 2:15-bk-25030-SK)<br><br>Chapter 11 Cases<br><br>**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS:**<br>**(I)    AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. § 364,**<br>**(II)   GRANTING LIENS AND SUPERPRIORITY CLAIMS PURSUANT TO 11 U.S.C. § 364,**<br>**(III) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. §363,**<br>**(IV) SCHEDULING A FINAL HEARING, AND**<br>**(V)   GRANTING RELATED RELIEF**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION IN SUPPORT THEREOF**<br><br>Hearing:<br>Date:  TBD[1]<br>Time:  TBD<br>Place:  Courtroom 1575<br>       255 East Temple Street<br>       Los Angeles, CA 90012 |

---

[1] The Debtors will provide notice of the hearing date and time once the hearing is set by the Court.

**TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, EACH OF THE DEBTORS' PURPORTED SECURED CREDITORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND ITS COUNSEL, AND OTHER PARTIES IN INTEREST:**

## SUMMARY

MediaShift, Inc. ("MediaShift") and Ad-Vantage Networks, Inc. ("Ad-Vantage"), Chapter 11 debtors and debtors in possession in the above-captioned, jointly-administered, Chapter 11 bankruptcy cases (collectively, the "Debtors"), hereby move, on an emergency basis by this motion (the "Motion"), pursuant to Local Bankruptcy Rules ("LBR") 2081-1(a)(9), 4001-2, and 9075-1, Federal Rule of Bankruptcy Procedure ("FRBP") 2002, 4001, and 9014, and sections 105(a), 361, 362, 363, and 364 of chapter 11 of title 11 of the United States Code §§ 101, et seq. (the "Bankruptcy Code"),[2] for the entry of an interim order in substantially the form attached hereto as **Exhibit "1"** (the "Interim Order") and a final order (the "Final Order" and, with the Interim Order, the "Financing Orders"), among other things:

(1)     Authorizing the Debtors, as borrowers, jointly and severally, to obtain postpetition financing up to the principal amount of $750,000 ($200,000 on an interim basis) (the "DIP Loan") from an unaffiliated third-party, Smith Micro Software, Inc. ("Smith") or its designee (with Smith, "Lender"), pursuant to the terms of a Binding Term Sheet (the "Term Sheet"), a true and correct copy of which is attached hereto as **Exhibit "2,"** and loan documents (the "DIP Loan Agreement" and together with the Term Sheet, the "DIP Loan Documents"), which will conform to the terms of the Term Sheet and contain other customary terms used in similar postpetition lending transactions and which the Lender and Debtor will prepare and lodge with the Court, and serve on parties in interest, after entry of the Interim Order and prior to the final hearing on the Motion, with the DIP Loan to be used to: (a) fund, among other things, ongoing working capital, general corporate, and other financing needs of the Debtors, (b) pay certain transaction fees, and

---

[2] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

2

other costs and expenses of administration of the Debtors' bankruptcy cases (the "Cases"), and (c) pay fees expenses owed to the Lender under the DIP Loan Documents, as set forth in the budget attached hereto as **Exhibit "3,"** as may be amended pursuant to the DIP Loan Documents (the "Budget");[3]

(2)     Authorizing and empowering the Debtors to execute and enter into the DIP Loan Documents and all other related documents and agreements and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(3)     Providing, pursuant to Sections 364(c) and (d), that the obligations under the DIP Loan Documents, including, without limitation, principal, accrued interest, and all other obligations and amounts due from time to time under the DIP Loan Documents:

> **a.**     have priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or 1114 or otherwise, which allowed superpriority claims of the Lender (the "DIP Superpriority Claims") shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors as will be provided in the DIP Loan Documents, provided, however, that the DIP Superpriority Claims shall be subject to (i) the allowed, accrued, but unpaid administrative claims of professionals employed by the Debtors and the official committee of unsecured creditors (the "Committee") for capped fees and expenses not to exceed the aggregate amount of $200,000 as set forth in the Budget which may be paid from the DIP Loan or deposited into a segregated account as accrued and Lender shall have no recourse against the funds paid to or deposited into the segregated account and (ii) the payment of fees pursuant to 28 U.S.C. § 1930; and

---

[3] While, at present, the DIP Loan to be provided by the Lender is the best and only postpetition financing commitment that has been provided to the Debtors, the Debtors will consider other financing commitments that can be provided on an expedited basis on better terms than set forth in the Term Sheet.

**b.** be and be deemed immediately secured (without any further filings) by valid, binding, continuing, enforceable, fully perfected, and unavoidable first priority security interests and liens (the "DIP Liens") in and on all prepetition and postpetition property and assets of the Debtors, including, but not limited to, all patents, patents pending, copyrights, and other intellectual property (the "Collateral"), provided, however, that the DIP Liens shall not extend or attach to, and the Collateral shall not include, causes of action under Chapter 5 of the Bankruptcy Code, including without limitation Sections 502(d), 544, 545, 547, 548, 549 and 550, any other avoidance actions under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, nonbankruptcy law, and the proceeds thereof, whether real or personal, tangible or intangible, and wherever located, and whether now existing or hereafter acquired, including proceeds, products, offspring, rents and profits thereof;

(4) Authorizing the Debtors, pursuant to Sections 105, 361, 363, 541 and 553 and FRBP 2002, 4001 and 9014, to use Cash Collateral (as defined under Section 363) in accordance with the terms of the DIP Loan Documents and the Budget, subject to any variance allowance provided by the DIP Loan Agreement or otherwise approved by Lender;

(5) Vacating and modifying the automatic stay imposed by Section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Financing Orders;

(6) Finding that adequate notice of the Motion has been provided;

(7) Finding that the Lender has acted in good faith in connection with the DIP Loan Documents and is entitled to the protections afforded under Section 364(e);

(8) Scheduling, pursuant to FRBP 4001, a final hearing (the "Final Hearing") before this Court to consider entry of the Final Order approving the DIP Loan and authorizing the use of Cash Collateral on a final basis;

(9) Waiving any applicable stay, including under FRBP 4001(b) and (c) and providing for the immediate effectiveness of the Interim Financing Order; and

(10) Granting related relief.

## OTHER INFORMATION REGARDING THE DIP LOAN DOCUMENTS AND CASH COLLATERAL USE THEREUNDER

In addition to the summary of terms set forth above, the Debtors provide the following information regarding principal terms of the proposed loan under the DIP Loan Documents as required by FRBP 4001(b)(1)(B) and (c)(1)(B):[4]

**Term:**  Maturity:  The earlier of (1) the close of any sale of all or substantially all of Debtors' assets pursuant to Section 363 and (2) February 29, 2016 (the "Maturity Date").

**Rate:**  10% simple.

**Origination Fee:**  5% of total available DIP Loan payable to the Lender upon entry of the Interim Order.

**Exit Fee:**  5% of DIP Loan amount actually advanced upon repayment.

**Effective Date:**  Upon the entry of the Interim Order approving the DIP Loan, provided that the Interim Order is not subject to a stay pending appeal, the DIP Loan shall be effective and the Debtors shall be entitled to draw, and the Lender shall be required to fund, amounts set forth in the Budget, provided that the Budget has been approved by Lender.

**Prepayment:**  The Debtors can pre-pay the DIP Loan prior to the Maturity Date without penalty, provided that the Debtors shall still be required to pay the 5% Exit Fee.

**Use of Proceeds:**  The proceeds of the DIP Loan shall be used in accordance with the Budget, provided that the Budget has been approved by Lender.

**Conditions Precedent:**

- Any liens of existing secured creditors to be primed by DIP Liens with the Financing Orders approving the DIP Loan containing good faith finding as to the Lender and no stay pending appeal of the Financing Orders.

---

[4] As discussed, the DIP Loan Agreement will conform to the terms of the Term Sheet and contain other customary terms used in similar postpetition lending transactions and which the Lender and Debtor will prepare and lodge with the Court, and serve on parties in interest, after entry of the Interim Order and prior to the Final Hearing on the Motion.  If there are any material differences between the actual terms of the DIP Loan Agreement and the summary of the expected terms set forth herein, the Debtors will describe the difference in conjunction with lodging the DIP Loan Agreement.

- Operating principals of the Debtors (David Grant, Rick Baran, and Mike Spalter) to enter into standard Non-Compete Agreements with the Lender for a period of 3 years, in the event of foreclosure or acquisition of substantially all of the Debtors assets, including patents and other intellectual property, by the Lender.

- Lender's pre-approval of the Budget.

- Lender must be paid in full upon the close of any sale of all or substantially all of the Debtors' assets pursuant to Section 363.

**Events of Default:** The following customary events of default will likely be events of default under the DIP Loan Agreement: (1) a default in the payment of any amounts due under the DIP Loan Agreement as and when the same shall become due and payable; (2) failure on the part of the Debtors to duly observe or perform any of the covenants or agreements on the part of the Debtors contained in the DIP Loan Agreement; (3) any representation, warranty or statement made or deemed made by the Debtors in the DIP Loan Agreement shall prove to be false or misleading in any material respect when so made; (4) any new and additional liens being granted or placed upon the Collateral other than the DIP Liens of the Lender; (5) the appointment of an examiner with expanded powers or a trustee in the Debtors' Cases, conversion of one or both of the Cases to a case under chapter 7 of the Bankruptcy Code or dismissal of one or both of the Cases by order of the Court; (6) entry of an order granting relief from the automatic stay applicable under Section 362 to a holder of any security interest to permit foreclosure (including under Article 9 of the Uniform Commercial Code and/or applicable state law) on any material assets of the Debtors; (7) any order of the Court shall be entered amending, modifying, superseding, staying, reversing or vacating any of the Financing Orders or having the effect of doing so without the prior written consent of the Lender; (8) the making of any material cash payment by the Debtors other than payments authorized by the Financing Orders; (9) the termination by the Court of the Debtors' exclusive period to file a plan under Section 1121, or the lapsing of such exclusive period; (10) the failure of the Debtors to perform Court orders in any material respect; and (11) any breach by the Debtor of any material term or condition of the Interim Order or the Final Order, as applicable.

Pursuant to FRBP 4001, the Debtors hereby provide the following disclosures with respect to the terms of the Term Sheet, the expected terms of the DIP Loan Agreement, and Interim Order:[5]

| | **Term Sheet** | **DIP Loan Agreement** | **Interim Order** |
|---|---|---|---|
| A grant of priority or a lien on property of the estate under § 364(c) or (d) | pp. 1-2 | To Follow | ¶¶ 3-4 |
| The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim | N/A | No | N/A |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | N/A | No | N/A |
| A waiver or modification of Code provisions or applicable rulings relating to the automatic stay | Not in Term Sheet, will be in DIP Loan Agreement regarding remedies in the event of a default | To Follow – only upon default | ¶ 7 |
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request to obtain authority to obtain credit under § 364 | Not in Term Sheet, however, as with similar postpetition lending arrangements, the DIP Loan Agreement will provide that the Debtors cannot obtain additional | To Follow | To Follow in Final Order |

[5] *See* n. 3.

| | **Term Sheet** | **DIP Loan Agreement** | **Interim Order** |
|---|---|---|---|
| | postpetition loans without the Lender's consent | | |
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | N/A | No | N/A |
| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | Not in Term Sheet, however, as with similar postpetition lending arrangements, the DIP Loan Agreement will provide that the Lender's liens for the DIP Loan will be automatically perfected by the Financing Orders without the requirement to take additional action to perfect the liens | To Follow – liens will be deemed perfected upon entry of the Financing Orders | ¶ 4 |
| A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | N/A | No | N/A |
| The indemnification of an entity | N/A | No | N/A |
| A release, waiver, or limitation of any right under Section 506(c) | Not in Term Sheet, however, as with similar postpetition lending arrangements, the DIP Loan Agreement will provide that the Debtors cannot | To Follow | ¶ 5 |

| | Term Sheet | DIP Loan Agreement | Interim Order |
|---|---|---|---|
| | seek to surcharge the Lender's collateral | | |
| The granting of a lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | N/A | No | N/A |

Pursuant to the provisions of LBR 4001-2, the Debtors hereby provide the following disclosures with respect to the terms of the Term Sheet, the expected terms of the DIP Loan Agreement, and Interim Order:[6]

| | Term Sheet | DIP Loan Agreement | Interim Order |
|---|---|---|---|
| Provisions that grant cross-collateralization protection to the prepetition secured creditors | N/A | No | N/A |
| Provisions that bind the estate or all parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against a secured creditor | N/A | No | N/A |
| Provisions that seek to waive or limit the estate's rights under 11 U.S.C. § 506(c) | Not in Term Sheet, however, as with similar postpetition lending arrangements, the DIP Loan Agreement will provide that the Debtors cannot seek to surcharge the Lender's collateral | To Follow | ¶ 5 |
| Provisions that grant to the prepetition secured creditor liens on the debtor's claims | N/A | No | N/A |

---

[6] *See* n. 3.

9

| | **Term Sheet** | **DIP Loan Agreement** | **Interim Order** |
|---|---|---|---|
| and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, or 549 | | | |
| Provisions that deem secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b) | N/A | No | N/A |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor with respect to a professional fee carve out | N/A | No | N/A |
| Provisions that prime any secured lien | pp. 1-2 | To Follow | N/A |

## INFORMATION REGARDING OTHER PURPORTED SECURED CREDITORS AND NOTICE OF THE MOTION

The Debtors are informed and believe that certain entities and individuals (the "Purported Secured Creditors") assert that they have liens on the Debtors' Collateral, including any Cash Collateral as defined under Section 363(a). The Purported Secured Creditors are listed in the UCC reports attached as **Exhibits "4" and "5"** to the annexed Memorandum of Points and Authorities (the "Memorandum") and in the summary of purported secured claims attached as **Exhibit "6"** to the annexed Memorandum.

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtors served by overnight mail, or NEF where applicable, a copy of the Motion upon (1) the Purported Secured Creditors (through counsel where counsel has appeared in the Cases), (2) counsel to the Committee, (3) the Office of the United States Trustee

for the Central District of California (the "UST"), and (4) any other party that has filed a request for notice pursuant to FRBP 2002 or is required to receive notice under the FRBP or LBRs.

This Motion is based on this Motion and the exhibits hereto, the annexed Memorandum and declarations, the arguments and statements of counsel to be made at the hearing on the Motion, and other admissible evidence properly brought before the Court.

**The Debtors submit that an emergency hearing is warranted because (1) the Debtors need to pay the expenses set forth in the Budget and currently lack the funds to do so and (2) the Debtors need to pay the expenses set forth in the Budget in order to maintain their Cases pending an auction sale of the Debtors' assets that the Debtors intend effectuate and close prior to the Maturity Date of February 29, 2015 and that the Debtors' believe will benefit all creditors and interest holders. Accordingly, the Debtors request that the Court set a hearing on the Motion as soon as is convenient for the Court.**

**WHEREFORE**, the Debtors respectfully request that the Court:

(1)     affirm the adequacy of the notice given;

(2)     grant the relief requested in the Motion on an interim basis;

(3)     enter the proposed Interim Order in substantially the form attached hereto as **Exhibit "1;"**

(4)     schedule a Final Hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(5)     grant such further relief as the Court deems just and proper.

Dated:  November 18, 2015

LEVENE, NEALE, BENDER, YOO
& BRILL L.L.P.


By:     */s/ Todd M. Arnold*
        RON BENDER
        TODD M. ARNOLD
        LEVENE, NEALE, BENDER, YOO
        & BRILL L.L.P.
Attorneys for Debtors and Debtors in Possession

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 12

I. STATEMENT OF FACTS ........................................................................... 12

    A.    BACKGROUND, THE DEBTORS' BUSINESS, EVENTS LEADING
          TO THE FILING OF THE DEBTORS' CHAPTER 11 BANKRUPTCY
          CASES AND ANTICIPATED EXIT STRATEGY ............................................. 12

    B.    THE DEBTORS' PURPORTED SECURED CREDITORS AND THE
          VALUE OF THE IP AND OTHER ASSETS ALLEGEDLY SECURING
          THE PURPORTED SECURED CLAIMS ............................................. 14

    C.    THE NEED FOR POSTPETITION FINANCING AND THE USE OF
          CASH COLLATERAL ............................................. 18

II. DISCUSSION ............................................................................... 22

    A.    THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN THE
          PROPOSED DIP LOAN ............................................. 22

        1.    THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN THE
             PROPOSED DIP LOAN FROM THE LENDER TO MAINTAIN THE
             DEBTORS' BUSINESS AND TO MAINTAIN AND PRESERVE THE
             VALUE OF THE DEBTORS' ASSETS ............................................. 22

    B.    THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH
          COLLATERAL PROVIDED BY THE DIP LOAN TO PAY
          NECESSARY OPERATING EXPENSES AS SET FORTH IN THE
          BUDGET ............................................. 31

        1.    The Debtors Must Be Authorized To Use Cash Collateral To Operate,
             Maintain, And Preserve Their Assets In Accordance With The Budget .... 31

        2.    The Lender Has Consented to the Debtors' Use of Cash Collateral and
             the Purported Secured Creditors Are Adequately Protected ...................... 32

    C.    THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE ................. 33

III. CONCLUSION ............................................................................... 33

DECLARATION OF RICK BARAN ............................................................. 35

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re 495 Cent. Park Ave. Corp.*,
    136 B.R. 626 (Bankr. S.D.N.Y. 1992) ................................................................ 27

*In re Ames Dept. Stores*,
    115 B.R. 34 (Bankr. S.D.N.Y. 1990) ...................................................... 22, 25, 30

*In re Aqua Assoc.*,
    123 B.R. 192 (Bankr. E.D.Pa. 1991) ............................................................ 24, 27

*In re Beker Ind. Corp.*,
    58 B.R. 725 (Bankr. S.D.N.Y. 1986) .................................................................. 27

*In re C.B.G. Ltd.*,
    150 B.R. 570 (Bankr. M.D.Pa. 1992) ................................................................. 24

*In re Crouse Group, Inc.*,
    71 B.R. 544 (Bankr. E.D.Pa. 1987) .................................................................... 24

*In re Defender Drug Stores*,
    126 B.R. 76 (Bankr. D. Ariz. 1991), *aff'd* 145 B.R. 312 (Bankr. 9th Cir. 1992) ..................... 23

*In re Dynaco*,
    162 B.R. 389 (Bankr. D.N.H. 1993) .............................................................. 28, 32

*In re Ellingsen MacLean Oil Co.*,
    834 F.2d 599 (6th Cir. 1987) ............................................................................ 23

*In re Hawaiian Pacific Industries*,
    17 B.R. 670 (Bankr. D. Hawaii 1982) ................................................................ 28

*In re Hubbard Power & Light*,
    202 B.R. 680 (Bankr. E.D.N.Y. 1996) ............................................................... 27

*In re Immenhausen Corp.*,
    164 B.R. 347 (Bankr. M.D. Fla. 1994) ............................................................... 28

*In re McCombs Properties VI, Ltd.*,
    88 B.R. 261 (Bankr. C.D. Cal. l988) ............................................................ 28, 32

*In re Mellor*,
    734 F.2d 1396 (9th Cir. 1984) ..................................................................... 28, 32

ii

*In re Newark Airport/Hotel Ltd. Partnership*,
    156 B.R. 444 (Bankr. D.N.J. 1993) ............................................................ 28

*In re O'Connor*,
    808 F.2d 1393 (10th Cir. 1987) ................................................... 28, 29, 32

*In re Oak Glen R-Vee*,
    8 B.R. 213 (Bankr. C.D. Cal. 1981) ........................................................... 31

*In re Photo Promotion Associates, Inc.*,
    87 B.R. 835 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989) ................ 23

*In re Planned System, Inc.*,
    78 B.R. 852 (Bankr. S.D. Ohio 1987) ......................................................... 27

*Matter of Pursuit Athletic Footwear, Inc.*,
    193 B.R. 713 (Bankr. D. Del. 1996) ........................................................... 28

*Richmond Leasing Co. v. Capital Bank N.A.*,
    762 F.2d 1303 (5th Cir. 1985) ................................................................... 30

*In re Rogers Development Corp.*,
    2 B.R. 679 (Bankr. E.D. Va. 1980) ............................................................ 28

*In re Simasko Production Co.*,
    47 B.R. 444 (D. Colo. 1985) ..................................................................... 22

*In re Snowshoe Co.*,
    789 F.2d 1085 (4th Cir. 1986) ................................................................... 24

*In re Stein*,
    19 B.R. 458 (Bankr. E.D. Pa. 1982) ........................................................... 28

*In re T.M. Sweeney & Sons LTL Services, Inc.*,
    131 B.R. 984 (Bankr. N.D. Ill. 1991) ........................................................ 23

*In re Triplett*,
    87 B.R. 25 (Bankr. W.D. Tex. 1988) .......................................................... 28

*In re Tucson Industrial Partners*,
    129 B.R. 614 (B.A.P. 9th Cir. 1991) .......................................................... 31

**Federal Statutes**

11 U.S.C.
    §§ 361(1), (2), (3) ................................................................................ 27
    § 363 ......................................................................... 15, 16, 27, 31
    § 363(a) ............................................................................................. 31
    § 363(c) ............................................................................................. 31
    § 363(c)(1) ......................................................................................... 31

§ 363(c)(2)(A) and (B) .................................................................................. 31

§ 363(c)(2)(B) .............................................................................................. 31

§ 364 ................................................................................... 23, 24, 27, 30

§ 364(a) and (b) ........................................................................................... 24

§ 364(b) ...................................................................................................... 24

§ 364(b)(1)(A) .............................................................................................. 24

§ 364(c) ................................................................................................. 22, 23

§ 364(c)(1) .................................................................................................. 24

§ 364(c) and (d) .................................................................................... 21, 25

§ 364(e) ............................................................................................... 22, 26

§ 364(d) ...................................................................................................... 23

§ 364 (d)(1) .......................................................................................... 22, 23

§§ 364(d)(1)(B) ........................................................................................... 27

§ 503(b)(1) .................................................................................................. 22

§ 503(b) ...................................................................................................... 22

§ 1107(a) .................................................................................................... 31

§§ 1107 and 1108 of the Bankruptcy Code ................................................. 12

iv

# MEMORANDUM OF POINTS AND AUTHORITIES[7]

## I.

## STATEMENT OF FACTS

### A. BACKGROUND, THE DEBTORS' BUSINESS, EVENTS LEADING TO THE FILING OF THE DEBTORS' CHAPTER 11 BANKRUPTCY CASES AND ANTICIPATED EXIT STRATEGY

On September 30, 2015 (the "Petition Date"), the Debtors each filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtors continue to manage their financial affairs and operate their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. On October 1, 2015, the Court entered orders granting the Debtors' motions for joint administration of their Chapter 11 cases, with the MediaShift, Inc. case serving as the lead case. On November 6, 2015, the UST appointed the Committee consisting of Essenture Incorporated, Glenn Lebowitz, Winthrop Couchot, PC, Ian Peters, and Eastward Capital Partners Venture, LP. The Debtors are informed and believe that the Committee generally supports the Motion.

Ad-Vantage is a wholly owned subsidiary of MediaShift. MediaShift is a public company. However, in February 2014, MediaShift filed a Form 15 with the Securities and Exchange Commission and, as a result, is no longer subject to the Securities and Exchange Commission's reporting requirements and experiences very little trading of its stock. The Debtors have the same officers and directors.

Ad-Vantage owns numerous patents and related computer software (the "IP") related to internet advertising. With the IP, the Debtors can enable the owners of wi-fi networks to monetize their networks through the placement of internet advertising both during the login to the wi-fi network and during sessions on the wi-fi network. The IP overrides advertising that would normally appear on web pages accessed through the wi-fi network so that the advertising space can be sold. The Debtors and affiliates sell the advertising space, place the advertising on pages

---

[7] All capitalized terms herein have the same meanings as in the preceding Motion.

accessed by users on the wi-fi network, and share the advertising revenue with the owner of the wi-fi network.

The Debtors, generally contracting through MediaShift, have contracts with, among others, JetBlue, JFK airport, MGM Las Vegas, and Hotel International Services, whereby the Debtors sell and place advertising that appears during login and sessions on the wi-fi networks operated by the foregoing entities. Google is one of the Debtors' largest purchasers of advertising space. The Debtors were in a position to contract with other wi-fi network providers and to expand their advertising placement footprint, and therefore their advertising sharing revenue. However, the Debtors needed additional funds to do so, as many parties interested in contracting with the Debtors require the Debtors to pay a guaranteed advertising sharing amount before they will allow the Debtors to place advertising on their wi-fi networks.

In order to fund operations, the development of its IP and platform, the implementation of its platform, and the expansion of its advertising footprint, Ad-Vantage obtained various rounds of equity financing. Unfortunately, due to various complications and the failure of equity contributors to perform as required, Ad-Vantage was not able to obtain all of the equity financing it expected to receive. As a result, the Debtors were forced to obtain a number of bridge loans to meet their financial needs. One such loan was provided by MediaShift Holdings, Inc. ("MS Holdings"). MS Holdings provided the Debtors with a loan in the approximate amount of $3.3 million. MS purported to roll that loan up with approximately $2.2 million in bridge loans previously made to one or both of the Debtors by entities and individuals affiliated with MS Holdings and allegedly secured the rolled up loan against the assets of both Debtors. In addition to MS Holdings, the Debtors have other purported common creditors. The equity financing, bridge loans, and loan provided by MS Holdings proved insufficient to enable the Debtors to fund their operations, their efforts to expand their advertising placement, and their debt obligations.

In light of the foregoing, in or about April 2015, the Debtors engaged Houlihan Lokey as their investment banker to assist in the marketing and sale of the Debtors' assets. The Debtors were pursuing such a sale and intend to continue pursuing a sale in bankruptcy. However, on August 3, 2015, before the Debtors could fully market their assets to obtain the highest and best

price for them and consummate a sale of their assets, MS Holdings called a default on its purported secured loan to the Debtors and started to initiate efforts to foreclose on the Debtors' assets, including the highly valuable IP.

As a result of the foregoing, and in an effort to protect the value of the Debtors' assets for the benefit of all creditors and interest holders, the Debtors decided to file for bankruptcy protection. On November 4, 2015, the Debtors filed an application to employ Houlihan Lokey as their investment banker in their Cases to assist the Debtors with their continued efforts to market and sell the Debtors' assets for the most money possible. [Dkt. 41 and 42] The application is pending with the Court. The Debtors are hopeful of paying their creditors in full with sale proceeds pursuant to a liquidating plan.

**B.** **THE DEBTORS' PURPORTED SECURED CREDITORS AND THE VALUE OF THE IP AND OTHER ASSETS ALLEGEDLY SECURING THE PURPORTED SECURED CLAIMS**

Prior to the Petition Date, on September 17, 2015, MediaShift obtained a report (the "MS UCC Report") listing the UCC-1 Financing Statements filed against MediaShift and the status of each such UCC-1 Financing Statement. The MS UCC Report includes as attachments copies of all UCC-1 Financing Statements filed against MediaShift. A true and correct copy of the MS UCC Report is attached hereto as **Exhibit "4."**

Prior to the Petition Date, on September 28, 2015, Ad-Vantage obtained a report (the "Ad-Vantage UCC Report" and together with the MS UCC Report, the "UCC Reports") listing the UCC-1 Financing Statements filed against Ad-Vantage and the status of each such UCC-1 Financing Statement. The Ad-Vantage UCC Report includes as attachments copies of all UCC-1 Financing Statements filed against MediaShift. A true and correct copy of the Ad-Vantage UCC Report is attached hereto as **Exhibit "5."**

As discussed above, the Debtors obtained a number of loans from various entities and individuals to fund operations. Based on a review of the notes and security agreements executed by the Debtors, and the UCC Reports and the UCC-1 Financing Statements attached thereto, Debtors estimate that their Purported Secured Creditors hold, at most, approximately $8.426 million of debt purportedly secured by the Debtors' assets (the "Purported Secured Debt"), which

includes interest through the Petition Date. A summary of the Purported Secured Creditors and Purported Secured Debt is attached hereto as **Exhibit "6."**[8]

As discussed below, the Debtors' IP is by far their most valuable asset. In addition to the IP, MediaShift has furniture, fixtures, and equipment with a fair market value of approximately $3,978.92, *see* MediaShift Schedule B [Dkt. 33], and Ad-Vantage has accounts receivable furniture, fixtures, and equipment with a fair market value of approximately $420,921.34, *see* MediaShift Schedule B [Dkt. 34]

As to the IP, prior to the Petition Date, the Debtors obtained a valuation (the "IP Valuation") of the Debtors' IP from Great American Group (the "Great American"). A true and correct copy of the IP Valuation is attached hereto as **Exhibit "7."** Pursuant to the IP Valuation, dated as of April 30, 2014, Great American estimated that the IP has (1) an orderly liquidation value of between $31 to $32 million and (2) a fair market value of between $48 to $56 million. The Debtors are not aware of any basis for any material modification to the foregoing valuations based on events occurring after the Great American IP Valuation was issued.

There is other evidence that the Debtors' assets have substantial value. As noted in MS Holdings objection (the "MS Holdings Objection") [Dkt. 52] to the Debtors' Emergency Motion for Entry of an Order … (2) Authorizing the Limited Use of Cash Collateral on an Interim Basis Pending a Final Hearing Pursuant to 11 U.S.C. § 363 (the "First Cash Collateral Motion") [Dkt. 27], in late 2014, the Debtors and MS Holdings negotiated a deal whereby, among other things, (1) MS Holdings would form a new entity ("Newco") to acquire the majority of MedisShift's assets (the "Proposed Transaction"), (2) in exchange for 75.55% of Newco's equity, MS Holdings would provide $25.038 million in consideration, including the Bridge Loan, as defined and described below, and (3) in exchange for 19.45% of Newco's equity, MediaShift would contribute all of its assets and those of its subsidiaries, including Ad-Vantage, to Newco. *See* MS Holdings Objection, a true and correct copy of which is attached hereto as **Exhibit "8,"** at ¶ 1; *see also* Great American Fairness Opinion, a true and correct copy of which is attached hereto as

---

[8] The chart attached as Exhibit "6" is for informational purposes only and is not an admission as to the validity of any claim or lien. The Debtors reserve the right to object to or seek the subordination of any claim listed in Exhibit

**Exhibit "9."**

In conjunction with the Proposed Transaction, the Debtors and related entities executed a Note and Bridge Loan Agreement (the "Bridge Loan Agreement") dated as of October 21, 2014 in favor of MS Holdings pursuant to which MS Holdings was to provide financing to the Debtors to fund operations pending a close of the Proposed Transaction (the "Bridge Loan"). MS Holdings Objection, at ¶¶ 2-3. As noted, the Bridge Loan was to be part of the consideration for MS Holdings acquisition of the majority of Newco's equity. MS Holdings asserts that one of the conditions to the Bridge Loan was the receipt of a favorable Fairness Opinion regarding the Proposed Transaction – *i.e.*, that the consideration to be paid by MS Holdings for equity in Newco was "fair," meaning that the consideration was at least equal to the value of the Debtors' assets to be contributed to Newco, as calculated on a price per share basis. *Id.*[9]

MS Holdings asserts the Debtors breached the Fairness Opinion condition of the Bridge Loan Agreement, because the Debtors did not get a favorable Fairness Opinion. *Id.*, at ¶ 5. MS Holdings is correct that the Debtors did not obtain a favorable Fairness Opinion, but that is not because the Debtors did not obtain any Fairness Opinion. Instead, the Fairness Opinion obtained by the Debtors indicated that value of the Debtors' assets greatly exceeded the proposed consideration to be paid by MS Holdings for its equity interests in Newco, as calculated on price per share basis. In particular, on November 21, 2014, Great American issued its Fairness Opinion, which is based on the assumption that Newco would issue approximately 63 million shares of stock. *See* Exhibit "9." In the Fairness Opinion, Great American provided a price per share for MediaShift's equity based on an income approach and market approach. *Id.* On a market approach, which is intended to value the assets of MediaShift and its subsidiaries to be contributed in the Proposed Transaction on a price per share basis, Great American estimated a low value of $0.67 per share and a high of $1.06 per share. Based on the estimated issuance of

---

"6" and to dispute, avoid, or subordinate any purported lien of any Purported Secured Creditor on any basis.
[9] The Debtors may have claims against MS Holdings and related entities and individuals for breach of funding and other obligations and for their conduct related to the management of the Debtors. Those claims, including any claims for damages, to disallow or subordinate any claims of MS Holdings and related entities and individuals, and/or to avoid or subordinate any purported liens of MS Holdings and related entities and individuals, are expressly preserved.

approximately 63 million shares of Newco, this equated to an asset valuation of between $42.2 and $66.7 million. The Debtors are not aware of any basis for any material modification to the foregoing IP Valuation and price per share set forth in the Fairness Opinion.

After the foregoing Proposed Transaction was not consummated because of the Fairness Opinion, the Debtors and MS Holdings discussed a possible new transaction that would involve the Debtors transition from operating an internet advertising company and placing its own ads to generating revenue through the licensing of its IP. In conjunction with those discussions, MS Holdings' own cable consultant, Dan O'Brien, prepared projections regarding expected licensing revenue (the "Licensing Projections"). Dan O'Brien appears to be well-qualified to opine on the potential revenue from the licensing of the Debtors' IP.[10]   On March 25, 2015, Dan O'Brien forwarded his Licensing Projections to the Debtors. A true and correct copy of the Dan O'Brien's Licensing Projections and his email transmittal thereof to the Debtors is attached hereto as **Exhibit "10."** As can be seen, in the Licensing Projections, Dan O'Brien estimated that that the Debtors could obtain over $82 million in monthly revenue from licensing their IP to Comcast alone and over $175 million in monthly revenue from licensing its IP to various other cable, internet, and mobile phone service providers (including Comcast). The Debtors met with Comcast in an effort to pursue a licensing business model, and Comcast gave no indication that the estimated licensing revenue of $0.05 per ad used for the Licensing Projections would not be agreeable. The foregoing also supports a conclusion that the Debtors' IP is worth at least $30 million.

In the MS Holdings Objection, MS Holdings asserts that it "disputes the Debtors' valuation of the Collateral [at between $31 million $56 million as set forth in the First Cash Collateral Motion based on the IP Valuation] and that [MS] Holdings' interests are adequately

---

[10] As set forth at Skyline Partners' website (http://www.skylinepartnersllc.com/who-we-are.php), "Dan O'Brien is a Partner with Skyline Partners. With over 25 years experience, he is active on several boards in addition to Digitalsmiths including InDenverTimes, SinglePipe Communications, Connected Lyfe and AdXStream. Previously, he was President and COO of PRIMESTAR, Inc. he oversaw the company's growth to 2.2 million customers, culminating in a sale to DirecTV of $2.6B. He previously served as President of Time Warner Satellite Services, which marketed and installed PRIMESTAR services, and served on the board of PRIMESTAR Partners, LP. Prior to that, Daniel was VP of Operations in Time Warner Cable's Cincinnati division and served as VP of New Business for Warner Cable Communications, Inc. in Dublin, Ohio. Prior to Time Warner, Daniel worked for Jones Intercable as General Manager of several properties in multiple states."

protected by granting replacement liens in the Collateral." MS Holdings Objection, at ¶ 14. The Debtors anticipate that, in response to this Motion, MS Holdings may make similar arguments against the valuations of the Debtors' assets set forth in the IP Valuation and Fairness Opinion and supported by the Licensing Projections. However, the Debtors submit that MS Holdings cannot, on the one hand, assert that the Bridge Loan Agreement was breached because the asset valuation of between $42.2 and $66.7 million established by the Fairness Opinion was too high and then, on the other hand, argue that the foregoing values (and the revenue projections in the Licensing Projections provided by MS Holdings' own expert) do not establish and demonstrate that MS Holdings' is adequately protected by an equity cushion well in excess of 200% even at the lowest valuation of the Debtors' assets.

## C. THE NEED FOR POSTPETITION FINANCING AND THE USE OF CASH COLLATERAL

Pursuant to the First Cash Collateral Motion and the interim order thereon [Dkt. 27 and 39], the Debtors obtained interim approval to use $12,000 in Cash Collateral purportedly securing the Purported Secured Claims,[11] which constituted essentially all of the Debtors' cash. The Debtors already used such funds to pay necessary expenses as set forth in the budget approved in connection with the First Cash Collateral Motion. Accordingly, the Debtors need additional funds and authority to use such funds to pay additional necessary expenses as set forth in the Budget pending the auction sale of the Debtors' assets, which the Debtors intend to effectuate and close prior to the Maturity Date of the DIP Loan of February 29, 2015 and which the Debtors believe will benefit all creditors and interest holders.

The Debtors believe that all of the line-items set forth in the Budget are necessary to maintain the Debtors' operations and, therefore, going-concern and asset values, pending the auction sale of the Debtors' assets. For example, with reference to certain line-items:

- HRA – Health Plan / Executive Salaries – Prior to the Petition Date, the Debtors provided their officers/directors with cash compensation and reimbursement for their health insurance premiums. After the Petition Date, one of the Debtors'

---

[11] The final hearing on the Frist Cash Collateral Motion is set for November 19, 2015, at 8:30 a.m.

18

officers/directors, Sanjeev Kuwadekar, resigned due to the pre- and post-Petition Date non-payment of any compensation. The Debtors need to retain their three remaining officers/directors, David Grant (Chairman of the Board Member, Chief Strategy Officer), Rick Baran (Board Member, President, Chief Financial Officer, and Chief Executive Officer), and Mike Spalter (Chief Operating Officer) to maintain operations and, therefore, going-concern and asset values, as well as to pursue a liquidating or reorganizing plan for the benefit of creditors. Therefore, in order to prevent any further resignations of the Debtors' officers/directors, the Budget provides for the payment of reimbursement for their health insurance premiums and approximately 50% of the salaries to which they are entitled. David Grant and Rick Baran have been intimately involved with the Debtors' reorganization efforts since the Petition Date and have worked more than 40 hours a week in furtherance of those efforts. Mike Spalter has been involved in and is critical in maintaining the Debtors' existing inventory footprint and building out the platform pursuant to contracts with Jet Blue, MGM, and others, and, therefore, is also integral to the Debtors' efforts to maintain going concern and asset values pending a sale. Mike Spalter generally works more than 40 hours a week. Insider compensation forms will be filed for all of the foregoing officers and directors before any payments are made to them.

- Contractors – The Debtors utilize and/or need to utilize four, contractors pending a sale of the Debtors' assets in order to maintain operations and asset values: (1) a controller that is paid $3,000 per week that is intimately familiar with the Debtors' and cannot be easily replaced during the Budget period and (2) three software development/ad operations contractors that maintain the Debtors' deployed inventory with various wi-fi network owners that have contracted with the Debtors; for example, as part of the consideration for the JetBlue and MGM contracts, the Debtors have to allow those parties to place their own advertising during wi-fi sessions on their wi-fi networks, and the Debtors are responsible for making sure

such advertising is placed and working properly; thus, the foregoing contractors assist the Debtors in maintaining existing contracts that may be part of the assets that certain buyers are interested in purchasing; the foregoing contractors work between 20-40+ hours a week; one is paid $3,000 per week, another is paid $2,000 per week, and the other $1,000. One of the contractors is David Grant's son. An insider compensation form will be filed for him before any payments are made to him.

- Data Center / Ad Server – These line-items are for services provided by Google and Amazon Web Services that are necessary to maintain the Debtors' internet advertising platform.

- Technology Development – This line-item is for ever-changing requests from current and potential clients to utilize the Debtors' IP for ad-blocking and other different uses, to tailor the Debtors' IP for deployment on a client's specific network, and to generally maintain the deployed advertising platform.

- Patent Attorney – This line-item is for legal fees to maintain the Debtors' existing patents and pending patent applications.

- Travel – The Debtors officers/directors may need to travel to maintain existing relationships with wi-fi providers that the Debtors have contracts with so that they or, more importantly, any buyer that wants to utilize the Debtors' contracts, can continue to place ads with the wi-fi providers.

- Accountants for Tax Filing – This line-item is for fees payable to the Debtors' accountants to finalize and file the Debtors' 2014 consolidated tax returns.

- Insurances – This line-item is for the Debtors' Directors and Officers Policy and General Liability Policy.

In light of the foregoing, both prior to and after the Petition Date, the Debtors sought out debtor in possession financing from well-over 50 entities and individuals, including the Lender, MS Holdings, Chuck Kirby, Glenn Lebowitz, Eclipse Capital, Cedar Glade Capital, Shamrock Capital, Marblegate Capital, Lucas Group, Centre Lane Finance Co., Summit Capital, Marlin Equity Partners, Opus Bank, Paragon Resource Group, Rob Parish, Victory Park, Old Hill Partners,

Atalaya Capital, Columbia Pacific, White Springs Capital, Stone Lion, Monarch Alternative Capital, Perry Capital, Black River Asset Management, TICC Capital, Contrarian Capital, Alpine Investors, Crescent Capital, Maquarie Capital, Parabellum Capital, Diamond Ventures, Redwood Capital, Acrius Capital, and others. Ultimately, the Lender was the only party that could provide required financing on the expedited basis required by the Debtors. The Lender agreed to provide the Debtors with the postpetition DIP Loan of up to $750,000 and to allow the Debtors to use the Lender's Cash Collateral subject to the terms of the Term Sheet, a true and correct copy of which is attached hereto as **Exhibit "2,"** the DIP Loan Agreement to follow after the entry of the Interim Order and prior to the Final Hearing on the Motion, and in accordance with the Budget, a true and correct copy of which is attached hereto as **Exhibit "3."** Based on the Debtors' Budget, which sets forth the Debtors' projected cash receipts and cash disbursements through the February 29, 2015 Maturity Date of the DIP Loan, the Debtors believe that the proposed DIP Loan will provide them with sufficient funds to maintain operations and their Cases pending the planned auction sale of the Debtors' assets.

The Debtors were unable to obtain sufficient interim and long-term financing in a timely manner from sources other than the Lender on terms and subject to conditions more favorable to the Debtors than under the Term Sheet, because lenders are not willing to lend to debtors with a negative cash flow without obtaining superpriority claims and liens to protect and secure claims arising from postpetition financing. Accordingly, the Lender requested that the Debtors provide, and the Debtors agreed to provide, the Lender with the DIP Superpriority Claims and first priority DIP Liens pursuant to Sections 364(c) and (d). In consideration of other terms and conditions obtained by other debtor-in-possession borrowers in similar circumstances, the Debtors believe that the proposed terms and conditions of the DIP Loan are reasonable.

After considering the lack of better alternatives, the Debtors concluded, in an exercise of their sound business judgment, that the DIP Loan proposed to be provided by the Lender, when coupled with the authorization to use Cash Collateral to be provided by the Lender, represents the best financing presently available to the Debtors. The Term Sheet underlying the DIP Loan is the product of protracted arms' length negotiations between the Debtors and the Lender, which is

unaffiliated with the Debtors and is not an insider of the Debtors. Thus, any credit extended, loans made, and other financial accommodations extended to the Debtors by the Lender have been extended, issued, or made, as the case may be, in "good faith" within the meaning of Section 364(e).

**II.**

**DISCUSSION**

**A.    THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN THE PROPOSED DIP LOAN**

**1.    THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN THE PROPOSED DIP LOAN FROM THE LENDER TO MAINTAIN THE DEBTORS' BUSINESS AND TO MAINTAIN AND PRESERVE THE VALUE OF THE DEBTORS' ASSETS**

Pursuant to Section 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where debtor's business judgment indicated financing was necessary and reasonable for benefit of estate); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"). Section 364(c) provides, in pertinent part, that:

> (c)   If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
> 
> (1)   with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title:
> 
> (2)   secured by a lien on property of the estate that is not otherwise subject to a lien; or
> 
> (3)   secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Section 364(d)(1) governs the incurrence of senior secured debt or "priming" loans.

Pursuant to Section 364(d)(1), the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if –

> (1) the trustee is unable to obtain such credit otherwise; and
>
> (2) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364 (d)(1).

Section 364 is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the postpetition period. *In re Photo Promotion Associates, Inc.*, 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989). Where a trustee or debtor in possession cannot otherwise obtain unsecured postpetition credit, such credit may be obtained under certain carefully proscribed conditions. *In re T.M. Sweeney & Sons LTL Services, Inc.*, 131 B.R. 984, 989 (Bankr. N.D. Ill. 1991). For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including, without limitation, liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364(d). *In re Photo Promotion Associates, Inc.*, 87 B.R. at 839.

Section 364(c) also enumerates certain incentives that a court may grant to postpetition lenders. However, the list set forth in Section 364(c) is not exhaustive. Courts have frequently authorized the use of inducements not specified in the statute. *See, e.g., In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); *In re Defender Drug Stores*, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to postpetition lender), *aff'd* 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364").

As discussed above, the Debtors' cash alone will be insufficient to meet the Debtors' ability to pay immediate and ongoing expenses, especially considering the added administrative costs to be incurred by the Debtors in their Cases. Additional financing is necessary to maintain business

operations pending the Debtors' pursuit of the auction sale of their assets for the benefit of all creditors and interest holders. Thus, subject to the approval of the Court, and in order to obtain the necessary DIP Loan, the Debtors have agreed to provide the Lender with (1) the DIP Superpriority Claims pursuant to Section 364(c)(1) for all amounts owed by the Debtors to the Lender under the DIP Loan and (2) perfected first priority DIP Liens on all of the Debtors' prepetition and postpetition collateral to secure all obligations under the DIP Loan pursuant to Section 364(c)(2) and (d). For all of the reasons explained herein, the Debtors believe that granting the Lender the foregoing protections is warranted, appropriate, and necessary given the circumstances of these Cases where the Lender has agreed to provide the Debtors with critically necessary emergency DIP Loan and to consensual Cash Collateral use thereafter, without which the Debtors would be forced to cease operations.

Two factors courts consider in determining whether to authorize postpetition financing which contemplates the granting of a security interest in favor of the lender are (1) whether the debtor is unable to obtain unsecured credit per Section 364(b), *i.e.*, by allowing a lender only an administrative claim per Section 364(b)(1)(A); and (2) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); *see also In re Aqua Assoc.*, 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

In addition to the foregoing, a debtor in possession seeking subordination of liens to new financing must establish adequate protection of the liens to be subordinated to the new financing. *In re C.B.G. Ltd.*, 150 B.R. 570, 571 (Bankr. M.D.Pa. 1992).

The Debtors submits that all of these standards have been satisfied in this case.

      a. **The Debtors Are Unable To Obtain Unsecured Credit Or Secured Credit On A Junior Lien Basis**

In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under § 364(a) and (b). *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith effort that credit was not available without senior lien by

unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *Ames, supra*, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lending institutions).

To date, the best (and only current) postpetition financing commitment that has been provided to the Debtors is the one offered by the Lender. In order to avoid a complete shutdown of the Debtors' business, immediate liquidation of the Debtors' assets, and the possible dismissal or conversion of the Debtors' Cases, the Debtors diligently sought other sources of additional financing before and after the Petition Date. Considering the circumstances and that lenders are likely not willing to lend to a debtor with a negative cash flow without obtaining superpriority claims and liens to protect and secure claims arising from postpetition financing, the Debtors believed they would be unable to obtain sufficient financing on a timely basis from sources other than the Lender on terms and subject to conditions more favorable to the Debtors than under the terms of the Term Sheet and the DIP Loan Agreement to be filed after interim approval of the DIP Loan.

Fortunately, the Lender offered to provide the Debtors with postpetition secured financing but solely on the terms and conditions outlined in the Term Sheet. Accordingly, at the Lender's request, Debtors agreed to provide the Lender with superpriority claims and senior DIP Liens pursuant to Sections 364(c) and (d), as well as the other customary protections that will be set forth in the DIP Loan Agreement and Financing Orders. The Debtors have little doubt that, even if there was another lender who was willing to provide the Debtors with the necessary postpetition financing, such lender would also require that its financing be secured by a senior lien against the Debtors' assets, upon terms that would very likely be no more favorable than those offered by the Lender. Indeed, most, if not all, of the other parties that the Debtors contacted to provide postpetition financing that responded were also requiring superpriority claims and first priority liens to secure any loans provided to the Debtors. The terms and conditions set forth in the Term Sheet were negotiated extensively, in good faith, and at arms' length by the parties.

After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Loan to be provided by the Lender (particularly, in conjunction with the authorization to use Cash Collateral to be provided by the Lender) represents the best financing presently available to the Debtor.

**b.**      **The Terms Of The Proposed Postpetition DIP Loan From The Lender Are Fair, Reasonable, and Adequate**

The Debtors submit that terms of the proposed DIP Loan from the Lender are fair, reasonable, and adequate. As noted above, the terms and conditions set forth in the Term Sheet were negotiated extensively, in good faith, and at arms' length by the parties. The Lender is well aware of the fact that the Debtors would have very little chance of avoiding an immediate shutdown of the Debtors' business if not for the DIP Loan offered by the Lender. The Lender has agreed to provide the DIP Loan to the Debtors in an effort to assist the Debtors in preserving the going concern value of the Debtors' business and to facilitate the successful consummation of an auction sale of the Debtors' assets. The Debtors submit that the benefits afforded to the Debtors by the DIP Loan justify the protections being afforded under the terms of the Term Sheet. The DIP Loan offers the Debtors their best and, likely, only opportunity to maintain and preserve the value of their assets while pursuing their asset sale, which will benefit all creditors and parties in interest in these Cases.

Based on the foregoing, the Debtors believes that (1) the terms and conditions of the proposed DIP Loan under the Term Sheet are fair and reasonable, reflect the Debtors' exercise of prudent business judgment in light of the current circumstances and are supported by reasonably equivalent value and fair consideration, (2) the DIP Loan has been negotiated in good faith and at arm's length by the Debtors and the Lender, and (3) any credit extended, loans made, and other financial accommodations extended to the Debtors by the Lender have been extended, issued or made, as the case may be, in "good faith" within the meaning of Section 364(e).

**c.**      **Any Liens Being "Primed" Are Adequately Protected**

As discussed, the Debtors obtained a number of loans from various entities and individuals to fund operations. Based on a review of the notes and security agreements executed

by the Debtors, and the UCC Reports and the UCC-1 Financing Statements attached thereto, the Debtors estimate that their Purported Secured Creditors hold, at most, approximately $8.426 million of Purported Secured Debt purportedly secured by the Debtors' assets. The purported liens of the Purported Secured Creditors can be "primed" even in the absence of their consent. Such priming should be allowed here.

Section 364(d)(1)(B) requires the furnishing of adequate protection in favor of lien holders which assert an interest in collateral. 11 U.S.C. §§ 364(d)(1)(B). Although Section 364 does not specifically define the term "adequate protection," Section 361 requires that adequate protection be furnished to the extent Debtors' "use, sale, or lease under section 363 …, or any grant of a lien under section 364 … results in a decrease in the value of such entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3). Stated succinctly, adequate protection protects a secured creditor against a decrease in the value of its collateral. *See e.g., In re Planned System, Inc.*, 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987). This standard applies equally with respect to "priming" financing under Section 364(d)(1)(B). *See, e.g., In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests."); *In re Aqua Assoc.*, 123 B.R. at 196; *In re Beker Ind. Corp.*, 58 B.R. 725, 741-42 (Bankr. S.D.N.Y. 1986).

The Court has broad discretion to determine whether adequate protection is furnished. *See e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Whether the party entitled to such protection is over or undersecured is not dispositive of whether adequate protection is furnished. As the court in *Aqua Assoc.*, 123 B.R. 192, noted:

> Therefore, we believe that, while the presence of an equity cushion should be a relevant factor, it should not be a determinative factor in any 'adequate protection' analysis, and particularly one relating to § 364(d)(1)(B). The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.

*Id.* at 196 (emphasis added; approving priming financing where interest rate was 5% over prime

and loan likely would enhance value of estate).

Further, it is well established that the existence of an equity cushion alone can constitute adequate protection to a secured creditor when a debtor seeks to use cash collateral. *In re Mellor*, 734 F.2d 1396 (9th Cir. 1984). In *Mellor*, the Ninth Circuit held that a 20% equity cushion constituted adequate protection as a matter of law. *Id.* at 140-01. The Ninth Circuit indicated that a cushion of less than 20% could also constitute adequate protection and cited with approval decisions holding that equity cushions of between 10% and 20% constituted adequate protection. *Id.,* (*citing In re McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding that a 10% cushion is adequate protection); *In re Rogers Development Corp.,* 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (equity cushion of approximately 15% to 20% was adequate protection notwithstanding that the debtors had no equity in the property); *see also, In re Hawaiian Pacific Industries,* 17 B.R. 670, 673 (Bankr. D. Hawaii 1982) (15% cushion constituted adequate protection).

The preservation of the value of a secured creditor's lien is also sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. *In re Triplett*, 87 B.R. 25 (Bankr. W.D. Tex. 1988); *see also In re Stein*, 19 B.R. 458 (Bankr. E.D. Pa. 1982). The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. *See also In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. l988), where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral. Other courts have also determined that a debtor's continued business operations can constitute the adequate protection of a secured creditor. *See Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996); *In re Newark Airport/Hotel Ltd. Partnership,* 156 B.R. 444, 450 (Bankr. D.N.J. 1993); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

In determining adequate protection, Courts have stressed the importance of promoting a debtor's reorganization. In *In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987), the Tenth

Circuit stated:

> In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.

808 F.2d at 1937.

Here, the Purported Secured Creditors are adequately protected by a substantial equity cushion, replacement lien, and by the continued operation of the Debtors' business. **First,** as discussed, the Debtors believe that, at most, there is approximately $8.426 million of debt purportedly secured by the Debtors' assets, which amount includes interest through the Petition Date. If the Debtors were to draw down the entire $750,000 DIP Loan, actual and purported secured debt would total approximately $9.176 million. Based on the IP Valuation, the Fairness Opinion, and the Licensing Projections, the Debtors believe that their IP alone has a value of between $30 – 100 million. Even at the lowest estimated IP value of $30 million, the Purported Secured Creditors are adequately protected by an equity cushion of over 200%. Based on MS Holdings' argument that the Debtors breached the Bridge Loan Agreement because the valuation in the Fairness Opinion established that the value of the Debtors assets was in the range of $42.2 and $66.7 million exceeded consideration to be paid by MS Holdings for shares in Newco calculated on a per share basis, as well as the Licensing Projections provided by MS Holdings' own expert, MS Holdings itself implicitly admits that the Debtors' IP assets have substantial value sufficient to adequately protect MS Holdings liens the other liens allegedly securing the claims of the Purported Secured Creditors. **Second,** pursuant to the attached Interim Order, the Debtors will provide the Purported Secured Creditors with additional adequate protection in the form of replacement liens, with such replacement liens to have the same extent, validity, and

priority as the prepetition liens held by such creditors, subject to the Lender's DIP Liens and any claims to challenge pre-petition liens. **Third,** the Purported Secured Creditors will be further adequately protected by the continued operation of the Debtors' business.

In consideration of the foregoing, the Debtors submit that the Purported Secured Creditors alleged liens are and will be adequately protected.

### d. The Proposed DIP Loan From the Lender Is Necessary And Proper

While in determining whether to approve such a transaction, a Court is authorized to act in its informed discretion, *In re Ames Department Stores, Inc.*, 115 B.R. at 37, the Court should give broad deference to the business decision of a Chapter 11 debtor, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds. *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). As the Court noted in *In re Ames Dept. Stores Inc., supra*, "the court's discretion under section 364 is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to be exercised . . ." *In re Ames Department Stores, Inc.*, 115 B.R. at 40.

There is little dispute that, without substantial postpetition financing, the Debtors will be forced to immediately cease business operations and engage in a disorderly fire-sale liquidation of their assets without the ability to maximize value through the planned auction sale of the Debtors' assets, which the Debtors intend to effectuate by the end of February 29, 2015, if not sooner, and which will benefit all creditors and interest holders. In contrast, the proposed DIP Loan affords the Debtors the ability to maintain the going-concern value of its business and provides the Debtors with the time necessary to pursue the orderly auction sale of their assets. The Debtors have therefore concluded that obtaining the proposed DIP Loan from the Lender is critically important to maximizing the recovery for creditors, and is therefore in the best interests of the Debtors' estates.

**B.** **THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL PROVIDED BY THE DIP LOAN TO PAY NECESSARY OPERATING EXPENSES AS SET FORTH IN THE BUDGET**

    **1.** **The Debtors Must Be Authorized To Use Cash Collateral To Operate, Maintain, And Preserve Their Assets In Accordance With The Budget**

The Debtors' use of property of the estate is governed by Section 363. 11 U.S.C. § 363(c). Section 363(c)(1) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. … 1108 … of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363. 11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest [.]" 11 U.S.C. § 363(a). Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if:

> (A)    each entity that has an interest in such cash collateral consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property. 11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (B.A.P. 9th Cir. 1991). In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of

reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

For all of the reasons discussed herein, the Debtors have no ability to continue to maintain their business operations or preserve the value of their assets unless the Debtors (1) obtain the DIP Loan from the Lender, which will result in the Debtors' cash becoming the Lender's Cash Collateral and the purported Cash Collateral of the Purported Secured Creditors, and (2) have the ability to use Cash Collateral to pay the Debtors' projected expenses in accordance with the Budget. The Debtors' inability to pay those expenses would cause immediate and irreparable harm to the Debtors' bankruptcy estates. Indeed, the Debtors' inability to pay their expenses, including rent, utilities, insurance, and other "bare bones" operating expenses set forth in the Budget would result in the immediate or near immediate shutdown of the Debtors' business and the decimation of the value (going-concern or otherwise) of the Debtors' business and assets. The maintenance of the Debtors' business and preservation of the Debtors' assets are critical to maximizing value and providing for recoveries to creditors in these Cases.

### 2. The Lender Has Consented to the Debtors' Use of Cash Collateral and the Purported Secured Creditors Are Adequately Protected

Pursuant to Section 363(c)(2), the Court may authorize a debtor in possession to use a secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is adequately protected. *In re Mellor*, 734 F.2d at 1400; *see also In re O'Connor*, 808 F.2d at 1398; *In re McCombs Properties VI, Ltd.*, 88 B.R. at 265.

Here, the Lender has consented to the Debtors' use of Cash Collateral to pay the expenses set forth in the Budget in accordance with the provisions of the Term Sheet. As to the Purported Secured Creditors, as set forth above, they are adequately protected by an equity cushion in excess of 200% for any diminution in the value of their collateral resulting from the Debtors' use of Cash Collateral. Moreover, in the absence of the DIP Loan to be provided by the Lender, the Cash Collateral provided by the DIP Loan, which constitutes essentially all of the Debtors' funds, would not exist, so the Purported Secured Creditors cannot argue (at least not with any merit) that

the use of the funds from the DIP Loan would cause a diminution in the value of their alleged collateral base.

Based on the foregoing, the Debtors submit that the requirements of Section 363(c)(2) have been satisfied and that the Debtors should be authorized to use their Cash Collateral in accordance with the Budget.

## C.  **THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE**

For the reasons noted herein, the Debtors will suffer immediate and irreparable harm if the Debtors are not able to pay the expenses set forth in the Budget, pending a final hearing on the Motion. The Debtors require the terms of the Interim Order to become immediately effective to ensure that the Debtors will be able to obtain the proposed DIP Loan from the Lender and use the Cash Collateral provided by the DIP Loan to pay their critical expenses. Based on the foregoing, the Debtors requests that any applicable stay, including the stay provided under FRBP 6004, be waived to allow the Interim Order to become immediately effective.

## III.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court:

(1)  affirm the adequacy of the notice given;

(2)  grant the relief requested in the Motion on an interim basis;

(3)  enter the proposed Interim Order in substantially the form attached hereto as **Exhibit "1;"**

(4)  schedule a Final Hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

///

///

(5)    grant such further relief as the Court deems just and proper.

Dated:  November 18, 2015                    LEVENE, NEALE, BENDER, YOO
                                              & BRILL L.L.P.

                                             By:    /s/ Todd M. Arnold
                                                   RON BENDER
                                                   TODD M. ARNOLD
                                                   LEVENE, NEALE, BENDER, YOO
                                                     & BRILL L.L.P.
                                             Attorneys for Debtors and Debtors in Possession

## DECLARATION OF RICK BARAN

I, Rick Baran, hereby declare as follows:

1. I am over 18 years of age. Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2. I make this declaration in support of the Motion to which this declaration is attached. Unless otherwise stated, capitalized terms herein have the same meanings as in the Motion.

3. I am the President, Chief Financial Officer, and Chief Executive Officer of the Debtors. I have served as the Chief Financial Officer of the Debtors since May 2013. I have served as the President and Chief Executive Officer of the Debtors since July 2014. Based on my positions with the Debtors, I have access to the Debtors' books and records and am familiar with them. The Debtors' books and records forming the basis for any statements in this declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtors' businesses at or near the time of act, condition or event to which they relate by persons employed by the Debtors who had a business duty to the Debtors to accurately and completely take, make, and maintain such records and documents. Based on my positions with the Debtors, I am also familiar with the history, organization, operations, and financial condition of the Debtors.

4. On September 30, 2015 (the "Petition Date"), the Debtors each filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtors continue to manage their financial affairs and operate their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. On October 1, 2015, the Court entered orders granting the Debtors' motions for joint administration of their Chapter 11 cases, with the MediaShift, Inc. case serving as the lead case. On November 6, 2015, the UST appointed the Committee consisting of Essenture Incorporated, Glenn Lebowitz, Winthrop Couchot, PC, Ian Peters, and Eastward Capital Partners Venture, LP. I am informed and believe that the Committee generally supports the Motion.

5. Ad-Vantage is a wholly owned subsidiary of MediaShift. MediaShift is a public company. However, in February 2014, MediaShift filed a Form 15 with the Securities and Exchange Commission and, as a result, is no longer subject to the Securities and Exchange Commission's reporting requirements and experiences very little trading of its stock. The Debtors have the same officers and directors.

6. Ad-Vantage owns numerous patents and related computer software (the "IP") related to internet advertising. With the IP, the Debtors can enable the owners of wi-fi networks to monetize their networks through the placement of internet advertising both during the login to the wi-fi network and during sessions on the wi-fi network. The IP overrides advertising that would normally appear on web pages accessed through the wi-fi network so that the advertising space can be sold. The Debtors and affiliates sell the advertising space, place the advertising on pages accessed by users on the wi-fi network, and share the advertising revenue with the owner of the wi-fi network.

7. The Debtors, generally contracting through MediaShift, have contracts with, among others, JetBlue, JFK airport, MGM Las Vegas, and Hotel International Services, whereby the Debtors sell and place advertising that appears during login and sessions on the wi-fi networks operated by the foregoing entities. Google is one of the Debtors' largest purchasers of advertising space. The Debtors were in a position to contract with other wi-fi network providers and to expand their advertising placement footprint, and therefore their advertising sharing revenue. However, the Debtors needed additional funds to do so, as many parties interested in contracting with the Debtors require the Debtors to pay a guaranteed advertising sharing amount before they will allow the Debtors to place advertising on their wi-fi networks.

8. In order to fund operations, the development of its IP and platform, the implementation of its platform, and the expansion of its advertising footprint, Ad-Vantage obtained various rounds of equity financing. Unfortunately, due to various complications and the failure of equity contributors to perform as required, Ad-Vantage was not able to obtain all of the equity financing it expected to receive. As a result, the Debtors were forced to obtain a number of bridge loans to meet their financial needs. One such loan was provided by MediaShift Holdings,

Inc. ("MS Holdings").  MS Holdings provided the Debtors with a loan in the approximate amount of $3.3 million.  MS purported to roll that loan up with approximately $2.2 million in bridge loans previously made to one or both of the Debtors by entities and individuals affiliated with MS Holdings and allegedly secured the rolled up loan against the assets of both Debtors.  In addition to MS Holdings, the Debtors have other purported common creditors.  The equity financing, bridge loans, and loan provided by MS Holdings proved insufficient to enable the Debtors to fund their operations, their efforts to expand their advertising placement, and their debt obligations.

9.     In light of the foregoing, in or about April 2015, the Debtors engaged Houlihan Lokey as their investment banker to assist in the marketing and sale of the Debtors' assets.  The Debtors were pursuing such a sale and intend to continue pursuing a sale in bankruptcy.  However, on August 3, 2015, before the Debtors could fully market their assets to obtain the highest and best price for them and consummate a sale of their assets, MS Holdings called a default on its purported secured loan to the Debtors and started to initiate efforts to foreclose on the Debtors' assets, including the highly valuable IP.

10.    As a result of the foregoing, and in an effort to protect the value of the Debtors' assets for the benefit of all creditors and interest holders, the Debtors decided to file for bankruptcy protection.  On November 4, 2015, the Debtors filed an application to employ Houlihan Lokey as their investment banker in their Cases to assist the Debtors with their continued efforts to market and sell the Debtors' assets for the most money possible.  [Dkt. 41 and 42]  The application is pending with the Court.  The Debtors are hopeful of paying their creditors in full with sale proceeds pursuant to a liquidating plan.

11.    Prior to the Petition Date, on September 17, 2015, MediaShift, through its counsel, obtained a report (the "MS UCC Report") listing the UCC-1 Financing Statements filed against MediaShift and the status of each such UCC-1 Financing Statement.  The MS UCC Report includes as attachments copies of all UCC-1 Financing Statements filed against MediaShift.  A true and correct copy of the MS UCC Report is attached hereto as **Exhibit "4."**

12.    Prior to the Petition Date, on September 28, 2015, Ad-Vantage, through its counsel, obtained a report (the "Ad-Vantage UCC Report" and together with the MS UCC

Report, the "UCC Reports") listing the UCC-1 Financing Statements filed against Ad-Vantage and the status of each such UCC-1 Financing Statement. The Ad-Vantage UCC Report includes as attachments copies of all UCC-1 Financing Statements filed against MediaShift. A true and correct copy of the Ad-Vantage UCC Report is attached hereto as **Exhibit "5."**

13. As discussed above, the Debtors obtained a number of loans from various entities and individuals to fund operations. Based on a review of the notes and security agreements executed by the Debtors, and the UCC Reports and the UCC-1 Financing Statements attached thereto, I estimate that their Purported Secured Creditors hold, at most, approximately $8.426 million of debt purportedly secured by the Debtors' assets (the "Purported Secured Debt"), which includes interest through the Petition Date. A summary of the Purported Secured Creditors and Purported Secured Debt is attached hereto as **Exhibit "6."**

14. As discussed below, the Debtors' IP is by far their most valuable asset. In addition to the IP, MediaShift has furniture, fixtures, and equipment which I estimate has a fair market value of approximately $3,978.92, *see* MediaShift Schedule B [Dkt. 33], and Ad-Vantage has accounts receivable furniture, fixtures, and equipment which I estimate has a fair market value of approximately $420,921.34, *see* MediaShift Schedule B [Dkt. 34]

15. As to the IP, prior to the Petition Date, the Debtors obtained a valuation (the "IP Valuation") of the Debtors' IP from Great American Group (the "Great American"). A true and correct copy of the IP Valuation is attached hereto as **Exhibit "7."** Pursuant to the IP Valuation, dated as of April 30, 2014, Great American estimated that the IP has (1) an orderly liquidation value of between $31 to $32 million and (2) a fair market value of between $48 to $56 million. I am not aware of any basis for any material modification to the foregoing valuations based on events occurring after the Great American IP Valuation was issued.

16. There is other evidence that the Debtors' assets have substantial value. As noted in MS Holdings objection (the "MS Holdings Objection") [Dkt. 52] to the Debtors' Emergency Motion for Entry of an Order … (2) Authorizing the Limited Use of Cash Collateral on an Interim Basis Pending a Final Hearing Pursuant to 11 U.S.C. § 363 (the "First Cash Collateral Motion") [Dkt. 27], in late 2014, the Debtors and MS Holdings negotiated a deal whereby, among other

things, (1) MS Holdings would form a new entity ("Newco") to acquire the majority of MedisShift's assets (the "Proposed Transaction"), (2) in exchange for 75.55% of Newco's equity, MS Holdings would provide $25.038 million in consideration, including the Bridge Loan, as defined and described below, and (3) in exchange for 19.45% of Newco's equity, MediaShift would contribute all of its assets and those of its subsidiaries, including Ad-Vantage, to Newco. A true and correct copy of MS Holdings Objection is attached hereto as **Exhibit "8,"** at ¶ 1. A true and correct copy of the Great American Fairness Opinion is attached hereto as **Exhibit "9."**

17.  In conjunction with the Proposed Transaction, the Debtors and related entities executed a Note and Bridge Loan Agreement (the "Bridge Loan Agreement") dated as of October 21, 2014 in favor of MS Holdings pursuant to which MS Holdings was to provide financing to the Debtors to fund operations pending a close of the Proposed Transaction (the "Bridge Loan"). As noted, the Bridge Loan was to be part of the consideration for MS Holdings acquisition of the majority of Newco's equity. MS Holdings asserts that one of the conditions to the Bridge Loan was the receipt of a favorable Fairness Opinion regarding the Proposed Transaction – *i.e.*, that the consideration to be paid by MS Holdings for equity in Newco was "fair," meaning that the consideration was at least equal to the value of the Debtors' assets to be contributed to Newco, as calculated on a price per share basis.

18.  MS Holdings asserts the Debtors breached the Fairness Opinion condition of the Bridge Loan Agreement, because the Debtors did not get a favorable Fairness Opinion. MS Holdings is correct that the Debtors did not obtain a favorable Fairness Opinion, but that is not because the Debtors did not obtain any Fairness Opinion. Instead, the Fairness Opinion obtained by the Debtors indicated that value of the Debtors' assets greatly exceeded the proposed consideration to be paid by MS Holdings for its equity interests in Newco, as calculated on price per share basis. In particular, on November 21, 2014, Great American issued its Fairness Opinion, which is based on the assumption that Newco would issue approximately 63 million shares of stock. In the Fairness Opinion, Great American provided a price per share for MediaShift's equity based on an income approach and market approach. On a market approach, which I understand is intended to value the assets of MediaShift and its subsidiaries to be

contributed in the Proposed Transaction on a price per share basis, Great American estimated a low value of $0.67 per share and a high of $1.06 per share. Based on the estimated issuance of approximately 63 million shares of Newco, this equated to an asset valuation of between $42.2 and $66.7 million. I am not aware of any basis for any material modification to the foregoing IP Valuation and price per share set forth in the Fairness Opinion.

19. After the foregoing Proposed Transaction was not consummated because of the Fairness Opinion, the Debtors and MS Holdings discussed a possible new transaction that would involve the Debtors transition from operating an internet advertising company and placing its own ads to generating revenue through the licensing of its IP. In conjunction with those discussions, MS Holdings' own cable consultant, Dan O'Brien, prepared projections regarding expected licensing revenue (the "Licensing Projections").

20. Dan O'Brien appears to be well-qualified to opine on the potential revenue from the licensing of the Debtors' IP. As set forth at Skyline Partners' website (http://www.skylinepartnersllc.com/who-we-are.php), "Dan O'Brien is a Partner with Skyline Partners. With over 25 years experience, he is active on several boards in addition to Digitalsmiths including InDenverTimes, SinglePipe Communications, Connected Lyfe and AdXStream. Previously, he was President and COO of PRIMESTAR, Inc. he oversaw the company's growth to 2.2 million customers, culminating in a sale to DirecTV of $2.6B. He previously served as President of Time Warner Satellite Services, which marketed and installed PRIMESTAR services, and served on the board of PRIMESTAR Partners, LP. Prior to that, Daniel was VP of Operations in Time Warner Cable's Cincinnati division and served as VP of New Business for Warner Cable Communications, Inc. in Dublin, Ohio. Prior to Time Warner, Daniel worked for Jones Intercable as General Manager of several properties in multiple states."

21. On March 25, 2015, Dan O'Brien forwarded his Licensing Projections to the Debtors. A true and correct copy of the Dan O'Brien's Licensing Projections and his email transmittal thereof to the Debtors, which I personally received, is attached hereto as **Exhibit "10."** As can be seen, in the Licensing Projections, Dan O'Brien estimated that that the Debtors could obtain over $82 million in monthly revenue from licensing their IP to Comcast alone and over

$175 million in monthly revenue from licensing its IP to various other cable, internet, and mobile phone service providers (including Comcast). I and others met with Comcast in an effort to pursue a licensing business model, and Comcast gave no indication that the estimated licensing revenue of $0.05 per ad used for the Licensing Projections would not be agreeable.

22. Pursuant to the First Cash Collateral Motion and the interim order thereon [Dkt. 27 and 39], the Debtors obtained interim approval to use $12,000 in Cash Collateral purportedly securing the Purported Secured Claims, which constituted essentially all of the Debtors' cash. The Debtors already used such funds to pay necessary expenses as set forth in the budget approved in connection with the First Cash Collateral Motion. Accordingly, the Debtors need additional funds and authority to use such funds to pay additional necessary expenses as set forth in the Budget pending the auction sale of the Debtors' assets, which the Debtors intend to effectuate and close prior to the Maturity Date of the DIP Loan of February 29, 2015 and which I believe will benefit all creditors and interest holders.

23. I believe that all of the line-items set forth in the Budget are necessary to maintain the Debtors' operations and, therefore, going-concern and asset values, pending the auction sale of the Debtors' assets. For example, with reference to certain line-items:

- HRA – Health Plan / Executive Salaries – Prior to the Petition Date, the Debtors provided their officers/directors with cash compensation and reimbursement for their health insurance premiums. After the Petition Date, one of the Debtors' officers/directors, Sanjeev Kuwadekar, resigned due to the pre- and post-Petition Date non-payment of any compensation. The Debtors need to retain their three remaining officers/directors, David Grant (Chairman of the Board Member, Chief Strategy Officer), Mike Spalter (Chief Operating Officer), and me (Board Member, President, Chief Financial Officer, and Chief Executive Officer), to maintain operations and, therefore, going-concern and asset values, as well as to pursue a liquidating or reorganizing plan for the benefit of creditors. Therefore, in order to prevent any further resignations of the Debtors' officers/directors, the Budget provides for the payment of reimbursement for their health insurance premiums and

41

approximately 50% of the salaries to which they are entitled. David Grant and I have been intimately involved with the Debtors' reorganization efforts since the Petition Date and have worked more than 40 hours a week in furtherance of those efforts. Mike Spalter has been involved in and is critical in maintaining the Debtors' existing inventory footprint and building out the platform pursuant to contracts with Jet Blue, MGM, and others, and, therefore, is also integral to the Debtors' efforts to maintain going concern and asset values pending a sale. Mike Spalter generally works more than 40 hours a week. Insider compensation forms will be filed for all of the foregoing officers and directors before any payments are made to them.

- Contractors – The Debtors utilize and/or need to utilize four, contractors pending a sale of the Debtors' assets in order to maintain operations and asset values: (1) a controller that is paid $3,000 per week that is intimately familiar with the Debtors' and cannot be easily replaced during the Budget period and (2) three software development/ad operations contractors that maintain the Debtors' deployed inventory with various wi-fi network owners that have contracted with the Debtors; for example, as part of the consideration for the JetBlue and MGM contracts, the Debtors have to allow those parties to place their own advertising during wi-fi sessions on their wi-fi networks, and the Debtors are responsible for making sure such advertising is placed and working properly; thus, the foregoing contractors assist the Debtors in maintaining existing contracts that may be part of the assets that certain buyers are interested in purchasing; the foregoing contractors work between 20-40+ hours a week; one is paid $3,000 per week, another is paid $2,000 per week, and the other $1,000. One of the contractors is David Grant's son. An insider compensation form will be filed for him before any payments are made to him.

- Data Center / Ad Server – These line-items are for services provided by Google and Amazon Web Services that are necessary to maintain the Debtors' internet advertising platform.

- Technology Development – This line-item is for ever-changing requests from current and potential clients to utilize the Debtors' IP for ad-blocking and other different uses, to tailor the Debtors' IP for deployment on a client's specific network, and to generally maintain the deployed advertising platform.

- Patent Attorney – This line-item is for legal fees to maintain the Debtors' existing patents and pending patent applications.

- Travel – The Debtors officers/directors may need to travel to maintain existing relationships with wi-fi providers that the Debtors have contracts with so that they or, more importantly, any buyer that wants to utilize the Debtors' contracts, can continue to place ads with the wi-fi providers.

- Accountants for Tax Filing – This line-item is for fees payable to the Debtors' accountants to finalize and file the Debtors' 2014 consolidated tax returns.

- Insurances – This line-item is for the Debtors' Directors and Officers Policy and General Liability Policy.

24.     In light of the foregoing, both prior to and after the Petition Date, the Debtors, with me often serving as the point person, sought out debtor in possession financing from well-over 50 entities and individuals, including the Lender, MS Holdings, Chuck Kirby, Glenn Lebowitz, Eclipse Capital, Cedar Glade Capital, Shamrock Capital, Marblegate Capital, Lucas Group, Centre Lane Finance Co., Summit Capital, Marlin Equity Partners, Opus Bank, Paragon Resource Group, Rob Parish, Victory Park, Old Hill Partners, Atalaya Capital, Columbia Pacific, White Springs Capital, Stone Lion, Monarch Alternative Capital, Perry Capital, Black River Asset Management, TICC Capital, Contrarian Capital, Alpine Investors, Crescent Capital, Maquarie Capital, Parabellum Capital, Diamond Ventures, Redwood Capital, Acrius Capital, and others.  Ultimately, the Lender was the only party that could provide required financing on the expedited basis required by the Debtors.  The Lender agreed to provide the Debtors with the postpetition DIP Loan of up to $750,000 and to allow the Debtors to use the Lender's Cash Collateral subject to the terms of the Term Sheet, a true and correct copy of which is attached hereto as **Exhibit "2,"** the DIP Loan Agreement to follow after the entry of the Interim Order and prior to the Final Hearing on the

Motion, and in accordance with the Budget, a true and correct copy of which is attached hereto as **Exhibit "3."** Based on the Debtors' Budget, which sets forth the Debtors' projected cash receipts and cash disbursements through the February 29, 2015 Maturity Date of the DIP Loan, I believe that the proposed DIP Loan will provide the Debtors with sufficient funds to maintain operations and their Cases pending the planned auction sale of the Debtors' assets.

25. The Debtors were unable to obtain sufficient interim and long-term financing in a timely manner from sources other than the Lender on terms and subject to conditions more favorable to the Debtors than under the Term Sheet, because lenders are not willing to lend to debtors with a negative cash flow without obtaining superpriority claims and liens to protect and secure claims arising from postpetition financing. Accordingly, the Lender requested that the Debtors provide, and the Debtors agreed to provide, the Lender with the DIP Superpriority Claims and first priority DIP Liens pursuant to Sections 364(c) and (d). In consideration of other terms and conditions obtained by other debtor-in-possession borrowers in similar circumstances, I, in an exercise of my business judgment, believe that the proposed terms and conditions of the DIP Loan are reasonable.

26. After considering the lack of better alternatives, I concluded, in an exercise of my business judgment, that the DIP Loan proposed to be provided by the Lender, when coupled with the authorization to use Cash Collateral to be provided by the Lender, represents the best financing presently available to the Debtors. The Term Sheet underlying the DIP Loan is the product of protracted arms' length negotiations between the Debtors and the Lender, which is unaffiliated with the Debtors and is not an insider of the Debtors.

27. To date, the best (and only current) postpetition financing commitment that has been provided to the Debtors is the one offered by the Lender. In order to avoid a complete shutdown of the Debtors' business, immediate liquidation of the Debtors' assets, and the possible dismissal or conversion of the Debtors' Cases, the Debtors diligently sought other sources of additional financing before and after the Petition Date. Considering the circumstances and that lenders are likely not willing to lend to a debtor with a negative cash flow without obtaining superpriority claims and liens to protect and secure claims arising from postpetition financing, the Debtors

believed they would be unable to obtain sufficient financing on a timely basis from sources other than the Lender on terms and subject to conditions more favorable to the Debtors than under the terms of the Term Sheet and the DIP Loan Agreement to be filed after interim approval of the DIP Loan.

28.     I have little doubt that, even if there was another lender who was willing to provide the Debtors with the necessary postpetition financing, such lender would also require that its financing be secured by a senior lien against the Debtors' assets, upon terms that would very likely be no more favorable than those offered by the Lender.  Indeed, most, if not all, of the other parties that the Debtors contacted to provide postpetition financing that responded were also requiring superpriority claims and first priority liens to secure any loans provided to the Debtors.

29.     I believe that granting the Lender the protections in the Term Sheet is warranted, appropriate, and necessary given the circumstances of these Cases where the Lender has agreed to provide the Debtors with critically necessary emergency DIP Loan and to consensual Cash Collateral use thereafter, without which the Debtors would be forced to cease operations.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 18th day of November 2015, at ___/2:15, Pm___.

RICK BARAN


EXHIBIT "1"

RON BENDER (SBN 143364)
TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; tma@lnbyb.com

Attorneys for Chapter 11 Debtors & Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>MediaShift, Inc.,<br><br>      Debtor and Debtor in Possession.<br><br>_____<br><br>In re:<br><br>Ad-Vantage Networks, Inc.,<br><br>      Debtor and Debtor in Possession.<br><br>_____<br><br>☒ Affects Both Debtors<br><br>☐ Affects MediaShift, Inc. Only<br><br>☐ Affects Ad-Vantage Networks, Inc. Only | Lead Case No.: 2:15-bk-25024-SK<br>(Jointly administered with:<br>Case No. 2:15-bk-25030-SK)<br><br>Chapter 11 Cases<br><br>**INTERIM ORDER:**<br><br>**(I)**   **AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. § 364,**<br>**(II)**  **GRANTING LIENS AND SUPERPRIORITY CLAIMS PURSUANT TO 11 U.S.C. § 364,**<br>**(III)** **AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. §363,**<br>**(IV)** **SCHEDULING A FINAL HEARING, AND**<br>**(V)**  **GRANTING RELATED RELIEF**<br><br>Hearing:<br>Date:<br>Time:<br>Place:  Courtroom 1575<br>        255 East Temple Street<br>        Los Angeles, CA 90012 |

At the above-referenced date, time, and location, the Court held an interim hearing on the emergency motion (the "Motion") of MediaShift, Inc. ("MediaShift") and Ad-Vantage Networks, Inc. ("Ad-Vantage" and, with MediaShift, the "Debtors"), Chapter 11 debtors and debtors in possession in the above-captioned, jointly-administered, Chapter 11 bankruptcy cases (the "Cases"), pursuant to Local Bankruptcy Rules ("LBR") 2081-1(a)(9), 4001-2, and 9075-1, Federal Rule of Bankruptcy Procedure ("FRBP") 2002, 4001, and 9014, and sections 105(a), 361, 362, 363, and 364 of chapter 11 of title 11 of the United States Code §§ 101, et seq. (the "Bankruptcy Code"),[1] for the entry of an interim order (the "Interim Order") and a final order (the "Final Order" and, with the Interim Order, the "Financing Orders"), among other things:

(1)	Authorizing the Debtors, as borrowers, jointly and severally, to obtain postpetition financing up to the principal amount of $750,000 (the "DIP Loan") from an unaffiliated third-party, Smith Micro Software, Inc. ("Smith") or its designee (with Smith, "Lender"), pursuant to the terms of a Binding Term Sheet (the "Term Sheet") attached to the Motion as Exhibit "2" and loan documents (the "DIP Loan Agreement" and together with the Term Sheet, the "DIP Loan Documents"), which will conform to the terms of the Term Sheet and contain other customary terms used in similar postpetition lending transactions and which the Lender and Debtor will prepare and lodge with the Court, and serve on parties in interest, after entry of this Interim Order and prior to the final hearing on the Motion, with the DIP Loan to be used to: (a) fund, among other things, ongoing working capital, general corporate, and other financing needs of the Debtors, (b) pay certain transaction fees, and other costs and expenses of administration of the Debtors' bankruptcy Cases, and (c) pay fees expenses owed to the Lender under the DIP Loan Documents, as set forth in the budget attached to the Motion as Exhibit "3" and attached hereto as Exhibit "1," as may be amended pursuant to the DIP Loan Documents (the "Budget");

(2)	Authorizing and empowering the Debtors to execute and enter into the DIP Loan Documents and all other related documents and agreements and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

---

[1] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

(3)     Providing, pursuant to Sections 364(c) and (d), that the obligations under the DIP Loan Documents, including, without limitation, principal, accrued interest, and all other obligations and amounts due from time to time under the DIP Loan Documents:

a.     have priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or 1114 or otherwise, which allowed superpriority claims of the Lender (the "DIP Superpriority Claims") shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors as will provided in the DIP Loan Documents, provided, however, that the DIP Superpriority Claims shall be subject to (i) the allowed, accrued, but unpaid administrative claims of professionals employed by the Debtors and the official committee of unsecured creditors (the "Committee") for fees and expenses not to exceed the aggregate amount of $200,000 as set forth in the Budget which may be paid from the DIP Loan or deposited into a segregated account as accrued and Lender shall have no recourse against the funds paid to or deposited into the segregated account and (ii) the payment of fees pursuant to 28 U.S.C. § 1930; and

b.     be and be deemed immediately secured (without any further filings) by valid, binding, continuing, enforceable, fully perfected, and unavoidable first priority security interests and liens (the "DIP Liens") in and on all prepetition and postpetition property and assets of the Debtors, including, but not limited to, all patents, patents pending, copyrights, and other intellectual property (the "Collateral"), provided, however, that the DIP Liens shall not extend or attach to, and the Collateral shall not include, causes of action under Chapter 5 of the Bankruptcy Code, including without limitation Sections 502(d), 544, 545, 547, 548, 549 and 550, any other avoidance actions under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, nonbankruptcy law, and the proceeds thereof, whether real or personal,

tangible or intangible, and wherever located, and whether now existing or hereafter acquired, including proceeds, products, offspring, rents and profits thereof;

(4)     Authorizing the Debtors, pursuant to Sections 105, 361, 363, 541 and 553 and FRBP 2002, 4001 and 9014, to use Cash Collateral (as defined under Section 363) in accordance with the terms of the DIP Loan Documents and the Budget, subject to any variance allowance provided by the DIP Loan Agreement or otherwise approved by Lender;

(5)     Vacating and modifying the automatic stay imposed by Section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Financing Orders;

(6)     Finding that adequate notice of the Motion has been provided;

(7)     Finding that the Lender has acted in good faith in connection with the DIP Loan Documents and is entitled to the protections afforded under Section 364(e);

(8)     Scheduling, pursuant to FRBP 4001, a final hearing (the "Final Hearing") before this Court to consider entry of the Final Order approving the DIP Loan and authorizing the use of Cash Collateral on a final basis;

(9)     Waiving any applicable stay, including under FRBP 4001(b) and (c) and providing for the immediate effectiveness of the Interim Financing Order; and

(10)     Granting related relief.

Pursuant to FRBP 4001(b) and 4001(c)(1), due and sufficient notice under the circumstances of the Motion and the interim hearing on the Motion before this Court to consider entry of this Interim Order (the "Interim Hearing") having been provided by the Debtors, and the Interim Hearing having been held at the above-referenced date, time, and location, and the Court having considered of all the pleadings filed with this Court, including any objections to the relief requested in the Motion that were not withdrawn or resolved at or prior to the hearing, and upon the record made by the Debtors at the Interim Hearing, and upon consideration of the record in the Debtors' jointly administered Cases, and after due deliberation and consideration and good and sufficient cause appearing therefore;

**IT IS HEREBY FOUND:**

A.     On September 30, 2015 (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

B.     The Debtors continue to manage their financial affairs and operate their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108.

C.     On October 1, 2015, the Court entered orders granting the Debtors' motions for joint administration of their Chapter 11 Cases, with the MediaShift, Inc. case serving as the lead case.

D.     On November 6, 2015, the UST appointed the an Official Committee of Unsecured Creditors (the "<u>Committee</u>") consisting of Essenture Incorporated, Glenn Lebowitz, Winthrop Couchot, PC, Ian Peters, and Eastward Capital Partners Venture, LP.

E.     No request for the appointment of a trustee or examiner has been made in these Cases.

F.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

G.     The Debtors' business has an immediate need for financing under the DIP Loan and use of Cash Collateral in order to permit, among other things, the orderly continuation of the operation of their business, to maintain business relationships with vendors, customers, and counter-parties to contracts, pay officers, directors, and independent contractors, to make certain capital expenditures, and to satisfy other working capital and operational, financial and general corporate needs.  The access of the Debtor to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations and use of Cash Collateral is vital to the preservation and maintenance of the going concern and asset values of the Debtors and to the success of the Case.  Without such credit and use of Cash Collateral, the Debtors would not be able to operate their business and the Debtors' estates would be irreparably harmed.

H.    The Debtors were unable to obtain sufficient interim and long-term financing in a timely manner from sources other than the Lender on terms and subject to conditions more favorable to the Debtors than under the Term Sheet and any other DIP Loan Documents approved by the Court.  The Debtors have been unable to obtain sufficient unsecured credit solely under Section 503(b) (1) as an administrative expense.  New credit is unavailable to the Debtors without providing the Lender with the benefit of the DIP Superpriority Claims and the DIP Liens as provided herein and in the Term Sheet and any other DIP Loan Documents approved by the Court.

I.    Pending entry of the Final Order, Lender is willing to provide financing to the Debtor and/or consent to the use of Cash Collateral and other Collateral by the Debtor subject to (1) the entry of this Interim Order, (2) the terms and conditions of the Term Sheet, and (3) findings by the Court that such interim postpetition financing and use of Cash Collateral is essential to the Debtors' estates, that the terms of such interim financing and use of Cash Collateral were negotiated in good faith and at arm's length, and that the DIP Liens, DIP Superpriority Claims, and the other protections granted pursuant to this Interim Order, the Term Sheet, and any other DIP Loan Documents approved by the Court with respect to such interim financing and use of Cash Collateral will not be affected by any subsequent reversal, modification, vacatur, or amendment of this Interim Order or any other order, as provided in Section 364(e) .  Without limiting the foregoing, any advances made to the Debtors under the Term Sheet and any other DIP Loan Documents approved by the Court after entry of this Interim Order and prior to entry of the Final Order shall be entitled to the protections provided by Section 364(e).  The Lender has acted in good faith in, as applicable, negotiating, consenting to, and agreeing to provide the postpetition financing arrangements and use of Cash Collateral on an interim basis as contemplated by this Interim Order, the Term Sheet, and any other DIP Loan Documents approved by the Court, and the reliance by the Lender on the assurances referred to above is in good faith.

J.    Telephonic, facsimile, overnight mail, and/or NEF notice of the Interim Hearing and the proposed entry of this Interim Order has been provided to (1) creditors with

clams purportedly secured by the Debtors' assets (the "<u>Purported Secured Debt</u>"), (2) counsel to the Committee, (3) the Office of the United States Trustee for the Central District of California (the "<u>UST</u>"), and (4) any other party that has filed a request for notice pursuant to FRBP 2002 or is required to receive notice under the FRBP or LBRs (collectively, the "<u>Notice Parties</u>").  Under all the exigent circumstances, the requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001.

   K.  The Debtors have requested immediate entry of this Interim Order pursuant LBR 4001(b) (2) and 4001(c) (2).  Absent entry of this Interim Order, the Debtors' business, assets, and estates will be immediately and irreparably harmed.

   L.  The ability of the Debtors to finance their operations and the availability to the Debtors of sufficient working capital and other financial and general corporate liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations, and use of Cash Collateral are in the best interests of the Debtors and their creditors and estates.

   M.  Based upon the record presented by the Debtors to this Court:  (1) the terms of the DIP Loan and use of Cash Collateral are the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty, and are supported by reasonably equivalent value and fair consideration; and (2) the DIP Loan and use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors and the Lender, and any loans, credit, use of Cash Collateral or other financial accommodations set forth in this Interim Order shall be deemed to have been extended, issued, made, or consented to, as the case may be, in "good faith" within the meaning of Section 364(e).

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

   1.  <u>Disposition</u>.  The Motion is granted as set forth in this Interim Order.  Any objections that have not previously been withdrawn or resolved at the hearing are hereby overruled.  This Interim Order shall immediately become effective upon its entry.

   2.  <u>Authorization to Borrow Under the DIP Loan</u>.  As of the date hereof, Debtors and the Lender are deemed to have executed and delivered the Term Sheet and the

requirements of the Term Sheet and any other DIP Loan Documents approved by the Court shall be binding on the Debtor. Notwithstanding the foregoing, the Lender and Debtor shall prepare and lodge with the Court, and serve on parties in interest by no later than _____, a DIP Loan Agreement that shall conform to the terms of the Term Sheet and contain other customary terms used in similar postpetition lending transactions, with the DIP Loan to be used to: (a) fund, among other things, ongoing working capital, general corporate, and other financing needs of the Debtors, (b) pay certain transaction fees, and other costs and expenses of administration of the Debtors' bankruptcy Cases, and (c) pay fees expenses owed to the Lender under the DIP Loan Documents, as set forth in the budget attached hereto as **Exhibit "1,"** as may be amended pursuant to the DIP Loan Documents. Provided that the Debtors are not in default under the terms of this Interim Order, the Term Sheet, or or and any other DIP Loan Documents approved by the Court, the Debtors are authorized to borrow under the DIP Loan from the Lender, in accordance with the terms and conditions of the Term Sheet and only in the amounts and at the times set forth in the Budget, the interim amount of $200,000 (pending a final hearing) and to use the DIP Loan to make payments as set forth in the Budget pending the Final Hearing in accordance with the Term Sheet and this Interim Order; <u>provided</u>, <u>however</u>, that, until entry of the Final Order and without further order of the Court, amounts actually advanced by the Lender shall not exceed those amounts set forth in the Budget through the date of entry of the Final Order. Upon their execution and delivery (or deemed execution and delivery pursuant to this Interim Order), the Term Sheet and any other DIP Loan Documents approved by the Court shall constitute a legal, valid, and binding obligation of the Debtors, enforceable against the Debtors in accordance with its terms.

3. <u>DIP Superpriority Claims</u>. For the DIP Loan and any other of the Debtors' obligations arising under the Term Sheet and any other DIP Loan Documents approved by the Court, the Lender is granted, pursuant to Section 364(c)(1), the allowed DIP Superpriority Claims, which are deemed to have priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in, or

ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or 1114 or otherwise, which allowed DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors as will provided in the DIP Loan Documents, provided, however, that the DIP Superpriority Claims shall be subject to (a) the allowed, accrued, but unpaid administrative claims of professionals employed by the Debtors and the Committee for fees and expenses as set forth in the Budget which may be paid from the DIP Loan or deposited into a segregated account as accrued and the Lender shall have no recourse against the funds paid to or deposited into the segregated account and (b) the payment of fees pursuant to 28 U.S.C. § 1930. The DIP Superpriority Claims shall be deemed legal, valid, binding, enforceable, and perfected claims, not subject to subordination, impairment or avoidance other than as provided herein, for all purposes in the Cases and any successor cases.

4. <u>DIP Liens</u>. As security for the repayment of the DIP Loan arising under the Term Sheet and any other DIP Loan Documents approved by the Court, pursuant to Sections 364(c) (2), (c) (3) and (d), the Lender is hereby granted (without the necessity of the execution by the Debtors or the filing, recordation, or execution and delivery of mortgages, security agreements, control agreements, financing statements, or otherwise) the DIP Liens, which shall be deemed immediately secured, valid, binding, continuing, enforceable, fully perfected, and unavoidable first priority liens in and on all prepetition and postpetition property and assets of the Debtors, including, but not limited to, all patents, patents pending, copyrights, and other intellectual property (the "<u>Collateral</u>"), provided, however, that the DIP Liens shall not extend or attach to, and the Collateral shall not include, causes of action under Chapter 5 of the Bankruptcy Code, including without limitation Sections 502(d), 544, 545, 547, 548, 549 and 550, any other avoidance actions under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, nonbankruptcy law, and the proceeds thereof, whether real or personal, tangible or intangible, and wherever located, and whether now existing or hereafter acquired, including proceeds, products, offspring, rents and profits thereof.

5. <u>Section 506(c) and 552(b) Waivers</u>. Effective upon entry of a Final Order providing for such relief, except as otherwise permitted by this Interim Order, the Term Sheet,

and any other DIP Loan Documents approved by the Court, neither the Collateral nor the Lender, nor any of its claims, shall be subject to any costs or expenses of administration that have been or may be incurred at any time, pursuant to Sections 105, 506(c) or 552, or otherwise, by the Debtors or any other party in interest without the prior written consent of the Lender, and no such consent shall be implied from any action, inaction, or acquiescence by any party, including, but not limited to, funding of the Debtors' ongoing operations by the Lender. Effective upon entry of a Final Order providing for such relief, the "equities of the case" exception contained in Section 552(b) shall be deemed waived with respect to the Collateral. The Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

6. <u>Authorization to Use Cash Collateral.</u> Upon entry of this Interim Order and during the term hereof, the Debtors are authorized pursuant to Sections 105, 361, 363, 541 and 553 and FRBP Rules 2002, 4001 and 9014, to use Cash Collateral in accordance with the Budget.

7. <u>Additional Perfection Measures</u>. The Lender shall not be required to file financing statements, mortgages, deeds of trust, security deeds, notices of lien, or similar instruments in any jurisdiction, or take any other action, to attach or perfect the security interests and liens granted under this Interim Order, the Term Sheet, and any other DIP Loan Documents approved by the Court (including, without limitation, taking possession of or obtaining control over any of the Collateral, or taking any action to have security interests or liens noted on certificates of title or similar documents). Notwithstanding the foregoing, the Lender may, in its discretion, file this Interim Order or such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments, or otherwise confirm perfection of such liens, security interests, and mortgages, without seeking modification of the automatic stay under Section 362, and all such documents shall be deemed to have been filed or recorded or other action taken on the Petition Date, with the priorities set forth herein; <u>provided,</u> that the failure of the Lender to file any such financing statement, mortgage, deed of trust, notice of lien or other instrument, or to

otherwise confirm perfection of such liens, security interests or mortgages or make any other such request shall not affect either the perfection or priority of the DIP Liens.

8. <u>Replacement Liens.</u>  The Purported Secured Creditors are hereby granted additional adequate protection in the form of replacement liens, with such replacement liens to have the same extent, validity, and priority as the prepetition liens held by such creditors, subject to the Lender's DIP Liens and any claims to challenge pre-petition liens.

9. <u>Binding Effect</u>.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the Lender, the Debtors and their respective successors and assigns, including any trustee hereafter appointed for the estate of any of the Debtors, whether in the Cases or any successor cases, including the conversion of the Cases to Cases under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Interim Order.

10. <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order (a) confirming any plan under chapter 11 of the Bankruptcy Code in the Cases (and, to the extent not satisfied in full in cash, the DIP Loan shall not be discharged by the entry of any such order, or pursuant to Section 1141(d)(4) , the Debtors having hereby waived such discharge), (b) approving any sale under Section 363, (c) converting the Cases to chapter 7 Case unless permitted under the DIP Loan Documents, or (d) to the maximum extent permitted by law, dismissing the Cases, unless permitted under the DIP Loan Documents, and notwithstanding the entry of any such order, the terms and provisions of this Interim Order shall continue in full force and effect, and the DIP Superpriority Claims and DIP Liens granted pursuant to this Interim Order, the Term Sheet, and any other DIP Loan Documents approved by the Court shall continue in full force and effect and shall maintain their priority as provided by this Interim Order and the DIP Loan Agreement to the maximum extent permitted by law until all of the DIP Loan is indefeasibly paid in full in cash or otherwise addressed pursuant to a confirmed plan.

11. <u>Authorization to Act</u>.  The Debtors are authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, mortgages and financing statements), and to pay interest,

fees and all other amounts as provided under this Interim Order, the Term Sheet, and any other DIP Loan Documents approved by the Court, which may be reasonably required or necessary for the Debtors' full and timely performance under this Interim Order, the Term Sheet, and any other DIP Loan Documents approved by the Court.

12. <u>Insurance Policies</u>. Upon entry of this Interim Order, the Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors which in any way relates to the Collateral and each liability insurance policy maintained by the Debtor.

13. <u>Subsequent Reversal</u>. If any or all of the provisions of this Interim Order, the Term Sheet, and any other DIP Loan Documents approved by the Court are hereafter modified, vacated, amended, or stayed by subsequent order of this Court or any other court: (a) such modification, vacatur, amendment, or stay shall not affect (i) the validity of any obligation of the Debtors to the Lender pursuant to this Interim Order that is or was incurred prior to the Lender receiving written notice of the effective date of such modification, vacatur, amendment, or stay (the "<u>Effective Date</u>"), or (ii) the validity, enforceability or priority of the DIP Superpriority Claims, DIP Liens, or other grant authorized or created by this Interim Order, the Term Sheet, and any other DIP Loan Documents approved by the Court that is or was incurred prior to such party receiving written notice of the Effective Date; (b) the DIP Loan pursuant to this Interim Order, the Term Sheet, and any other DIP Loan Documents approved by the Court arising prior to the Effective Date shall be governed in all respects by the provisions of this Interim Order, the Term Sheet, and any other DIP Loan Documents approved by the Court in effect immediately prior to the Effective Date; and (c) the use of Cash Collateral and the validity of any financing provided or security interest granted pursuant to this Interim Order, the Term Sheet, and any other DIP Loan Documents approved by the Court is and shall be protected by Section 364(e) . Notwithstanding any language in this Interim Order to the contrary, all findings and orders contained in this Interim Order shall be without prejudice to modification in any Final Order regarding the use of cash collateral or DIP financing, except that any such modification shall not apply with respect to any advances made pursuant to this Interim Order.

14. <u>Effect of Dismissal or Conversion of the Cases</u>. If the Cases are dismissed or converted, then neither the entry of such order nor the dismissal or conversion of the Cases shall affect the rights of the Lender under its documents or this Interim Order, and all of the respective rights and remedies thereunder of the Lender shall remain in full force and effect as if the Cases had not been dismissed or converted. If an order dismissing the Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349) that (i) the DIP Liens and DIP Superpriority Claims granted to and conferred upon the Lender and the protections afforded to the Lender pursuant to this Interim Order, the Term Sheet, and any other DIP Loan Documents approved by the Court shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Loan indebtedness shall have been paid and satisfied in full in cash (and that such DIP Liens, DIP Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties), (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens and DIP Superpriority Claims, and (iii) any hearing on a motion to dismiss the Cases shall require at least twenty-one (21) days' prior notice to the Lender, unless otherwise ordered by the Court for good cause shown.

15. <u>Findings of Fact and Conclusions of Law</u>. This Interim Order constitutes findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon the entry thereof.

16. <u>Controlling Effect of Order</u>. To the extent any provision of this Interim Order conflicts with any provision of the Motion, the Term Sheet, and any other DIP Loan Documents approved by the Court, the provisions of this Interim Order shall control.

17. <u>Final Hearing</u>. The Final Hearing shall be heard before this Court on [_____], 2015 at ___:___ ___.m. at the United States Bankruptcy Court for the Central District of California, Courtroom 1575, 255 East Temple Street, Los Angeles, CA 90012.

18. <u>Adequate Notice</u>. The notice given by the Debtor of the Interim Hearing was given in accordance with FRBP 4001(c)(2). Any party in interest objecting to the relief sought in the Final Order shall submit any such objection in writing and file same with the Court

(with a courtesy copy to chambers) and serve (so as to be received) such objection no later than [_____], 2015 at 5:00 p.m. (PDT). Any party replying to any such objection shall submit their reply in writing and file same with the Court (with a courtesy copy to chambers) and serve (so as to be received) such reply no later than [_____], 2015 at 5:00 p.m. (PDT).

**IT IS SO ORDERED.**

# # #

EXHIBIT "2"

# BINDING TERM SHEET – MEDIASHIFT, INC.

## November 12, 2015

**Borrowers:** MediaShift, Inc. and Ad-Vantage Networks, Inc. (joint and several) ("Borrowers").

**Lender:** Smith Micro Software, Inc. ("Smith") or its designee (with Smith, "Lender").

**Amount:** Up to $750,000 Post-Petition Debtor In Possession (DIP) Loan (the "DIP Loan").

**Term:** Maturity: The earlier of (1) the close of any sale of all or substantially all of Borrowers' assets pursuant to 11 U.S.C. § 363 and (2) February 29, 2016 (the "Maturity Date").

**Rate:** 10% simple.

**Origination Fee:** 5% of total available DIP Loan payable to Lender upon interim DIP Loan Approval.

**Exit Fee:** 5% of DIP Loan amount actually advanced upon repayment.

**Effective Date:** Upon the entry of an interim order approving the DIP Loan (the "Interim Order"), provided that the Interim Order is not subject to a stay pending appeal, the DIP Loan shall be effective and Borrowers shall be entitled to draw, and Lender shall be required to fund, amounts set forth in the budget through February 28, 2016 (the "Budget"), provided that the Budget has been approved by Lender.

**Prepayment:** Borrowers can pre-pay the DIP Loan prior to the Maturity Date without penalty, provided that Borrowers will still be required to pay the 5% Exit Fee.

**Collateral:**

- Lender to have a superpriority first priority lien secured position ahead of all creditors (no carve-out for professionals but line items in Budget – total of $250,000 – for professional fees).

- Lender to <u>prime</u> all existing secured creditors on all assets, including a <u>priming</u> first priority lien on all patents, all patents pending and all other assets.

- No lien on preference or fraudulent transfer causes of action.

**Documentation:** Standard DIP loan documents (to be drafted and lodged with the Court after entry of the Interim Order and before the final hearing on approval of the DIP Loan).

**Use of Proceeds:** The proceeds of the DIP Loan shall be used in accordance with the Budget.

**Conditions Precedent:**

- Existing secured lenders to be primed by DIP Loan with an order approving the DIP Loan containing good faith finding as to Lender and no stay pending appeal of order.

- Operating principals of the Borrowers (David Grant, Rick Baran, and Mike Spalter) to enter into standard Non-Compete Agreements with Borrower for a period of 3 years, in the event of foreclosure or acquisition substantially all of Borrowers' assets, including patents and other intellectual property, by Lender.

- Lender's pre-approval of Borrowers Budget.

- Lender must be paid in full upon the close of any sale of all or substantially all of Borrowers' assets pursuant to 11 U.S.C. § 363.

/ / /

/ / /

/ / /

- Subject mutual agreement between Borrowers and Lender for the terms of an asset purchase agreement, which terms shall not conflict with the terms of the DIP Loan, Lender may be a "stalking horse" bidder for all or substantially all of Borrowers' assets.

| Smith Micro Software, Inc. | MediaShift, Inc. and Ad-Vantage Networks, Inc. |
|---|---|
| *[signature]*<br>[sign name]<br>**Steven M. Yasbek**<br>**Vice President, Chief Financial Officer**<br>**Smith Micro Software, Inc.**<br>[print name]<br><br>Its:_____<br>[print position] | _____<br>Rick Baran, President |

- Subject mutual agreement between Borrowers and Lender for the terms of an asset purchase agreement, which terms shall not conflict with the terms of the DIP Loan, Lender may be a "stalking horse" bidder for all or substantially all of Borrowers' assets.

| Smith Micro Software, Inc. | MediaShift, Inc. and Ad-Vantage Networks, Inc. |
|---|---|
| *[signature]* | *[signature]* |
| [sign name] | Rick Baran, President |
| Steven M. Yasbek<br>Vice President, Chief Financial Officer<br>Smith Micro Software, Inc. | |
| [print name] | |
| Its:_____ | |
| [print position] | |

EXHIBIT "3"

**MediaShift / Ad-Vantage**
**Budget**

| | 11/12/2015 | 11/19/2015 | 11/26/2015 | 12/3/2015 | 12/10/2015 | 12/17/2015 | 12/24/2015 | 12/31/2015 | 1/7/2016 | 1/14/2016 | 1/21/2016 | 1/28/2016 | 2/4/2016 | 2/11/2016 | 2/18/2016 | 2/25/2016 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | TOTAL |
| **Beginning Cash** | 0 | 0 | 169,200 | 9,908 | 158,308 | 132,016 | 123,016 | 85,974 | 46,974 | 110,682 | 95,932 | 64,640 | 21,890 | 85,598 | 76,598 | 43,806 | 0 |
| **Cash Receipts** | | | | | | | | | | | | | | | | | |
| Cash on hand / Collection on receivables | 5,000 | 0 | 0 | 0 | 0 | 0 | 0 | 5,000 | 0 | 0 | 0 | 5,000 | 0 | 0 | 0 | 5,000 | 20,000 |
| DIP Financing | 0 | 200,000 | 0 | 200,000 | 0 | 0 | 0 | 0 | 200,000 | 0 | 0 | 0 | 100,000 | 0 | 0 | 0 | 700,000 |
| **Total Receipts** | 5,000 | 200,000 | 0 | 200,000 | 0 | 0 | 0 | 5,000 | 200,000 | 0 | 0 | 5,000 | 100,000 | 0 | 0 | 5,000 | 720,000 |
| **Disbursements (including un-paid post-petition amounts)** | | | | | | | | | | | | | | | | | |
| *Operating* | | | | | | | | | | | | | | | | | |
| Labor and Payroll Taxes | | | | | | | | | | | | | | | | | 0 |
| HRA - Health Plan | 0 | 0 | 5,000 | 0 | 0 | 0 | 5,000 | 0 | | 0 | 5,000 | 0 | | 0 | 5,000 | 0 | 20,000 |
| Executive Salaries | | 0 | 17,292 | 0 | 17,292 | 0 | 17,292 | 0 | 17,292 | 0 | 17,292 | 0 | 17,292 | 0 | 17,292 | 0 | 121,044 |
| Contractors | 3,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 138,000 |
| Rent | | 8,000 | | 4,000 | | | | 4,000 | | | | 4,000 | | | | | 20,000 |
| Rev Shares | | | | | | | | | | | | | | | | | 0 |
| Data Center | 1,000 | | | 5,000 | | | | 5,000 | | | | 5,000 | | | | 5,000 | 21,000 |
| Ad Server | 1,000 | | | 5,000 | | | | 5,000 | | | | 5,000 | | | | 5,000 | 21,000 |
| Technology Development | | | | 5,000 | | 5,000 | | | | 5,000 | | | 5,000 | | | | 20,000 |
| Software Licenses | | 1,000 | | 500 | | | 500 | | | 500 | | 500 | | | 500 | | 3,500 |
| Patent Attorney | | | | 10,000 | | | | 5,000 | | | | 5,000 | | | | 5,000 | 25,000 |
| Travel | | | | 1,000 | | | 1,000 | | | | | 1,000 | | | 1,000 | | 4,000 |
| Utilities | | 2,000 | | 2,000 | | | | 2,000 | | | | 2,000 | | | | 2,000 | 10,000 |
| Legal / APA | | | - | | | | | | | | | | | | | | 0 |
| Supplies | | | | 100 | | | 250 | | | | 250 | | | | | | 600 |
| Accountants for Tax filing | | | 15,000 | | | | | | | | | | | | | | 15,000 |
| Insurances | | | 13,000 | | | | | 13,000 | | | | 13,000 | | | | 13,000 | 52,000 |
| Commissions | | | | | | | | | | | | | | | | | 0 |
| Total | 5,000 | 20,000 | 59,292 | 41,600 | 26,292 | 9,000 | 37,042 | 44,000 | 26,292 | 14,750 | 31,292 | 44,500 | 31,292 | 9,000 | 32,792 | 39,000 | 471,144 |
| *Bankruptcy* | | | | | | | | | | | | | | | | | |
| Dip Fees to Lender | | 10,000 | 0 | 10,000 | 0 | 0 | 0 | 0 | 10,000 | 0 | 0 | 0 | 5,000 | 0 | 0 | 0 | 35,000 |
| Security Deposits | | 800 | | | | | | | | | | | | | | | 800 |
| Broker fee | | | | | | | | | | | | | | | | | 0 |
| U.S. Trustee Fees | | | | | | | | | | | | 3,250 | | | | | 3,250 |
| Debtors' Legal Fees (Debtors' Counsel and Committee Counsel) | | | 100,000 | | | | | | 100,000 | | | | | | | | 200,000 |
| Total | 0 | 10,800 | 100,000 | 10,000 | 0 | 0 | 0 | 0 | 110,000 | 0 | 0 | 3,250 | 5,000 | 0 | 0 | 0 | 239,050 |
| **Total Disbursements** | 5,000 | 30,800 | 159,292 | 51,600 | 26,292 | 9,000 | 37,042 | 44,000 | 136,292 | 14,750 | 31,292 | 47,750 | 36,292 | 9,000 | 32,792 | 39,000 | 710,194 |
| **Ending Cash** | 0 | 169,200 | 9,908 | 158,308 | 132,016 | 123,016 | 85,974 | 46,974 | 110,682 | 95,932 | 64,640 | 21,890 | 85,598 | 76,598 | 43,806 | 9,806 | 9,806 |

EXHIBIT "4"



Do It Yourself Doesn't Mean Do It Alone!

Call CLAS For Assistance: 800.952.5696

# UCC Search Report

| | |
|---:|:---|
| **Type of Search :** | UCCs and Federal Tax Liens |
| **Jurisdiction/Filing Office :** | State of Nevada, Secretary of State Uniform Commercial Code Division |
| **Effective Index Date :** | Sep. 17, 2015 |
| **Subject Search Name :** | MEDIASHIFT |
| **Search Key Entered :** | MEDIASHIFT |

# Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of Nevada, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein.
**Certification can only be obtained through the office of the Nevada Secretary of State.**

### 1. Financing Statement

| | |
|---:|:---|
| **Document No. :** | 2013027283-8      **Lapses:** 10/22/2018 |
| **Filed :** | 10/22/2013 |
| **Debtor :** | MEDIASHIFT, INC.<br>20062 SW BIRCH ST, STE 220<br>NEWPORT BEACH  CA  92660 |
| **Secured Party:** | FAST PAY PARTNERS, LLC<br>9300 WILSHIRE BLVD., SUITE 500<br>BEVERLY HILLS  CA  90212 |
| **Amendment Type :** | Termination |
| **File No. :** | 2015005490-5 |
| **Filed :** | 3/2/2015 |

### 2. Financing Statement

| | |
|---:|:---|
| **Document No. :** | 2014001180-2      **Lapses:** 1/15/2019 |
| **Filed :** | 1/15/2014 |
| **Debtor :** | MEDIASHIFT, INC.<br>20062 SW BIRCH ST. #220<br>NEWPORT BEACH  CA  92660 |
| **Secured Party:** | ELEVATION FUND, LLC<br>5825 E IRISH PLACE<br>CENTENNIAL  CO  80112 |
| **Secured Party:** | KIRBY ENTERPRISE FUND, LLC<br>5825 IRISH PLACE<br>CENTENNIAL  CO  80112 |
| **Secured Party:** | VELDKAMP, JAMES A<br>2324 S CLAYTON STREET<br>DENVER  CO  80210 |
| **Secured Party:** | WEST HAMPTON SPECIAL SITUATIONS FUND, LLC<br>5825 IRISH PLACE<br>CENTENNIAL  CO  80112 |

### 3. Financing Statement

**Document No. :** 2014003724-8     **Lapses:** 2/11/2019

**Filed :** 2/11/2014

**Debtor :** MEDIASHIFT, INC.
20062 S.W. BIRCH STREET, SUITE 220
NEWPORT BEACH  CA  92660

**Secured Party:** JMW FUND, LLC
4 RICHLAND PLACE
PASADENA  CA  91103

**Secured Party:** RICHLAND FUND, LLC
4 RICHLAND PLACE
PASADENA  CA  91103

## 4. Financing Statement

**Document No. :** 2014009177-3     **Lapses:** 4/14/2019

**Filed :** 4/14/2014

**Debtor :** MEDIASHIFT, INC.
20062 S.W. BIRCH STREET, SUITE 220
NEWPORT BEACH  CA  92660

**Secured Party:** ELEVATION FUND, LLC
5825 E. IRISH PLACE
CENTENNIAL  CO  80112

**Secured Party:** KIRBY ENTERPRISE FUND, LLC
5825 E. IRISH PLACE
CENTENNIAL  CO  80112

## 5. Financing Statement

**Document No. :** 2014013123-6     **Lapses:** 5/28/2019

**Filed :** 5/28/2014

**Debtor :** MEDIASHIFT, INC.
20062 S. W. BIRCH STREET, SUITE 220
NEWPORT BEACH  CA  92660

**Secured Party:** FISK INVESTMENTS, LLC
4550 CHERRY CREEK DRIVE
SOUTH GLENDALE  CO  80246

## 6. Financing Statement

**Document No. :** 2014016399-2     **Lapses:** 6/27/2019

**Filed :** 6/27/2014

**Debtor :** MEDIASHIFT, INC.
20062 S. W. BIRCH STREET, SUITE 220
NEWPORT BEACH  CA  92660

**Secured Party:** KEARNEY HOLDINGS, LLC
5825 E. IRISH PLACE
CENTENNIAL  CO  80112

**Secured Party:** KEARNEY PROPERTIES, LLC
5825 E. IRISH PLACE
CENTENNIAL  CO  80112

**Secured Party:** LARSON, DON
500 FORD ROAD
ST. LOUIS PARK  MN  55426

## 7. Financing Statement

**Document No. :** 2014028284-3     **Lapses:** 11/3/2019

**Filed :** 11/3/2014

**Debtor :** MEDIASHIFT, INC.
600 NORTH BRAND BLVD., SUITE 230
GLENDALE  CA  91203

**Secured Party:** MEDIASHIFT HOLDINGS, INC.
4500 CHERRY CREEK DRIVE SOUTH, SUITE 550
GLENDALE  CO  80246

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

**---------- END OF REPORT ----------**

## Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
TRACY HUFF

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

TRACY HUFF
FIRST CORPORATE SOLUTIONS
914 S STREET
SACRAMENTO, CA 95814

Filed in the office of
Ross Miller
Secretary of State
State of Nevada

Document Number
2013027283-8
Filing Date and Time
10/22/2013 11:02 AM

(This document was filed electronically.)
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| MEDIASHIFT, INC. | | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 20062 SW BIRCH ST, STE 220 | NEWPORT BEACH | CA | 92660 | |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME |
|---|
| |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| FAST PAY PARTNERS, LLC | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 9300 WILSHIRE BLVD., SUITE 500 | BEVERLY HILLS | CA | 90212 | |

4. This FINANCING STATEMENT covers the following collateral:

ALL OF THE DEBTOR'S ACCOUNTS, BOOKS AND RECORDS, CONTRACT RIGHTS, DEPOSIT ACCOUNTS, DOCUMENTS, EQUIPMENT, URLS, GENERAL INTANGIBLES (INCLUDING INTELLECTUAL PROPERTY, PATENTS, TRADEMARKS, COPYRIGHTS AND LICENSES THEREOF),
GOODS, INSTRUMENTS, INVENTORY, INVESTMENT PROPERTY, LETTER-OF-CREDIT RIGHTS, LETTERS OF CREDIT, AND ALL SUMS ON
DEPOSIT IN ANY COLLECTION OR DEPOSIT ACCOUNT; ANY MONEY, OR OTHER ASSETS OF DEBTOR THAT COME INTO THE POSSESSION,
CUSTODY, OR CONTROL OF SECURED PARTY NOW OR IN THE FUTURE; PROCEEDS OF ANY OF THE ABOVE; AND ALL OF THE ABOVE
COLLATERAL, WHETHER NOW OWNED OR EXISTING OR ACQUIRED NOW OR IN THE FUTURE OR IN WHICH DEBTOR HAS RIGHTS NOW OR
IN THE FUTURE.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
TRACY HUFF

B. E-MAIL CONTACT AT FILER (optional)
TRACYH@FICOSO.COM

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

TRACY HUFF
FIRST CORPORATE SOLUTIONS
914 S STREET
SACRAMENTO, CA 95814

Filed in the office of

*Barbara K. Cegavske*
Barbara K. Cegavske
Secretary of State
State of Nevada

Document Number
**2015005490-5**

Filing Date and Time
**03/02/2015 1:40 PM**

**THIS DOCUMENT WAS FILED ELECTRONICALLY**
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
2013027283-8

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in Item 13

2. ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in Item 7a or 7b, and address of Assignee in Item 7c and name of Assignor in Item 9
For partial assignment, complete Items 7 and 9 and also indicate affected collateral in Item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:          AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record | ☐ CHANGE name and/or address: Complete Item 6a or 6b; and Item 7a or 7b and Item 7c | ☐ ADD name: Complete Item 7a or 7b, and Item 7c | ☐ DELETE name: Give record name to be deleted in Item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME |
|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME |
| | INDIVIDUAL'S FIRST PERSONAL NAME |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME FAST PAY PARTNERS, LLC | | | |
|---|---|---|---|---|
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Howard Kern                                3108576342

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Howard Kern
HOWARD J. KERN, PC
579 Erskine Drive
Pacific Palisades, CA 90272

Filed in the office of

Ross Miller
Secretary of State
State of Nevada

Document Number
2014001180-2

Filing Date and Time
01/15/2014 10:09 AM

(This document was filed electronically.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| MEDIASHIFT, INC. | | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 20052 SW BIRCH ST. #220 | NEWPORT BEACH | CA | 92660 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME |
|---|

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| KIRBY ENTERPRISE FUND, LLC | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5825 IRISH PLACE | CENTENNIAL | CO | 80112 | USA |

4. This FINANCING STATEMENT covers the following collateral:

?COLLATERAL? SHALL MEAN AND INCLUDE ALL RIGHT, TITLE, INTEREST, CLAIMS AND DEMANDS OF THE DEBTOR IN AND TO EACH AND EVERY ACCOUNTS RECEIVABLE, WHETHER NOW OWNED OR HEREAFTER ACQUIRED, TOGETHER WITH ALL SUBSTITUTIONS, RENEWALS OR REPLACEMENTS OF AND ADDITIONS, IMPROVEMENTS, REPLACEMENT PARTS AND ACCUMULATIONS TO ANY AND ALL OF SUCH ASSETS.

| 5. ALTERNATIVE DESIGNATION (if applicable): | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

# UCC FINANCING STATEMENT ADDITIONAL PARTY
**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

## 19. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

| | | | |
|---|---|---|---|
| 19a. ORGANIZATION'S NAME<br>MEDIASHIFT, INC. | | | |

OR

| 19b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
|---|---|---|
| | | |

**20. MISCELLANEOUS:**

[This document was filed electronically.]
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

## 21. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (21a or 21b) - do not abbreviate or combine names

| 21a. ORGANIZATION'S NAME |
|---|
| |

OR

| 21b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 21d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 21e. TYPE OF ORGANIZATION | 21f. JURISDICTION OF ORGANIZATION | 21g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

## 22. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (22a or 22b) - do not abbreviate or combine names

| 22a. ORGANIZATION'S NAME |
|---|
| |

OR

| 22b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 22d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 22e. TYPE OF ORGANIZATION | 22f. JURISDICTION OF ORGANIZATION | 22g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

## 23. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (23a or 23b) - do not abbreviate or combine names

| 23a. ORGANIZATION'S NAME |
|---|
| |

OR

| 23b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 23d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 23e. TYPE OF ORGANIZATION | 23f. JURISDICTION OF ORGANIZATION | 23g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

## 24. ADDITIONAL SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE) - insert only one name (24a or 24b)

| 24a. ORGANIZATION'S NAME<br>WEST HAMPTON SPECIAL SITUATIONS FUND, LLC |
|---|
| |

OR

| 24b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 24c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5825 IRISH PLACE | CENTENNIAL | CO | 80112 | USA |

## 25. ADDITIONAL SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE) - insert only one name (25a or 25b)

| 25a. ORGANIZATION'S NAME<br>ELEVATION FUND, LLC |
|---|
| |

OR

| 25b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 25c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5825 E IRISH PLACE | CENTENNIAL | CO | 80112 | USA |

# UCC FINANCING STATEMENT ADDITIONAL PARTY
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

## 19. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

| | 19a. ORGANIZATION'S NAME |
|---|---|
| OR | MEDIASHIFT, INC. |

| | 19b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
|---|---|---|---|
| | | | |

## 20. MISCELLANEOUS:

[This document was filed electronically.]
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

## 21. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one name (21a or 21b) - do not abbreviate or combine names

| | 21a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 21b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 21d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 21e. TYPE OF ORGANIZATION | 21f. JURISDICTION OF ORGANIZATION | 21g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

## 22. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one name (22a or 22b) - do not abbreviate or combine names

| | 22a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 22b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 22d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 22e. TYPE OF ORGANIZATION | 22f. JURISDICTION OF ORGANIZATION | 22g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

## 23. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one name (23a or 23b) - do not abbreviate or combine names

| | 23a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 23b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 23d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 23e. TYPE OF ORGANIZATION | 23f. JURISDICTION OF ORGANIZATION | 23g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

## 24. ADDITIONAL SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE) - insert only one name (24a or 24b)

| | 24a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 24b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | VELDKAMP | JAMES | A | |

| 24c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2324 S CLAYTON STREET | DENVER | CO | 80210 | |

## 25. ADDITIONAL SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE) - insert only one name (25a or 25b)

| | 25a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 25b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 25c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
NICOLE PARNELL                           949-955-9585

B. SEND ACKNOWLEDGMENT TO:   (Name and Address)

NICOLE PARNELL
CHARLES BACLET AND ASSOCIATES, INC.
2030 MAIN STREET,
SUITE 1030
IRVINE, CA 92614

Filed in the office of

Ross Miller
Secretary of State
State of Nevada

Document Number
2014003724-8
Filing Date and Time
02/11/2014 4:01 PM

(This document was filed electronically.)
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MEDIASHIFT, INC. | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 20062 S.W. BIRCH STREET, SUITE 220 | NEWPORT BEACH | CA | 92660 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| RICHLAND FUND, LLC | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4 RICHLAND PLACE | PASADENA | CA | 91103 | |

4. This FINANCING STATEMENT covers the following collateral:

ALL RIGHT, TITLE AND INTEREST OF THE DEBTOR IN AND TO THE COLLATERAL. ?COLLATERAL? SHALL MEAN AND INCLUDE ALL RIGHT, TITLE, INTEREST, CLAIMS AND DEMANDS OF THE DEBTOR IN AND TO EACH AND EVERY ASSET, TANGIBLE AND INTANGIBLE, IN WHICH THE DEBTOR HAS ANY RIGHT, TITLE, INTEREST, CLAIM OR DEMAND, INCLUDING, BUT NOT LIMITED TO, ACCOUNTS RECEIVABLE, EQUIPMENT, FIXTURES, REAL AND PERSONAL PROPERTY, PATENTS, TRADEMARKS, COPYRIGHTS, TRADE SECRETS, CONFIDENTIAL INFORMATION AND ANY OTHER PROPRIETARY OR INTELLECTUAL PROPERTY RIGHTS, WHETHER NOW OWNED OR HEREAFTER ACQUIRED, TOGETHER WITH ALL SUBSTITUTIONS, RENEWALS OR REPLACEMENTS OF AND ADDITIONS, IMPROVEMENTS, REPLACEMENT PARTS AND ACCUMULATIONS TO ANY AND ALL OF SUCH ASSETS.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

# UCC FINANCING STATEMENT ADDITIONAL PARTY
**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

## 19. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

| | 19a. ORGANIZATION'S NAME |
|---|---|
| OR | MEDIASHIFT, INC. |

| | 19b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
|---|---|---|---|
| | | | |

20. MISCELLANEOUS:

(This document was filed electronically.)
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

## 21. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one name (21a or 21b) - do not abbreviate or combine names

| | 21a. ORGANIZATION'S NAME |
|---|---|
| OR | |

| | 21b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 21d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 21e. TYPE OF ORGANIZATION | 21f. JURISDICTION OF ORGANIZATION | 21g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

## 22. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one name (22a or 22b) - do not abbreviate or combine names

| | 22a. ORGANIZATION'S NAME |
|---|---|
| OR | |

| | 22b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 22d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 22e. TYPE OF ORGANIZATION | 22f. JURISDICTION OF ORGANIZATION | 22g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

## 23. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one name (23a or 23b) - do not abbreviate or combine names

| | 23a. ORGANIZATION'S NAME |
|---|---|
| OR | |

| | 23b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 23d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 23e. TYPE OF ORGANIZATION | 23f. JURISDICTION OF ORGANIZATION | 23g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

## 24. ADDITIONAL SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE) - Insert only one name (24a or 24b)

| | 24a. ORGANIZATION'S NAME |
|---|---|
| OR | JMW FUND, LLC |

| | 24b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 24c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4 RICHLAND PLACE | PASADENA | CA | 91103 | |

## 25. ADDITIONAL SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE) - Insert only one name (25a or 25b)

| | 25a. ORGANIZATION'S NAME |
|---|---|
| OR | |

| | 25b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 25c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
NICOLE PARNELL                    949-955-9585

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

NICOLE PARNELL
CHARLES BACLET AND ASSOCIATES, INC.
2030 MAIN STREET,
SUITE 1030
IRVINE, CA 92614

Filed in the office of

*Ross Miller*
Ross Miller
Secretary of State
State of Nevada

Document Number
**2014009177-3**
Filing Date and Time
**04/14/2014 2:36 PM**

(This document was filed electronically.)
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MEDIASHIFT, INC. | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 20062 S.W. BIRCH STREET, SUITE 220 | NEWPORT BEACH | CA | 92660 | |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| KIRBY ENTERPRISE FUND, LLC | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 5825 E. IRISH PLACE | CENTENNIAL | CO | 80112 | |

4. This FINANCING STATEMENT covers the following collateral:

?COLLATERAL? SHALL MEAN AND INCLUDE ALL RIGHT, TITLE, INTEREST, CLAIMS AND DEMANDS OF THE DEBTOR IN AND TO EACH AND EVERY ASSET, TANGIBLE AND INTANGIBLE, IN WHICH THE DEBTOR HAS ANY RIGHT, TITLE, INTEREST, CLAIM OR DEMAND, INCLUDING, BUT NOT LIMITED TO, ACCOUNTS RECEIVABLE, EQUIPMENT, FIXTURES, REAL AND PERSONAL PROPERTY, PATENTS, TRADEMARKS, COPYRIGHTS, TRADE SECRETS, CONFIDENTIAL INFORMATION AND ANY OTHER PROPRIETARY OR INTELLECTUAL PROPERTY RIGHTS, WHETHER NOW OWNED OR HEREAFTER ACQUIRED, TOGETHER WITH ALL SUBSTITUTIONS, RENEWALS OR REPLACEMENTS OF AND ADDITIONS, IMPROVEMENTS, REPLACEMENT PARTS AND ACCUMULATIONS TO ANY AND ALL OF SUCH ASSETS.

| 5. ALTERNATIVE DESIGNATION (If applicable): | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

**FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)**

# UCC FINANCING STATEMENT ADDITIONAL PARTY
**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

## 19. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

| OR | 19a. ORGANIZATION'S NAME MEDIASHIFT, INC. | | |
|---|---|---|---|
| | 19b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |

**20. MISCELLANEOUS:**

(This document was filed electronically.)
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

## 21. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (21a or 21b) - do not abbreviate or combine names

| OR | 21a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 21b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 21d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 21e. TYPE OF ORGANIZATION | 21f. JURISDICTION OF ORGANIZATION | 21g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

## 22. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (22a or 22b) - do not abbreviate or combine names

| OR | 22a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 22b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 22d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 22e. TYPE OF ORGANIZATION | 22f. JURISDICTION OF ORGANIZATION | 22g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

## 23. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (23a or 23b) - do not abbreviate or combine names

| OR | 23a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 23b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 23d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 23e. TYPE OF ORGANIZATION | 23f. JURISDICTION OF ORGANIZATION | 23g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

## 24. ADDITIONAL SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE) - insert only one name (24a or 24b)

| OR | 24a. ORGANIZATION'S NAME ELEVATION FUND, LLC | | | |
|---|---|---|---|---|
| | 24b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | 24c. MAILING ADDRESS 5825 E. IRISH PLACE | CITY CENTENNIAL | STATE CO | POSTAL CODE 80112 | COUNTRY |

## 25. ADDITIONAL SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE) - insert only one name (25a or 25b)

| OR | 25a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 25b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | 25c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Howard Kern                                     3108576342

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Howard Kern
HOWARD J. KERN, PC
579 Erskine Drive
Pacific Palisades, CA 90272

Filed in the office of

Ross Miller
Secretary of State
State of Nevada

Document Number
2014013123-6

Filing Date and Time
05/28/2014 7:31 AM

(This document was filed electronically.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MEDIASHIFT, INC. | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 20062 S. W. BIRCH STREET, SUITE 220 | NEWPORT BEACH | CA | 92660 | UNITE |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| FISK INVESTMENTS, LLC | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4550 CHERRY CREEK DRIVE | SOUTH GLENDALE | CO | 80246 | UNITE |

4. This FINANCING STATEMENT covers the following collateral:

"COLLATERAL" SHALL MEAN AND INCLUDE ALL RIGHT, TITLE, INTEREST, CLAIMS AND DEMANDS OF THE DEBTOR IN AND TO EACH AND EVERY ASSET, TANGIBLE AND INTANGIBLE, IN WHICH THE DEBTOR HAS ANY RIGHT, TITLE, INTEREST, CLAIM OR DEMAND, INCLUDING, BUT NOT LIMITED TO, ACCOUNTS RECEIVABLE, EQUIPMENT, FIXTURES, REAL AND PERSONAL PROPERTY, PATENTS, TRADEMARKS, COPYRIGHTS, TRADE SECRETS, CONFIDENTIAL INFORMATION AND ANY OTHER PROPRIETARY OR INTELLECTUAL PROPERTY RIGHTS, WHETHER NOW OWNED OR HEREAFTER ACQUIRED, TOGETHER WITH ALL SUBSTITUTIONS, RENEWALS OR REPLACEMENTS OF AND ADDITIONS, IMPROVEMENTS, REPLACEMENT PARTS AND ACCUMULATIONS TO ANY AND ALL OF SUCH ASSETS.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Howard Kern                                    3108576342

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

```
┌                                              ┐
  Howard Kern
  HOWARD J. KERN, PC
  579 Erskine Drive
  Pacific Palisades, CA 90272

└                                              ┘
```

Filed in the office of

Ross Miller
Secretary of State
State of Nevada

Document Number
2014016399-2

Filing Date and Time
06/27/2014 9:10 AM

(This document was filed electronically.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| MEDIASHIFT, INC. | | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 20052 S. W. BIRCH STREET, SUITE 220 | NEWPORT BEACH | CA | 92660 | US |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| KEARNEY HOLDINGS, LLC | | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5825 E. IRISH PLACE | CENTENNIAL | CO | 80112 | US |

4. This FINANCING STATEMENT covers the following collateral:

"COLLATERAL" SHALL MEAN AND INCLUDE ALL RIGHT, TITLE, INTEREST, CLAIMS AND DEMANDS OF THE DEBTOR IN AND TO EACH AND EVERY ASSET, TANGIBLE AND INTANGIBLE, IN WHICH THE DEBTOR HAS ANY RIGHT, TITLE, INTEREST, CLAIM OR DEMAND, INCLUDING, BUT NOT LIMITED TO, ACCOUNTS RECEIVABLE, EQUIPMENT, FIXTURES, REAL AND PERSONAL PROPERTY, PATENTS, TRADEMARKS, COPYRIGHTS, TRADE SECRETS, CONFIDENTIAL INFORMATION AND ANY OTHER PROPRIETARY OR INTELLECTUAL PROPERTY RIGHTS, WHETHER NOW OWNED OR HEREAFTER ACQUIRED, TOGETHER WITH ALL SUBSTITUTIONS, RENEWALS OR REPLACEMENTS OF AND ADDITIONS, IMPROVEMENTS, REPLACEMENT PARTS AND ACCUMULATIONS TO ANY AND ALL OF SUCH ASSETS.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.     Attach Addendum     [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]     [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

# UCC FINANCING STATEMENT ADDITIONAL PARTY
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

## 19. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

| | |
|---|---|
| 19a. ORGANIZATION'S NAME | MEDIASHIFT, INC. |

OR

| 19b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
|---|---|---|
| | | |

20. MISCELLANEOUS:

(This document was filed electronically.)
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

## 21. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one name (21a or 21b) - do not abbreviate or combine names

| 21a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 21b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 21d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 21e. TYPE OF ORGANIZATION | 21f. JURISDICTION OF ORGANIZATION | 21g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

## 22. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one name (22a or 22b) - do not abbreviate or combine names

| 22a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 22b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 22d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 22e. TYPE OF ORGANIZATION | 22f. JURISDICTION OF ORGANIZATION | 22g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

## 23. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one name (23a or 23b) - do not abbreviate or combine names

| 23a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 23b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 23d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 23e. TYPE OF ORGANIZATION | 23f. JURISDICTION OF ORGANIZATION | 23g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

## 24. ADDITIONAL SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE) - insert only one name (24a or 24b)

| 24a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 24b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| LARSON | DON | | |

| 24c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 500 FORD ROAD | ST. LOUIS PARK | MN | 55426 | US |

## 25. ADDITIONAL SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE) - insert only one name (25a or 25b)

| 25a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| KEARNEY PROPERTIES, LLC | | | | |

OR

| 25b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 25c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5825 E. IRISH PLACE | CENTENNIAL | CO | 80112 | US |

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDITIONAL PARTY (FORM UCC1AP) (REV. 05/22/02)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|

| B. E-MAIL CONTACT AT FILER (optional) |
|---|

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Corporation Service Company
830 Bear Tavern Road
Suite 305
West Trenton, New Jersey 08628

**Filed in the office of**

Ross Miller
Secretary of State
State of Nevada

Document Number
**2014028284-3**

Filing Date and Time
**11/03/2014 5:03 PM**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MediaShift, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 North Brand Blvd., Suite 230 | Glendale | CA | 91203 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MediaShift Holdings, Inc. | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4500 Cherry Creek Drive South, Suite 550 | Glendale | CO | 80246 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

See attached Exhibit A.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
File with NV SOS                    360417 004

# EXHIBIT A

## Collateral

All rights, titles, and interests of Debtor in, to, and under all the following property held, in all its forms, whether now or hereafter existing, whether now owned or hereafter acquired, created or arising, and wherever located (collectively, but without duplication, and except for any Excluded Collateral, the "**Collateral**"):

    (i)      all Accounts;

    (ii)     all Equipment;

    (iii)    all Inventory;

    (iv)    all General Intangibles;

    (v)     all Fixtures;

    (vi)    all Documents, Chattel Paper, and Letter-of-Credit Rights;

    (vii)   all Deposit Accounts;

    (viii)  all Instruments and Investment Property;

    (ix)    all Commercial Tort Claims;

    (x)     all Supporting Obligations; and

    (xi)    all Proceeds of any and all of the foregoing.


The following terms, as used herein, have the corresponding meanings:

"**Account**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, any right to payment arising out of goods or other property (including, without limitation, intellectual property) sold or leased, licensed, assigned or disposed of or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance, including all rights to payment of rents and other obligations under any lease, license, or other contract, and all rights incident thereto.

"**Chattel Paper**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, a writing or writings which evidence both a monetary obligation and a security interest in, or a lease of, specific goods.

"**Commercial Tort Claims**" is used as defined in the Uniform Commercial Code, except it shall refer only to such claims that have been asserted in judicial proceedings.

Page 1 of 4

"**Deposit Account**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, any demand, time, savings, passbook or other deposit account, except that it shall not include any Excluded Deposit Account.

"**Document**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, any bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the Person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers.

"**Equipment**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, tangible personal property held by Debtor for use primarily in business and shall include equipment, machinery, furniture, vehicles, fixtures, furnishings, dyes, tools, and all accessories and parts now or hereafter affixed thereto as well as all attachments, replacements, substitutes, accessories, additions and improvements to any of the foregoing, but Equipment shall not include Inventory.

"**Excluded Collateral**" means (1) assets subject to capital leases, purchase money financing, and cash to secure letter-of-credit reimbursement obligations, to the extent such capital leases, purchase money financing or letters of credit prohibit other liens and are permitted under the terms of any indebtedness secured by the security interest evidenced hereby; and (2) assets sold to a person who is not an obligor of any such indebtedness in compliance with the terms of such indebtedness.

"**Excluded Deposit Accounts**" means any deposit accounts exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of the employees of the Debtor or any other obligor of the indebtedness secured by the security interest evidenced hereby.

"**Fixtures**" is used as defined in the Uniform Commercial Code.

"**General Intangibles**" is used as defined in the Uniform Commercial Code but in any event shall include, but not be limited to, all personal property of every kind and description other than Goods, Accounts, Fixtures, Documents, Letter-of-Credit Rights, Chattel Paper, Deposit Accounts, Instruments, Investment Property, Commercial Tort Claims and Supporting Obligations, and shall include, without limitation, payment intangibles, contract rights (other than Accounts), franchises, licenses, choses in action, books, records, customer lists, tax, insurance and other kinds of refunds, patents, trademarks, trade names, service marks, slogans, trade dress, copyrights, other intellectual property rights and applications for intellectual property rights, goodwill, plans, licenses, software (to the extent it does not constitute Goods) and other rights in personal property.

"**Goods**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, all computer programs imbedded in goods and any supporting information provided in connection with the transaction relating to the program and all other things that are movable.

"**Instruments**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, promissory notes, negotiable certificates of deposit, a negotiable instrument or a security or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is, in the ordinary course of business, transferred by delivery with any necessary endorsement or assignment.

"**Inventory**" is used as defined in the Uniform Commercial Code but in any event shall include, but not be limited to, tangible personal property held by or on behalf of Debtor (or in which Debtor has an interest in mass or a joint or other interest) for sale or lease or to be furnished under contracts of service, tangible personal property which Debtor has so leased or furnished, and raw materials, work in process and materials used, produced or consumed in Debtor's business, and shall include tangible personal property returned to Debtor by the purchaser following a sale thereof by Debtor and tangible personal property represented by Documents. All equipment, accessories and parts at any time attached or added to items of Inventory or used in connection therewith shall be deemed to be part of the Inventory.

"**Investment Property**" is used as defined in the Uniform Commercial Code but in any event shall include, but not be limited to, all securities, whether certificated or uncertificated, all financial assets, all security entitlements, all securities accounts, all commodity contracts and all commodity accounts.

"**Letter-of-Credit Right**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, any right to payment or performance under a letter of credit, whether or not the beneficiary has demanded or is at the time entitled to demand payment or performance.

"**Proceeds**" is used as defined in the Uniform Commercial Code but, in any event, shall include, but not be limited to, (a) any and all proceeds of any insurance (whether or not the Secured Party is named as the loss payee thereof), indemnity, warranty or guaranty payable to Debtor or the Secured Party from time to time with respect to any of the Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any person acting under color of governmental authority), (c) any and all amounts received when Collateral is sold, leased, licensed, exchanged, collected or disposed of, (d) any rights arising out of Collateral, and (e) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"**Software**" is used as defined in the Uniform Commercial Code but in any event, shall include, but not be limited to, any computer program or supporting information provided in connection with the transaction relating to the program.

"**Supporting Obligations**" is used as defined in the Uniform Commercial Code but in any event shall include, but not be limited to, guarantees and letters of credit that support payment of another obligation.

"**Uniform Commercial Code**" means the Uniform Commercial Code in effect on the date hereof and as amended from time to time, as enacted in the state in which this UCC-1 financing statement is filed or recorded, or in any state or states which, pursuant to the Uniform Commercial Code as enacted in the state in which this UCC-1 financing statement is filed or recorded, has jurisdiction with respect to all, or any portion of, the Collateral from time to time. The parties intend that the definitions set forth above should be construed in their broadest sense so that Collateral will be construed in its broadest sense. Accordingly, if there are, from time to time, changes to defined terms in the Uniform Commercial Code that broaden the definitions, they are incorporated herein and if existing definitions in the Uniform Commercial Code are broader than the amended definitions, the existing ones shall be controlling. Similarly, where the phrase "as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to . . ." is used above, it means as defined in the Uniform Commercial Code except that if any of the enumerated types of items specified thereafter would not fall within the Uniform Commercial Code definition, they shall nonetheless be included in the applicable definition for purposes of this Agreement.

EXHIBIT "5"

# Delaware

*Page 1*

### The First State

CERTIFICATE

SEARCHED SEPTEMBER 28, 2015 AT 2:31 P.M.
FOR DEBTOR, AD-VANTAGE NETWORKS, INC.

   1 OF 3         FINANCING STATEMENT         20113434050

               EXPIRATION DATE: 09/07/2016
DEBTOR:       AD-VANTAGE NETWORKS, INC.

             23052-H ALICIA PARKWAY, #371      ADDED    09-07-11

             MISSION VIEJO, CA 92692

SECURED:     JPG INVESTMENTS, LLC

             4 RICHLAND PLACE           ADDED    09-07-11

             PASADENA, CA 91103

### F I L I N G   H I S T O R Y

| 20113434050 | FILED 09-07-11 | AT 12:21 P.M. | FINANCING STATEMENT |
| 20151025039 | FILED 03-11-15 | AT 1:54 P.M. | TERMINATION |
| 20151318848 | FILED 03-30-15 | AT 12:20 P.M. | TERMINATION |

   2 OF 3         FINANCING STATEMENT         20122729657

               EXPIRATION DATE: 07/16/2017
DEBTOR:       AD-VANTAGE NETWORKS, INC.



Jeffrey W. Bullock, Secretary of State

20157412335-UCC11
SR# 20150289314

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 10141654
Date: 09-28-15

600 N. BRAND BLVD., SUITE 230          ADDED    07-16-12

GLENDALE, CA 91203

SECURED:      JMG EXPLORATION, INC.

180 SOUTH LAKE AVENUE, SEVENTH        ADDED    07-16-12

FLOOR

PASADENA, CA 91101


### FILING HISTORY

20122729657     FILED 07-16-12    AT 4:24 P.M.    FINANCING STATEMENT

20151330298     FILED 03-30-15    AT 3:47 P.M.    TERMINATION


3 OF 3              FINANCING STATEMENT              20144404059

EXPIRATION DATE: 10/31/2019

DEBTOR:      AD-VANTAGE NETWORKS, INC.

600 NORTH BRAND BLVD., SUITE 230      ADDED    10-31-14

GLENDALE, CA 91203

SECURED:      MEDIASHIFT HOLDINGS, INC.

4500 CHERRY CREEK DRIVE SOUTH,        ADDED    10-31-14

SUITE 550

GLENDALE, CO 80246



Jeffrey W. Bullock, Secretary of State

# Delaware

## The First State

*F I L I N G   H I S T O R Y*

*20144404059     FILED 10-31-14     AT 5:32 P.M.     FINANCING STATEMENT*

*E N D   O F   F I L I N G   H I S T O R Y*

*THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE ABOVE LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING STATEMENTS, FEDERAL TAX LIENS AND UTILITY SECURITY INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE ABOVE DEBTOR, AD-VANTAGE NETWORKS, INC. AS OF SEPTEMBER 7, 2015 AT 11:59 P.M.*



Jeffrey W. Bullock, Secretary of State

20157412335-UCC11
SR# 20150289314

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 10141654
Date: 09-28-15

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

8012577924

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

KENT W LARSEN

185 S. STATE ST., #1300

SALT LAKE CITY UT 84111

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:21 PM 09/07/2011
INITIAL FILING # 2011 3434050

SRV: 110983665

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| AD-VANTAGE NETWORKS, INC. | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 23052-H ALICIA PARKWAY, #371 | MISSION VIEJO | CA | 92692 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | CORPORATION | DE | |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| JFG INVESTMENTS, LLC | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4 RICHLAND PLACE | PASADENA | CA | 91103 | US |

4. This FINANCING STATEMENT covers the following collateral:

All of the accounts receivable of the Debtor, together with all proceeds thereof
and all increases, substitutions, replacements, additions and accessions
thereto.

10. miscellaneous: ADVN

| 6. | This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|---|
| 8. OPTIONAL FILER REFERENCE DATA | | | | | |

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

John McGrain

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

AD-VANTAGE NETWORKS

4 RICHLAND PLACE

PASAADENA CA 91103

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 01:54 PM 03/11/2015
INITIAL FILING # 2011 3434050
AMENDMENT # 2015 1025039
SRV: 150342596

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2011 3434050 | ☐ |

2. ☒ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. ☐ DELETE name: Give record name to be deleted in item 6a or 6b. ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION |
|---|---|
| | |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

Ad Vantage Networks

10. OPTIONAL FILER REFERENCE DATA

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] | |
|---|---|
| B. SEND ACKNOWLEDGMENT TO: (Name and Address) | |

AD-VANTAGE NETWORKS
4 RICHLAND PLACE

PASAADENA CA 91103

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:20 PM 03/30/2015
INITIAL FILING # 2011 3434050
AMENDMENT # 2015 1318848
SRV: 150431866

---

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2011 3434050 | ☐ |

| 2. ☐ | TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement. |
|---|---|

| 3. | CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law. |
|---|---|

| 4. ☐ | ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9. |
|---|---|

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

JPG Investments, LLC

10. OPTIONAL FILER REFERENCE DATA

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
**Howard Appel (310-788-7577)**

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

> **Howard Appel**
> **c/o Law Offices of Aaron A. Grunfeld & Associates**
> **1100 Glendon Avenue, Suite 850**
> **Los Angeles, California 90024**

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 04:24 PM 07/16/2012
INITIAL FILING # 2012 2729657

SRV: 120840090

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Ad-Vantage Networks, Inc.** | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **600 N. Brand Blvd., Suite 230** | **Glendale** | **CA** | **91203** | **USA** |
| 1d. SEE INSTRUCTIONS / ADD'L INFO RE ORGANIZATION DEBTOR / 1e. TYPE OF ORGANIZATION **Corporation** | 1f. JURISDICTION OF ORGANIZATION **Delaware** | 1g. ORGANIZATIONAL ID #, if any **DE4791955** ☐ NONE | | |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |
| 2d. SEE INSTRUCTIONS / ADD'L INFO RE ORGANIZATION DEBTOR / 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any ☐ NONE | | |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **JMG Exploration, Inc.** | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **180 South Lake Avenue, Seventh Floor** | **Pasadena** | **CA** | **91101** | **USA** |

4. This FINANCING STATEMENT covers the following collateral:

**All the assets of Debtor including, but not limited to, all tools, inventory, contract rights, consumer goods, equipment, inventory, general intangibles, accounts, chattel paper, deposit accounts, documents, instruments, investment property, letter-of-credit rights, letters of credit, money, patents, licenses, intellectual property, cash, cash equivalents, cash collateral, accounts receivable, contracts rights, real property, plant, machinery, equipment, fixtures, vehicles, stock and equity instruments, commercial tort claims, supporting obligations, to the extent not covered by the foregoing types of Collateral, choses in action and all other personal property of Debtor, whether tangible or intangible, and book and records pertaining to Collateral; all proceeds, replacements, substitutions, products, rents and profits of or from any and all of the foregoing Collateral and, to the extent not otherwise included, all payments under insurance (whether or not Debtor is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral; and any after acquired collateral or asset.**

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 | | |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)    International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 03:47 PM 03/30/2015
INITIAL FILING # 2012 2729657
AMENDMENT # 2015 1330298
SRV: 150435937

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

CSC
2711 Centerville Road
Suite 400
Wilmington, DE 19808

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**20122729657**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☑ **TERMINATION**: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial)**: Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION**: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE**:

Check one of these two boxes:

This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME

OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME

OR 7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

8. ☐ **COLLATERAL CHANGE**: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☑ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME
**Ad-Vantage Networks, Inc.**

OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10. OPTIONAL FILER REFERENCE DATA:

International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 05:32 PM 10/31/2014
INITIAL FILING # 2014 4404059

SRV: 141360337

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

┌     CSC               ┐
    2711 Centerville Road
    Suite 400
    Wilmington, DE 198°°
└                  ┘

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Ad-Vantage Networks, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 North Brand Blvd., Suite 230 | Glendale | CA | 91203 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MediaShift Holdings, Inc. | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4500 Cherry Creek Drive South, Suite 550 | Glendale | CO | 80246 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

See attached Exhibit A.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)  ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
File with DE SOS

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

## EXHIBIT A

### Collateral

All rights, titles, and interests of Debtor in, to, and under all the following property held, in all its forms, whether now or hereafter existing, whether now owned or hereafter acquired, created or arising, and wherever located (collectively, but without duplication, and except for any Excluded Collateral, the "**Collateral**"):

(i)     all Accounts;

(ii)    all Equipment;

(iii)   all Inventory;

(iv)   all General Intangibles;

(v)    all Fixtures;

(vi)   all Documents, Chattel Paper, and Letter-of-Credit Rights;

(vii)  all Deposit Accounts;

(viii) all Instruments and Investment Property;

(ix)   all Commercial Tort Claims;

(x)    all Supporting Obligations; and

(xi)   all Proceeds of any and all of the foregoing.

The following terms, as used herein, have the corresponding meanings:

"**Account**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, any right to payment arising out of goods or other property (including, without limitation, intellectual property) sold or leased, licensed, assigned or disposed of or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance, including all rights to payment of rents and other obligations under any lease, license, or other contract, and all rights incident thereto.

"**Chattel Paper**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, a writing or writings which evidence both a monetary obligation and a security interest in, or a lease of, specific goods.

"**Commercial Tort Claims**" is used as defined in the Uniform Commercial Code, except it shall refer only to such claims that have been asserted in judicial proceedings.

ACTIVE/ 77691277.1

"**Deposit Account**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, any demand, time, savings, passbook or other deposit account, except that it shall not include any Excluded Deposit Account.

"**Document**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, any bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the Person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers.

"**Equipment**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, tangible personal property held by Debtor for use primarily in business and shall include equipment, machinery, furniture, vehicles, fixtures, furnishings, dyes, tools, and all accessories and parts now or hereafter affixed thereto as well as all attachments, replacements, substitutes, accessories, additions and improvements to any of the foregoing, but Equipment shall not include Inventory.

"**Excluded Collateral**" means (1) assets subject to capital leases, purchase money financing, and cash to secure letter-of-credit reimbursement obligations, to the extent such capital leases, purchase money financing or letters of credit prohibit other liens and are permitted under the terms of any indebtedness secured by the security interest evidenced hereby; and (2) assets sold to a person who is not an obligor of any such indebtedness in compliance with the terms of such indebtedness.

"**Excluded Deposit Accounts**" means any deposit accounts exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of the employees of the Debtor or any other obligor of the indebtedness secured by the security interest evidenced hereby.

"**Fixtures**" is used as defined in the Uniform Commercial Code.

"**General Intangibles**" is used as defined in the Uniform Commercial Code but in any event shall include, but not be limited to, all personal property of every kind and description other than Goods, Accounts, Fixtures, Documents, Letter-of-Credit Rights, Chattel Paper, Deposit Accounts, Instruments, Investment Property, Commercial Tort Claims and Supporting Obligations, and shall include, without limitation, payment intangibles, contract rights (other than Accounts), franchises, licenses, choses in action, books, records, customer lists, tax, insurance and other kinds of refunds, patents, trademarks, trade names, service marks, slogans, trade dress, copyrights, other intellectual property rights and applications for intellectual property rights, goodwill, plans, licenses, software (to the extent it does not constitute Goods) and other rights in personal property.

"**Goods**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, all computer programs imbedded in goods and any supporting information provided in connection with the transaction relating to the program and all other things that are movable.

"**Instruments**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, promissory notes, negotiable certificates of deposit, a negotiable instrument or a security or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is, in the ordinary course of business, transferred by delivery with any necessary endorsement or assignment.

"**Inventory**" is used as defined in the Uniform Commercial Code but in any event shall include, but not be limited to, tangible personal property held by or on behalf of Debtor (or in which Debtor has an interest in mass or a joint or other interest) for sale or lease or to be furnished under contracts of service, tangible personal property which Debtor has so leased or furnished, and raw materials, work in process and materials used, produced or consumed in Debtor's business, and shall include tangible personal property returned to Debtor by the purchaser following a sale thereof by Debtor and tangible personal property represented by Documents. All equipment, accessories and parts at any time attached or added to items of Inventory or used in connection therewith shall be deemed to be part of the Inventory.

"**Investment Property**" is used as defined in the Uniform Commercial Code but in any event shall include, but not be limited to, all securities, whether certificated or uncertificated, all financial assets, all security entitlements, all securities accounts, all commodity contracts and all commodity accounts.

"**Letter-of-Credit Right**" is used as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to, any right to payment or performance under a letter of credit, whether or not the beneficiary has demanded or is at the time entitled to demand payment or performance.

"**Proceeds**" is used as defined in the Uniform Commercial Code but, in any event, shall include, but not be limited to, (a) any and all proceeds of any insurance (whether or not the Secured Party is named as the loss payee thereof), indemnity, warranty or guaranty payable to Debtor or the Secured Party from time to time with respect to any of the Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any person acting under color of governmental authority), (c) any and all amounts received when Collateral is sold, leased, licensed, exchanged, collected or disposed of, (d) any rights arising out of Collateral, and (e) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"**Software**" is used as defined in the Uniform Commercial Code but in any event, shall include, but not be limited to, any computer program or supporting information provided in connection with the transaction relating to the program.

"**Supporting Obligations**" is used as defined in the Uniform Commercial Code but in any event shall include, but not be limited to, guarantees and letters of credit that support payment of another obligation.

"**Uniform Commercial Code**" means the Uniform Commercial Code in effect on the date hereof and as amended from time to time, as enacted in the state in which this UCC-1 financing statement is filed or recorded, or in any state or states which, pursuant to the Uniform Commercial Code as enacted in the state in which this UCC-1 financing statement is filed or recorded, has jurisdiction with respect to all, or any portion of, the Collateral from time to time. The parties intend that the definitions set forth above should be construed in their broadest sense so that Collateral will be construed in its broadest sense. Accordingly, if there are, from time to time, changes to defined terms in the Uniform Commercial Code that broaden the definitions, they are incorporated herein and if existing definitions in the Uniform Commercial Code are broader than the amended definitions, the existing ones shall be controlling. Similarly, where the phrase "as defined in the Uniform Commercial Code, but in any event shall include, but not be limited to . . ." is used above, it means as defined in the Uniform Commercial Code except that if any of the enumerated types of items specified thereafter would not fall within the Uniform Commercial Code definition, they shall nonetheless be included in the applicable definition for purposes of this Agreement.

EXHIBIT "6"

|  | A | B | C | D | E | AE | AF | AG | AJ |
|---|---|---|---|---|---|---|---|---|---|
| 3 | | | | | | | | | |
| 4 | **Note Date** | **Amount** | **From** | **Rate** | **Daily Rate** | | **Total Interest** | **Total Note as of Sep 2015** | **Obligor** |
| 11 | 9/17/2013 | $ 300,000.00 | Richland Fund | 12% | Paid Monthly | | | $ 300,000.00 | MSHF |
| 12 | 9/17/2013 | $ 200,000.00 | JMW Fund | 12% | Paid Monthly | | | $ 200,000.00 | MSHF |
| 18 | 11/19/2013 | $ 100,000.00 | Elevation Fund - 2 | 10% | $ 27.40 | | $ 18,630.14 | $ 118,630.14 | MSHF |
| 19 | 11/27/2013 | $ 25,000.00 | Kirby Enterprises Fund LLC | 12% | $ 8.22 | | $ 5,523.29 | $ 30,523.29 | MSHF |
| 20 | 11/29/2013 | $ 25,000.00 | Elevation Fund -3 | 12% | $ 8.22 | | $ 5,506.85 | $ 30,506.85 | MSHF |
| 21 | 11/29/2013 | $ 25,000.00 | Charles Kirby | 12% | $ 8.22 | | $ 5,506.85 | $ 30,506.85 | MSHF |
| 22 | 12/11/2013 | $ 140,000.00 | Kirby Enterprises Fund LLC | 12% | $ 46.03 | | $ 30,286.03 | $ 170,286.03 | MSHF |
| 23 | 12/11/2013 | $ 100,000.00 | West Hampton Special Situations Fund | 12% | $ 32.88 | | $ 21,632.88 | $ 121,632.88 | MSHF |
| 24 | 12/11/2013 | $ 60,000.00 | Elevation Fund - 4 | 12% | $ 19.73 | | $ 12,979.73 | $ 72,979.73 | MSHF |
| 25 | 12/16/2013 | $ 20,000.00 | Elevation Fund - 5 | 12% | $ 6.58 | | $ 4,293.70 | $ 24,293.70 | MSHF |
| 26 | 12/26/2013 | $ 100,000.00 | Elevation Fund - 6 | 12% | $ 32.88 | | $ 21,139.73 | $ 121,139.73 | MSHF |
| 27 | 1/13/2014 | $ 105,000.00 | Elevation Fund 7 | 12% | $ 34.52 | | $ 21,575.34 | $ 126,575.34 | MSHF |
| 29 | 1/17/2014 | $ 200,000.00 | James Veldkamp | 12% | $ 65.75 | | $ 40,832.88 | $ 240,832.88 | MSHF |
| 30 | 1/29/2014 | $ 30,000.00 | West Hampton Special Situations Fund | 12% | $ 9.86 | | $ 6,006.58 | $ 36,006.58 | MSHF |
| 31 | 2/12/2014 | $ 45,000.00 | West Hampton Special Situations Fund | 12% | $ 14.79 | | $ 8,802.74 | $ 53,802.74 | MSHF |
| 32 | 2/12/2014 | $ 45,000.00 | Elevation Fund - 11 | 12% | $ 14.79 | | $ 8,802.74 | $ 53,802.74 | MSHF |
| 33 | 2/12/2014 | $ 10,000.00 | Kirby Enterprises Fund LLC | 12% | $ 3.29 | | $ 1,956.16 | $ 11,956.16 | MSHF |
| 34 | 2/13/2014 | $ 175,000.00 | Elevation Fund-8 | 12% | $ 57.53 | | $ 34,175.34 | $ 209,175.34 | MSHF |
| 41 | 4/1/2014 | $ 80,000.00 | Kirby Fund LLC | 12% | $ 26.30 | | $ 14,386.85 | $ 94,386.85 | MSHF |
| 42 | 4/14/2014 | $ 40,000.00 | Kirby Enterprises Fund LLC | 12% | $ 13.15 | | $ 7,022.47 | $ 47,022.47 | MSHF |
| 43 | 4/14/2014 | $ 40,000.00 | Elevation Fund | 12% | $ 13.15 | | $ 7,022.47 | $ 47,022.47 | MSHF |

THIS CHART IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT AN ADMISSION AS TO THE VALIDITY OF ANY CLAIM OR LIEN, THE DEBTORS RESERVE THE RIGHT TO OBJECT TO ANY CLAIM LISTED HEREIN ON ANY BASIS

| | A | B | C | D | E | AE | AF | AG | AJ |
|---|---|---|---|---|---|---|---|---|---|
| 44 | 4/28/2014 | $ 50,000.00 | Kirby Enterprises Fund LLC | 12% | $ 16.44 | | $ 8,547.95 | $ 58,547.95 | MSHF |
| 45 | 4/30/2014 | $ 70,000.00 | West Hampton Special Situations Fund | 12% | $ 23.01 | | $ 11,921.10 | $ 81,921.10 | MSHF |
| 46 | 4/30/2014 | $ 30,000.00 | Kirby Enterprises Fund LLC | 12% | $ 9.86 | | $ 5,109.04 | $ 35,109.04 | MSHF |
| 47 | 5/13/2014 | $ 25,000.00 | Elevation Fund | 12% | $ 8.22 | | $ 4,150.68 | $ 29,150.68 | MSHF |
| 48 | 5/14/2014 | $ 50,000.00 | Fisk Investments | 12% | $ 16.44 | | $ 8,284.93 | $ 58,284.93 | MSHF |
| 49 | 5/28/2014 | $ 25,000.00 | Kearney Holdings LLC | 12% | $ 8.22 | | $ 4,027.40 | $ 29,027.40 | MSHF |
| 50 | 5/28/2014 | $ 50,000.00 | Fisk Investments | 12% | $ 16.44 | | $ 8,054.79 | $ 58,054.79 | MSHF |
| 51 | 5/28/2014 | $ 50,000.00 | Kirby Enterprises Fund LLC | 12% | $ 16.44 | | $ 8,054.79 | $ 58,054.79 | MSHF |
| 52 | 6/3/2014 | $ 30,000.00 | Don Larson | 12% | $ 9.86 | | $ 4,773.70 | $ 34,773.70 | MSHF |
| 55 | 7/24/2014 | $ 150,000.00 | Mediashift Holdings, Inc. assignee of Fisk Investments | 0% | $ - | | $ - | $ 150,000.00 | MSHF |
| 56 | 7/30/2014 | $ 1,000,000.00 | Mediashift Holdings, Inc. assignee of Fisk Investments | 12% | $ 328.77 | | $ 140,383.56 | $ 1,140,383.56 | MSHF |
| 57 | 8/28/2014 | $ 350,000.00 | Mediashift Holdings, Inc. assignee of Fisk Investments | 12% | $ 115.07 | | $ 45,797.26 | $ 395,797.26 | MSHF |
| 58 | 9/15/2014 | $ 240,000.00 | Mediashift Holdings, Inc. assignee of Fisk Investments | 12% | $ 78.90 | | $ 29,983.56 | $ 269,983.56 | MSHF |

THIS CHART IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT AN ADMISSION AS TO THE VALIDITY OF ANY CLAIM OR LIEN, THE DEBTORS RESERVE THE RIGHT TO OBJECT TO ANY CLAIM LISTED HEREIN ON ANY BASIS

| | A | B | C | D | E | AE | AF | AG | AJ |
|---|---|---|---|---|---|---|---|---|---|
| 59 | 10/15/2014 | $ 55,000.00 | Mediashift Holdings, Inc. assignee of Fisk Investments | 12% | $ 18.08 | | $ 6,328.77 | $ 61,328.77 | MSHF |
| 60 | 10/21/2014 | $ 35,000.00 | Mediashift Holdings, Inc. assignee of Fisk Investments | 12% | $ 11.51 | | $ 3,958.36 | $ 38,958.36 | MSHF |
| 62 | 10/31/2014 | $ 150,045.11 | Mediashift Holdings, Inc. | 12% | $ 49.33 | | $ 16,476.19 | $ 166,521.30 | MSHF/ADVN/ Delphi/Travora |
| 63 | 11/7/2014 | $ 2,300,000.00 | Mediashift Holdings, Inc. | 12% | $ 756.16 | | $ 247,265.75 | $ 2,547,265.75 | MSHF/ADVN/ Delphi/Travora |
| 64 | 2/23/2015 | $ 1,000,000.00 | Mediashift Holdings, Inc. | 12% | $ 328.77 | | $ 72,000.00 | $ 1,072,000.00 | MSHF/ADVN/ Delphi/Travora |
| 65 | **TOTAL ALLEGED SECURED DEBT WITH INTEREST THROUGH 9-30-15** | | | | | | | $ 8,426,245.68 | |

THIS CHART IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT AN ADMISSION AS TO THE VALIDITY OF ANY CLAIM OR LIEN, THE DEBTORS RESERVE THE RIGHT TO OBJECT TO ANY CLAIM LISTED HEREIN ON ANY BASIS


EXHIBIT "7"



MediaShift, Inc.

**Patent Portfolio Valuation – May 2014**

Valuation Date as of April 30, 2014



Prepared for David Grant and Brendon Kensel of MediaShift

GREAT AMERICAN GROUP®



Via Email:  brendon.kensel@mediashift.com
                 david.grant@mediashift.com


May 20, 2014


David Grant                                          Brendon Kensel
Chief Executive Officer                          President
MediaShift Inc.                                     MediaShift Inc.
20062 S.W. Birch Street, Suite 220        20062 S.W. Birch Street Suite 220
Newport Beach, CA  92660                    Newport Beach, CA  92660


RE:  Patent Portfolio Valuation – MediaShift, Inc.

Dear Mr. Grant and Mr. Kensel:

Pursuant to our May 1, 2014 engagement letter, whereby you retained Great American Group Intellectual Property Advisors, L.L.C. DBA Great American Group Corporate Valuation Services ("GA"), the following appraisal report is GA's appraisal of certain assets held by MediaShift, Inc. ("MediaShift" or the "Company").

The appraisal is being performed to assist the Company in obtaining financing by estimating the Fair Market Value ("FMV") and Orderly Liquidation Value ("OLV") of the Patents held by the Company (the "Valuation"). The conclusions presented by GA in this report should not be construed as a fairness opinion, solvency opinion, or an investment recommendation. No other purpose is intended or should be inferred. This report may be invalid if used for any other purpose.

The contents of the appraisal are to be considered confidential and for the use of MeidaShift and its prospective capital providers only. The contents of such appraisal will not be transmitted to any other third party without the express written consent of GA. The Company agrees not to reference GA's name or report(s), in whole or in part, in any document distributed to third parties, without GA's written consent.

**Fair Market Value:** The Fair Market Value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. (Internal Revenue Code, Section 20.2031-1(b))

**Orderly Liquidation Value:** An estimated amount, expressed in terms of currency in U.S. dollars, which the subject asset could typically realize assuming that the sale is properly advertised and professionally managed by a seller obligated to sell over an extended period of time, usually within six to twelve months, as of the effective date of this appraisal report with both parties fully aware of all relevant facts. Furthermore, the ability of the asset to draw sufficient prospective buyers to insure competitive offers is considered. Any modifications to the asset appraised could change the psychological and/or monetary appeal necessary to gain the values indicated. This appraisal concept is intended for asset-based lending purposes. Consideration is given for goodwill and intangible assets. This value does not represent expectations of value in a bankruptcy auction.



The effective date of this appraisal is April 30, 2014 ("Valuation Date"). The appraisal was performed in accordance with the guidelines established by the Uniform Standards of Professional Appraisal Practice. GA has assumed, without independent verification, that all information utilized was accurate and complete.

The information included in this report is subject to assumptions and limiting conditions expressed within this document. Based on our analysis, the FMV and OLV, on a gross basis, of the Patents as of the Valuation Date falls within the following ranges:

**FMV – $48.0 to $56.0 million.**

**OLV – $31.0 to $32.0 million.**

If you have any questions regarding this report, please call Gregg Johnson at 818-746-9332.

Sincerely,

Gregg Johnson
Principal Appraiser

Tejash Lodhavia, ASA, AVA
Concurring Appraiser

Edward Belanger, ASA, CFA
Concurring Appraiser



# Table of Contents

I. Executive Summary......................................................................................5
    Purpose of Appraisal............................................................................5
    Sources of Information .........................................................................5
    Company Profile...................................................................................6
    Key Business Indicators.......................................................................6
II. Company Overview .....................................................................................7
    Products & Services.............................................................................7
    Distribution Network ............................................................................8
    Customers..........................................................................................10
    Patent Portfolio..................................................................................12
III. Industry Overview....................................................................................14
    Digital Advertising Agencies .............................................................14
    Digital Advertising Key External Drivers ...........................................14
    Products & Services...........................................................................15
    Digital Advertising Demand................................................................16
    Determinants......................................................................................16
    Technology & Systems ......................................................................16
    Mobile Internet...................................................................................17
    Digitizing Media..................................................................................18
    Digital Ad Spending...........................................................................18
    U.S. Mobile Ad Spending..................................................................20
    Industry Outlook.................................................................................21
    Impact of Industry on the Company...................................................22
IV. Economic Overview..................................................................................23
    Labor and Employment......................................................................24
    Consumer Confidence and Spending................................................25
    Manufacturing ....................................................................................25
    Construction Spending and the Housing Markets .............................26
    Interest Rates and Financial Markets ...............................................27
    Outlook...............................................................................................28
V. Valuation Principles and Concepts ..........................................................29
    Standard of Value..............................................................................29
    Approaches to Valuation...................................................................29
        Cost Approach...........................................................................29
        Market Approach .......................................................................30
        Income Approach ......................................................................30
    Selection of Methods.........................................................................30



VI. Liquidation Strategy ........................................................................................... 31

    Liquidation of the Patent Portfolio ..................................................................... 31

    Time to Complete the Liquidation ...................................................................... 31

    Costs of the Liquidation .................................................................................... 32

    Likely Buyers .................................................................................................... 32

    Potential Buyers ............................................................................................... 32

    Primary Recovery Factors ................................................................................ 33

    Valuation Considerations .................................................................................. 33

VII. Valuation Methodology ...................................................................................... 35

    Weighted Average Cost of Capital .................................................................... 35

        Capital Asset Pricing Model ......................................................................... 35

        Beta ............................................................................................................. 36

        Cost of Equity ($K_e$) .................................................................................. 38

        Cost of Debt and Capital Structure ............................................................... 39

        Patent Portfolio Cost of Capital for FMV ...................................................... 39

        Patent Portfolio Cost of Capital for OLV ....................................................... 39

    Patent Portfolio - FMV ...................................................................................... 40

        Relief from Royalty Method - FMV ................................................................ 40

        Excess Earnings Method – FMV .................................................................. 41

    Patent Portfolio - OLV ...................................................................................... 42

    Summary of Values .......................................................................................... 43

VIII. Additional Appraisal Information ........................................................................ 44

    Certifications .................................................................................................... 44

    Statement of Contingent and Limiting Conditions .............................................. 45

    Glossary of Terms ............................................................................................ 46

    Project Team .................................................................................................... 47

    Curriculum Vitae .............................................................................................. 48

IX. Appendix .......................................................................................................... 52



# I. Executive Summary

Mr. Grant and Mr. Kensel, of MediaShift, Inc ("MediaShift" or the "Company"), retained Great American Group Intellectual Property Advisors, L.L.C. DBA Great American Group Corporate Valuation Services ("GA") to appraise certain assets held by the Company.

## Purpose of Appraisal

The appraisal is being performed to assist the Company in obtaining financing by estimating the Fair Market Value ("FMV") and Orderly Liquidation Value ("OLV") of the Patents held by the Company (the "Valuation"). No other purpose is intended or should be inferred. The conclusions contained in this report should not be construed as a fairness opinion, solvency opinion, or investment recommendation. This report may be invalid if used for any other purpose.

The contents of the appraisal are to be considered confidential and for the use of the Company and its prospective capital providers only. The contents of such appraisal will not be transmitted to any other third party without the express written consent of GA. The Company agrees not to reference GA's name or report(s), in whole or in part, in any document distributed to third parties, without GA's written consent.

## Sources of Information

GA's analysis was based on information obtained from the Company and private and publicly available sources believed to be reliable. GA has assumed, without independent verification, that all information utilized was accurate and complete. Sources used during the course of the appraisal included, but were not limited to:

- Company provided Five-year forecasted financial statements;

- Network publisher agreements;

- Patent summaries from the USPTO;

- Memo from Bingham McCutchen LLP on FCC regulation compliance of MediaShift's patents;

- Memo from Bingham McCutchen on defensibility of MediaShift's patents;

- Management presentation;

- *Stocks, Bonds, Bills, and Inflation 2014 Valuation Yearbook*, Morningstar;

- Federal Reserve Statistical Release, website: www.federalreserve.gov;

- IBISWorld industry reports;

- *Overview of the Economy, First Quarter 2014*, JT Research LLC;



- Standard & Poor's Capital IQ resources;

- ktMINE intellectual property database; and

- Industry reports provided by management on WiFi, hospitality, and digital advertising.

In addition to reviewing the information described above, GA held discussions with Company management.

## Company Profile

| Company Name | MediaShift, Inc. |
|---|---|
| Headquarters | Newport Beach, California |
| Internet Site | www.mediashift.com |
| Industry | Digital Advertising and Application Software |
| Noteworthy Competitors | Google, Yahoo!, Microsoft, The Rubicon Project, Inc. |
| Noteworthy Customers | Row 44, Uniguest, Netstorm, Social WiFi Marketing, Panasonic Avionics Corporation, Ovation Networks, Docomo |
| Fiscal Year End | December 31 |
| Valuation Date | April 30, 2014 |
| Standard of Value | FMV and OLV |
| Reported Currency | U.S. Dollars |

## Key Business Indicators

| Key Business Indicators | Total |
|---|---|
| Net Sales | $6.953 million |
| 2103 Ad Impressions | 2.1 billion |
| Distribution agreements signed to date | 22 |
| Hotel rooms | Over 550,000 |
| Airport travelers | Over 150 million |
| Airline passengers | Over 109 million |



# II. Company Overview

MediaShift is a digital ad tech company that monetizes WiFi networks and web publishing sites, while offering advertisers access to one of the fastest growing audience platforms targeting on-the-go consumers. The Company was founded in 2010 and is headquartered are in Newport Beach, California. The Company's patented ad platform is the first in the industry to monetize WiFi networks with advertising at both sign-in and in-session. Advertisers can engage the captive on-the-go audience across multiple devices, through videos, app downloads, lead capture, and other sponsored opportunities, while leveraging its proprietary first-party data to reach highly targeted customer segments.

## Products & Services

The Company's patented MediaShift Monetization Platform ("MMP") enables WiFi and broadband partners to generate advertising revenue at both user sign-in and also while users are in session. The Company is focused on being an advertising revenue partner for WiFi network providers at restaurants, airports, hotels, airplanes, other transit environments and any other locations where consumers regularly connect to hotspots.

The Company's platform allows for a value exchange between brands and users. Free WiFi access in exchange for a relevant ad experience. The goal is to seamlessly integrate brand sponsorships throughout the user experience through placements ranging from fully skinned welcome pages to a short video message to get online.

The Company's airport network launched with 20 major U.S. airports, including four of the 10 largest in the country. Currently the MediaShift platform is rolling out on all Southwest airline flights that have in-flight WiFi, so when airport patrons are in transit, they will likely log-in to in-flight WiFi networks that are partnering with MediaShift. In addition, the Company is in process of installing their platform to more than 5,000 hotels. This initial footprint represents advertiser's access to more than 23 million monthly unique users and most of these initial agreements with network providers were signed during the last six months of 2013.

The Company's software works as an integrated software solution with off the shelf hardware, customized customer appliances, OEM integrated installations, and cloud computing.


**Figure 1. MediaShift Monetization Platform (MMP)**



In efforts to deepen its network provider offerings and accelerate its distribution, the Company has partnered with OEMs to deliver customized solutions. Currently the company has relationships with:

The Company is building one of the largest proprietary first parts data sets of the on-the-go consumers focused on travel and hospitality. MediaShift's technology does not rely on cookies and collects large amounts of relevant behavioral data on travelers both before and after they enter the WiFi network. This type of data can be very valuable to advertisers looking to understand mobile user's behavior and preferences.

## Distribution Network

As described above the company has been rapidly expanding their distribution network over the last twelve months. In that time they have reached agreements with network providers providing WiFi service to the following well-known hotels:















In addition to hotels, the Company's MMP is installed in 16 major airports with four more scheduled to come on line in 2014. The Company has also signed an agreement with the inflight WiFi provider for Southwest Airlines which comprises approximately 25% of all domestic passengers on a daily basis.

The following is a list of current signed agreements with network providers and a description of their network size:

1. Advanced Wireless Group – WiFi provider to 18 Airports

2. Alliance Data Services – Regional ISP with approximately 20,000 subscribers

3. AM3 – WiFi Provider to collegiate and tenant housing

4. DeepBlue Communications – Hospitality WiFi provider to 500 hotels including Wyndham

5. Direct Video Entertainment – WiFi provider to 900 hotels

6. Docomo interTouch – OEM

7. Federal Realty Investment Trust – 87 retail and mixed use projects

8. Hill Companies – Commercial real estate

9. Hospitality WiFi – WiFi provider for more than 600 hotels including Best Western, Holiday Inn, and Crowne Plaza

10. Hotel internet Services – 350 hotels resort and Las Vegas hospitality WiFi provider

11. Mobilite – 12 hotels boasting the world's largest WiFi hotspot in 3 of the worlds largest hotels

12. Netstorm – 300 resort hotels



13. The Network Operations Company – Hospitaility WiFi provider for IHG, Hilton, Choice and Wyndham

14. Ovation Networks – WiFi provider in 700 hotels

15. Panasonic Avionics Corporation – Has contracts to deploy WiFI in over 2,000 planes

16. Peterson Communications Group – WiFi provider for 25 hotels in northern California

17. PurePages – WiFi provider for 350 hotels

18. Row 44 – WiFi provider for Southwest Airlines

19. Social WiFi Marketing – WiFi provider for 1,800 Dunkin Donuts and 180 Burger King restaurants

20. Uniguest – WiFi provider for 3,500 hotels including Hilton and Marriott

21. United Solutions – WiFi provider for 800 hotels

22. WiFi Guys – WiFi provider for 40 hotels

In addition to the agreements listed above, the company has recently entered discussions and negotiations with national cable and telecommunication companies that provide the largest deployment of WiFi hotspots across the United States. While agreements with these providers are not in place as of the Valuation Date, it is an indication for the viability of the Company's MMP.

# Customers

MediaShift provides advertisers with targeted access to mobile users when they are in environments that are rich with consumer spending choices. One such environment is through the travel process. MediaShift is able to provide advertisers with access to travelers throughout all points in the process from trip planning, trip booking, in the airport, in-flight and in hotel. MediaShift's first-party data enables precise targeting of customers wherever they are at in the process of a trip. This allows advertisers to place meaningful ads at times when consumers are most interested in the content.

MediaShift has current relationships with many advertisers including many prominent names in the hospitality space including:

1. Virgin

2. Starwood Hotels and Resorts

3. Marriott

4. Hilton

5. JetBlue

6. Kayak



7. British Airways

8. Royal Caribbean

9. Carnival

10. Amtrak

In addition, to hospitality, the company has a strong following financial service firms including:

1. Visa

2. MasterCard

3. American Express

4. Discover

5. Citi

6. Bank of America

7. Chase

Mediashifts MMP has also garnered the attention of the advertisers for many other legacy brands including:

1. AT&T

2. T Mobile

3. Verizon

4. Skype

5. Allstate

6. GM

7. Google

8. Showtime

9. Cadillac

10. Jeep

11. A&E

12. The North Face

These lists are not all-inclusive as the Company maintains relationships with over 270 advertisers.



# Patent Portfolio

As of the Valuation Date, the Company has the following three issued patents and seven patent applications. These patents and applications make up the Patent Portfolio, which is the subject of the Valuation:

**Patents**

1. U.S. 8,554,630 – Filed on 3/19/2010 and issued on 10/8/2013 – Methods and Systems for Processing and Displaying Content

2. U.S. 8,234,275 – Filed on 7/15/2011 and issued on 7/31/2012 – Methods and Systems for Searching, Selecting, and Displaying

3. U.S. 8,386,321 – Filed on 7/15/2011 and issued on 2/26/2013 – Methods and Systems for Searching, Selecting and Displaying

**Patent Applications**

1. U.S. 12/728037 – Filed on 3/19/2010 – Methods and Systems for Searching Selecting and Displaying

2. U.S. 14/045239 – Filed on 10/3/2013 – Methods and Systems for Processing and Displaying Content

3. U.S. 13/836672 March 15, 2013 – Methods and Systems for Processing and Displaying Video Content

4. Australia 2010226395 – Filed on 3/19/2010 – Methods and Systems for Searching Selecting and Displaying

5. Canada 2755645 – Filed on 3/19/2010 – Methods and Systems for Searching, Selecting, and Displaying Content.

6. China 201080022098.0 – Filed on 3/19/2010 - Methods and Systems for Searching, Selecting, and Displaying Content.

7. EPC 10754213.6 - Filed on 3/19/2010 - Methods and Systems for Searching, Selecting, and Displaying Content.

8. Hong Kong 12107344.4 – Filed on 7/25/2012 - Methods and Systems for Searching, Selecting, and Displaying Content.

9. Japan 2012-501022 - Filed on 3/19/2010 - Methods and Systems for Searching, Selecting, and Displaying Content.

10. South Korea 102011-7024824 - Filed on 3/19/2010 - Methods and Systems for Searching, Selecting, and Displaying Content.


11. U.S. 13/896057 – Filed on 5/16/2013 – Content Easement and management System for Internet Access Providers and Premise Operators

12. PCT PCT/US2013/041435 – Filed on 5/16/2013 – Content Easement and management System for Internet Access Providers and Premise Operators

The three issued patents have more than 70 prior art references indicating a thorough research threshold and strength in defensibility. The company has had the Patent Portfolio reviewed by Bingham McCutchen LLP, a law firm with a sizeable intellectual property practice, for both its compliance with FCC regulations, and to gauge the strength of the portfolio's defensibility. In both cases the firm concluded that the Company's patents were in compliance with FCC regulations and that the defensibility in the event of potential infringement lawsuits appeared strong.



# III. Industry Overview

MediaShift is impacted by the digital advertising industry as well and mobile computing industry; in particular the growth in mobile computing over WiFi networks. Though MediaShift is not a digital advertising agency many of the same drivers that fuel digital advertising agencies also impact the Company.

## Digital Advertising Agencies

The Digital Advertising Agencies industry has enjoyed strong growth from an improving economy and new trends in online media. Over the past five years, industry revenue increased at an average annual rate of 6.3% to $12.6 billion in 2013. The recovering economy and labor market over the past five years have provided consumers with buying power and businesses with higher profit, allowing them to invest in future growth through digital advertising. Consumers are switching from newspapers, magazines, radio and TV to online news outlets, websites, podcasts and video streaming services, providing an opportunity for digital advertising agencies to promote products and services online. The improving economy and growth in online platforms are expected to increase digital advertising revenue 8.6% during 2013.

As internet traffic volume increases over the next five years, more companies will want to expose their businesses to consumers through online media. Social media such as Facebook and Twitter have paved the way for new methods of advertising that allow users to spread the word instead of the businesses directly targeting the consumers. Streaming video and music services like YouTube and Spotify have also provided new ways for businesses to reach potential customers through online ads. As internet use increases, more businesses are expected to seek the expertise of digital advertising agencies to develop marketing materials.

Over the next five years, industry revenue is forecast to grow at an average annual rate of 6.5% to $17.3 billion. Corporate profit and the consumer sentiment index are projected to increase over the next five years, increasing the demand for digital advertising. Growing popularity in online media streaming services and social media are expected to continue and increase the percentage of digital advertising in total advertising expenditure.

## Digital Advertising
## Key External Drivers

**Internet traffic volume**

Internet traffic volume represents the total data sent over the internet globally per month. As the amount of internet traffic increases, the demand for digital advertising agencies is expected to increase. Internet traffic volume is expected to increase over 2013, representing a potential opportunity for the industry.

**Total advertising expenditure**

Trends in total mainstream media advertising, particularly on radio, TV, newspapers and magazines, have a direct effect on this industry. Growth in total U.S. advertising expenditure positively influences digital advertising. Total U.S. advertising expenditure is expected to increase slowly during 2013. If it increases too slowly, it could represent a potential threat for digital advertising industry.



**Consumer sentiment index**

Consumer sentiment incorporates many factors, including household finances, business conditions, unemployment and inflation. During times of heightened consumer sentiment, the return on advertising expenses is higher, raising industry revenue. The consumer sentiment index is expected to increase during 2013.

**Per capita disposable income**

A rise in per capita disposable income will boost retail sales, benefiting corporate businesses. An increase in corporate revenue ultimately leads to greater advertising budgets. Per capita disposable income is expected to increase slowly during 2013.

**Corporate profit**

An increase in corporate profit will allow companies to spend more money on marketing and advertising. When corporate profit is higher, businesses will be more likely to seek out services from advertising agencies. Corporate profit is expected to increase slowly during 2013.

## Products & Services

**Search engine optimization**

Digital advertising industry's largest product segment consists of the development of search engine optimization (SEO) and search engine marketing services. SEO services help increase a company's unpaid visibility in a search engine, such as Google or Bing. Generally, the higher ranked a website is in a search engine, the more visitors it will receive. Over the five years to 2013, experts estimates this segment's share of industry revenue remained relatively stable in comparison with total digital advertising industry revenue.

**Digital display advertising**

The development of digital display advertising includes a range of format displays, including digital billboards and storefront advertising signage. The segment also consists of rich media images, digital video content, display banners and other interactive applications. Experts expect this segment's share of industry revenue grew moderately over the past five years. The growth can largely be attributed to continued development in the product segment; digital display advertising is becoming more targeted to users and, in turn, becoming a more effective means of digital advertising.

**Mobile advertising**

Mobile advertising is advertising targeted at consumers who use mobile phones, particularly smartphones. Mobile advertising includes a wide scope of advertisements, such as mobile web banners and posters displayed at the top and bottom of the screen, respectively. Other forms of mobile advertising include targeted text messages, and advertising within mobile video games and mobile videos. Experts estimates that this product segment has grown rapidly over the past five years, primarily due to rapid technology advancement and growth in mobile phone use over the period.

**Other services**

Other digital advertising services include lead generation, sponsorship and e-mail advertising services. Lead generation involves referrals to qualified purchase inquiries, while sponsorships are custom content created for clients that may or may not include advertising elements. Lead generation services have displayed marginal contraction over the past five years and account for an estimated



4.0% of digital advertising industry revenue. Sponsorship and e-mail combined are expected to account for about 3.0% of Industry revenue and have both remained relatively stable over the past five years.

## Digital Advertising Demand Determinants

Demand for digital advertising is influenced by a number of economic factors that affect advertising expenditure. The demand for industry's services is also influenced by the advertising budgets of clients.

Over the past five years to 2013, total expenditure on advertising rose marginally at an annualized 0.2%. The digital advertising industry managed annualized growth of 6.3% over the period largely due to the rise in demand for digital advertising services compared with an expected decline in demand for traditional advertising services. One area of growth has been the number of mobile internet connections, which grew at an estimated 53.0% over the past five years. This indicates the rising number of consumer's on-the-go and using mobile technology, whether it is smartphones or tablets. Meanwhile, the number of cable TV subscriptions grew at a marginal 0.1% annualized over the same period. This indicates that consumers are switching their consumption of media, which in turn requires advertisers to change course. To this end, the level and type of media consumption affects demand for this industry's services.

Demand is also affected by the state of the wider economy as recessionary conditions can cause consumers and businesses alike to refrain the spending. Such an event occurred over 2009, when disposable incomes fell and consumer sentiment dropped. This sent shockwaves of reduced expenditure throughout the U.S. economy, as consumers scaled back forcing corporations to reduce discretionary spending as well. During times of economic prosperity, expenditure increased across the board. As a result, the level of economic activity affects demand for digital advertising services.

## Technology & Systems

As operators in the digital era, firms in digital advertising experienced a high rate of technological change over the past five years. Digital advertising industry sits on the cutting edge of technological development, and as advertising space becomes increasingly saturated digital advertisers must constantly conjure up new ways to reach consumers.

Social media platforms, such as Facebook and Twitter, provided a new space for digital advertising. For instance, in April 2010 Twitter began releasing Promoted Tweets; essentially, the social media site released its platform for advertising. Promoted Tweets are included in search term results, along with organic results. Coca-Cola and Virgin America tried it out, with Coca-Cola reporting a 6.0% engagement rate for its campaign. To this end, digital advertisers are leveraging social media spaces to increase the penetration of advertising campaigns. The measurement of digital advertisements is also changing to incorporate viral marketing campaigns. Viral campaigns used to be about planting enough seeds, but further emphasis is now being place on their initial placement and tracking where and how they spread.



In addition to the increasing availability of advertising platforms, the rate of technology is also increasing in regard to the tools used by digital advertisers. Industry firms use a range of software, such as analytics platforms, which include Adobe SiteCatalyst or Google Analytics. Moreover, digital advertisers also use tracking technology, such as Doubleclick and AdWords, which are often provided by the networks the digital advertisement is run on. These tools are used to track the reach of ad campaigns and analyze the results. Experts expects the rate of technological change to increase over the next five years as software programs evolve and begin to integrate aspects of tracking and analyzing campaign effectiveness.

# Mobile Internet

The Mobile Internet 2.0 is a new ecosystem that is emerging where various companies contribute certain aspects of a mobile experience, such as location services, notification/offer services, indoor blue dot detail, mobile client foot tracking, etc. Firms like Cisco Systems, Nokia and Qualcomm are working on client-network Wi-Fi infrastructure linkage. Small or start-up firms are working on aspects, such as Single Digits offers a guest portal policy, Frontporch focuses on push advertising, ThinkSmart Technologies provides foot traffic analytics, SITA, an airline IT association, developed a Mobile Internet 2.0 solution for airports, nearby systems provides location based in store analytics, and there are many others.

Firms are offering floor layout plans/maps for all kinds of venues to map foot traffic analytics upon. IOS and Android apps, such as the Meridian "App for Places", provide turn-by-turn directions at select in-door locals, ets. This ecosystem is coming together at a fevered pace to deliver a unique Mobile 2.0 Internet experience.

Mobile clients and some Wi-Fi networks will start to work together in an effort to provide the most useful indoor mobile experience. There are four major components to the Mobile Internet 2.0 Architecture;

- **Secure Seamless Roaming:** To make authentication interoperable and standard between cellular and Wi-Fi networks Cisco has been leading in this space with its Hotspot 2.0 initiative. Secure roaming utilized 802.11u technology that enables hotspots to distribute information to mobile clients before being associated to a Wi-Fi network. This enables a new roaming experience plus whole monetization of a service experience beyond just roaming.

- **Guest Portal Polic**y**:** Provides the first impression to a smartphone user when entering a venue. For example, when entering a hotel, a smartphone guest may be offered basic internet access for reading email for free and video steaming via Wi-Fi for a fee. In the hospitality market, Wi-Fi is mostly treated like a service that must be offered at the lowest possible cost or free. In most hospitalities, there are three bottlenecks: 1) the portal policy where the policy refers to a gateway, 2) usually there's a small Wi-Fi box that's easily overwhelmed by traffic load and 3) the size of wide area network Internet access. To provide an excellent Mobile Internet experience inside a hotel, an appropriately-sized Internet connection is needed.

- **Mobile Client:** Tighter linkage between mobile client and Wi-Fi network infrastructure. To deliver on the next generation mobile experience, a sliver of the smartphone client becomes part of the infrastructure to determine more precise location based services, For network architects who are implementing Mobile Internet 2.0 infrastructure, it's important to be aware of the very fast rate of change occurring in mobile client standardization.



- **Context Aware Platform:** This platforms maps a smartphone or Wi-Fi device location to an indoor floor plan of services, thereby providing the smartphone user the basis for being aware of his/her surroundings. Taking this one step further, the Wi-Fi network can push information to the smartphone based upon its location context. The Wi-Fi device is able to push information to a smartphone or Wi-Fi based upon its radio beacon signal with the smartphone before its associates or connects with a Wi-Fi network. Context aware builds upon the Wi-Fi network to offer SSID advertisements by being able to track movement and push offers via notification to smartphone users while roaming in a shopping mall, sport stadium,museum, hospital, coffee shop , airport etc.

# Digitizing Media

As internet traffic volume increases over the next five years, digital advertising agencies will find new ways to advertise products and services. Traditional advertisements on billboards, newspapers, magazines and radio are moving to new mediums that involve the use of the internet. Consumers are using online resources instead of reading newspapers. Banner ads are placed on online news outlets and are supported by pay-per-click (PPC) advertising revenue. Consumers are also listening to more podcasts as opposed to radio, with podcast creators promoting the products of sponsors within the podcast. New forms of media are moving to the digital space. Video streaming services like Hulu are becoming more popular and allow users to access their favorite TV shows online. This has allowed companies to advertise their products and services to a targeted demographic.

At the same time, more targeted marketing automation will also increase industry revenue over the next five years. Online newsletters and email marketing is forecast to grow over the next five years as new software and technology allows companies to target a demographic and customize timing and frequency of marketing emails. Search engine advertising is also increasing as sites like Google and Bing collect user data and display ads tailored to the users' interests.

# Digital Ad Spending

Digital ad spending in the US remains concentrated in a handful of advertising formats. The greatest spending will be on paid search and banner ads through 2016, although their shares will drop throughout the forecast period as rich media, sponsorships and video increase in revenue.

Combined, Google, Yahoo!, Microsoft, Facebook and AOL will represent 64% of total US digital ad revenues this year. Google alone will account for 41.3% of digital ad revenues in the US.



**Figure 2. U.S. Digital Ad Spending, 2012-2016**

### U.S. Digital Ad Revenue & % of Total U.S. Ad Spend (billions)

| Year | U.S. Digital Advertising | Display as a % of Total U.S. Ad Spend |
|------|--------------------------|----------------------------------------|
| 2012 | $37.3 | 22.5% |
| 2013E | $42.5 | 24.8% |
| 2014E | $47.8 | 26.8% |
| 2015E | $52.0 | 28.4% |
| 2016E | $55.3 | 29.2% |

*Source: eMarketer and BI Intelligence*

The overall strong growth in digital ad spending across verticals reflects the fact that marketers in all industries are beefing up investments in online and mobile channels, albeit at different rates. eMarketer projects that the media, entertainment and travel industries will experience the fastest growth through 2015.

Entertainment's growth for 2012, revised upward substantially from the earlier forecast of a 7.5% decline, largely stems from networks and studios pushing original advertising content to digital channels such as YouTube, Hulu and Fandango. Though fewer movies are being released by the studios, those that are being released are being more heavily promoted through digital channels. Other entertainment broadcasts, such as sports and live events, are adding to growth as well. In addition, entertainment advertising is increasingly shifting to mobile channels as more consumers access videos, watch film trailers and purchase movie tickets through smartphones and tablets on the go.


**Figure 3. U.S. Digital Ad Spending Growth, by Industry (2010-2016)**

### US Digital Ad Spending Growth, by Industry, 2010-2016
*% change*

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Media | 14.9% | 36.9% | 27.0% | 23.2% | 18.8% | 12.6% | 8.2% |
| Entertainment | 14.9% | 33.8% | 24.6% | 18.8% | 17.0% | 10.9% | 8.4% |
| Travel | 34.0% | 30.4% | 24.4% | 16.8% | 16.5% | 8.7% | 6.4% |
| CPG & consumer products | 37.3% | 25.5% | 20.8% | 15.3% | 13.8% | 10.1% | 8.9% |
| Automotive | 14.9% | 25.0% | 18.7% | 16.9% | 13.4% | 10.6% | 7.2% |
| Retail | 20.6% | 29.8% | 16.1% | 13.9% | 11.4% | 8.7% | 5.9% |
| Financial services | 14.9% | 27.7% | 15.7% | 13.0% | 12.4% | 7.9% | 5.5% |
| Computing products & consumer electronics | -8.1% | 18.6% | 15.1% | 12.4% | 12.4% | 8.7% | 6.4% |
| Telecom | -6.7% | 15.1% | 10.9% | 11.0% | 10.4% | 7.8% | 5.4% |
| Healthcare & pharma | 38.8% | -11.9% | 9.3% | 6.3% | 4.8% | 4.2% | 2.1% |
| Other | 31.3% | -6.0% | 5.7% | 3.7% | 3.4% | 2.0% | 3.9% |
| **Total** | **14.9%** | **21.7%** | **16.6%** | **13.9%** | **12.4%** | **8.7%** | **6.4%** |

*Note: includes advertising that appears on desktop and laptop computers as well as mobile phones and tablets, and includes all the various formats of advertising on those platforms; data through 2011 is derived from IAB/PwC data*
*Source: eMarketer, Sep 2012*

The challenge of the entire mobile media industry is striking the balance between providing an optimal user experience while creating advertising opportunities that are both relevant for users and drive engagement for brands. The mobile device is as personal as it gets. These experiences need to be tailored to the user, the device and the location (time and place of access) for the most powerful messaging platform.

## U.S. Mobile Ad Spending

Mobile display ad spending, which includes banners, rich media and video, will nearly triple between 2012 and 2014, from $1.10 billion to $3.07 billion. Between 2012 and 2016, mobile display ad spending will grow more than fivefold.

Mobile search ad spending will rise on a similar trajectory, from $1.28 billion in 2012 to $3.33 billion in 2014. This growth will be driven by the rapid ascension of Google's mobile search advertising business. Local advertising also plays a role in mobile search, as a growing number of marketers are targeting mobile ads to users on the go in a specific state, city or neighborhood.

Video will be the fastest-growing mobile ad format, increasing from $151.5 million this year to $1.19 billion by the end of the forecast period. Tablet users will help fuel increases in mobile video ad spending. Video viewing is one of the most popular activities for tablet users looking for a portable,



high-definition experience, and eMarketer expects the number of US tablet users to nearly double between 2012 and 2015, from 69.6 million to 133.5 million. The adoption of smartphones will also help spur growth. eMarketer estimates that between 2012 and 2016, US mobile video viewers will climb from 61.2 million to 110.1 million.

In 2016, mobile display advertising will account for nearly a quarter of total display advertising, rising from 7.4% of the total in 2012. Growth will be driven by rising mobile internet usage as more users browse the web and access social networks and apps via mobile devices.

**Figure 4. U.S. Mobile Display Ad Spending (2010-2016)**



## Industry Outlook

According to eMarketer the Digital advertising industry is forecasted to increase to $55 billion by 2016 as digital advertisers take advantage of emerging trends in the space. Over the same period, the economy and overall labor conditions are expected to improve, giving more consumers the ability to spend and providing companies with the resources to invest in digital advertising. Over the next five years, per capita disposable income is forecast to increase at an average annual rate of 2.4%, giving purchasing power to consumers and incentivizing companies to advertise their products. At the same time, corporate profit is forecast to increase at an average annual rate of 4.3%, allowing businesses to reinvest profit into future growth through the use of digital advertising.

Internet traffic volume is expected to increase at an average annual rate of 27.7% over the next five years, giving digital advertising agencies more opportunities to create marketing campaigns in the digital space. While total advertising expenditure is forecast to increase at an average annual rate of 2.0%, digital advertising is expected to capture an increasingly large portion of total expenditures on



advertising. Projected improvements in the overall economy and new trends in digital advertising will boost industry revenue an additional 7% to 12% during 2014 according to various sources.

## Impact of Industry on the Company

MediaShift is uniquely positioned to benefit from the increase in mobile advertisement spending expected over the next few years.  Their patent portfolio will likely act as a barrier to entry near to mid-term as they are able to control the advertisements viewed on the WiFi networks where their MMP is deployed.  The overall outlook for MediaShift as it pertains to the industry is positive.



# IV. Economic Overview

The Federal Reserve (Fed) reports overall economic activity has improved since its December 2013 report and most Fed Districts maintain an optimistic outlook. Nearly all Districts reported growth at a "modest to moderate pace," although the New York and Philadelphia Districts reported a slight decline. Severe winter weather caused weaker retail sales, including autos, in several Districts, while others reported modest improvement in sales. Tourism activity varied across Districts, as did demand for nonfinancial services; activity in the manufacturing, construction, and residential real estate sectors was also mixed. The commercial real estate and energy sectors saw gains, while agricultural conditions improved and price pressures remained minimal, except for some energy and construction products.[1]

The Bureau of Economic Analysis (BEA) reports real gross domestic product increased at an annual rate of 2.6% in the fourth quarter of 2013, following the previous quarter's growth of 4.1%, as indicated in the table below. The BEA attributes the fourth quarter's GDP growth to increases in personal consumption expenditures (PCE), exports, and nonresidential fixed investment that were partly offset by declines in federal government spending and residential fixed investment. Imports, which are a subtraction in the calculation of GDP, increased. The deceleration in growth, however, reflected a downturn in private inventory investment, a larger decrease in federal government spending, a downturn in residential fixed investment, and a deceleration in state and local government spending that were partly offset by accelerations in PCE, nonresidential fixed investment and in exports, and a deceleration in imports.[2]

**Table 1. Real Gross Domestic Product and Related Measures**

|  | 2012 Q4 | 2013 Q1 | 2013 Q2 | 2013 Q3 | 2013 Q4 |
|---|---|---|---|---|---|
| Gross domestic product | 0.1 | 1.1 | 2.5 | 4.1 | 2.6 |
| Durable Goods | 10.5 | 5.8 | 6.2 | 7.9 | 2.8 |
| Nondurable Goods | 0.6 | 2.7 | 1.6 | 2.9 | 2.9 |
| Services | 0.6 | 1.5 | 1.2 | 0.7 | 3.5 |

Source: Bureau of Economic Analysis. U.S. Department of Commerce.

The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.1% in February on a seasonally adjusted basis, and 1.1% over the last 12 months before seasonal adjustment, according to the U.S. Bureau of Labor Statistics (BLS). While the food index rose 0.4% in February, the energy index declined 0.5%. All items except food and energy rose 0.1%, mainly due to increases in the shelter, medical and personal care, recreation and new vehicles indexes; the indexes for home furnishings, apparel, used autos, and tobacco all declined in February. For the 12 months ending in February, the all items index rose 1.1%, the all items less food and energy index rose 1.6%, energy fell 2.5%, and food rose 1.4%.[3]

---

[1] "Summary of Commentary on Current Economic Conditions by Federal Reserve District." March 5, 2014. Internet: http://www.federalreserve.gov/monetarypolicy/beigebook/beigebook201403.htm

[2] "National Income and Product Accounts Gross Domestic Product, 4th Quarter and Annual 2013 (third estimate)." Press Release. Bureau of Economic Analysis. March 27, 2014. Internet: http://www.bea.gov/newsreleases/national/gdp/gdpnewsrelease.htm

[3] "Consumer Price Index Summary." Bureau of Labor Statistics. March 18, 2014. Internet: http://www.bls.gov/news.release/cpi.nr0.htm



The Fed remains concerned about the inflation rate – still running below the Fed's 2% objective - being too low, which could jeopardize economic performance as consumers delay purchases, and companies postpone investment and hiring as demand for their products dries up.[4]

The Producer Price Index for "final demand" (goods, services, and construction sold for personal consumption, capital investment, government purchases and export) decreased 0.1% in February, seasonally adjusted, according to the BLS. February's decrease followed a 0.2% increase in January and a 0.1% increase in December. February's increase reflected a 0.3% decline in final demand prices for services (mainly attributed to decreases in the margins received by wholesalers and retailers, and decreased prices for transportation and warehousing services) offset by a 0.4% increase in prices for final demand goods (including food, energy, and goods less foods and energy).[5]

Corporate profits from current production in the fourth quarter rose by $47.1 billion after increasing by $39.2 billion in the third quarter, according to the BEA. For 2013, corporate profits rose $92.6 billion, compared to a $131.8 billion increase in 2012.[6] On an annualized basis, fourth-quarter profits increased 7.9%, decelerating from 10.8% growth in the third quarter; year-over-year, however, profits rose 6.0% in the fourth quarter, up from 5.6% in the third quarter.[7] In 2013, corporate profits reached new highs as companies continued to limit their hiring and spending. The fourth quarter increase continued a two-year trend of growing faster than the GDP.[8] For first quarter 2014, however, analysts are forecasting a 0.4% year-over-year decline, the first since the third quarter of 2012.[9]

## Labor and Employment

According to the BLS, total nonfarm payroll employment increased by 175,000 in February, driven by job increases in the professional and business services sector and in wholesale trade. The unemployment rate was 6.7%, compared to 6.6% in January and down 1.0% from February 2013, as indicated in the table below.[10] The BLS also reports 29 states had unemployment rate decreases from January, while 10 states had increases, and 11 states and the District of Columbia remained unchanged. Year-over-year, unemployment in 49 states and DC fell, and one state was unchanged.[11]

[4] Gage, Caroline Salas. "Yellen's First Challenge: Coping with Too-Low Inflation." Bloomberg. January 26, 2014. Internet: http://tinyurl.com/lp722f4

[5] "Producer Price Indexes – February 2014." Bureau of Labor Statistics. March 14, 2014. Internet: http://www.bls.gov/news.release/ppi.nr0.htm

[6] "National Income and Product Accounts Gross Domestic Product, 4th Quarter and Annual 2013 (third estimate)." Press Release. Bureau of Economic Analysis. March 27, 2014. Internet: http://www.bea.gov/newsreleases/national/gdp/gdpnewsrelease.htm

[7] "Economic Report: Corporate Profits." Econoday. March 27, 2014. Internet: http://tinyurl.com/pvzqhu9

[8] House, Jonathan. "Firms' Profits Rise to Record High, Outpacing GDP Growth." The Wall Street Journal. March 27, 2014. Internet: http://tinyurl.com/olxyapb

[9] Scaggs, Alexandra. "Wall Street Takes Dimmer View of First-Quarter Profits." The Wall Street Journal. March 28, 2014. Internet: http://tinyurl.com/nhh9oq8

[10] "The Employment Situation – February 2014." Bureau of Labor Statistics. March 7, 2014. Internet: http://www.bls.gov/news.release/empsit.nr0.htm

[11] "Regional and State Employment and Unemployment." Bureau of Labor Statistics. March 28, 2014. http://www.bls.gov/news.release/laus.nr0.htm


**Table 2. National Unemployment Rate (seasonally adjusted)**

|      | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2011 | 9.0 | 8.9 | 8.8 | 9.0 | 9.1 | 9.2 | 9.1 | 9.1 | 9.1 | 9.0 | 8.7 | 8.5 |
| 2012 | 8.3 | 8.3 | 8.2 | 8.1 | 8.2 | 8.2 | 8.3 | 8.1 | 7.8 | 7.9 | 7.7 | 7.8 |
| 2013 | 7.9 | 7.7 | 7.6 | 7.5 | 7.6 | 7.6 | 7.4 | 7.3 | 7.2 | 7.3 | 7.0 | 6.7 |
| 2014 | 6.6 | 6.7 | 6.7 |     |     |     |     |     |     |     |     |     |

Source:  Bureau of Labor Statistics

## Consumer Confidence and Spending

The Conference Board Consumer Confidence Index, which fell to 78.3 in February, rose in March and is now at 82.3 (1985=100). The Present Situation Index, which had risen for four consecutive months, decreased 0.6 points to 81.0, while the Expectations Index rose 7.0 points to 83.5. Consumers were most optimistic about future economic and job prospects, but were more pessimistic about income growth. Overall, however, "consumers expect the economy to continue improving and believe it may even pick up a little steam in the months ahead," says Lynn Franco of The Conference Board.[12]

## Manufacturing

The latest Manufacturing ISM Report On Business indicates the February Purchasing Managers' Index (PMI) is 53.2%, a 1.9% increase over January's reading. The February reading indicates the ninth consecutive month of expansion in the manufacturing sector. A reading above 50% indicates that the manufacturing economy is generally growing. The New Orders Index rose 3.3 percentage points in February to 54.5%; however, severe winter weather affected the Production Index, which fell 6.6 percentage points to 48.2%. Inventories of raw materials rose 8.5 points to 52.5%. Most manufacturing sectors report business conditions are generally improving, and are optimistic for increased demand and growth in the near term.[13]

The U.S. Census Bureau reports new orders for manufactured durable goods in February increased 2.2% to $229.4 billion. This increase followed decreases in both January and December. Excluding transportation, new orders increased 0.2%. Excluding defense, new orders increased 1.8%.[14]

Inventories of manufactured durable goods, which rose 0.3% in January, also increased 0.8% in February— the tenth increase in the past 11 months. Transportation equipment accounted for most of the increase. Nondefense new orders for capital goods in February decreased 2.8% to $75.1 billion while shipments increased 0.1%. Defense new orders for capital goods in February increased 13.5% and inventories increased 4.0%; shipments fell 1.7%, however.[15]

[12] "The Conference Board Consumer Confidence Index Rebounds in March." The Conference Board. Press Release. March 25, 2014. Internet: http://www.conference-board.org/press/pressdetail.cfm?pressid=5137

[13] "New Orders, Employment and Inventories Growing Production Contracting Supplier Deliveries Slowing." **March 3, 2014.** *February 2014 Manufacturing ISM Report On Business. Institute for Supply Management. Internet.* http://www.ism.ws/about/MediaRoom/newsreleasedetail.cfm?ItemNumber=24056

[14] "Advance Report on Durable Goods Manufacturers' Shipments, Inventories and Orders: February 2014." *U.S. Census Bureau News.* US Department of Commerce. March 26, 2014. Internet: http://www.census.gov/manufacturing/m3/adv/pdf/durgd.pdf

[15] *Ibid.*



## ——— Construction Spending and the Housing Markets ———

Reed Construction Data reports new single-family and multi-family construction spending for 2013 increased 28.9% (not including improvements), while nonresidential building spending gained just 0.1%. The firm forecasts total residential spending will increase by 13.6% in 2014, and 15.6% in 2015, as indicated in the table below.[16]

**Table 3. U.S. Total Construction Spending (Year over Year Change)**

|  | ACTUAL | | | FORECAST | | |
|---|---|---|---|---|---|---|
|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| New Single - Family | 6.9% | -3.9% | 22.0% | 27.9% | 18.0% | 21.0% |
| New Multi - Family | -32.9% | -5.7% | 22.6% | 33.7% | 13.4% | 9.7% |
| Total Residential * | -1.9% | 1.4% | 13.4% | 17.5% | 13.6% | 15.6% |
| Nonresidential Building | -22.7% | -2.2% | 5.1% | 0.1% | 6.1% | 8.3% |

Source:  Reed Construction Data

* Total Residential = New Single-Family + New Multi-Family + Residential Improvements

U.S. housing construction dipped 0.2% in February to a seasonally adjusted annual rate of 907,000 following a similarly flat January. According to Kevin Kelly, chairman of the National Association of Home Builders (NAHB), bad weather and shortages of buildable lots and labor were the primary reasons for the lull. Single-family starts increased 0.3% to a seasonally adjusted annual rate of 583,000 units in February, while multi-family starts fell 2.5% to 312,000 units.[17]

Bad weather hampered sales of newly built, single-family homes, which decreased 3.3% in February to a seasonally adjusted annual rate of 440,000 units. Homebuilders nevertheless continued to increase their inventory of for-sale homes in anticipation of a stronger spring buying season. According to David Crowe, NAHB's chief economist, "We still expect 2014 will be a strong year for housing. The first two-month average of 2014 is exactly in line with where 2013 left off. If not for the unusual weather, we would easily be ahead of last year's pace." The inventory of new homes rose to 189,000 units, a 5.2-month supply at the current pace.[18]

The severe winter weather also put a chill on home prices. The January seasonally adjusted Case-Shiller 20-City Home Price Index declined by 0.1% for the third consecutive month, with 12 cities posting declines; the 10-City Composite was unchanged. Year-over-year, however, both indexes saw healthy increases: the 10-City index rose 13.5%, while the 20-City index rose 13.2%.[19]

---

[16] Markstein, Bernard M. "Outlook for Construction Spending Better than Results for 2013." News Release. February 26, 2014. Reed Construction Data. Internet: http://tinyurl.com/n2wtyun

[17] "Housing Starts Hold Steady in February."  News Release. National Association of Home Builders. March 18, 2014. Internet: http://www.nahb.org/news_details.aspx?newsID=16726

[18] "New-Home Sales Continue Trend Relatively Flat in February." News Release.  National Association of Home Builders. March 25, 2014. Internet: http://www.nahb.org/news_details.aspx?newsID=16747

[19] "Pace of Home Price Grains Slow According to the S&P/Case-Shiller Home Price Indices." Press Release. Standard & Poor's Dow Jones Indices. March 25, 2014. Internet: http://tinyurl.com/mbg57jc



## Interest Rates and Financial Markets

At its latest meeting, the Federal Open Market Committee (FOMC) decided to keep short-term interest rates at record lows and also maintain the target range for the federal funds rate at 0 to 0.25%. The Committee anticipates keeping the low levels as long as the unemployment rate remains above 6.5% and inflation is projected to be no more than 2.0%.[20] The table below represents forecasted interest rates published by Wells Fargo Securities, Mesirow Financial and Fannie Mae.[21][22][23]

**Table 4. Interest Rate Forecast**

|                            | 2012 | 2013 | 2014 | 2015 |
|----------------------------|------|------|------|------|
| Federal Funds Rate         | 0.25 | 0.25 | 0.25 | 0.44 |
| 1-Year Treasury Note Yield | 0.2  | 0.1  | 0.1  | 0.6  |
| 3 Month LIBOR              | 0.43 | 0.27 | 0.25 | 0.61 |
| 3 Month Treasury Bill      | 0.09 | 0.06 | 0.20 | 0.69 |
| 10 Year Treasury Note      | 1.80 | 2.35 | 3.12 | 3.69 |
| 30 Year Bond               | 2.92 | 3.45 | 4.05 | 4.59 |
| Prime Rate                 | 3.25 | 3.25 | 3.25 | 3.44 |
| Corporate Bond BAA         | 4.93 | 5.10 | 5.21 | 5.68 |

Sources: Wells Fargo Securities, Mesirow Financial and Fannie Mae

*Value Line* analysts are increasingly confident in the economic outlook, despite the delays, dislocations and higher costs that came with the long winter. The first quarter reports brought better-than-expected numbers regarding homebuilding, building permits, industrial production, factory use, and retail spending.[24] Analysts at CNNMoney deemed the first quarter "lackluster" for most of the major market indexes, although the S&P 500 nearly reached its all-time high again at the end of March.[25] Still, for 2014, Value Line analysts foresee "few major challenges in 2014," with quarterly growth of 2% in the first quarter, 2.5% in the second quarter, and possibly 3% by the fourth quarter. Listed below are the market increases as reported by *Value Line.*[26]

**Table 5. Closing Stock Market Averages**

|                              | CLOSING AVERAGES 3/19/2014 | % CHANGE 12 MONTHS |
|------------------------------|----------------------------|--------------------|
| Standard & Poor's 500        | 1860.77                    | +20.2%             |
| Dow Jones Industrial Average | 16222.17                   | +12.2%             |
| NASDAQ Composite             | 4307.60                    | +33.4%             |
| NYSE  Composite              | 10359.50                   | +14.9%             |

Source:  *Value Line Investment Survey*

---

[20] Swonk, Diane C. "Mesirow Financial Economic Forecast." Mesirow Financial. *Themes on the Economy*. March 11, 2014. Internet: http://www.mesirowfinancial.com/economics/swonk/themes/themes_0314.pdf

[21] Swonk, Diane C. "Mesirow Financial Economic Forecast." Mesirow Financial. *Themes on the Economy*. March 11, 2014. Internet: http://www.mesirowfinancial.com/economics/swonk/themes/themes_0314.pdf

[22] "U.S. Economic Forecast." Wells Fargo Securities LLC Economics Group. March 12, 2014. Internet: http://tinyurl.com/ksagxua

[23] "Economic Forecast: March 2014" Fannie Mae. Internet: http://tinyurl.com/kaz4a7n

[24] Economic and Stock Market Commentary. *Value Line Investment Survey.* March 28, 2014.

[25] Solomon, Jesse. "US Stocks End Choppy Quarter on a High Note." *CNNMoney.* March 31, 2014. Internet: http://money.cnn.com/2014/03/31/investing/stocks-markets/

[26] Economic and Stock Market Commentary. *Value Line Investment Survey.* March 28, 2014.



## Outlook

The most recent projections by the 45 forecasters surveyed by the Federal Reserve Bank of Philadelphia are generally more positive than those of three months ago. The panel expects real GDP to increase at an annual rate of 2.0% during the first quarter, 3.0% in the second quarter, and 2.8% in the third quarter. On an annual-average over annual-average basis, the forecasters see real GDP growing 2.8% in 2014, 3.1% in 2015, and 3.1% in 2016, as indicated in the table below.[27]

**Table 6. Projections for Major Economic Indicators**

| | REAL GDP (%) | | UNEMPLOYMENT RATE (%) | | PAYROLLS (000S/MONTH) | |
|---|---|---|---|---|---|---|
| | PREVIOUS | NEW | PREVIOUS | NEW | PREVIOUS | NEW |
| Quarterly data | | | | | | |
| 2014:Q1 | 2.5 | 2.0 | 7.1 | 6.7 | 187.0 | 177.4 |
| 2014:Q2 | 2.9 | 3.0 | 7.0 | 6.6 | 193.5 | 193.5 |
| 2014:Q3 | 2.9 | 2.8 | 6.9 | 6.4 | 201.8 | 195.2 |
| 2014:Q4 | 2.9 | 2.7 | 6.8 | 6.3 | 202.1 | 215.0 |
| 2015:Q1 | N.A. | 3.2 | N.A. | 6.2 | N.A. | 201.0 |
| ANNUAL DATA (PROJECTIONS ARE BASED ON ANNUAL-AVERAGE LEVELS) | | | | | | |
| 2014 | 2.6 | 2.8 | 7.0 | 6.5 | 189.9 | 197.7 |
| 2015 | 2.8 | 3.1 | 6.4 | 6.1 | N.A. | 206.9 |
| 2016 | 2.7. | 3.1 | 6.0 | 5.7 | N.A. | N.A. |
| 2017 | N.A. | 2.4 | N.A. | 5.5 | N.A. | N.A. |

Source: *First Quarter 2014 Survey of Professional Forecaster*

27 "First Quarter 2013 Survey of Professional Forecasters." Federal Reserve Bank of Philadelphia. February 15, 2013.
   Internet: http://tinyurl.com/bwq9ej8


# V. Valuation Principles and Concepts

## Standard of Value

For the purposes financial planning, the Patent Portfolio was valued to estimate the Fair Market Value ("FMV") and Orderly Liquidation Value ("OLV").

**Fair Market Value:** The Fair Market Value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. (Internal Revenue Code, Section 20.2031-1(b))

**Orderly Liquidation Value:** An estimated amount, expressed in terms of currency in U.S. dollars, which the subject asset could typically realize assuming that the sale is properly advertised and professionally managed by a seller obligated to sell over an extended period of time, usually within six to twelve months, as of the effective date of this appraisal report with both parties fully aware of all relevant facts. Furthermore, the ability of the asset to draw sufficient prospective buyers to insure competitive offers is considered. Any modifications to the asset appraised could change the psychological and/or monetary appeal necessary to gain the values indicated. This appraisal concept is intended for asset-based lending purposes. Consideration is given for goodwill and intangible assets. This value does not represent expectations of value in a bankruptcy auction.

## Approaches to Valuation

There are three generally accepted valuation approaches when valuing an asset: cost approach, market approach, and income approach. Each approach is briefly described below.

### Cost Approach

Also known as the "asset approach", the cost approach is based on the principle of substitution whereby the value indication of an individual asset or of an enterprise is determined by quantifying the amount of money would be required to replace or reproduce the same asset or an asset with similar utility. This approach is commonly used when valuing an enterprise that holds a significant amount of tangible asset or when there is little to no contribution to products from labor. The cost approach is sometimes used when future benefits associated with the ownership of an individual asset are difficult or impossible to quantify. This approach is less applicable for enterprises that have a large amount of intangible assets.



## Market Approach

The market approach is based on the principle of substitution whereby the value indication of an individual asset or of an enterprise is determined by using one or more methods that compare the subject asset or enterprise to similar assets or enterprises that have been sold. The primary intent of the market approach is to estimate the value of the assets based on recent sales or offerings of similar assets. Because the comparable assets sold are not exactly the same as the asset being appraised, adjustments must be made to the sale price to reflect the differences. This approach tends to be the most objective of the three approaches as it observes recent public transactions and incorporates current market conditions, such as reflections of investor growth and risk expectations.

## Income Approach

The income approach is based on the principle of anticipated benefits whereby the value indication of an individual asset or of an enterprise is determined by using one or more methods that convert anticipated economic benefits into a present value. Anticipated benefits are generally expressed in monetary terms and may consist of net cash flow, dividends, and other various forms of earnings. This approach tends to contain a level of subjectivity as forecasts are generally used to estimate the basis of anticipated economic benefits.

## Selection of Methods

GA used Income Approaches for the valuation of the Patent Portfolio. There are several methods to consider within the Income Approach. Below is a description of the methods used for the analysis.

**Relief from Royalty Method:** This method within the income approach that operates on the assumption that in owning an asset (e.g., a trade name), a company does not have to rent the asset from (pay royalties to) another party. The value of the subject asset is the present value of the stream of net royalties the company does not have to pay.

**Excess Earnings Method:** A specific way of determining a value indication of a business, business ownership interest, security, or asset determined as the sum of a) the value of the assets derived by capitalizing excess earnings and b) the value of the selected asset base.



# VI. Liquidation Strategy

The following liquidation strategy assumes an orderly liquidation of the Patent Portfolio.

The liquidation of the Patents would likely involve the following steps:

- creation of marketing material;

- target and contact qualified buyers;

- due diligence performed by interested parties;

- negotiation; and

- closing.

**Figure 5. Example of Steps and Timing of Liquidation**



The liquidator would work with Company management to create marketing materials and identify a list of qualified buyers. The liquidator would then begin contacting potential buyers and would take the lead on the coordination of all facets of the diligence performed by interested parties. Once a buyer was identified, the liquidator would work with stakeholders through the negotiation and close process.

## Liquidation of the Patent Portfolio

GA's valuation opinion for OLV assumes the unencumbered and free use patents used by the Company for its various product lines. While the analysis provides a valuation of the portfolio of patents isolated from other company assets, the patents would likely need to be bundled with the existing customer and distribution contracts, and other associated assets in order to draw sufficient interest. Selling these assets separately, particularly the customer and distribution contracts, could negatively impact the value of the Patents as it may hinder the buyer's distribution relationships and continuity of sales. GA's valuation opinion assumes a bundled sale of all Patents.

## Time to Complete the Liquidation

GA estimates that the time to complete the liquidation of the Patent Portfolio would be approximately 6 to 12 months.


## Costs of the Liquidation

The primary costs associated with the sale of the Patent Portfolio would be brokerage fees, which are typically contingent success fees (pre-determined percentage of sales price), and legal fees required to negotiate and draft definitive purchase agreements and closing documents. A reasonable estimate of the costs to liquidate the Patent Portfolio would be approximately 10-15% of the gross OLV as provided in this appraisal report.

## Likely Buyers

- Financial buyers with strong relationships with network providers or portfolio companies seeking to expand their portfolio. These buyers would most likely assume the Company's personnel and consolidate other services to reap efficiencies.

- Digital advertising companies looking to expand their consumer reach and overcome the barriers to entry that the patent portfolio provides.

- WiFi network OEMs looking to vertically integrate an advertising offering to provide revenue opportunities for both themselves and their customers.

- Cable and telecommunication companies that provide a large network of WiFi hotspots looking to secure 100% of advertising revenue opportunity for themselves rather than share the opportunity with MediaShift.

## Potential Buyers

The following is a list of potential buyers of the Patent Portfolio, as determined by GA and reviewed by Company management.

- Google, Inc.

- Yahoo! Inc.

- Microsoft Corporation

- Comcast Corporation

- AT&T

- EchoStar Corp.

- Cisco Systems, Inc.

- NTT Docomo

- JCDecaux SA



- Clear Channel Communications, Inc.

While a list of potential buyers we have identified is being provided, the valuation opinion in this appraisal report does not consider a specific buyer. Incorporating a specific buyer in the valuation analysis would result in "Investment Value" standard of value, which assumes certain levels of synergies in the valuation conclusion. Those synergies have not been quantified and are not included in the FMV and OLV conclusions provided in this appraisal report.

## Primary Recovery Factors

In estimating the FMV and OLV for the patent Portfolio, GA reviewed certain factors that we believe may impact the recovery value of the patent Portfolio. These factors include, but are not limited to, the following:

- Current economic conditions;

- Historical trends and outlook for the Industry;

- Historical trends and outlook for the Company;

- Consumer demand for the subject assets considered;

- Digital advertising spending;

- Potential buyers for the Patent Portfolio;

- The liquidation strategy employed;

- The estimated time to liquidate the patent Portfolio;

- Technological obsolescence and disruption caused by competing technologies; and

- Patent litigation.

## Valuation Considerations

In estimating the FMV and OLV for the patent Portfolio, GA considered various relevant factors that may impact the values of the patent Portfolio. The valuation opinion provided in this report assumes, but is not limited to, the following:

- The liquidation of the Patent Portfolio would take approximately 6 to 12 months to complete;

- The liquidation of the Patent Portfolio would be an all-cash sale;

- The Patent Portfolio would be sold on an "as-is" basis;



- Taxes are estimated from a United States investor's perspective and incorporate an estimated combined federal and state tax rate of 40%;

- The Patent Portfolio would sold as a bundled portfolio of all patents and patent applications;

- The liquidation of the Patent Portfolio would be bundled with existing advertising and network provider contracts;

- Customers and network providers must continue to be serviced during the selling process and any transitional period;

- There are no material changes to the obsolescence of the subject Patents, either pending or approved, as of the Valuation Date, unless stated otherwise in this appraisal report;

- The Patent Portfolio is free and clear of all liens;

- There are no proposed court-ordered remedies that would dilute the value of the Patent Portfolio that would be distributed to any and all interested parties in a liquidation;

- All aspects of the Company's operations (e.g., sales mix, gross margin levels, overall profitability, vendor relationships, distribution relationships, customer relationships, etc.) are reasonably consistent with the Company's operations as of the Valuation Date;

- The state of the economy and industry are reasonably consistent with the outlook of the economy and industry provided by Company management and third-party resources as of the Valuation Date;

- The OLV indicated in this appraisal report does not represent the values expected in a bankruptcy auction;

- The FMV and OLV indicated in this appraisal report are gross of any commissions and legal expenses necessary to liquidate the Patent Portfolio;

- All of the information provided by Company management and other internal and external sources identified in this appraisal report is accurate and complete; and

- The contents of this appraisal report would not be distributed to any potential buyer, any agent of the potential buyer, and/or any third party who is not indicated as an intended user in this appraisal report prior to the sale of the Patent Portfolio.



# VII. Valuation Methodology

## ———— Weighted Average Cost of Capital ————

The present value of future income depends on the amount and timing of that income. Since both the amount and timing are uncertain, income might be less than expected and/or income might materialize later than expected. This uncertainty must be quantified and incorporated into a discount rate.

One strong indicator of the appropriate discount rate, that is, the rate of return required by an investor, is the alternative market for the investor's funds, which can generally be based upon the yields available on competing financial assets in the public markets. This view is grounded in the fundamental economic and financial concepts of substitution and opportunity cost.

A market participant should expect to achieve a return that compensates for the risk characteristics of the subject asset as measured by the Weighted Average Cost of Capital ("WACC"), which is the weighted average of the required rate of return demanded by equity holders (represented by the subject company's cost of equity from the perspective of market participants, or $K_e$) and the required rate of return demanded by debt-holders (represented by the firm's cost of debt or borrowing rate, $K_d$). The formula for determining the WACC is as follows:

$$WACC = \left[ \left( \frac{E}{(E + D)} \right) \times K_e \right] + \left[ \left( \frac{D}{(E + D)} \right) \times K_d \times (1 - t) \right]$$

where:

$E$ = market value of equity
$D$ = market value of interest-bearing debt
$K_e$ = cost of equity capital
$K_d$ = cost of debt capital
$t$ = tax rate

For purposes of this analysis, we will refer to this as the asset-specific WACC, or Company WACC. We have determined that the Company WACC, as of the Valuation Date, was 27.0%. Our WACC analysis is illustrated in Exhibit 2.

## Capital Asset Pricing Model

GA utilized the capital asset pricing model (CAPM), which states that the return on any risky asset must be greater than the risk-free rate, to calculate $K_e$. The CAPM formula is generally stated as follows:

$$Ke = R_f + \left[ \left( R_m - R_f \right) \times \beta \right] + RP_s + \alpha$$

where:

$R_f$ = risk-free rate of return



(R_m - R_f) $\quad$ = historical excess return on market portfolio
β $\quad$ = leveraged beta
RP_s $\quad$ = risk premium for size (size premium)
α $\quad$ = alpha or specific asset premium

## Beta

The beta is a measure of a stock's return over time relative to the market. For the purpose of determining $K_e$ for the Industry, we calculated an Industry β based on the stock price of comparable companies who have publicly traded stock. We chose the following comparable companies:

- **Smith Micro Software Inc**: Smith Micro Software, Inc. provides software and services that simplify, secure, and enhance the mobile experience. The company's wireless solutions include various client and server applications that manage devices, communications, and network connectivity for end-users, as well as machine-to-machine endpoints. Its Wireless segment develops QuickLink connection management applications and software components, which allow mobile users to connect a tablet, laptop, or other wireless device to cellular or Wi-Fi networks. This segment also offers NetWise, a policy-based control solution for managing data traffic, network authentication, user entitlement to wireless services, and device behavior; and CommSuite, a services platform that allows operators and enterprises to deliver and monetize voice, video, and messaging applications. The company's Productivity and Graphics segment focuses on developing software for the consumer, prosumer, and professional markets. This segment's products include Poser, a solution for creating 3D character art and animations; Anime Studio, an animation tool for professionals and digital artists; Manga Studio, a solution for creating manga and comic art; and MotionArtist, a solution for creating interactive presentations. It also provides ScatterShow, which creates interactive slide shows from photo albums on mobile devices; and StuffIt Deluxe, a compression solution for documents and media. In addition, this segment republishes and markets third party software titles. This segment offers its products through direct sales on the company's Websites and affiliate Websites, customer service order desks, on-line resellers, and traditional retail outlets. The company also provides technical support and customer services. The company primarily serves wireless service providers, mobile device and chipset manufacturers, and enterprise businesses. Smith Micro Software, Inc. was founded in 1982 and is headquartered in Aliso Viejo, California.

- **Ubiquiti Networks**: Ubiquiti Networks, Inc., together with its subsidiaries, offers a portfolio of networking products and solutions for service providers and enterprises. Its service provider product platforms provide carrier-class network infrastructure for fixed wireless broadband, wireless backhaul systems, and routing; and enterprise product platforms provide wireless LAN infrastructure, video surveillance products, and machine-to-machine communication components. The company offers high performance radios, antennas, software, communications protocols, and management tools that are designed to deliver carrier and enterprise class wireless broadband access and other services primarily in the unlicensed RF spectrum. The company offers various technology platforms, including airMAX, which includes protocols that contain technologies for minimizing signal noise; EdgeMAX, a disruptive price-performance software and systems routing platform; and airFiber, a 24 GHz point-to-point radio system. It also provides UniFi, an enterprise Wi-Fi System that includes Wi-Fi certified hardware with software based management controller; AirCam H.264 megapixel IP cameras; airVision, a management controller software that are used to manage multiple airCam H.264 IP cameras as well as manage digital video recorder devices; and mFi, which comprises hardware sensors, power devices, and management software that allows devices to be monitored and controlled remotely via WiFi. In addition, the company provides antenna products, as well as miscellaneous products, such as mounting brackets,



cables, and power over Ethernet adapters. Ubiquiti Networks sells its products and solutions through a network of distributors, resellers, and original equipment manufacturers. The company was formerly known as Pera Networks, Inc. and changed its name to Ubiquiti Networks, Inc. in 2005. Ubiquiti Networks, Inc. was incorporated in 2003 and is headquartered in San Jose, California.

- **ReachLocal Inc.**: ReachLocal, Inc. provides a suite of online marketing and reporting solutions to small and medium-sized businesses (SMBs). The company offers ReachSearch, a search engine marketing product; ReachDisplay, a display advertising product; ReachCast, a Web presence solution; and ReachRetargeting, a display retargeting product. It also provides ReachEdge, an optimized Website and automated lead management system. In addition, the company develops a comprehensive suite of digital marketing solutions, such as TotalTrack, TotalLiveChat, TotalVideoNow, and TotalBannerNow products to address specific marketing needs, including lead optimization, online analytics, and digital creative solutions. It serves SMBs in healthcare, home services, professional services, and specialty services industries through a combination of its proprietary technology platform and direct sales force of Internet marketing consultants and service professionals, as well as through select third-party agencies and resellers, and a franchisee. The company operates primarily in North America, Australia, the United Kingdom, the Netherlands, Germany, Japan, Brazil, Austria, Belgium, India, and New Zealand. ReachLocal, Inc. was founded in 2003 and is headquartered in Woodland Hills, California.

- **Yahoo!, Inc**: Yahoo! Inc. operates as a technology company worldwide. The company offers search products, including Yahoo Search that serves as a starting point to navigate the Internet and discover information; and Yahoo Answers, which enables users to seek, discover, and share knowledge and opinions across mobile phones, tablets, and desktop. It also provides communications products, such as Yahoo Mail that connects users to the people and things; Yahoo Messenger, an instant messaging service; and Yahoo Groups, which enables users to join groups based on shared interests and involvements. In addition, the company offers digital magazines comprising Yahoo.com that brings together the relevant content; My Yahoo, a customizable homepage; Yahoo Weather, which provides users with weather conditions and information for various cities and locations; Yahoo News that offers news through text, photos, and video; Yahoo Sports, which serves audiences of digital sports enthusiasts; Yahoo Finance that offers financial data, information, and tools, which facilitate users to make financial decisions; and Yahoo Entertainment and Lifestyles, a collection of properties focused on various trends and information in culture, women's issues, and media. Further, it provides original, premium, and third-party news, finance, sports, entertainment, and lifestyle video content through various Yahoo properties, including Yahoo Screen and Yahoo Smart TV; Flickr, a Web and mobile photo management and sharing service; and Tumblr that offers a Web service and mobile applications, which facilitate users to create and share content of various kinds. Additionally, the company's advertiser offerings include Search Advertising, Native Advertising, Yahoo Audience Ads, Yahoo Premium Ads, and Yahoo Video; and ad platforms comprise Yahoo Ad Manager, Yahoo Ad Manager Plus, and Yahoo Ad Exchange. It has approximately 800 million monthly users. Yahoo! Inc. was founded in 1994 and is headquartered in Sunnyvale, California.

- **Google, Inc**: Google Inc., a technology company, builds products and provides services to organize the information. The company offers Google Search, which provides information online; Knowledge Graph that allows to search for things, people, or places, as well as builds systems that recognize speech and understand natural language; Google Now, which provides information to users when they need it; and Product Listing Ads that offer product image, price, and merchant information. It also provides AdWords, an auction-based advertising program; AdSense, which enables Websites that are part of the Google Network



to deliver ads; Google Display, a display advertising network; DoubleClick Ad Exchange, a marketplace for the trading display ad space; and YouTube that offers video, interactive, and other ad formats. In addition, the company offers Android, an open source mobile software platform; hardware products, including Chromebook, Chrome, Chromecast, and Nexus devices; Google+ to share things online with people; Google Play, a cloud-based digital entertainment store for apps, music, books, and movies; Google Drive, a place for users to create, share, collaborate, and keep their stuff; and Google Wallet, a virtual wallet for in-store contactless payments. Further, it provides Google Apps, which include Gmail, Calendar, and Google Sites that are built for people to work anywhere, anytime, on any device without loss of security or control; Google Maps Application Programming Interface; and Google Earth Enterprise, a software solution for imagery and data visualization. Additionally, the company offers Google App Engine, a platform as a service offering; Google Cloud Storage; Google BigQuery for real time analytics; Google Cloud SQL for structured query language; and Google Compute Engine, an infrastructure as a service platform. It also offers mobile wireless devices, and related products and services. Google Inc. was founded in 1998 and is headquartered in Mountain View, California.

GA utilized the five year monthly betas reported by the S&P Capital IQ database. Since beta measures the systematic risk a firm's equity has when compared to the market, it is important to remove any beneficial effects gained by incorporating debt; therefore, we unlevered each comparable company's beta. We then took the average unlevered beta and re-levered it based on an assumed capital structure and tax rate of the subject company. As shown in Exhibit 2, the Industry generated a beta of 1.49 as it tends to be less stable than the overall market.

## Cost of Equity ($K_e$)

The risk-free rate of return, as of the Valuation Date, was approximately 3.2% based on the yield of long-term (20-year) Treasury Bonds.

Because equity investors require a greater expected return than the risk-free rate to compensate for the inherent risks of an equity investment versus an investment in U.S. Government Bonds, CAPM applies a beta adjusted premium or premiums to the risk-free rate in order to determine the appropriate required return (or discount rate) to apply to the subject equity investment. A "market risk premium" reflects the additional return that investors in the stock market as a whole (often represented by the S&P 500) would require over and above the "risk-free rate". The most recent studies compiled by Morningstar prior to the Valuation Date indicate that, the forward looking equity premium was approximately 6.2% above the 20-year Treasury Bond rate. The indicated return reflects that of large sized publicly traded companies, which is likely to be larger than an investment in the subject asset.

Investors in smaller entities generally require a higher rate of return, therefore, an additional premium is added to take into account the smaller investment in the subject assets. This is sometimes referred to as the "size equity premium". This additional premium reflects the fact that, historically, the stocks of larger entities have experienced lower returns than smaller rapid growth entities, but have also been more consistent relative to sales and earnings and consequently less risky. Over the past 70 years, as compiled by Morningstar, investors in entities in a similar size range as the subject assets required an additional return of approximately 6.0%.

One of the fundamental assumptions of CAPM states that rational investors hold a diversified portfolio of assets; therefore, the only risk for which they should be compensated is systematic risk – i.e. undiversifiable risk. However, if the investor is not holding a diversified portfolio, it is often appropriate to add a subjective adjustment that compensates for unsystematic risk. This subjective adjustment is often made based on the specific riskiness of the subject asset and includes such risks as volatility of



returns, concentration of customer base, key person and/or supplier dependence, abnormal present or pending competition, pending regulatory changes or lawsuits, and strengths/weaknesses of management. This adjustment is known as the Unsystematic Risk Premium (or alpha). We chose to add an alpha of 10% because due to the fact that this is an early stage company that faces significant execution risk coupled with potential threats of infringement lawsuits despite the perceived strength of its patents. The company's technology is quite disruptive in that it has the ability to replace digital advertisements placed in other non-WiFi channels.  These market disruptions will likely result in a significant incentive for competitors to design around the patents and attempt to produce non-infringing alternatives to the technology.  Though the Patent Portfolio's strength appears sound, the rate of innovation within the industry is quite high and this threat does exist.

Using these inputs, a Company $K_e$ of 28.4% was determined as follows:

$$3.2\% \; + \; (1.49 \times 6.2\%) + 6.0\% \; + \; 10.0\% = \; 28.4\% \; (\text{rounded})$$

## Cost of Debt and Capital Structure

The capital structure used to calculate the Company's WACC was based on the capital structure of the comparable used to estimate beta. The capital structure was comprised of 5.0% debt and 95% equity, which translates to a 0.1 debt-to-equity ratio.

We estimated an average interest rate (cost of debt) of approximately 10.0% before tax (or 6.0% after-tax using an estimated tax rate of 40.0%). The cost of debt reflects the interest rate reported in the company's financial statements filed with the SEC. Based on these inputs, we estimated a WACC of approximately 27.0%, which was calculated as follows:

$$(28.4\% \times 95.0\%) \; + \; (6.0\% \times 5.0\%) \; = \; 27.0\% \; (\text{rounded})$$

## Patent Portfolio Cost of Capital for FMV

When determining the appropriate cost of capital that is applicable to the patent portfolio under the FMV standard of value, one must consider the level of risk that is specific to the patent portfolio and if those risks are different than what is assumed for the entire company.  With regards to the Patent Portfolio, GA assumed a capital structure of 100% equity due the fact that traditional lenders are reluctant to lend against intangible assets without a long history of market acceptance. Given that the company's primary asset is the Patent Portfolio GA did not assume any additional unsystematic risk, and assumed that the 10% alpha utilized in the development of the company's WACC was appropriate. Based on these inputs, we estimated the cost of capital for the Patent Portfolio to be 28.0% under a FMV standard of value.

## Patent Portfolio Cost of Capital for OLV

When determining the appropriate cost of capital that is applicable to the patent portfolio under the OLV standard of value, one must consider the level of risk that is specific to the patent portfolio under the circumstances of a liquidation scenario and if those risks are different than what is assumed for the entire company. With regard to the Patent Portfolio, GA assumed a capital structure of 100% equity due the fact that traditional lenders are reluctant to lend against intangible assets without a long history of market acceptance. In addition, GA assumed an unsystematic risk premium of 25%, which is 15% higher than the Patent Portfolio's alpha under an FMV standard of value.  The reason for this difference stems from the fact that under a liquidation scenario the company is likely experiencing financial distress.  This distress will likely decrease the pool of potential buyers and as such, attract those requiring a higher return.  In addition, the financial distress may signal that the technology's viability in the marketplace is in question. Based on these inputs, we estimated the cost of capital for the patent portfolio under an OLV standard of value to be 43.0%.



# Patent Portfolio - FMV

## Relief from Royalty Method - FMV

We valued the MediaShift Patent Portfolio using the relief from royalty method.

Management provided a five-year forecast of revenue and expenses. We reviewed this forecast and compared it to other comparable companies in the industry. Given that the company is an early stage start-up, the company is expected to grow at a pace that significantly outpaces its competitors and what is expected within the industry. Management built its projections from the ground up considering the following sources of revenue:

1. WiFi Revenue Cable includes securing an agreement with one of the major cable companies that provided WiFi hotspots. (currently in negotiation);

2. WiFi Revenue Other includes the following revenue sources: Hotels, Airports, In-Flight, transit, Collegiate, and Other;

3. Publisher Revenue includes: Network Carlson Wagonlit and United.com; and

4. Special Opportunities includes peer to peer as well as other non-Wifi applications

Each of these channels has assumptions for cost per thousand views ("CPM") that are generally in line with industry averages. The following are Management's CPM assumptions:

| CPM by Channel 2014E - 2018E | | | | | |
|---|---|---|---|---|---|
| Channel | 2014E | 2015E | 2016E | 2017E | 2018E |
| Hotels | $ 5.50 | $ 14.11 | $ 14.93 | $ 14.09 | $ 13.42 |
| Airports | 51.99 | 46.02 | 43.31 | 40.65 | 38.75 |
| In-Flight | 31.79 | 28.80 | 29.69 | 27.54 | 25.61 |
| Transit | 44.48 | 37.07 | 35.20 | 32.40 | 29.77 |
| Collegiate | 3.38 | 9.66 | 9.16 | 7.95 | 6.98 |
| Other | 24.30 | 27.79 | 26.71 | 24.03 | 21.84 |
| Publisher | 4.37 | 5.15 | 5.36 | 5.57 | 5.80 |
| Special Opportunities | 0.25 | 0.43 | 0.63 | 0.80 | 1.04 |
| **Fully-Weighted Average CPM** | $ **2.50** | $ **3.77** | $ **4.55** | $ **4.92** | $ **5.21** |

- Forrester Research projects average CPM to grow from $2.66 in 2012 to $4.68 by 2017.

- ZenithOptimedia and IPG's Magna Global report the following with respect to CPM rates for 2013 – premium placements for mobile $9.30, premium placements for general display $10.40, video CPM average $24.60, mobile average $3.00.

- Credit Suisse reports the average online video CPM is 24.60 in 2013 and is expected to grow to $25.80 by 2017.

- Hochman Consultants reports that the average CPM for its clients was $4.70 in 2013.



By 2016 digital advertising spending is expected to reach more than $55.0 billion annually. By 2016 the company is projecting to achieve $296.8 million in revenue. Currently the company splits advertisement revenue with its network providers partners based on roughly a 50/50 split. Assuming that this relationship holds true, the company is expected to participate in nearly 600 million in digital advertising spent in 2016. This equates to approximately 1% of total digital advertising dollars expected to be spent in that year. GA determined that this projection appears reasonable. Management believes that there remains significant additional upside to the forecast due to the fact that only one cable company hotspot provider was included in the forecast and that other telecommunication and cable providers are currently in discussions with the Company.

GA extended the forecast through 2030 to cover the period in which the patents have legal protection. In addition, in 2019 GA began to decrease the company growth rates from what was projected by management in every year until they stabilize at the long-term growth rate of 3% in 2026. Cost of sales is expected to remain near 60% of revenue over the life of the forecast and EBIT margin is expected eventually stabilize near 25% in 2022.

Due to the fact that the industry continues to experience technological leaps and innovation is very high, GA assumed a patent utility curve that is much less than the legal life of the patents. It is assumed that the company will enjoy 100% utility through 2016 and that beginning in 2017 competing technologies will begin to diminish the patent's utility such that by 2024 the current patent portfolio will likely be completely replaced by new technology not currently in the market.

The projected revenue after applying the patent portfolio utility curve is the base to which the selected royalty rate is applied.

Using proprietary and third-party databases, we examined comparable royalty rates paid for the use of similar technologies that compete in the same or similar industry. These royalties ranged from 1.0% to 15.0%. We then conducted a qualitative comparative analysis of the patents held by MediaShift to the guideline patents based on numerous factors. Based on our analysis, we applied a royalty rate of 8.5% to the revenue forecast described above in order to estimate the total royalties saved. Income taxes at 40% were then deducted to estimate the after-tax net royalty income.

The after-tax net royalty income was then discounted to a present value using a FMV asset-specific rate of return of 28.0% and applying the mid-year discounting convention. This present value of the discrete period after-tax net royalty income was $47,800 million.

Based on the Relief from Royalty Method, as of the Valuation Date, the FMV, on a gross basis, of the Patent Portfolio was:

**$48.0 million.**

Our FMV analysis of the Patent Portfolio under the Relief from Royalty Method is provided Exhibit 3 pages 3 and 5.

## Excess Earnings Method – FMV

We also valued the MediaShift Patent Portfolio utilizing the Excess Earnings Method.

GA utilized the projections discussed above to value the patent Portfolio under the Excess Earning Method. The theoretical premise of the Excess Earnings Method is based on the notion that the only asset owned by the company is the one being valued. All other assets required to generate the revenues and expenses of the company must be rented. The amount of rent charged per asset type


is based on the premise that a lessor of the asset will require a return on the asset being rented that is commensurate with the riskiness and quantity of the leased asset. These "economic rents", also called contributory asset charges, are then subtracted from the projected EBIT to arrive at the cash flow generated by the subject asset.

GA projected working capital and fixed asset levels that were comparable to publicly traded guideline companies. These projected working capital and fixed asset amounts were then used to calculate contributory asset charges for the company's tangible assets over the life of the forecast. GA also assumed certain intangible assets must also be rented such as a trade name, distribution agreements, advertiser relationships, and assembled workforce. The contributory asset charge calculation can be found on Exhibit 3.

The subtraction of all operating expenses and contributory asset charges results in a modified debt free net cash flow ("DFNCF"). The modified DFNCF was then discounted to a present value using an asset-specific rate of return of 28% and applying the mid-year discounting convention. This present value of the discrete period modified DFNCF was $56.083 million

Based on the Excess Earnings Method, as of the Valuation Date, the FMV, on a gross basis, of the Patent Portfolio was:

**$56.0 million**

Our FMV analysis of the Patent Portfolio under the Excess Earnings Method is provided in Exhibit 3 pages 6 and 8.

## Patent Portfolio - OLV

GA also utilized the Relief from Royalty and Excess Earnings Methods to value the Patent Portfolio under the OLV standard of value. The methodology under the OLV scenario is the same as described above, with the exception that an OLV asset specific discount rate of 43.0% was applied to the after tax royalty income for the Relief From Royalty Method and the DFNCF derived in the Excess Earnings Method.

Based on the Relief from Royalty Method, as of the Valuation Date, the OLV, on a gross basis, of the Patent Portfolio was:

**$32.0 million**

Our OLV analysis of the Patent Portfolio under the Relief from Royalty Method is provided in Exhibit 3 pages 4 and 5.

Based on the Excess Earnings Method, as of the Valuation Date, the OLV, on a gross basis, of the Patent Portfolio was:

**$31.0 million**

Our OLV analysis of the Patent Portfolio under the Excess Earnings Method is provided in Exhibit 3 pages 7 and 8.


## Summary of Values

After performing an extensive analysis of the Company's Patent Portfolio, GA has determined that the FMV for the Patent Portfolio as of the Valuation Date falls within the following range:

        **Relief from Royalty FMV**        **$48.0 million**

        **Excess Earnings FMV**        **$56.0 million**

Similarly, GA has also determined that the OLV for Patent Portfolio falls within the following range before deducting liquidation expenses that can range from 10% to 15% of the gross OLV of the asset:

        **Relief from Royalty OLV**        **$32.0 million**

        **Excess Earnings OLV**        **$31.0 million**



# VIII. Additional Appraisal Information

### Certifications

I certify that, to the best of my knowledge and belief:

1. the statements of fact contained in this report are true and correct.

2. the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved.

4. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. my engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. my compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. my analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

8. certain individuals provided significant appraisal assistance to the person(s) signing this certification.


Gregg Johnson
Principal Appraiser

Tejash Lodhavia, ASA, AVA
Concurring Appraiser

Edward Belanger, ASA, CFA
Concurring Appraiser



# Statement of Contingent and Limiting Conditions

GA and its principals assume no responsibility for the legal description or matters including legal or title considerations. Title to the subject business interest is assumed to be good and marketable unless otherwise stated.

The subject business and/or intangible asset ownership interest(s) is/are appraised free and clear of any or all liens or encumbrances unless otherwise stated.

We assume responsible ownership and competent management with respect to the subject business and/or intangible asset ownership interest(s).

The information furnished to us by others is believed to be complete and accurate. However, we did not make independent examinations of this information. Accordingly, we make no representations or warranties, nor do we express any opinion, regarding the accuracy or reasonableness of such information.

We assume no hidden or unapparent conditions regarding the subject business and/or intangible asset ownership interest(s).

We assume that there is full compliance with all applicable federal, state, and local regulations and laws unless the lack of compliance is stated, defined, and considered in this report.

We assume that all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state, or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in this report is based.

Unless otherwise stated in this report, we did not observe, and we have no knowledge of, the existence of hazardous materials with regard to the subject business and/or intangible asset ownership interest(s). However, we are not qualified to detect such substances. We assume no responsibility for such conditions or for any expertise required to discover them.

Possession of this report does not carry with it the right of publication. It may not be used for any purpose by any person other than the client to whom it is addressed without our written consent, and, in any event, only with proper written qualifications and only in its entirety.

We, by reason of this valuation report, are not required to give testimony or to be in attendance in court with reference to the business and/or intangible asset ownership interest(s) in question unless arrangements have previously been made.

Neither all nor any part of the contents of this report shall be disseminated to the public through advertising, public relations, news, sales, or other media without our prior written consent and approval.

The analyses, opinions, and conclusions presented in this report apply to this engagement only and may not be used out of the context presented herein. This report is valid only as of the Valuation Date specified herein and only for the purpose specified herein.



# Glossary of Terms

**Cost Approach:** Based on the premise that the informed purchaser would pay no more for an asset than the cost of producing a substitute property with the same utility as the subject property, this approach considers that the maximum value of a property to a knowledgeable buyer would be the amount currently required to construct or purchase a new asset of equal utility. The cost approach is sometimes used when future benefits associated with the ownership of an individual asset are difficult or impossible to quantify.

**Excess Earnings Method:** A specific way of determining a value indication of a business, business ownership interest, or security determined as the sum of a) the value of the assets derived by capitalizing excess earnings and b) the value of the selected asset base.

**Fair Market Value:** is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. (Internal Revenue Code, Section 20.2031-1(b))

**Going Concern:** An ongoing operating business enterprise.

**Income Approach:** This approach considers value in relation to the present worth of future benefits expected to be derived from ownership and is often measured through the capitalization of a specific level of income.

**Market Approach:** This approach involves the collection of market data meaningful to the subject assets being appraised. The primary intent of the market approach is to estimate the value of the assets based on recent sales or offerings of similar assets. Because the comparable assets sold are not exactly the same as the asset being appraised, adjustments must be made to the sale price to reflect the differences.

**Orderly Liquidation Value:** An estimated amount, expressed in terms of currency in U.S. dollars, which the subject asset could typically realize assuming that the sale is properly advertised and professionally managed by a seller obligated to sell over an extended period of time, usually within six to twelve months, as of the effective date of this appraisal report with both parties fully aware of all relevant facts. Furthermore, the ability of the asset to draw sufficient prospective buyers to insure competitive offers is considered. Any modifications to the asset appraised could change the psychological and/or monetary appeal necessary to gain the values indicated. This appraisal concept is intended for asset-based lending purposes. Consideration is given for goodwill and intangible assets. This value does not represent expectations of value in a bankruptcy auction.

**Relief from Royalty Method:** This method operates on the assumption that in owning an asset (e.g., a trade name), a company does not have to rent the asset from (pay royalties to) another party. The value of the subject asset is the present value of the stream of net royalties the company does not have to pay.

**Report Date:** The date conclusions are transmitted to the client.

**Valuation Date:** The specific point in time as of which the appraiser's opinion of value applies (also referred to as "Effective Date" or "Appraisal Date").



## Project Team

**Gregg Johnson**
Director
21860 Burbank Blvd
Suite 300 South
Tel: (818) 746-9332
dneumyer@greatamerican.com


**Tejash Lodhavia, ASA, AVA**
Vice President
10 S. La Salle, Suite 2170
Chicago, IL 60603
Tel: (312) 777-7951
tlodhavia@greatamerican.com

**Ed Belanger, CFA, ASA**
Practice Leader
2745 N. Dallas Parkway, Suite 660
Plano, TX  75093
Tel: (972) 338-2625
ebelanger@greatamerican.com


# Curriculum Vitae



# Gregg L. Johnson

Gregg Johnson is a Director in the Los Angeles office of Great American Group's Corporate Valuation Services division.

Mr. Johnson has more than twelve years of professional experience with a specialization in valuing domestic and international businesses, subsidiaries, joint ventures, equity interests, intangible assets, and intellectual property for both publicly traded as well as privately held businesses including large private equity firms and hedge funds. These valuation studies have been performed for a variety of purposes including federal financial reporting, federal tax reporting, asset-based lending, bankruptcy and restructuring, litigation support, mergers and acquisitions, investment analysis, and corporate planning and strategy.

Mr. Johnson has experience within the following industries:

- Industrial markets and manufacturing
- Consumer products
- Entertainment and media
- Wholesale and retail distribution
- Financial services
- Publishing and printing
- Healthcare
- Construction and building materials
- Automotive
- Pharmaceuticals
- Biotechnology
- Hospitality
- Medical devices
- Oil and gas exploration and development
- Mining and minerals
- Food services

**PREVIOUS EXPERIENCE:**

Prior to joining Great American Group, Mr. Johnson was a Manager with KPMG LLP's Economic and Valuation Services. Prior his work at KPMG, Mr. Johnson worked for AccuVal Associates, a national valuation and advisory services firm. Mr. Johnson also worked for Ernst & Young LLP as well as Arthur Andersen LLP prior to his time at AccuVal Associates.

**EDUCATION:**

Bachelor of Science in Business Administration with concentrations in finance from Brigham Young University's Marriot School of Management



# Tejash B. Lodhavia, ASA, AVA

Tejash Lodhavia is a vice president with Great American Group Corporate Valuation Services.

Mr. Lodhavia has provided the following types of valuation consulting services: business and stock valuations; cost of capital analyses; industry and competitive analyses, intangible asset valuations, and related litigation support services.

These services have been performed for the following purposes: asset based lending, estate and gift taxation, restructuring and bankruptcies, buy/sell agreements, shareholder buyouts, management buyouts, leveraged buyouts, financial reporting – ASC 805, 350, & 820 and IRC Section 409(a), collateralization, collateral monitoring, divorce, dispute resolution, mergers and acquisitions, strategic planning, and others.

Mr. Lodhavia has provided consulting services for companies in following industries, including, but not limited to:

- Apparel Manufacturing and Wholesaling
- ATM Services
- Armored Vehicle Services
- Auto and Truck manufacturing
- Automotive Parts Manufacturing
- Aviation Fuel Wholesaler
- China and Crystal Manufacturing
- Climbing Equipment Manufacturing
- Consulting Services
- Copyrights
- Dinning Cruises
- Educational Software
- Electronic Document Management
- Equipment Rental
- Expedite Services
- Financial Services
- Flatware Designers and Wholesalers
- Food Processing
- Footwear Retail
- Gaming Machines

- Home Medical Equipment Rental
- Industrial Products and Services
- Iron & Steel Foundries
- Laminate Flooring
- Linen Rental and Laundry Service
- Manufacture Of Specialty Chemicals
- Metal Stamping
- Newspaper and Magazine Publishing
- Plastic Forming
- Portable Storage Container Rental
- Radio Broadcasting
- Restaurants
- Retailers
- Software
- Tank Rental
- Tanning Salons
- Toy Design and Manufacturing
- Trailer Rental
- TV and Film Production and Distribution
- Video Game Distribution

## PREVIOUS EXPERIENCE:

Prior to joining Great American Group Corporate Valuation Services, Mr. Lodhavia spent four years with Hilco Enterprise Valuation Services, LLC, an intellectual property/business valuation firm. Prior to joining Hilco, Mr. Lodhavia was employed as a Portfolio Manager/Underwriter for the Commercial Banking Group of Fifth Third Bank, for four years.

## EDUCATION:

Masters of Business Administration (MBA), Finance & Accounting, University of Illinois at Chicago.

Bachelor of Commerce in Accounting, University of Mumbai, India.

## DESIGNATIONS AND MEMBERSHIPS:

Mr. Lodhavia is an Accredited Valuation Analyst, and a member of the National Association of Certified Valuation Analysts (NACVA). Mr. Lodhavia is also an Accredited Senior Appraiser and member of the American Society of Appraisers (ASA), certified in business valuation.



# Edward Belanger, CFA, ASA

Edward Belanger is an executive managing director and the national practice leader of Great American Group Corporate Valuation Services.

Mr. Belanger has extensive experience in the valuation of businesses, intangible assets, and derivative securities. His work has been for financial reporting purposes; tax-related assignments such as international reorganizations, property tax, MLP establishment, outside tax basis studies, interest expense allocation and the valuation of closely held securities; and solvency and fairness opinions.

Mr. Belanger has completed valuations of common and preferred stock, restricted securities, debt instruments, and numerous types of intangible assets including patents and technology, customer relationships, license agreements, telecom and broadcasting operating licenses, trademarks and trade names, and numerous other forms of intellectual property and contractual assets.

The purposes of these valuations and financial advisory services include, in part, tax planning and implementation, acquisitions, divestitures, pre-transaction valuation analysis and advisory services, formations of IP holding companies, mergers, litigation support, and recapitalization.

He has experience in a diverse range of industries, most notably energy, technology, and communications.

***PREVIOUS EXPERIENCE*:**

Mr. Belanger was previously Managing Director of the Southwest region for American Appraisal. Before that, he was an Executive Director of the Transaction Advisory Services practice for Ernst & Young and a technical leader of its national practice. He began his valuation career at Arthur Andersen, and had previously worked in Operations Research for Lockheed Martin.

***EDUCATION*:**

Master of Business Administration with a concentration in finance, McCombs School of Business, The University of Texas at Austin

Master of Engineering Management, Southern Methodist University

Bachelor of Science, Industrial Engineering, Northwestern University



# IX. Appendix



**Great American Group**
**Corporate Valuation Services**

# MediaShift, Inc.
# Table of Contents

| Description | | Reference |
|---|---|---|
| Historical Financial Statements | | Exhibit 1.0 |
| | | |
| Historical Financial Statements | Summary Balance Sheet | Page 1 of 5 |
| Historical Financial Statements | Common Size Balance Sheet | Page 2 of 5 |
| Historical Financial Statements | Summary Income Statement | Page 3 of 5 |
| Historical Financial Statements | Common Size Income Statement | Page 4 of 5 |
| | | |
| Weighted Average Cost of Capital | | Exhibit 2.0 |
| | | |
| Weighted Average Cost of Capital | Capital Asset Pricing Model | Page 1 of 3 |
| Weighted Average Cost of Capital | Beta Calculation | Page 2 of 3 |
| Weighted Average Cost of Capital | Asset Discount Rate | Page 3 of 3 |
| | | |
| Patent Portfolio | | Exhibit 3.0 |
| | | |
| Patent Portfolio | Assumptions | Page 1 of 8 |
| Patent Portfolio | Assumptions | Page 2 of 8 |
| Patent Portfolio | Fair Market Value - Relief from Royalty | Page 3 of 8 |
| Patent Portfolio | Orderly Liquidation Value -Relief from Royalty | Page 4 of 8 |
| Patent Portfolio | Market Royalty Rate Analysis | Page 5 of 8 |
| Patent Portfolio | Fair Market Value  - Excess Earnings | Page 6 of 8 |
| Patent Portfolio | Orderly Liquidation Value - Excess Earnings | Page 7 of 8 |
| Patent Portfolio | Contribtory Asset Charges | Page 8 of 8 |


Great American Group                                             Exhibit 1.0
Corporate Valuation Services                                     Page 1 of 5

## MediaShift, Inc.
## Historical Financial Statements
## Summary Balance Sheet

($ in 000s)

| | As of December 31, | | |
|---|---|---|---|
| ***Assets*** | 2011 | 2012 | 2013 |
| Current Assets: | | | |
| Cash & Equivalents | $648 | $903 | $94 |
| Accounts Receivable | 3 | 6 | 1,930 |
| Prepaid Expenses | 13 | 58 | 96 |
| Total Current Assets | 664 | 967 | 2,120 |
| | | | |
| Fixed Assets: | | | |
| Gross Fixed Assets | 29 | 192 | 593 |
| Less: Accumulated Depreciation | (2) | (28) | (146) |
| Net Fixed Assets | 27 | 164 | 447 |
| | | | |
| Other Assets: | | | |
| Intangible Assets | 141 | 216 | 295 |
| Other Assets | 0 | 21 | 130 |
| Total Other Assets | 141 | 237 | 425 |
| | | | |
| Total Assets | $832 | $1,368 | $2,992 |
| | | | |
| | | | |
| ***Liabilities & Stockholders' Equity*** | | | |
| Current Liabilities: | | | |
| Current Portion Notes Payable | $84 | $295 | $3,896 |
| Current Portion Long-term Debt | 0 | 0 | 2,580 |
| Other Current Liabilities | 0 | 378 | 379 |
| Total Current Liabilities | 84 | 673 | 6,855 |
| | | | |
| Long-term Liabilities: | | | |
| Long-term Debt | 0 | 250 | 1,604 |
| Other Long-term Liabilities | 0 | 0 | 0 |
| Total Long-term Liabilities | 0 | 250 | 1,604 |
| | | | |
| Total Liabilities | 84 | 923 | 8,459 |
| | | | |
| Stockholders' Equity: | | | |
| Preferred Stock | 6 | 2 | 0 |
| Common Stock | 10 | 6 | 22 |
| Additional Paid In Capital | 1,643 | 10,430 | 28,296 |
| Retained Earnings | (911) | (9,993) | (33,785) |
| Accumulated Other Comprehensive Income | 0 | 0 | 0 |
| Less: Treasury Stock | 0 | 0 | 0 |
| Total Stockholders' Equity | 748 | 445 | (5,467) |
| | | | |
| Total Liabilities & Stockholders' Equity | $832 | $1,368 | $2,992 |

Source(s): SEC Filings



Great American Group            Exhibit 1.0
Corporate Valuation Services           Page 2 of 5

# MediaShift, Inc.
## Historical Financial Statements
## Common Size Balance Sheet
(in %)

|  | As of December 31, | | |
|---|---|---|---|
| **Assets** | **2011** | **2012** | **2013** |
| Current Assets: | | | |
| Cash & Equivalents | 77.9 | 66.0 | 3.1 |
| Accounts Receivable | 0.4 | 0.4 | 64.5 |
| Prepaid Expenses | 1.6 | 4.2 | 3.2 |
| Total Current Assets | 79.8 | 70.7 | 70.9 |
| | | | |
| Fixed Assets: | | | |
| Gross Fixed Assets | 3.5 | 14.0 | 19.8 |
| Less: Accumulated Depreciation | (0.2) | (2.0) | (4.9) |
| Net Fixed Assets | 3.2 | 12.0 | 14.9 |
| | | | |
| Other Assets: | | | |
| Intangible Assets | 16.9 | 15.8 | 9.9 |
| Other Assets | 0.0 | 1.5 | 4.3 |
| Total Other Assets | 16.9 | 17.3 | 14.2 |
| | | | |
| Total Assets | **100.0** | **100.0** | **100.0** |
| | | | |
| **Liabilities & Stockholders' Equity** | | | |
| Current Liabilities: | | | |
| Current Portion Notes Payable | 10.1 | 21.6 | 130.2 |
| Current Portion Long-term Debt | 0.0 | 0.0 | 86.2 |
| Other Current Liabilities | 0.0 | 27.6 | 12.7 |
| Total Current Liabilities | 10.1 | 49.2 | 229.1 |
| | | | |
| Long-term Liabilities: | | | |
| Long-term Debt | 0.0 | 18.3 | 53.6 |
| Other Long-term Liabilities | 0.0 | 0.0 | 0.0 |
| Total Long-term Liabilities | 0.0 | 18.3 | 53.6 |
| | | | |
| Total Liabilities | 10.1 | 67.5 | 282.7 |
| | | | |
| Stockholders' Equity: | | | |
| Preferred Stock | 0.7 | 0.1 | 0.0 |
| Common Stock | 1.2 | 0.4 | 0.7 |
| Additional Paid In Capital | 197.5 | 762.4 | 945.7 |
| Retained Earnings | (109.5) | (730.5) | (1,129.2) |
| Accumulated Other Comprehensive Income | 0.0 | 0.0 | 0.0 |
| Less: Treasury Stock | 0.0 | 0.0 | 0.0 |
| Total Stockholders' Equity | 89.9 | 32.5 | (182.7) |
| | | | |
| Total Liabilities & Stockholders' Equity | **100.0** | **100.0** | **100.0** |

Source(s): SEC Filings



# MediaShift, Inc.
# Historical Financial Statements
# Summary Income Statement

($ in 000s)

|  | *Fiscal Year Ended December 31,* | | |
|---|---|---|---|
|  | *2011* | *2012* | *2013* |
| Net Sales | $3 | $13 | $6,953 |
| Cost of Sales | 1 | 9 | 5,188 |
| Gross Profit | 2 | 4 | 1,765 |
| Operating Expenses: |  |  |  |
|    Selling General & Administrative | 534 | 5,394 | 12,253 |
|    Research & Development | 134 | 203 | 402 |
|       Total Operating Expenses | 668 | 5,597 | 12,655 |
| Earnings Before Interest, Taxes |  |  |  |
|    Depreciation and Amortization (EBITDA) | (666) | (5,593) | (10,890) |
| Less: Depreciation & Amortization | 2 | 83 | 1,584 |
| Operating Income (Loss) | (668) | (5,676) | (12,474) |

Source(s): SEC filings



Great American Group                                                   Exhibit 1.0
Corporate Valuation Services                                           Page 4 of 5

# MediaShift, Inc.
# Historical Financial Statements
# Common Size Income Statement

(in %)

|  | Fiscal Year Ended December 31, | | |
|---|---|---|---|
|  | 2011 | 2012 | 2013 |
| Net Sales | 100.0 | 100.0 | 100.0 |
| Cost of Sales | 33.3 | 69.2 | 74.6 |
| Gross Profit | 66.7 | 30.8 | 25.4 |
| Operating Expenses: | | | |
| Selling General & Administrative | 17,800.0 | 41,492.3 | 176.2 |
| Research & Development | 4,466.7 | 1,561.5 | 5.8 |
| Total Operating Expenses | 22,266.7 | 43,053.8 | 182.0 |
| Earnings Before Interest, Taxes Depreciation and Amortization (EBITDA) | (22,200.0) | (43,023.1) | (156.6) |
| Less: Depreciation & Amortization | 66.7 | 638.5 | 22.8 |
| Operating Income (Loss) | (22,266.7) | (43,661.5) | (179.4) |

Source(s): SEC filings


Great American Group                                                Exhibit 2.0
Corporate Valuation Services                                        Page 1 of 3

# MediaShift, Inc.
# Weighted Average Cost of Capital
# Capital Asset Pricing Model

| | | | Sources: |
|---|---|---|---|
| **Cost of Equity Capital:** | | | |
| Risk-free Rate of Return | | 3.2% | (1) |
| Long-term Equity Risk Premium | 6.2% | | (2) |
| Beta | 1.49 | | (2) |
| Beta-adjusted Equity Risk Premium | | 9.2% | (2) |
| Size Equity Risk Premium | | 6.0% | (2) |
| Unsystematic Risk Premium | | 10.0% | (3) |
| Total Cost of Equity Capital | | 28.4% | |
| **Cost of Debt Capital:** | | | |
| Pre-tax Cost of Debt | | 10.0% | (3) |
| Tax Rate | | 40.0% | (3) |
| Total After-tax Cost of Debt Capital | | 6.0% | |
| **Capital Structure:** | | | |
| Equity / Invested Capital | | 95.0% | (4) |
| Debt / Invested Capital | | 5.0% | (4) |
| | | 100.0% | |
| **Weighted Average Cost of Capital (Rounded)** | | **27.0%** | |

Source(s):
(1) Federal Reserve Statistical Release, April 30, 2014
(2) Stocks, Bills, Bonds, & Inflation Valuation Edition 2014 Yearbook, Morningstar
(3) Analyst's estimate primarily based on company debts rates disclosed in their SEC filings
(4) Analysis of capital structure of guideline comparable companies.



**Great American Group**                                                                 Exhibit 2.0
**Corporate Valuation Services**                                                        Page 2 of 3

# MediaShift, Inc.
# Weighted Average Cost of Capital
# Beta Calculation

| | 5-Year Levered Beta (1) | Outstanding Debt (2) ($000) | Market Value of Equity (3) ($000) | Debt / Equity | Enterprise Value (4) ($000) | Tax Rate | Unlevered Beta |
|---|---|---|---|---|---|---|---|
| Smith Micro Software Inc. | 2.05 | 0 | 66,671 | 0.0x | 58,051 | 33.3% | 2.05 |
| Ubiquiti Networks, Inc. | 2.03 | 72,408 | 3,444,472 | 0.0x | 3,225,210 | 18.6% | 1.99 |
| ReachLocal, Inc. | 1.05 | 0 | 293,203 | 0.0x | 219,540 | 39.6% | 1.05 |
| Yahoo! Inc. | 1.04 | 1,166,251 | 35,516,204 | 0.0x | 35,484,439 | 16.8% | 1.01 |
| Google Inc. | 1.14 | 8,396,000 | 358,268,374 | 0.0x | 352,128,374 | 20.2% | 1.12 |

**MediaShift, Inc. Beta Relevering Calculation:**

| | |
|---|---|
| Tax Rate (Marginal) | 40.00% |
| Unlevered Beta (Sector) (5) | 1.44 |
| MediaShift, Inc. Debt/Equity | 0.1x |
| Relevered Beta (MediaShift, Inc.) (6) | 1.49 |

Note(s)
(1)  As of  April 30, 2014.
(2)  Includes total interest bearing debt.
(3)  Includes preferred stock and minority interest.
(4)  Cash has been subtracted in the calculation of enterprise value (Market Capitalization+Total Debt-Cash).
(5)  Unlevered Beta (Sector) = Levered Beta (Sector)/(1+((1-Tax Rate (Sector) X Debt/Equity (Sector)) selection based on average of comparable set
(6)  Relevered Beta (Subject Company) = Unlevered Beta (Sector) x (1+((1 - Tax Rate (Sector) X Debt/Equity (Sector)


Great American Group                                                                                    Exhibit 2.0
Corporate Valuation Services                                                                            Page 3 of 3

**MediaShift, Inc.**
**Weighted Average Cost of Capital**
**Asset Discount Rate Analysis**

| | Cost of Equity Capital | | | | Cost of Debt Capital | | | | |
| | Risk-free Rate of Return (1) | Beta-Adjusted Equity Risk Premium (2) | Size Equity Risk Premium (2) | Unsystematic Risk Premium (3) | Cost of Equity Capital | Pre-tax Cost of Debt (3) | Tax Rate | After-tax Cost of Debt Capital | Debt / Equity | Weighted Average Cost of Capital |
|---|---|---|---|---|---|---|---|---|---|---|
| Patents - FMV | 3.22% | 9.21% | 6.00% | 10.00% | 28.43% | 10.00% | 40.00% | 6.00% | 0.0 | 28.0% |
| Patents - OLV | 3.22% | 9.21% | 6.00% | 25.00% | 43.43% | 10.00% | 40.00% | 6.00% | 0.0 | 43.0% |

Source(s):
(1) Federal Reserve Statistical Release, April 30, 2014
(2) Stocks, Bills, Bonds, & Inflation Valuation Edition 2014 Yearbook, Morningstar
(3) Analyst's estimate primarily based on company debts rates disclosed in their SEC filings



Great American Group
Corporate Valuation Services

Exhibit 3.0
Page 1 of 8

**MediaShift, Inc.**
**Patent Portfolio**
**Assumptions**

($ in 000s)

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | *For the Projected 12 Months Ending December 31,* | | | | | | | | | | | | |
| **Operating Assumptions** | | | | | | | | | | | | | | | | | |
| WiFi Revenue Cable (one national provider) | | 700.0% | 300.0% | 75.0% | 42.9% | 5.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| WiFi Revenue Other | | 1546.8% | 109.8% | 76.9% | 68.2% | 65.0% | 55.0% | 45.0% | 35.0% | 25.0% | 15.0% | 5.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| Publisher Revenue | | 161.3% | 16.4% | 17.0% | 17.8% | 15.0% | 13.0% | 11.0% | 9.0% | 7.0% | 5.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| Special Opportunities | | 851.6% | 133.3% | 100.3% | 102.4% | 85.0% | 70.0% | 55.0% | 40.0% | 25.0% | 10.0% | 5.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| Sales Growth | 88.4% | 628.3% | 211.0% | 73.4% | 48.4% | 20.7% | 21.9% | 22.6% | 20.6% | 16.2% | 10.1% | 4.3% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| | | | | | | | | | | | | | | | | | |
| Cost of Sales as a % of Sales | 62.7% | 61.2% | 60.8% | 60.2% | 59.5% | 60.0% | 60.0% | 60.0% | 60.0% | 60.0% | 60.0% | 60.0% | 60.0% | 60.0% | 60.0% | 60.0% | 60.0% |
| Selling, General, & Administrative Expenses | | | | | | | | | | | | | | | | | |
| Selling General & Administrative as a % of Sales | 131.8% | 41.4% | 27.9% | 22.4% | 17.8% | 17.0% | 16.3% | 15.7% | 15.2% | 14.8% | 14.5% | 14.3% | 14.2% | 14.2% | 14.2% | 14.2% | 14.2% |
| Total Operating Expenses as a % of Sales | 194.5% | 102.6% | 88.7% | 82.6% | 77.3% | 77.0% | 76.3% | 75.7% | 75.2% | 74.8% | 74.5% | 74.3% | 74.2% | 74.2% | 74.2% | 74.2% | 74.2% |
| | | | | | | | | | | | | | | | | | |
| Net Operating Profit | -94.5% | -2.6% | 11.3% | 17.4% | 22.7% | 23.0% | 23.7% | 24.3% | 24.8% | 25.2% | 25.5% | 25.7% | 25.8% | 25.8% | 25.8% | 25.8% | 25.8% |
| **Fixed Asset Investment** | | | | | | | | | | | | | | | | | |
| Net Fixed Assets | $332 | $451 | $2,148 | $9,769 | $26,106 | $47,339 | $68,701 | $91,523 | $117,176 | $123,823 | $131,548 | $140,051 | $148,923 | $158,061 | $167,473 | $177,168 | $187,153 |
| | | | | | | | | | | | | | | | | | |
| Capital Expenditures | 131 | 1,909 | 8,904 | 20,590 | 30,562 | 36,899 | 44,976 | 55,121 | 66,469 | 77,243 | 85,036 | 88,718 | 91,380 | 94,121 | 96,945 | 99,853 | 102,849 |
| *As % of Sales* | *1.0%* | *2.0%* | *3.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* |
| | | | | | | | | | | | | | | | | | |
| Depreciation | 13 | 211 | 1,283 | 4,253 | 9,329 | 15,537 | 22,153 | 29,468 | 59,822 | 69,519 | 76,532 | 79,847 | 82,242 | 84,709 | 87,250 | 89,868 | 92,564 |
| *As a % of Sales* | *0.1%* | *0.2%* | *0.4%* | *0.8%* | *1.2%* | *1.7%* | *2.0%* | *2.1%* | *3.6%* | *3.6%* | *3.6%* | *3.6%* | *3.6%* | *3.6%* | *3.6%* | *3.6%* | *3.6%* |
| *As a % of prior NFA* | *3.8%* | *46.8%* | *59.7%* | *43.5%* | *35.7%* | *32.8%* | *32.2%* | *32.2%* | *51.1%* | *56.1%* | *58.2%* | *57.0%* | *55.2%* | *53.6%* | *52.1%* | *50.7%* | *49.5%* |
| Fixed Asset Turnover | 29.1x | 44.4x | 30.4x | 19.7x | 16.1x | 13.4x | 12.3x | 11.8x | 13.4x | 14.7x | 15.2x | 14.9x | 14.5x | 14.1x | 13.7x | 13.3x | 13.0x |
| **Working Capital Investment** | | | | | | | | | | | | | | | | | |
| Accounts Receivable (days) | 75 | 65 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| Accounts Payable (days) | 35 | 37 | 39 | 41 | 43 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| | | | | | | | | | | | | | | | | | |
| Working Capital | $1,931 | $11,227 | $29,918 | $50,499 | $73,041 | $84,560 | $103,070 | $126,320 | $152,324 | $177,016 | $194,874 | $203,113 | $209,412 | $215,695 | $222,166 | $228,831 | $235,695 |
| *As a % of Sales* | *14.7%* | *11.8%* | *10.1%* | *9.8%* | *9.6%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* |
| **Discount Period** | | | | | | | | | | | | | | | | | |
| Partial Period | 0.6712 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| Mid-point | 0.3356 | 1.1712 | 2.1712 | 3.1712 | 4.1712 | 5.1712 | 6.1712 | 7.1712 | 8.1712 | 9.1712 | 10.1712 | 11.1712 | 12.1712 | 13.1712 | 14.1712 | 15.1712 | 16.1712 |

Source(s): Internally prepared and audited Company financial statements and discussions with Management.



Great American Group
Corporate Valuation Services

Exhibit 3.0
Page 2 of 8

**MediaShift, Inc.**
**Patent Portfolio**
**Assumptions**
($ in 000s)

*For the Projected 12 Months Ending December 31,*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income Statement** | | | | | | | | | | | | | | | | | |
| WiFi Revenue Cable (one national provider) | 6,983 | 55,867 | 223,470 | 391,072 | 558,674 | 586,608 | 604,206 | 622,332 | 641,002 | 660,232 | 680,039 | 700,440 | 721,453 | 743,097 | 765,390 | 788,352 | 812,002 |
| WiFi Revenue Other | 1,537 | 25,317 | 53,106 | 93,920 | 157,961 | 260,635 | 403,985 | 585,778 | 790,800 | 988,500 | 1,136,775 | 1,193,613 | 1,229,422 | 1,266,304 | 1,304,294 | 1,343,422 | 1,383,725 |
| Publisher Revenue | 4,253 | 11,115 | 12,941 | 15,134 | 17,835 | 20,510 | 23,176 | 25,726 | 28,041 | 30,004 | 31,504 | 32,449 | 33,423 | 34,425 | 35,458 | 36,522 | 37,617 |
| Special Opportunities | 329 | 3,127 | 7,294 | 14,612 | 29,580 | 54,723 | 93,030 | 144,196 | 201,875 | 252,344 | 277,578 | 291,457 | 300,201 | 309,207 | 318,483 | 328,037 | 337,878 |
| Net Sales | 13,103 | 95,425 | 296,810 | 514,738 | 764,050 | 922,476 | 1,124,397 | 1,378,032 | 1,661,718 | 1,931,079 | 2,125,896 | 2,217,960 | 2,284,498 | 2,353,033 | 2,423,624 | 2,496,333 | 2,571,223 |
| Cost of Sales | 8,215 | 58,400 | 180,461 | 309,872 | 454,610 | 553,486 | 674,638 | 826,819 | 997,031 | 1,158,648 | 1,275,537 | 1,330,776 | 1,370,699 | 1,411,820 | 1,454,175 | 1,497,800 | 1,542,734 |
| Gross Profit | 4,887 | 37,025 | 116,350 | 204,866 | 309,440 | 368,991 | 449,759 | 551,213 | 664,687 | 772,432 | 850,358 | 887,184 | 913,799 | 941,213 | 969,450 | 998,533 | 1,028,489 |
| *Gross Margin* | 37.3% | 38.8% | 39.2% | 39.8% | 40.5% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% |
| Selling, General, & Administrative Expenses: | | | | | | | | | | | | | | | | | |
| Selling General & Administrative | 17,264 | 39,483 | 82,797 | 115,559 | 135,787 | 156,821 | 183,277 | 216,351 | 252,581 | 285,800 | 308,255 | 317,168 | 324,399 | 334,131 | 344,155 | 354,479 | 365,114 |
| Total SG&A Expenses | 17,264 | 39,483 | 82,797 | 115,559 | 135,787 | 156,821 | 183,277 | 216,351 | 252,581 | 285,800 | 308,255 | 317,168 | 324,399 | 334,131 | 344,155 | 354,479 | 365,114 |
| EBITDA | (12,377) | (2,458) | 33,553 | 89,307 | 173,653 | 212,170 | 266,482 | 334,862 | 412,106 | 486,632 | 542,103 | 570,016 | 589,401 | 607,083 | 625,295 | 644,054 | 663,376 |
| *EBITDA Margin* | -94.5% | -2.6% | 11.3% | 17.4% | 22.7% | 23.0% | 23.7% | 24.3% | 24.8% | 25.2% | 25.5% | 25.7% | 25.8% | 25.8% | 25.8% | 25.8% | 25.8% |
| Depreciation | 13 | 211 | 1,283 | 4,253 | 9,329 | 15,537 | 22,153 | 29,468 | 59,822 | 69,519 | 76,532 | 79,847 | 82,242 | 84,709 | 87,250 | 89,868 | 92,564 |
| EBIT | (12,389) | (2,669) | 32,269 | 85,054 | 164,324 | 196,633 | 244,329 | 305,393 | 352,284 | 417,113 | 465,571 | 490,169 | 507,159 | 522,373 | 538,045 | 554,186 | 570,812 |
| *EBIT Margin* | -94.6% | -2.8% | 10.9% | 16.5% | 21.5% | 21.3% | 21.7% | 21.2% | 21.2% | 21.6% | 21.9% | 22.1% | 22.2% | 22.2% | 22.2% | 22.2% | 22.2% |
| Less: Taxes @ 40.0% | 0 | 0 | 6,885 | 34,022 | 65,730 | 78,653 | 97,731 | 122,157 | 140,914 | 166,845 | 186,228 | 196,068 | 202,863 | 208,949 | 215,218 | 221,674 | 228,325 |
| Net Operating Profit After Taxes | 0 | 0 | 10,327 | 51,032 | 98,594 | 117,980 | 146,597 | 183,236 | 211,370 | 250,268 | 279,343 | 294,101 | 304,295 | 313,424 | 322,827 | 332,512 | 342,487 |
| **Working Capital** | | | | | | | | | | | | | | | | | |
| Accounts Receivable | $2,730 | $17,230 | $49,468 | $85,790 | $127,342 | $153,746 | $187,399 | $229,672 | $276,953 | $321,847 | $354,316 | $369,660 | $380,750 | $392,172 | $403,937 | $416,056 | $428,537 |
| Accounts Payable | 799 | 6,002 | 19,550 | 35,291 | 54,301 | 69,186 | 84,330 | 103,352 | 124,629 | 144,831 | 159,442 | 166,347 | 171,337 | 176,477 | 181,772 | 187,225 | 192,842 |
| Working Capital | 1,931 | 11,227 | 29,918 | 50,499 | 73,041 | 84,560 | 103,070 | 126,320 | 152,324 | 177,016 | 194,874 | 203,313 | 209,412 | 215,695 | 222,166 | 228,831 | 235,695 |
| *As a % of Sales* | 14.7% | 11.8% | 10.1% | 9.8% | 9.6% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% |
| Change in Working Capital | n/a | 9,296 | 18,691 | 20,580 | 22,542 | 11,519 | 18,509 | 23,250 | 26,005 | 24,691 | 17,858 | 8,439 | 6,099 | 6,282 | 6,471 | 6,665 | 6,865 |
| *As a % of Change in Sales* | n/a | 11.3% | 9.3% | 9.4% | 9.0% | 7.3% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% | 9.2% |

Source(s): Internally prepared and audited Company financial statements and discussions with Management.



## MediaShift, Inc.
## Patent Portfolio
## Fair Market Value - Relief from Royalty

($ in 000s)

| Calculation of Total Projected Net Royalty Income: | | For the Projected 12 Months Ending December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *2014* | *2015* | *2016* | *2017* | *2018* | *2019* | *2020* | *2021* | *2022* | *2023* |
| Projected Sales for Overall Business | $13,103 | $95,425 | $296,810 | $514,738 | $764,050 | $922,476 | $1,124,397 | $1,378,032 | $1,661,718 | $1,931,079 |
| Times: Sales Attributable to Patent Portfolio | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Projected Net Patent Portfolio Sales | 13,103 | 95,425 | 296,810 | 514,738 | 764,050 | 922,476 | 1,124,397 | 1,378,032 | 1,661,718 | 1,931,079 |
| Times: Utility Curve | 100.0% | 100.0% | 100.0% | 90.0% | 70.0% | 50.0% | 30.0% | 20.0% | 10.0% | 5.0% |
| Adjusted Net Patent Portfolio Sales | 13,103 | 95,425 | 296,810 | 463,264 | 534,835 | 461,238 | 337,319 | 275,606 | 166,172 | 96,554 |
| Total Royalties Saved at 8.5% | 1,114 | 8,111 | 25,229 | 39,377 | 45,461 | 39,205 | 28,672 | 23,427 | 14,125 | 8,207 |
| Total Projected Royalty Income | 1,114 | 8,111 | 25,229 | 39,377 | 45,461 | 39,205 | 28,672 | 23,427 | 14,125 | 8,207 |
| Pre-tax Net Royalty Income | 1,114 | 8,111 | 25,229 | 39,377 | 45,461 | 39,205 | 28,672 | 23,427 | 14,125 | 8,207 |
| Less: Income Taxes at 40.0% | (445) | (3,244) | (10,092) | (15,751) | (18,184) | (15,682) | (11,469) | (9,371) | (5,650) | (3,283) |
| After-tax Net Royalty Income | 668 | 4,867 | 15,137 | 23,626 | 27,277 | 23,523 | 17,203 | 14,056 | 8,475 | 4,924 |
| (1) Present Value Factor at 28.0% | 0.9205 | 0.7489 | 0.5851 | 0.4571 | 0.3571 | 0.2790 | 0.2180 | 0.1703 | 0.1330 | 0.1039 |
| Present Value of After-tax Net Royalty Income | $413 | $3,645 | $8,857 | $10,800 | $9,741 | $6,563 | $3,750 | $2,393 | $1,127 | $512 |
| Total Present Value of Discrete Period After-tax Net Royalty Income | $47,800 | | | | | | | | | |
| **Fair Market Value of Patent Portfolio (Rounded)** | **$48,000** | | | | | | | | | |

Note(s):
(1) Calculated using mid-year convention.
(2) 2014 represents a partial period
Source: Discussions with Company management



Great American Group
Corporate Valuation Services

**Exhibit 3.0**
**Page 4 of 8**

## MediaShift, Inc.
### Patent Portfolio
### Orderly Liquidation Value -Relief from Royalty
($ in 000s)

| Calculation of Total Projected Net Royalty Income: | *For the Projected 12 Months Ending December 31,* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *2014* | *2015* | *2016* | *2017* | *2018* | *2019* | *2020* | *2021* | *2022* | *2023* |
| Projected Sales for Overall Business | $13,103 | $95,425 | $296,810 | $514,738 | $764,050 | $922,476 | $1,124,397 | $1,378,032 | $1,661,718 | $1,931,079 |
| Times: Sales Attributable to Patent Portfolio | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Projected Net Patent Portfolio Sales | 13,103 | 95,425 | 296,810 | 514,738 | 764,050 | 922,476 | 1,124,397 | 1,378,032 | 1,661,718 | 1,931,079 |
| Times: Utility Curve | 100.0% | 100.0% | 100.0% | 90.0% | 70.0% | 50.0% | 30.0% | 20.0% | 10.0% | 5.0% |
| Adjusted Net Patent Portfolio Sales | 13,103 | 95,425 | 296,810 | 463,264 | 534,835 | 461,238 | 337,319 | 275,606 | 166,172 | 96,554 |
| Total Royalties Saved at 8.5% | 1,114 | 8,111 | 25,229 | 39,377 | 45,461 | 39,205 | 28,672 | 23,427 | 14,125 | 8,207 |
| Total Projected Royalty Income | 1,114 | 8,111 | 25,229 | 39,377 | 45,461 | 39,205 | 28,672 | 23,427 | 14,125 | 8,207 |
| Pre-tax Net Royalty Income | 1,114 | 8,111 | 25,229 | 39,377 | 45,461 | 39,205 | 28,672 | 23,427 | 14,125 | 8,207 |
| Less: Income Taxes at 40.0% | (445) | (3,244) | (10,092) | (15,751) | (18,184) | (15,682) | (11,469) | (9,371) | (5,650) | (3,283) |
| After-tax Net Royalty Income | 668 | 4,867 | 15,137 | 23,626 | 27,277 | 23,523 | 17,203 | 14,056 | 8,475 | 4,924 |
| (1) Present Value Factor at 43.0% | 0.8869 | 0.6578 | 0.4600 | 0.3217 | 0.2249 | 0.1573 | 0.1100 | 0.0769 | 0.0538 | 0.0376 |
| Present Value of After-tax Net Royalty Income | $398 | $3,201 | $6,963 | $7,600 | $6,135 | $3,700 | $1,892 | $1,081 | $456 | $185 |
| Total Present Value of Discrete Period After-tax Net Royalty Income | $31,611 | | | | | | | | | |
| **Orderly Liquidation Value of Patent Portfolio (Rounded)** | **$32,000** | | | | | | | | | |

Note(s):
(1) Calculated using mid-year convention.
(2) 2014 represents a partial period
Source: Discussions with Company management



**Great American Group**
**Corporate Valuation Services**

**Exhibit 3.0**
**Page 5 of 8**

## MediaShift, Inc.
## Patent Portfolio
## Market Royalty Rate Analysis

| Note | Licensor | Licensee | Low End of Range | High End of Range | Weight Provided to Low End | Weight Provided to High End | Weighted Royalty |
|------|----------|----------|------------------|-------------------|---------------------------|----------------------------|------------------|
| 1 | Toshiba Corporation | Wink Communications | 5.0% | 5.0% | 50% | 50% | 5.0% |
| 2 | Science Applications International Corporat | VirnetX, Inc. | 15.0% | 15.0% | 50% | 50% | 15.0% |
| 3 | Mircoldea Software Development | Verticle Computer Systems, Inc. | 2.0% | 2.0% | 50% | 50% | 2.0% |
| 4 | ACTV Inc. | Hyper TV Networks | 5.0% | 5.0% | 50% | 50% | 5.0% |
| 5 | NASA | NexGen Systems | 5.0% | 5.0% | 50% | 50% | 5.0% |
| 6 | Intel Corporation | Symantec Corporation | 10.0% | 10.0% | 50% | 50% | 10.0% |
| 7 | Vidable AG | Vidable Inc. | 1.0% | 10.0% | 50% | 50% | 5.5% |
| 8 | ACTV Holdings | ACTV Entertainment | 5.0% | 5.0% | 50% | 50% | 5.0% |
| 9 | Engage Technologies | Engage Technologies Japan | 11.1% | 11.1% | 50% | 50% | 11.1% |
| 10 | Verisign | Visa | 7.0% | 7.0% | 50% | 50% | 7.0% |
| 11 | Engage Mobility | Total Communicator Solutions | 5.0% | 5.0% | 50% | 50% | 5.0% |

**Weighted Average Royalty Rate**

| | |
|---|---|
| Low | 2.0% |
| First Quartile | 5.0% |
| Third Quartile | 8.5% |
| High | 15.0% |
| Average | 6.9% |
| Median | 5.0% |

| Selected Royalty Rate | 8.5% |
|---|---|


Great American Group            **Exhibit 3.0**
Corporate Valuation Services            **Page 5 of 8**

## MediaShift, Inc.
## Patent Portfolio
## Market Royalty Rate Analysis

| Note | |
|---|---|
| 1 | Grant the right to enter into a WINK ONLINE SERVER FOR INTERTEXT LICENSE AGREEMENT, whereas, Wink communications, Inc. is a software developer and has developed its interactive television system of technology and related products, services, processes and materials (the "Wink ITV System"), which includes a software protocol for delivering interactive applications synchronized with or independent of television programs and advertisements. Also included without limitation in the Wink ITV System are an authoring tool, server software and the Wink Engine TM that decodes the protocol and displays the interactive applications overlaid on a television screen; whereas, Wink communications, Inc. and Toshiba Corporation desire that Wink communications, Inc. develop and grant to Toshiba Corporation the right to use and embed certain Wink products in Toshiba products identified by the parties from time to time. Wink communications, Inc. and Toshiba Corporation are therefore executing a series of agreements to accomplish this desired goal: (i) this Agreement, (ii) Wink Engine License Agreement, and (iii) Wink Application Server License Agreement; and whereas, The Wink Online Server software is among the Wink Products that Toshiba Corporation desires that Wink communications, Inc. modify and grant to Toshiba Corporation the right to use and distribute in Toshiba's products, as Toshiba Corporation wishes to include it in Toshiba's online server product. |
| 2 | Grant the right to utilize the SAIC Patent Rights relating to the facilitation of secure communications over networks, solely for use within the Field of Use (the field of secure communications in the following areas: Virtual Private Networks (VPN); Secure Voice Over Internet Protocol (VoIP); Electronic Mail (E-mail); Video Conferencing; Communications Logging; Dynamic Uniform Resource Locators (URLs); Denial of Service; Prevention of Functional Intrusions; IP Hopping; Voice Messaging and Unified Messaging; Live Voice and IP PBXs; Voice Web Video Conferencing and Collaboration; Instant Messaging (IM); Minimized Impact of Viruses; and Secure Session Initiation Protocol (SIP)), to (i) make, have made, import, use, offer for sale, and sell products and services covered by a valid claim under the SAIC Patent Rights, and (ii) make improvements to the SAIC Patent Rights and make, have made, import, use, offer for sale, and sell products and services covered by a valid claim under such improvements to the SAIC Patent Rights. |
| 3 | Grant the right to manufacture, develop, distribute, market, sell, license, sublicense, rent, and otherwise exploit the Technology (the web server software application known as "Tiny Web Server" and any derivative works, including its source code, documentation of the source code, object code, manuals, and all copyrights, patents, and all other legal rights in all such items) and any derivative products in any media now known or hereinafter discovered. |
| 4 | Grant the right to exploit and sublicense the Intellectual Property relating to patents entitled "Enhanced Video Programming System and Method for Incorporating and Displaying Retrieved Integrated Internet Information Segments", "A Distance Learning System Providing Individualized Television Participation, Audio Responses, and Memory for Every Student.", and Patent Application: Enhanced Video Programming #3. |
| 5 | Grant the right to make or have made ROYALTY-BASE PRODUCTS (any LICENSED INVENTION sold, used or otherwise disposed of by NextGen Systems, Inc. or its SUBLICENSEES, including use of the LICENSED INVENTION by NextGen Systems, Inc. or its SUBLICENSEES to provide consulting or other services, and covered by the claims of United States Patent Application 08/641,041 entitled, "Method For Visually Integrating Multiple Data Acquisition Technologies For Real Time & Retrospective Analysis" or the LICENSED PATENT, including any continuation, divisional, reissue or reexamination thereof), or use, sell or offer for sale ROYALTY-BASE PRODUCTS in the United States, its territories and possessions, in the FIELD OF USE (DIRECT RESPONSE product or services promotion limited to DIRECT RESPONSE advertising to include package design and ON-PRODUCT advertising for use in television, print and Internet). |

Source(s): ktMINE and Great American Proprietary Database



# MediaShift, Inc.
## Patent Portfolio
## Market Royalty Rate Analysis

| Note | |
|------|--|
| 6 | Grant the right to utilize Intel Corporation's Intellectual Property ((i) copyrights and trade secrets in the software as delivered; and (ii) to the minimum extent that is necessary to exercise the copyright license, claims of patents that read on inventions incorporated into the software as delivered) in the LDVP Software (Intel LANDesk(R) Virus Protect software) to reproduce, have reproduced, prepare and have prepared derivative works of, publicly display, use, and distribute the LDVP Software and derivative works thereof, in both Object Code and Source Code form to third parties. |
| 7 | Grant the right to utilize the Software Properties (an internet technology business concept pursuant to which, inter alia, customers will be able to view a video instead of a static image when viewing potential items for purchase, rent, etc. for the purpose of a video-based online classified website, and other uses), Technical Information (all unpublished research and development information, the formulation of proprietary products, method, software inventions, know-how, trade secrets, and technical data) and Trade Marks ("Vidable" and all of its likenesses) to make, use, sell and offer for sale Licensed Products. |
| 8 | Grant the right to use, distribute and sublicense the Intellectual Property (individualized television programming technologies, which includes the Patents and proprietary technologies, programming methods, the ACTV Programming and Coding Language, and other trade secrets and know-how) and Improvements throughout the Territory for individualized television directly to home subscribers through the mass distribution systems of cable broadband distribution system located in the Territory. |
| 9 | Grant the right to use the Know How (all inventions discoveries, improvements, know-how, techniques, materials, products, designs, processes or other technology or intellectual property rights), including the Technology, including Provider Technology and Subscriber Technology related to the Engage-proprietary computer software, including Journal Server, Link Server, Knowledge DSS Engine, Knowledge Profile Engine, and Knowledge Report Engine, as well as all updates, upgrades and revisions thereto, including the localized versions thereof, internally only at Provider's principal sales office to construct and maintain a data repository for the purposes of (a) marketing and selling to Subscribers subscriptions to the Data Services (proprietary Internet behavioral profiling and marketing data services as is currently marketed by Engage as "Engage.Knowledge", which services permit a Subscriber to access and use a repository of data generated by user activity on the Internet) and (b) marketing and selling Products (a report or analysis) to Customers. |
| 10 | Grant the right to utilize the relevant claim(s) of a patent to the extent necessary for VISA International Service Association to use the Private Label Certificate System as provided in this Agreement in the event that any technology included in the VSE (the software module created by VeriSign, Inc. under contract from VISA International Service Association) as delivered to VISA International Service Association by VeriSign, Inc. is hereafter covered by a claim of a patent issued to or assigned to VeriSign, Inc. |
| 11 | Grant the right to access, use, exploit and commercialize the patent pending and licensed AR technology (augmented reality (AR) technology that allows businesses to upload a target image such as a logo or advertisement and allows users to point a mobile device at such target and view an AR video or image) owned and/or developed by Total Communicator Solutions, Inc., as enhanced, modified, improved or replaced from time to time, for all purposes consistent with MarketKast, Inc.'s business plans anywhere where MarketKast, Inc. does business throughout the world. |

Source(s): ktMINE and Great American Proprietary Database



Great American Group          **Exhibit 3.0**
Corporate Valuation Services          **Page 6 of 8**

## MediaShift, Inc.
## Patent Portfolio
## Fair Market Value  - Excess Earnings
($ in 000s)

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | *For the Projected 12 Months Ending December 31,* | | | | | |
| Net Sales | $13,103 | $95,425 | $296,810 | $514,738 | $764,050 | $922,476 | $1,124,397 | $1,378,032 | $1,661,718 | $1,931,079 |
| *Growth* | *88.4%* | *628.3%* | *211.0%* | *73.4%* | *48.4%* | *20.7%* | *21.9%* | *22.6%* | *20.6%* | *16.2%* |
| Times: Utility Curve | 100.0% | 100.0% | 100.0% | 90.0% | 70.0% | 50.0% | 30.0% | 20.0% | 10.0% | 5.0% |
| Sales Attributable to Patents | 13,103 | 95,425 | 296,810 | 463,264 | 534,835 | 461,238 | 337,319 | 275,606 | 166,172 | 96,554 |
| Times: Expected EBIT Margin | -94.6% | -2.8% | 10.9% | 16.5% | 21.5% | 21.3% | 21.7% | 22.2% | 21.2% | 21.6% |
| Expected Earnings from patent Portfolio | (12,389) | (2,669) | 32,269 | 76,549 | 115,027 | 98,316 | 73,299 | 61,079 | 35,228 | 20,856 |
| Less: Income Taxes @ 40.0% | 0 | 0 | 12,908 | 30,619 | 46,011 | 39,327 | 29,319 | 24,431 | 14,091 | 8,342 |
| After-tax Earnings | (12,389) | (2,669) | 19,362 | 45,929 | 69,016 | 58,990 | 43,979 | 36,647 | 21,137 | 12,513 |
| **Less: Contributory Asset Charges** | | | | | | | | | | |
| Debt-free Operating Working Capital | 144 | 573 | 1,781 | 2,780 | 3,209 | 3,229 | 2,361 | 1,929 | 1,163 | 676 |
| Net Fixed Assets | 13 | 95 | 594 | 1,853 | 3,209 | 3,690 | 3,036 | 2,480 | 1,496 | 772 |
| Trade Name | 79 | 573 | 1,781 | 2,780 | 3,209 | 2,767 | 2,024 | 1,654 | 997 | 579 |
| Other Intangibles | 157 | 1,145 | 3,562 | 5,559 | 6,418 | 5,535 | 4,048 | 3,307 | 1,994 | 1,159 |
| Net Earnings | (12,782) | (5,054) | 11,644 | 32,958 | 52,971 | 43,769 | 32,510 | 27,277 | 15,487 | 9,327 |
| (1) Present Value Factor at 28.0% | 0.9205 | 0.7489 | 0.5851 | 0.4571 | 0.3571 | 0.2790 | 0.2180 | 0.1703 | 0.1330 | 0.1039 |
| Present Value of DFNCF | ($7,898) | ($3,785) | $6,813 | $15,065 | $18,917 | $12,211 | $7,086 | $4,645 | $2,060 | $969 |
| Cash Flow % | -98% | -5% | 4% | 7% | 10% | 9% | 10% | 10% | 9% | 10% |

**Valuation Summary:**

Present Value of DFNCF      $56,083

**Fair Market Value of Customer Relationships (Rounded)**      **$56,000**

Note(s):
 (1) Calculated using mid-year convention.
 (2) Based on when the current year's discounted cash flow contributes less than 2.0% of the cumulative discounted cash flow.
(3) 2014 represents a partial period
Source(s): Exhibit 3.0, Page 2 of 8 and Discussions with Company management


**Great American Group**  
Corporate Valuation Services

Exhibit 3.0  
Page 7 of 8

## MediaShift, Inc.
### Patent Portfolio
### Orderly Liquidation Value - Excess Earnings
($ in 000s)

| | For the Projected 12 Months Ending December 31, | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *2014* | *2015* | *2016* | *2017* | *2018* | *2019* | *2020* | *2021* | *2022* | *2023* |
| Net Sales | $13,103 | $95,425 | $296,810 | $514,738 | $764,050 | $922,476 | $1,124,397 | $1,378,032 | $1,661,718 | $1,931,079 |
| *Growth* | *88.4%* | *628.3%* | *211.0%* | *73.4%* | *48.4%* | *20.7%* | *21.9%* | *22.6%* | *20.6%* | *16.2%* |
| Times: Utility Curve | 100.0% | 100.0% | 100.0% | 90.0% | 70.0% | 50.0% | 30.0% | 20.0% | 10.0% | 5.0% |
| Sales Attributable to Patents | 13,103 | 95,425 | 296,810 | 463,264 | 534,835 | 461,238 | 337,319 | 275,606 | 166,172 | 96,554 |
| Times: Expected EBIT Margin | -94.6% | -2.8% | 10.9% | 16.5% | 21.5% | 21.3% | 21.7% | 22.2% | 21.2% | 21.6% |
| Expected Earnings from Patent Portfolio | (12,389) | (2,669) | 32,269 | 76,549 | 115,027 | 98,316 | 73,299 | 61,079 | 35,228 | 20,856 |
| Less: Income Taxes @ 40.0% | 0 | 0 | 12,908 | 30,619 | 46,011 | 39,327 | 29,319 | 24,431 | 14,091 | 8,342 |
| After-tax Earnings | (12,389) | (2,669) | 19,362 | 45,929 | 69,016 | 58,990 | 43,979 | 36,647 | 21,137 | 12,513 |
| **Less: Contributory Asset Charges** | | | | | | | | | | |
| Debt-free Operating Working Capital | 144 | 573 | 1,781 | 2,780 | 3,209 | 3,229 | 2,361 | 1,929 | 1,163 | 676 |
| Net Fixed Assets | 13 | 95 | 594 | 1,853 | 3,209 | 3,690 | 3,036 | 2,480 | 1,496 | 772 |
| Trade Name | 79 | 573 | 1,781 | 2,780 | 3,209 | 2,767 | 2,024 | 1,654 | 997 | 579 |
| Other Intangibles | 157 | 1,145 | 3,562 | 5,559 | 6,418 | 5,535 | 4,048 | 3,307 | 1,994 | 1,159 |
| Net Earnings | (12,782) | (5,054) | 11,644 | 32,958 | 52,971 | 43,769 | 32,510 | 27,277 | 15,487 | 9,327 |
| (1) Present Value Factor at 43.0% | 0.8869 | 0.6578 | 0.4600 | 0.3217 | 0.2249 | 0.1573 | 0.1100 | 0.0769 | 0.0538 | 0.0376 |
| Present Value of DFNCF | ($7,609) | ($3,325) | $5,356 | $10,601 | $11,915 | $6,885 | $3,576 | $2,098 | $833 | $351 |
| Cash Flow % | -98% | -5% | 4% | 7% | 10% | 9% | 10% | 10% | 9% | 10% |

**Valuation Summary:**

| | |
|---|---|
| Present Value of DFNCF | $30,681 |
| **Orderly Liquidation Value of Patent Portfolio (Rounded)** | **$31,000** |

Note(s):  
(1) Calculated using mid-year convention.  
(2) Based on when the current year's discounted cash flow contributes less than 2.0% of the cumulative discounted cash flow.  
(3) 2014 represents a partial period  
Source(s): Exhibit 3.0, Page 2 of 8 and Discussions with Company management


Great American Group                                                    Exhibit 3.0
Corporate Valuation Services                                              Page 8 of 8

## MediaShift, Inc.
## Patent Portfolio
## Contribtory Asset Charges
(\$ in 000s)

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Projected 12 Months Ending December 31, | | | | | |
| Projected Net Sales | | \$13,103 | \$95,425 | \$296,810 | \$514,738 | \$764,050 | \$922,476 | \$1,124,397 | \$1,378,032 | \$1,661,718 | \$1,931,079 |
| **Debt-free Operating Working Capital** | | | | | | | | | | | |
| Beginning Working Capital | | 1,551 | 1,931 | 11,227 | 29,918 | 50,499 | 73,041 | 84,560 | 103,070 | 126,320 | 152,324 |
| Change in Working Capital | | 380 | 9,296 | 18,691 | 20,580 | 22,542 | 11,519 | 18,509 | 23,250 | 26,005 | 24,691 |
| Ending Working Capital | | 1,931 | 11,227 | 29,918 | 50,499 | 73,041 | 84,560 | 103,070 | 126,320 | 152,324 | 177,016 |
| Average Working Capital | | 1,741 | 6,579 | 20,573 | 40,209 | 61,770 | 78,801 | 93,815 | 114,695 | 139,322 | 164,670 |
| As a % of Revenue | | 13.3% | 6.9% | 6.9% | 7.8% | 8.1% | 8.5% | 8.3% | 8.3% | 8.4% | 8.5% |
| *After-Tax CAC* | 8.0% | *1.1%* | *0.6%* | *0.6%* | *0.6%* | *0.6%* | *0.7%* | *0.7%* | *0.7%* | *0.7%* | *0.7%* |
| *Before-Tax CAC* | | *1.8%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.2%* | *1.2%* | *1.2%* | *1.2%* | *1.2%* |
| **Net Fixed Assets** | | | | | | | | | | | |
| Beginning Fixed Assets | | 0 | 118 | 1,816 | 9,437 | 25,773 | 47,007 | 68,369 | 91,191 | 116,844 | 123,491 |
| Plus: Capital Expenditures | | 131 | 1,909 | 8,904 | 20,590 | 30,562 | 36,899 | 44,976 | 55,121 | 66,469 | 77,243 |
| Less: Depreciation | | 13 | 211 | 1,283 | 4,253 | 9,329 | 15,537 | 22,153 | 29,468 | 59,822 | 69,519 |
| Ending Fixed Assets | | 118 | 1,816 | 9,437 | 25,773 | 47,007 | 68,369 | 91,191 | 116,844 | 123,491 | 131,215 |
| Average Fixed Assets | | 59 | 967 | 5,627 | 17,605 | 36,390 | 57,688 | 79,780 | 104,018 | 120,168 | 127,353 |
| As a % of Revenue | | 0.5% | 1.9% | 1.9% | 3.4% | 4.8% | 6.3% | 7.1% | 7.5% | 7.2% | 6.6% |
| *After-Tax CAC* | 12.0% | *0.1%* | *0.1%* | *0.2%* | *0.4%* | *0.6%* | *0.8%* | *0.9%* | *0.9%* | *0.9%* | *0.8%* |
| *Before-Tax CAC* | | *0.2%* | *0.2%* | *0.3%* | *0.7%* | *1.0%* | *1.3%* | *1.5%* | *1.5%* | *1.5%* | *1.3%* |

**Trade Name**

| | |
|---|---|
| Percentage of Revenue Supported by Trade Name | 100.0% |
| Royalty Rate | 1.0% |
| Tax Rate | 40.0% |
| *After-Tax CAC* | *0.6%* |

**Other Intangibles**

| | |
|---|---|
| Percentage of Revenue Supported by Other Intangibles | 100.0% |
| Royalty Rate | 2.0% |
| Tax Rate | 40.0% |
| *After-Tax CAC* | *1.2%* |

Source(s): Exhibit 3.0, Page 1 of 8 and Exhibit 3.0, Page 2 of 8

# A valuable strategic partner through every stage of the business lifecycle.

Across virtually every sector of the economy, at every stage of the business life cycle, Great American Group helps companies in transition understand and realize the maximum value of their assets. With more than 37 years of experience, our team of trusted professionals offers unparalleled expertise at assessing the value and managing the sale of assets. We bring clarity to the process and improve our clients' business intelligence, capital position and confidence.



### Appraisals

A deep understanding of our clients' industries and specific businesses helps us deliver accurate achievable valuations. We perform inventory, machinery and equipment, real estate and intellectual property appraisals only within those industries with which we have significant expertise and experience and develop appraisal reports customized for each client.



### Auctions

We leverage an international network of buyers with advanced web technologies, real-time digital communication tools and proven marketing expertise to move assets or equipment quickly, efficiently and for the highest market prices possible.

- Live Auction with Webcast and Remote Bidding
- Live On-Site Auctions
- Online Auctions



### Corporate Valuation Services

Clients trust our experience and expertise for a variety of valuation services, validated by the prominent clients we serve. We assist private equity groups, corporations, and other financial institutions with valuations for accounting, reporting, compliance and tax requirements; portfolio valuation; insurance valuations, and transaction support.



### Asset Dispositions

Whether the result of a bankruptcy, merger or acquisition, loan default or simply executing a sales promotion, Great American Group has more than 37 years of expertise providing:

- Orderly Liquidations
- Strategic Disposition Programs
- Wind-down Services



### Capital

GA Capital provides loans between $15 million to $250 million on a junior secured basis to help meet our business partners' financing needs. Our expertise in valuing collateral assets allows GA Capital to maximize the size of a loan to meet any company's needs.



### Real Estate Maximization

GA Keen Realty Advisors develops and executes real estate strategies designed to maximize the value of owned and leased real property and minimize ongoing liabilities. We represent property owners, retail and commercial tenants, investors, developers and creditors. We have a particular expertise in workouts and restructurings.

# GREAT AMERICAN GROUP

**Los Angeles (corporate)**
21860 Burbank Blvd., Suite 300 South
Woodland Hills, CA  91367

**Boston**
300 First Ave. Suite 201
Needham, MA  02494

**Chicago**
10 South LaSalle Street, Suite 2170
Chicago, IL  60603

**Atlanta**
1200 Abernathy Rd. Suite 1700
Alpharetta, GA  30328

**Charlotte**
15720 John J Delaney Dr., Suite 300
Charlotte, NC  28277

**New York**
Graybar Building
420 Lexington Ave. Suite 3001
New York, NY  10170

**Dallas**
2745 N. Dallas Parkway, Suite 660
Plano, TX 75093

**London**
14 Berkeley Street
Mayfair, London  W1J  8DX


EXHIBIT "8"

1  GEORGE C. WEBSTER II (CA Bar No. 82870)
   DRINKER BIDDLE & REATH LLP
2  1800 Century Park East, Ste. 1500
   Los Angeles, CA 90067-1517
3  (310) 203-4000/Telephone
   (310) 229-1285/Facsimile
4  Attorneys for MediaShift Holdings, Inc.

5

6                  UNITED STATES BANKRUPTCY COURT

7         CENTRAL DISTRICT OF CALIFORNIA-LOS ANGELES DIVISION

8

9  In re:                              LEAD CASE NO.  2:15-bk-25024-SK

10 MEDIASHIFT, INC.,                   JOINTLY ADMINISTERED WITH:
                                       CASE NO. 2:15-bk-25030-SK
11           Debtor.
                                       Chapter 11
12
   In re:                              **LIMITED OBJECTION TO DEBTORS'
13                                      EMERGENCY MOTION FOR ENTRY OF
   AD-VANTAGE NETWORKS, INC.,          AN ORDER (1) AUTHORIZING DEBTORS
14                                      TO PROVIDE ADEQUATE ASSURANCE
             Debtor.                    OF FUTURE PAYMENT TO UTILITY
15                                      COMPANIES PURSUANT TO 11 U.S.C.
                                       § 366 AND (2) AUTHORIZING THE
16                                      LIMITED USE OF CASH COLLATERAL**

17
                                       Hearing:
18                                     Date: November 18, 2015
                                       Time: 9:00 a.m.
19 ☒ Affects All Debtors               Place: Courtroom 1575, 255 East Temple Street,
   ☐ Afffects MediaShift, Inc. Only    Los Angeles, CA 90012
20 ☐ Affects Ad-Vantage networks, Inc. Only

21
   TO:    THE HONORABLE SANDRA R. KLEIN
22         UNITED STATES BANKRUPTCY JUDGE

23 MediaShift Holdings, Inc. ("Holdings"), by and through its undersigned attorneys, hereby files

24 this limited objection (the "Limited Objection") to *Debtors' Emergency Motion for Entry of an*

25 *Order (1) Authorizing Debtors to Provide Adequate Assurance of Future Payment to Utility*

26 *Companies Pursuant to 11 U.S.C. § 366 and (2) Authorizing the Limited Use of Cash Collateral*

27 *on an Interim Basis Pending a Final Hearing Pursuant to 11 U.S.C. § 363* [Docket No. 27] (the

28 "Emergency Motion") and respectfully states as follows:

## FACTUAL AND PROCEDURAL BACKGROUND

1.     Holdings is a Delaware corporation specially formed for the purpose of making certain loans and acquiring substantially all of the assets of MediaShift, Inc. ("MediaShift") and certain of its subsidiaries, including Ad-Vantage Networks, Inc. ("Ad-Vantage" and together with MediaShift, the "Debtors").  Throughout October 2014, Holdings and MediaShift negotiated the terms of a transaction whereby Holdings and MediaShift would enter into an asset purchase agreement, subject to certain conditions to closing on both sides, and Holdings would make bridge loans to MediaShift to fund its anticipated working capital needs through the closing of such asset purchase (the "Proposed Acquisition").

2.     The October negotiations led to the execution and delivery of a Note and Bridge Loan Agreement dated as of October 31, 2014 (the "Bridge Loan Agreement"), between MediaShift, Ad-Vantage, Delphi Media Holdings, LLC, a Delaware limited liability company and indirect wholly owned subsidiary of Ad-Vantage, and Travora Networks, Inc., a Delaware corporation and a wholly owned subsidiary of MediaShift,, jointly and severally, as borrowers, and Holdings, as lender.

3.     Pursuant to the Bridge Loan Agreement, Holdings agreed, *inter alia*, to make loans to MediaShift (the "Bridge Loans") up to a principal amount not to exceed $9 million based upon certain conditions related to the Proposed Acquisition, including, but not limited to, receipt of a Favorable Fairness Opinion.  The Debtors' obligations under the Bridge Loan Agreement were secured by a pledge of  security interests in and liens on all of the Debtors' assets (the "Collateral") pursuant to that certain Security Agreement dated October 31, 2014 (the "Security Agreement").  In addition, the Debtors, as grantors, and Holdings, as collateral assignee, executed certain U.S. Patent Security Agreements and U.S. Trademark Security Agreements (together with the Bridge Loan Agreement and the Security Agreement, the "Loan Documents").

4.      Holdings perfected its security interests and liens on the Collateral by filing UCC-1 financing statements in appropriate filing offices and Notices of Recordation in the United States Patent and Trademark Office.

5.      Among other unsatisfied conditions and defaults by the Debtors under the Loan Documents, the Debtors did not receive a Favorable Fairness Opinion and the Proposed Acquisition was never consummated.

6.      On July 31, 2015, the Bridge Loans matured.  As of that date, the Debtors owed Holdings not less than $5,743,108.74 in principal and interest under the Bridge Loan Agreement.

7.      Holdings is by far the Debtors' largest secured creditor.

8.      By letter dated August 3, 2015, Holdings provided the Debtors with written notice of default under the Loan Documents.

9.      On September 15, 2015, Holdings provided the Debtors with written notice that Holdings had engaged Hilco Streambank, as its agent, to assist Holdings in enforcing its rights as lender and secured party under the Loan Documents, by selling the Collateral in a public sale pursuant to Article 9 of the Uniform Commercial Code.

10.     On September 30, 2015 (the "Petition Date"), MediaShift and Ad-Vantage each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code  in the United States Bankruptcy Court for the Central District of California.

11.     Twenty-eight (28) days after the Petition Date, the Debtors filed the Emergency Motion.

12.     The relief sought by the Debtors' in the Emergency Motion was expressly limited to the use of $11,770 of Holdings' cash collateral.

13.     At no time prior to filing the Emergency Motion, or since, did the Debtors seek Holdings' consent to use cash collateral.

## LIMITED OBJECTION

14.    At the initial hearing on the Emergency Motion, Holdings consented to the

Debtors' limited use of $12,000.00 pursuant to the two-week budget appended to the Emergency

Motion.  However, because the Emergency Motion is not entirely clear regarding whether the use

of cash collateral will be limited *only* to the use of $12,000.00, in an abundance of caution,

Holdings files this Limited Objection to make clear its objection to any further use of cash

collateral beyond that set forth in the two-week budget without its consent.  Further, Holdings

disputes the Debtors' valuation of the Collateral and that Holdings' interests are adequately

protected by granting replacement liens in the Collateral.  Holdings expressly reserves all of its

rights and remedies, including the right to object to the use of cash collateral without its consent.

Dated: November 12, 2015                     DRINKER BIDDLE & REATH LLP


                                             By: */s/    George C. Webster II*
                                             George C. Webster II

                                             Attorneys for MediaShift Holdings, Inc.



EXHIBIT "9"


<u>Via Email:david.grant@mediashift.com</u>

November 21, 2014

Board of Directors
c/o David Grant, CEO
MediaShift, Inc.
600 North Brand Blvd, Suite 230
Glendale, CA 91203

### **Fairness Opinion**

Members of the Board:

You have requested the opinion of Great American Group Advisory & Valuation Services, L.L.C. dba Great American Group Corporate Valuation Services ("GA") as to the fairness, from a financial point of view, to the holders of MediaShift, Inc. ("MediaShift" or the "Company") common stock (the "Shareholders"), of the consideration to be received by the Shareholders as a result of the proposed transaction (as defined below).

### **Proposed Transaction**
We understand that MediaShift is negotiating a sale transaction (the "Transaction") for all of MediaShift's assets and certain liabilities with a group of investors (the "Investors") whereby:

- The Investors will provide a $6.0 million bridge loan to MediaShift in a first round of financing via a to-be-formed company ("Holdings").

- Holdings will then form a wholly-owned subsidiary ("Newco") and will raise approximately $16.038 million in cash from the Investors.

- In exchange for 75.55% of Newco equity (on an as-converted basis), Holdings will contribute to Newco $16.038 million in cash, the $6.0 million bridge loan, and $3.0 million in debt owed by MediaShift to named Investors.

- MediaShift will contribute to Newco all the assets of the Company and its subsidiaries, in exchange for (a) 19.45% of Newco equity, (b) approximately $7.338 million in cash, (c) the assumption by Newco of the $6.0 million bridge loan, and (d) the cancellation by Newco of the additional $3.0 million in debt.

- After close of the transaction described above, MediaShift will cancel and/or redeem approximately 3.345 million shares of MediaShift held by individual investors at a price of $0.40 per share.

### **Consideration for Medishift Assets (in $000)**

| | | |
|---|---|---:|
| Cash | $ | 16,038 |
| Bridge Loan | | 6,000 |
| Senior Notes (Fisk and Kirby) | | 3,000 |
| Total Consideration | $ | 25,038 |

CORPORATE HEADQUARTERS
21860 Burbank Boulevard, Suite 300 South
Woodland Hills, CA 91367
(818) 884-3737 • Fax (818) 746-9917

The consideration listed above is for 75.55% of Newco's common stock which translates to an implied equity value for Newco of $33.141 million or $0.54 cents per share.  This is the price that accredited investor shareholders would receive in consideration.  Per the Transaction, the remaining minority shareholders would be bought out at $0.40 cents per share.

## Scope of Work

In arriving at our opinion, we have performed the following:

1.  Reviewed Final Bridge Loan Terms dated 10/14/2014;

2.  Reviewed document titled, "Proposed Transaction to Acquire Assets of MediaShift" dated 10/12/2014;

3.  Reviewed certain publicly available business and financial information including audited financial statements concerning MediaShift;

4.  Reviewed MediaShift's internal financial statements and other financial and operating data;

5.  Discussed the past and current operations, financial condition and the prospects of the Company;

6.  Compared financial and operating performance of the Company with publicly available information concerning companies we deemed relevant;

7.  Reviewed certain internal financial analyses and forecasts prepared by MediaShift management;

8.  Reviewed current and historical market prices as well as historical trading volumes for MediaShift's common stock;

9.  Compared the financial performance of the Company and the prices and trading activity of the Company's common stock with that of certain other publicly traded companies comparable to MediaShift;

10. Reviewed recent mergers and acquisitions including the financial terms, to the extent publicly available, of other companies we deemed relevant;

11. Reviewed signed distribution agreements held by MediaShift for the distribution of their platform;

12. Reviewed recent communications related to ongoing negotiations for future distribution agreements between MediaShift and potential distribution partners; and

13. Performed valuation analyses using the discounted cash flow method, guideline public company method and similar transaction method; and

14. Performed such other analyses, reviewed such other information and considered such other factors as we have deemed appropriate.

## Limiting Conditions and Disclosures

We have assumed and relied upon, without independent verification, the accuracy and completeness of the information that was publicly available or supplied or otherwise made available to us by the Company and formed a substantial basis for this opinion.  With respect to the financial projections, we have assumed that they have been reasonably prepared and reflect the best currently available estimates and judgments of the

respective managements of the Company. We are not legal, tax or regulatory advisors. We are financial advisors only and have relied upon, without independent verification, the assessment of the Company and their legal, tax or regulatory advisors with respect to legal, tax or regulatory matters. Our opinion is necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to us as of, the date hereof. Events occurring after the date hereof may affect this opinion and the assumptions used in preparing it, and we do not assume any obligation to update, revise or reaffirm this opinion. In arriving at our opinion, we were not authorized to solicit, and did not solicit, interest from any party with respect to an acquisition, business combination or other extraordinary transaction involving the Company, nor did we negotiate with any party, other than MediaShift.

We have acted as financial advisor to the Board of Directors of the Company in connection with this transaction and will receive a fee for our services, which is not contingent upon the closing of the Transaction. In the two years prior to the date hereof, we have provided an appraisal of the Company's patent portfolio and have received fees in connection with such services. GA may also seek to provide such services to the Company in the future and expects to receive fees for the rendering of these services.

This opinion has been approved by a committee of GA professionals in accordance with our customary practice. This opinion is for the information of the Board of Directors of the Company and may not be used for any other purpose. The contents of this letter will not be transmitted to any third party without the express written consent of GA with the exception of the Board of Directors providing the letter to its shareholders, legal advisors and financial advisors as it deems necessary.

This opinion has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice, as promulgated by the Appraisal Standards Board of the Appraisal Foundation, and appropriate financial reporting and/or tax reporting guidance.

GA is not an auditor, accountant, or expert in the preparation of financial statements. Pursuant to this engagement, GA has neither been requested by the Client to assist, and is not assisting, the Company or its auditors in the preparation of the Company's financial statements. Furthermore, GA has neither been requested by the Client to advise, and is not advising the Company, as to whether its financial statements comply with applicable accounting or legal requirements including, but not limited to, generally accepted accounting principles.

## <u>Conclusion</u>

GA's review of information and analysis described herein resulted in a range of fair market value for MediaShift's common equity under each valuation method employed. The proposed Transaction (both $0.54 per share and $0.40 per share) falls below the range of all valuation methods employed. As such, GA is of the opinion on the date hereof that the consideration to be received by the Shareholders pursuant to the Transaction is not fair from a financial point of view.


Sincerely,


*Great American Group*
Great American Group
Corporate Valuation Services




EXHIBIT "10"

**From:** Dan O'Brien [mailto:dobrien@skylinepartnersllc.com]
**Sent:** Wednesday, March 25, 2015 7:51 AM
**To:** Mike Spalter; Jim bell
**Cc:** David Grant; Rick Baran; Tracy Norton
**Subject:** Mediashift Licensing Potential

All:

Last June, I had an extended discussion with Brendon Kensel about how to value MS in licensing deals with service providers.

I suggested that he compare a single operator (Cablevision, as an example), and run a model on the base business—representing the inventory, and providing a 60% ad revenue share back to the operator. That would allow us to know what our average revenue per ad served was on a direct basis. Then, to convert to a licensing model, back out sales commissions and overhead (since under a licensing model the client sells the media themselves), and get to an "overhead free" average revenue per ad served. ***He never responded, and it appears that no one saw or was involved in the desired business planning exercise.***

The attached summary model has 2 categories, broadband and wireless, and has various assumptions. I believe you will agree that the assumptions on sessions/month and ads served are conservative, but I have had no data to validate or refute the assumptions.

On broadband, we factor down subscribers for the % of high speed, then factor further for the % using wi-fi, and then assume that the average subscriber has only 1 session/day for 30 minutes, within which 5 ads are served. Finally, we assume a rate of $.05/ad served.

On Wireless, we factor down subscribers for the % of data subs, and then further for the percent who enable wi-fi. We assume shorter sessions and fewer ads served, and a lower rate per ad served.

**HEADLINE:** For Cablevision alone, licensing at $.05/ad served generates **$10MM in licensing revenue per month to Mediashift. They are waiting for me to tell them that we're stable to sit down and begin licensing discussions.**

We should create a presentation (after debating the methodology) that shows what we think Cablevision could sell the ads for (greater than $.05/ad), and what their P&L would look like.

This is ultimately the most important revenue stream for the company, so we should fully debate and validate the assumptions with the team (Matt, Chris)

Regards,

Dan

LICENSING MODEL

| | SUBS | % HSD SUBS | HSD SUBS | % WIFI | WIFI SUBS | SESSIONS/MO | TIME/SESSION | ADS/SESSION | ADS/MONTH | REVENUE/AD | MONTHLY REVENUE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| COMCAST | 34000000 | 65.00% | 22100000 | 50.00% | 11050000 | 30 | 30 | 5 | 150 | $0.05 | $82,875,000.00 |
| CHARTER | 10000000 | 45.00% | 4500000 | 35.00% | 1575000 | 30 | 30 | 5 | 150 | $0.05 | $11,812,500.00 |
| CABLEVISION | 3000000 | 65.00% | 1950000 | 75.00% | 1462500 | 30 | 30 | 5 | 150 | $0.05 | $10,968,750.00 |
| DISH | 14000000 | 10.00% | 1400000 | 35.00% | 490000 | 30 | 30 | 5 | 150 | $0.05 | $3,675,000.00 |
| DTV | 22000000 | 10.00% | 2200000 | 35.00% | 770000 | 30 | 30 | 5 | 150 | $0.05 | $5,775,000.00 |
| ATT | 6000000 | 65.00% | 3900000 | 50.00% | 1950000 | 30 | 30 | 5 | 150 | $0.05 | $14,625,000.00 |
| VZ | 6000000 | 65.00% | 3900000 | 50.00% | 1950000 | 30 | 30 | 5 | 150 | $0.05 | $14,625,000.00 |
| SUBTOTAL | 95000000 | | 40400000 | | | | | | | | $144,356,250.00 |
| VZ | 101000000 | 40.00% | 40400000 | 15.00% | 6060000 | 30 | 10 | 2 | 60 | $0.035 | $12,726,000.00 |
| ATT | 120000000 | 35.00% | 42000000 | 15.00% | 6300000 | 30 | 10 | 2 | 60 | $0.035 | $13,230,000.00 |
| SPRINT | 49000000 | 25.00% | 12250000 | 15.00% | 1837500 | 30 | 10 | 2 | 60 | $0.035 | $3,858,750.00 |
| T-MO | 30000000 | 20.00% | 6000000 | 15.00% | 900000 | 30 | 10 | 2 | 60 | $0.035 | $1,890,000.00 |
| SUBTOTAL | | | | | | | | | | | $31,704,750.00 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): **DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. § 364, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS PURSUANT TO 11 U.S.C. § 364, (III) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. §363, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On November 18, 2015, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Todd M Arnold    tma@lnbyb.com
- Ron Bender    rb@lnbyb.com
- Stephen L Burton    steveburtonlaw@aol.com
- Cathrine M Castaldi    ccastaldi@brownrudnick.com
- Michael I Gottfried    mgottfried@lgbfirm.com,
  kalandy@lgbfirm.com;cboyias@lgbfirm.com;rspahnn@lgbfirm.com;srichmond@lgbfirm.com
- Dare Law    dare.law@usdoj.gov, ron.maroko@usdoj.gov
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Aleksandra Zimonjic    azimonjic@lgbfirm.com, cboyias@lgbfirm.com;sdeiches@lgbfirm.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On November 18, 2015, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on November 18, 2015, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Sandra Klein **Served by Personal Delivery**
U.S. Bankruptcy Court
255 E. Temple Street, Courtroom 1575, Suite 1582
Los Angeles, CA 90012

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 18, 2015 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

MediaShift, Inc.
Ad-Vantage Networks, Inc.
File No. 7652
**RSN, Debtor, OUST, OCC & Secured**
**SERVICE BY OVERNIGHT MAIL**
**SERVICE BY NEF IF MARKED WITH \***

RSN
U. S. Securities and Exchange Commission
Attn: Bankruptcy Counsel
 444 South Flower Street, Suite 900
Los Angeles, CA 90071-9591


Committee Member
Winthrop Couchot, PC
Attn: Andy Levin
660 Newport Center Drive
Newport Beach, CA 92660


Committee Member
Eastward Capital Partners Venture, LP
Attn: Edward Dresner, Investment Partner
432 Cherry Street
W. Newton, MA 02465

**Debtor**
MediaShift, Inc.
Ad-Vantage Networks, Inc.
600 N. Brand Blvd., Suite 230
Glendale, CA 91203


Committee Member
Essenture Incorporated
Attn: Brad Commins, President
19349 Flauian Avenue
Torrance, CA 90503


Committee Member
Ian Peters
7219 Tribune Street
Granada Hills, CA 91344


Proposed Committee Counsel
Uzzi O Raanan **NEF\***
Danning Gill Diamond Kollitz
2029 Century Park East, Suite 300
Los Angeles, CA 90067


Secured Creditors

Dare Law
Office of the United States Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017


Committee Member
Glenn Lebowitz
1212 Suffield Drive
McLean, VA 22101


Counsel for Glenn Lebowitz
Michael Gottfried **NEF\***
1801 Century Park East, Suite 700
Los Angeles, CA 90067


RSN – Counsel for Mediashift Holdings, Inc.
George C. Webster II **NEF\***
Drinker Biddle & Reath LLP
1800 Century Park East, Ste. 1500
Los Angeles, CA 90067-1517


Don Larson
500 Ford Road
St. Louis Park, MN 55426


Fisk Investments LLC
Mediashift Holdings, Inc.
4550 Cherry Creek Dr.
South Glendale, CO 80246

Elevation Fund LLC
Kearney Holdings LLC
Kirby Enterprise Fund LLC
West Hampton Special Situations Fund LLC
6161 S Syracuse Way, Suite 320
Greenwood Village, CO 80111
**NEF\*** via counsel, Leslie Cohen Law PC


James A. Veldkamp
2324 S. Clayton Street
Denver, CO 80210

Kirby Enterprise Fund, LLC
West Hampton Special Situations
Fund, LLC
Elevation Fund, LLC
5825 Irish Place
Centennial, CO 80112
**NEF\*** via counsel, Leslie Cohen Law PC


JMW Fund LLC
Richland Fund, LLC
4 Richland Place
Pasadena, CA 91103
**NEF\*** via counsel, Leslie Cohen Law PC


Mediashift Holdings, Inc.
4500 Cherry Creek Drive South
Suite 550
Denver, CO 80246
**NEF\*** via counsel, George C. Webster, II


Leslie A. Cohen, Esq. **NEF\***
leslie@lesliecohenlaw.com
J'aime K. Williams, Esq.
jaime@lesliecohenlaw.com
Brian A. Link, Esq.
brian@lesliecohenlaw.com
LESLIE COHEN LAW, PC
506 Santa Monica Blvd., Suite 200
Santa Monica, CA 90401
Counsel to Kirby Enterprise Capital Management, LLC; Kirby Enterprise Fund, LLC; West Hampton Special Situations Fund, LLC; Elevation Fund, LLC; River Bend Fund, LLC; Kearney Holdings, LLC; Kearney Properties LLC; Charles F. Kirby; Chad K. Kirby; Kelsey W. Kirby; Charles B. Kirby; Charles F. Kirby Roth 401K; John McGrain; JMW Fund, LLC; San Gabriel Fund, LLC; Richland Fund, LLC; JPG Investments, LLC; LA & Linda J. Walker