GEORGE C. WEBSTER II (CA Bar No. 82870)
DRINKER BIDDLE & REATH LLP
1800 Century Park East, Ste. 1500
Los Angeles, CA 90067-1517
(310) 203-4000/Telephone
(310) 229-1285/Facsimile

*and*

Michael P. Pompeo (NJ Bar No. 03032-1996)
   (admitted *pro hac vice*)
DRINKER BIDDLE & REATH LLP
1177 Avenue of the AMERICAS, 41st Floor
New York, NY 10036-2714

Attorneys for MediaShift Holdings, Inc.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA-LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>MEDIASHIFT, INC.,<br><br>Debtor. | LEAD CASE NO.  2:15-bk-25024-SK<br><br>JOINTLY ADMINISTERED WITH:<br>CASE NO. 2:15-bk-25030-SK<br><br>Chapter 11 |
| In re:<br><br>AD-VANTAGE NETWORKS, INC.,<br><br>Debtor.<br><br>☒ Affects All Debtors<br>☐ Affects MediaShift, Inc. Only<br>☐ Affects Ad-Vantage Networks, Inc. Only | **OBJECTION TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. § 364; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS PURSUANT TO 11 U.S.C. § 364; (III) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF**<br><br>Hearing:<br>Date:  December 10, 2015<br>Time:  8:30 a.m.<br>Place:  Courtroom 1575<br>        255 East Temple Street<br>        Los Angeles, CA 90012 |

TO:    THE HONORABLE SANDRA R. KLEIN
       UNITED STATES BANKRUPTCY JUDGE

83621589.2

MediaShift Holdings, Inc. ("Holdings"), by and through its undersigned attorneys, hereby files this objection (the "Objection") to *Debtors' Emergency Motion For Entry Of Interim And Final Orders: (I) Authorizing Debtors To Obtain Postpetition Financing Pursuant To 11 U.S.C. § 364, (II) Granting Liens And Superpriority Claims Pursuant To 11 U.S.C. § 364, (III) Authorizing The Use Of Cash Collateral Pursuant To 11 U.S.C. §363, (IV) Scheduling A Final Hearing, And (V), Granting Related Relief* (the "Motion") [Docket No. 68], as amended by the *Amended Notice of Lodging of Supplemental Documents and Information Re: Debtors' Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing Debtors To Obtain Postpetition Financing Pursuant To 11 U.S.C. § 364, (II) Granting Liens And Superpriority Claims Pursuant To 11 U.S.C. § 364, (III) Authorizing The Use Of Cash Collateral Pursuant To 11 U.S.C. §363, (IV) Scheduling A Final Hearing, And (V), Granting Related Relief* [Docket No. 77], and respectfully states as follows:

**FACTUAL AND PROCEDURAL BACKGROUND**

1. On September 30, 2015, MediaShift, Inc. ("MediaShift") and Ad-Vantage Networks, Inc. ("Ad-Vantage" and together with MediaShift, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Central District of California.

2. On October 28, 2015, the Debtors filed a first motion for use of cash collateral to the extent of $11,770 [Docket No. 27], which motion was granted on November 2, 2015 and limited the Debtors' use of cash collateral to $12,000 [Docket No. 39].

3. On November 18, 2015, the Debtors filed the Motion, which goes significantly further and requests authorization for postpetition financing up to the principal amount of $750,000 ($165,000 on an interim basis) (the "DIP Loan") from Smith Micro Software, Inc. ("DIP Lender"). Mot. at 2. The Debtors assert that they will use the DIP Loan: (a) to fund

working capital, general corporate and other needs of the Debtors; (b) to fund the bankruptcy cases; and (c) pay fees and expenses as set forth in a 16-week budget. Mot. at 2-3. The Motion was supported by, among other things, a "Binding Term Sheet," proposed budget, Declaration of Rick Baran and a Patent Portfolio Valuation dated May 2014 (the "Patent Portfolio Valuation")[1].

4.  On November 19, 2015, the Court entered a scheduling order regarding the Motion and directed the Debtors to file and serve a copy of the loan agreement to govern the DIP Loan together with "further information regarding what payments in the Budget are needed to avoid irreparable harm during any interim period of DIP Loan approval pending a final hearing" [Docket No. 71].

5.  On November 23, 2015, the Debtors filed their *Amended Notice of Lodging of Supplemental Documents and Information*, which attached a draft of the DIP Loan Agreement, revised budget (the "Budget") and the Declarations of Rick Baran and Todd M. Arnold [Docket No. 77]. The Debtors have yet to file a final, executed version of the DIP Loan Agreement.

6.  Holdings is a senior secured creditor with a claim of at least $6,491,505. Holdings is by far the Debtors' largest secured creditor and has a lien on virtually all of the assets of the Debtors' estates.

**OBJECTIONS TO THE RELIEF REQUESTED AND REASONS THEREFOR**

7.  Section 364 of the Bankruptcy Code permits a debtor-in-possession to obtain postpetition financing on a superpriority, secured, and priming basis. 11 U.S.C. § 364(d). In order to obtain approval of such financing, the Debtors must establish: (1) that they are unable to obtain credit otherwise; (2) that the transaction constitutes an exercise of the Debtors' sound business judgment; and (3) that the interests of primed lienholders are adequately protected. *Id.*

---

[1] Holdings challenges the reliance on, and the admissibility of, the Patent Portfolio Valuation, as the appraiser Great American Group has not presented the appraisal as its business record and has not appeared to verify its accuracy. See Waddell v. C.I.R., 841 F.2d 264, 267 (9th Cir. 1988).

83621589.2                     - 3 -

8. Holdings acknowledges that many successful reorganization proceedings require debtor-in-possession financing and/or the use of cash collateral shortly after the commencement of a chapter 11 case. However, a bankruptcy court must scrutinize a proposed debtor-in-possession financing arrangement to ensure that it does not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of [a secured lender]." See, e.g., In re Tenney Village Co., Inc., 104 B.R. 562, 568 (Bankr. D.N.H. 1989). As explained by the Ninth Circuit Bankruptcy Appellate Panel:

> While certain favorable terms may be permitted as a reasonable exercise of the Debtors' business judgment, the bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender.

In re Defender Drug Stores, Inc., 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992).

9. The Motion fails because the Debtors (a) have failed to demonstrate that the DIP Loan is a reasonable exercise of their business judgment and (b) have not ensured that the interests of Holdings – a primed lienholder – are adequately protected.

**A.** *The DIP Loan is Not a Reasonable Exercise of the Debtors' Business Judgment*

10. Stated in most general terms, the business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984); see also Cal. Corp. Code § 309. Although a court will defer to decisions of a board under the business judgment rule, the substantive decision must be attributed to a rational business purpose and must be free of self-dealing. See, e.g., In re Access Cardiosystems, Inc., 404 B.R. 593, 691 (Bankr. D. Mass. 2009) (finding that the business judgment rule does not apply where there is self-dealing or a transaction is identified as self-interested); In re Total Containment, Inc., 355 B.R. 589, 606 (Bankr. E.D. Pa 2005) (noting that where it is demonstrated that directors or majority shareholders are self-interested in a corporate

83621589.2                              - 4 -

1    transaction, the company's business judgment is no longer entitled to deference); see also In re

2    infoUSA, Inc. S'holders Litig., 953 A.2d 963, 1000 (Del. Ch. 2007) ("The rule does not require

3    the Court to bless the conclusion of a director that is self-evidently nonsense on stilts, nor does it

4    protect a board that looks into the sun and names it the moon.").

5

6          11.    Through the Motion, the Debtors maintain that they are continuing to operate as a

7    going concern. However, the Debtors acknowledge that their patents and related computer

8    software (the "IP") are key to whatever value is left in the Debtors. Specifically, in his

9    Declaration in support, Rick Baran makes clear that "the Debtors' IP is by far their most valuable

10   asset;" remaining assets such as receivables, office furniture, fixtures and equipment are worth

11   little and have been valued by the Debtors at approximately $3,900 and $420,000 for MediaShift

12   and Ad-Vantage, respectively. Mot. at 38: 12-16. Thus, the only meaningful assets are the small

13   number of patents identified by the Debtors in the Patent Portfolio Valuation and at the Debtors'

14

15   section 341 meeting of creditors.[2]

16         12.    Review of the Budget itself also confirms that the Debtors have no meaningful

17   operations. First, the Budget does not contemplate payment of either labor or payroll taxes or

18   commissions during the 16-week period. In addition, the Budget reflects that the Debtors will

19   collect approximately $20,000 in receivables over the course of the 16-week period. At the same

20   time, the Debtors are proposing to spend approximately $666,402 of the $750,000 DIP Loan.

21

22   This rate – income of a mere $1,250 per week versus disbursements of over $41,000 per week –

23   is unreasonable, not within any tangible business judgment and does not satisfy even the lowest

24   of burdens. These so-called operational payments are the "nonsense on stilts" that courts have

25   cautioned against and should not be approved by this Court.

26

27

28       [2] The Patent Portfolio Valuation identifies three (3) patents that comprise the portfolio. At the Debtors' section 341 meeting, the Debtors testified that they now own five (5) patents.

83621589.2    - 5 -

13. The Budget reflects payment of the following categories (among others) in the following amounts over the course of the 16-week period: (a) executive/insider compensation, including health insurance premiums ($118,752); (b) patent attorney ($25,000); (c) contractors ($114,000); (d) travel ($4,000); and (e) insurance ($52,000). For the reasons set forth below, payment of each expense at this time is unnecessary and/or premature.

(a) <u>Executive/insider compensation</u>. The Budget contemplates payment to David Grant, Chairman of the Board, Chief Strategy Officer and largest shareholder; Rick Baran, Board member and Chief Financial Officer; and Michael Spalter, Chief Operating Officer, totaling (i) $103,752 over the course of the 16-week period, the equivalent of over $6,400 per week, and (ii) health insurance premiums in the amount of an additional $15,000. The Debtors support payment of these expenses by asserting that they need to retain their three remaining officers/directors in order to maintain operations and going concern and asset values. The Debtors further support this statement by asserting that Houlihan Lokey Capital, Inc. ("<u>Houlihan</u>") advised that the value of the IP "would be substantially impaired in the event David Grant resigns." Amended Notice of Lodging at 4:6-8; 9: 11-14. First, this statement is hearsay and not competent evidence in support of the Motion. It is also irrelevant given the lack of ongoing operations. More importantly, however, there is no evidence that David Grant has threatened to resign, nothing from Mr. Grant – who is not only the Chairman of the Board and Chief Strategy Officer, but also the Debtors' largest shareholder – that he will walk away from the Debtors if he is not compensated monthly. It is also unclear what Mr. Baran, the Chief Financial Officer, is responsible for, given that the Debtors are

paying a contract controller the sum of $3,000 per week. Id. at 10:3-6. The executive/insider compensation proposed in the Budget is an extravagance that these Debtors cannot afford, particularly in light of the lack of operations and almost exclusive value in the IP.

(b) Contractors. The Debtors assert that they need four (4) contractors at a cost of $114,000, or $9,000 per week, pending a sale of the assets in order to maintain operations and asset values. One of the contractors is David Grant's son, who the Debtors are proposing to pay up to $3,000 per week and up to $45,000 in total. Other than a few bold conclusory statements, the Debtors have presented no evidence about how retention of the contractors preserves the value of the Debtors assets, whatever that value may be, and whether they are revenue-generating (although the Budget conclusively demonstrates that they are not).

(c) Patent attorney. The Debtors' patent counsel, not yet retained as an ordinary course professional or otherwise, is scheduled to be paid a total of $25,000 over the 16-week period contemplated by the Budget. The Debtors have presented no evidence concerning the identity of their patent counsel, what services their patent counsel will render during this time period and what, if any, value those services add to the estate.

(d) Travel. The Debtors assert that they *may* need to travel to maintain existing relationships and have budgeted $4,000 during the 16-week period to that activity. There is no evidence that the Debtors will need to travel, no evidence about the extent to which they were required to travel generally pre-petition and no evidence about the value may be added to the estate by such travel.

      (e)    <u>Insurance.</u>  The Debtors have allocated payment of $52,000 to maintain their Directors and Officers Policy and General Liability Policy.  The Debtors have presented no evidence about whether the payments of $13,000 reflect the monthly cost of these policies or whether the $52,000 to be spent during the Budget period includes amounts due for any pre-petition period(s).[3]

14.    The failure of the Debtors to justify payment of these expenses with competent evidence in the Motion is fatal, and may not be corrected in their reply papers.[4]  The Budget is designed to compensate insiders of the Debtors, including Mr. Grant who is the Debtors' largest shareholder.  With a meager $20,000 in revenue during the 16-week period, the Debtors have wholly failed both to justify disbursements of nearly $700,000 and to articulate how the decision to permit such disparity in income and expenses is in the best interest of the estates, fair, reasonable, and/or within the Debtors' business judgment.

    **B.**    ***The Debtors Have Failed to Demonstrate the Value of Holdings' Collateral and That Holdings is Adequately Protected***

15.    "The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy.  In determining these values, the courts have considered 'adequate protection' a concept which is to be decided

---

[3] In fact, the Debtors' most recent monthly operating reports, which relate to the month ending October 31, 2015, suggest that the actual amount is far less – $7,099 for MediaShift [Docket No. 83 at 14] and $204 for Ad-Vantage [Docket No. 84 at 14], both on a current monthly basis and a cumulative post-petition basis.

[4] Courts have made clear that a moving party is "obligated to file with a motion the evidentiary materials necessary to justify the relief it seeks." <u>U.S. ex rel. Hendow v. University of Phoenix</u>, No. 03-CV-457 (GEB), 2009 WL 2705851, at *3 (E.D. Cal. Aug. 25, 2009) (citations omitted).  <u>See also</u> <u>Lewis v. Gotham Ins. Co.</u>, No. 09-CV-252 (POR), 2009 WL 3698028, at *1 (S.D. Cal. Nov. 5, 2009) (same); <u>Mercado v. Sandoval</u>, No. 08-CV-2648 (GEB), 2009 WL 2031715, at *1 (E.D. Cal. July 9, 2009) (same).  Such a rule prevents "sandbagging" the nonmoving party and affords the nonmoving party a meaningful opportunity to respond.  <u>Lewis</u>, 2009 WL 3698028, at *1.  Accordingly, it would be improper for the Debtors to introduce new facts or evidence, which could have been presented in its moving brief, in their reply papers.  <u>Id.</u>

flexibly on the proverbial 'case-by-case' basis." Dallas Bank, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396–97 (10th Cir. 1987). See also Security Leasing Partners, LP v. ProAlert (In re ProAlert, LLC), 314 B.R. 436, 441-42 (9th Cir. BAP 2004) (explaining that adequate protection ensures that the value that a creditor would have received through foreclosure "will not decline"); In re Las Vegas Monorail Co., 429 B.R. 317, 327 (Bankr. D. Nev. 2010) (noting that the general purpose of adequate protection "is to ensure that the secured creditor ultimately receives what it would have received had not bankruptcy intervened"). It is the Debtors' burden to prove that the secured creditor is adequately protected. 11 U.S.C. § 364(d)(2). See also, e.g., In re Swedeland Development Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) (stating the general rule that a debtor bears the burden to establish that the holder of a lien to be subordinated has adequate protection).

16.    The value of the Debtors' assets – the core of which is the 5 patents identified by the Debtors – will be guided by what a potential purchaser is willing to pay and will ultimately be determined at the time of a sale. Indeed, Houlihan was engaged in April 2015 – more than seven months ago – "to assist in the marketing and sale of the Debtors' assets." Mot. at 13. The original terms of Houlihan's retention contemplated a Sale Transaction Fee (as defined therein) based on consideration of at least $30 million; it has since reduced that floor number to $10 million. See *Application to Employ Houlihan Lokey Capital, Inc. as Financial Advisor and Investment Banker Pursuant to 11 U.S.C. § 327(a) With Compensation to be Determined and Paid Pursuant to 11 U.S.C. § 327(a)* [Docket No. 41]. Despite the Debtors' assertions on value, they have not presented a proposed sale transaction to the Court, nor have they even filed a motion to set bid procedures or auction for a sale.

17.    The Debtors' disclosures on the issue of value of Holdings' collateral is inadequate, inconclusive, and unrealistic. The Patent Portfolio Valuation, even if accepted by the

Court as admissible evidence, is nearly two (2) years old and, given the nature of the asset, outdated.

18.     The existence of Patent Portfolio Valuation notwithstanding, at this time the value of the Debtors' assets are unknown.  Accordingly, the Debtors have failed to meet their burden of proving that that Holdings is adequately protected.

### C.     *There Should be No Lien on Avoidance Actions*

19.     Section 5 of the Senior Secured Super-Priority Debtor-In-Possession Loan Agreement ("DIP Loan Agreement") is internally inconsistent regarding whether a lien on Avoidance Actions (defined generally as chapter 5 causes of action) and proceeds thereof will be granted to the DIP Lender.  Specifically, Section 5(a)(xxi) of the DIP Loan Agreement states that Avoidance Actions constitute the DIP Lender's collateral, while Section (f)(i)(2) of the DIP Loan Agreement excludes chapter 5 causes of action from the DIP Lender's Lien.  At a minimum, the DIP Loan Agreement – still in draft form – must be clarified on this point.  To the extent that the Debtors intend to grant the DIP Lender a lien on any causes of action or the proceeds thereof, however defined, such a lien is inappropriate.  The Debtors' causes of action under the Bankruptcy Code are intended to benefit all creditors, see In re Roblin Industries, Inc., 52 B.R. 241, 243 (Bankr. W.D.N.Y. 1985), and the Debtors should not grant to the DIP Lender the proceeds of such causes of action, see In re Tenney Village Co., Inc., 104 B.R. at 569.

20.     Holdings expressly reserves all of its rights and remedies, including the right to object to additional terms of the DIP Loan Agreement, to the extent that the final, executed DIP Loan Agreement differs from the draft that was filed on November 23, 2015.

21. Accordingly, Holdings respectfully requests that the Motion be denied and that the Debtors be directed to promptly hold the auction that they have been promising since the inception of these cases (see, e.g., *Debtors' Notice of Lodgment of Amended Projected Cash Flow Statement* [Docket No. 32] at 3:1-4).

Dated: December 2, 2015                    DRINKER BIDDLE & REATH LLP


                                            By: */s/    George C. Webster II*
                                                George C. Webster II

                                            Attorneys for MediaShift Holdings, Inc.

83621589.2                                    - 11 -

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Drinker Biddle & Reath LLP, One Logan Square, Ste. 2000, Philadelphia, PA 19103

A true and correct copy of the foregoing document entitled (*specify*): **OBJECTION TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. § 364; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS PURSUANT TO 11 U.S.C. § 364; (III) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF,** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 12-2-2015, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Todd M Arnold tma@lnbyb.com
Ron Bender  rb@lnbyb.com
Stephen L Burton  steveburtonlaw@aol.com
Cathrine M Castaldi ccastaldi@brownrudnick.com
Michael I Gottfried mgottfried@lgbfirm.com
Dare Law dare.law@usdoj.gov;
ustpregion16.la.ecf@usdoj.gov

Aleksandra Zimonjic azimonjic@lgbfirm.com
Zev Shechtman zshechtman@dgdk.com
Uzzi O Raanan  uor@dgdk.com
Leslie A. Cohen  leslie@lesliecohenlaw.com
Lance N. Jurich  ljurich@loeb.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) 12-2-2015, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

The Honorable Sandra R. Klein
United States Bankruptcy Court
Ctrm 1575
255 E. Temple Street
Los Angeles, CA 90012

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/2/2015 | Marita Erbeck | /s/ Marita Erbeck |
|---|---|---|
| Date | Printed Name | Signature |